UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE THE BOEING COMPANY | ) | Case No. 1:24-cv-151-LMB-LRV |
| SECURITIES LITIGATION | ) | |
| | ) | Hon. Leonie M. Brinkema |
| | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Richard C. Pepperman II (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
peppermanr@sullcrom.com

Judson O. Littleton (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
littletonj@sullcrom.com

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
bhatch@mcguirewoods.com

*Counsel for Defendants The Boeing
Company, David L. Calhoun, Dennis A.
Muilenburg, Brian J. West, and Gregory D.
Smith*

June 21, 2024

**TABLE OF CONTENTS**

*Page*

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................5

    A.     The Boeing Company ................................................................................................5

    B.     The 737 MAX Accidents in 2018 and 2019 ............................................................5

    C.     This Action ...............................................................................................................7

ARGUMENT .................................................................................................................................8

I.     Plaintiffs Do Not Adequately Plead a Materially False or Misleading Statement .............8

    A.     Plaintiffs fail to satisfy the requirements of Rule 9(b) and the PSLRA .........................8

    B.     Plaintiffs fail to plead that any of the 75 alleged misstatements are materially
          false or misleading ...................................................................................................10

          1.     General statements about safety and quality are not actionable ......................10

          2.     Aspirational statements related to codes of conduct are not actionable ..........12

          3.     Statements of opinions, beliefs, and future intentions are not actionable........13

          4.     Statements about the FAA's recertification process are not actionable ..........15

          5.     Statements about Boeing's rate of production are not actionable....................16

          6.     Risk factors in Boeing's SEC filings are not actionable.................................17

II.    Plaintiffs Do Not Plead Particularized Facts Raising a Strong Inference of
       Scienter .............................................................................................................................19

    A.     The Individual Defendants' positions and access to information do not support
          a strong inference of scienter ..................................................................................20

    B.     The importance of safety and quality control at Boeing does not support a
          strong inference of scienter.....................................................................................21

    C.     Defendants' statements that they were closely monitoring safety and quality do
          not support a strong inference of scienter................................................................22

    D.     Allegations by whistleblowers and confidential witnesses with no connection to
          the Individual Defendants do not support a strong inference of scienter ...................23

E.  Boeing's incentive compensation does not support a strong inference of scienter ...............................................................................................................25

F.  Allegations about Boeing's document productions to the government do not support a strong inference of scienter ........................................................26

G.  Three of the Individual Defendants' retirements from Boeing do not support a strong inference of scienter ..........................................................27

H.  Ongoing investigations do not support a strong inference of scienter .........................28

III.  Plaintiffs Do Not Adequately Plead Loss Causation ..........................................................29

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) ...............................................................14

*In re BearingPoint, Inc. Sec. Litig.*,
  525 F. Supp. 2d 759 (E.D. Va. 2007) .....................................................................28

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) .................................................. *passim*

*Bondali* v. *Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) ......................................................................13, 18

*Boykin* v. *K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ....................................................................................14

*City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...................................................................................10

*Coll. Ret. Equities Fund* v. *Boeing Co.*,
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ...........................................2, 5, 6, 11

*Cozzarelli* v. *Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...................................................................... *passim*

*In re Cree, Inc. Sec. Litig.*,
  333 F. Supp. 2d 461 (M.D.N.C. 2004) .....................................................................23

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .........................................................29

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005)..................................................................................................29

*Emps.' Ret. Sys. of Baton Rouge & Par. of E. Baton Rouge* v. *MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ....................................................................................14

*Iron Workers Loc. 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) .......................................................................20

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)..................................................................2, 9

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ...................................................................................29

*KBC Asset Mgmt. NV* v. *DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) .......................................................................22, 25, 30

*Knurr* v. *Orbital ATK Inc.*,
   272 F. Supp. 3d 784 (E.D. Va. 2017) ..................................................................22, 23

*In re Level 3 Commc'ns Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) .................................................................................10

*Longman* v. *Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ................................................................................2, 11

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014).........................................................................19

*Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017) ....................................................................................21

*In re Marriott Int'l, Inc.*,
   31 F.4th 898 (4th Cir. 2022) ...............................................................................17, 18

*Marsh Grp.* v. *Prime Retail, Inc.*,
   46 F. App'x 140 (4th Cir. 2002) ................................................................................10

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...................................................................................................14

*Paradise Wire & Cable Defined Benefit Pension Plan* v. *Weil*,
   918 F.3d 312 (4th Cir. 2019) ....................................................................................14

*In re PEC Sols. Sec. Litig.*,
   2004 WL 1854202 (E.D. Va. May 24, 2004) ...........................................................20

*Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010).......................................................................21

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..................................................................................13

*San Antonio Fire & Police Pension Fund* v. *Syneos Health Inc.*,
   75 F.4th 232 (4th Cir. 2023) .....................................................................................27

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
2020 WL 571724 (D. Md. Feb. 4, 2020) ...............................................................12

*Svezzese* v. *Duratek, Inc.*,
67 F. App'x 169 (4th Cir. 2003) ...........................................................................29

*Tabor* v. *Bodisen Biotech, Inc.*,
579 F. Supp. 2d 438 (S.D.N.Y. 2008)......................................................................9

*Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................20, 29

*In re Triangle Cap. Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021) ................................................................................19

*Yates* v. *Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ...........................................................20, 21, 22, 24

*Zucco Partners, LLC* v. *Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...............................................................................28

**Statutes and Rules**

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
15 U.S.C. § 78u-4 to § 78u-5 ......................................................................... *passim*

Fed. R. Civ. P. 9(b)  ...................................................................................... *passim*

**INTRODUCTION**

This lawsuit reflects no more than the baseless notion that, whenever a company suffers a negative event followed by declines in its stock price, its senior executives *must* have committed securities fraud. Lacking any basis for their fraud claims, Plaintiffs fill hundreds of pages with scattershot allegations in the apparent hope that sheer volume of allegations will mask the absence of particularity. Much of the complaint merely rehashes high-profile events from more than half a decade ago: the accidents in October 2018 and March 2019 when two Boeing 737-8 MAX airplanes crashed shortly after takeoff. In the wake of those tragic accidents, Boeing faced multiple lawsuits and investigations related to the design of software used in the 737 MAX, and the Company implemented significant measures to strengthen its commitment to safety and quality. Several of those lawsuits—one of which is a putative class action—allege violations of federal securities law. Those securities cases remain pending in the Northern District of Illinois.

But this case is not about those two tragic accidents. Plaintiffs filed this action shortly after an unrelated incident in January 2024, when an Alaska Airlines flight made an emergency landing after a door plug detached from a 737-9 MAX. That incident involved a manufacturing issue— not a design issue—with a different model of the MAX. In an attempt to transform the Alaska Airlines incident into a case for securities fraud, Plaintiffs catalogue nearly five years of public statements by Boeing that include any reference to "safety" and compile every negative press report they could find about Boeing or any of its airplanes since 2018. The result is a 345-page, 1,027-paragraph tome that purports to challenge 75 different statements as fraudulent, alleges that the "truth" was revealed through 22 different "corrective disclosures" in 2024, and relies on a highlight reel of the most attention-grabbing headlines about Boeing since 2018 as well as vague and irrelevant complaints from current or former employees. But those ingredients—no matter their volume and vitriol—do not combine to plead a claim for securities fraud. The Amended

Complaint ("Complaint" or "AC") should be dismissed for three independent reasons.

1.    Plaintiffs do not adequately plead that Defendants made any materially false or misleading statements.  At the outset, Plaintiffs fail to satisfy their obligation under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") to plead with particularity which specific statements were allegedly false or misleading and the reasons why.  As the bases for their claims, Plaintiffs point to 75 different statements, often set forth in lengthy block quotes.  Although Plaintiffs purport to highlight the allegedly misleading portions of those statements in bold and italics, they have bolded and italicized large swaths of the Complaint's lengthy quotations.  Such unfocused, shotgun pleadings fail to identify the challenged statements and "state with the required particularity the 'reason or reasons'" why each is allegedly misleading.  *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 577 (S.D.N.Y. 2012).

Plaintiffs' kitchen-sink approach to pleading cannot hide their failure to allege any materially false or misleading statements—*i.e.*, factual representations on which a reasonable investor would rely that are "demonstrable as being true or false." *Longman* v. *Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999).  The majority of the challenged statements consist of general comments extolling the importance of safety and Boeing's core values.  As both federal courts that have considered securities fraud claims asserted against Boeing after the 2018 and 2019 accidents have correctly held, such statements are immaterial as a matter of law.  *Coll. Ret. Equities Fund* v. *Boeing Co.*, 2023 WL 6065260, at *7, 15–16 (N.D. Ill. Sept. 18, 2023); *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9, 13, 18–19 (N.D. Ill. Aug. 23, 2022).  Those decisions are consistent with a large body of case law rejecting securities fraud claims based on similarly vague and general statements.  The Court should reach the same result here.

The remaining categories of alleged misstatements also are not actionable.  Plaintiffs

challenge aspirational statements in Boeing's corporate code of conduct and other policies that are likewise immaterial as a matter of law because they do not represent any present fact to the market. Many other challenged statements are classic opinions, couched in language like "we believe" or "I think," or are statements describing Boeing's future intentions. Plaintiffs do not allege that these statements were not honestly believed or lacked a reasonable basis. Venturing even further afield, Plaintiffs challenge various statements related to the FAA's process for recertifying the 737 MAX after it was grounded in 2019 and to Boeing's rate of production and deliveries after the MAX was recertified in 2020, but Plaintiffs do not plead any facts demonstrating that those statements were false. And Plaintiffs challenge general risk-factor disclosures in Boeing's periodic filings with the Securities and Exchange Commission ("SEC"), but do not adequately allege that any of those statements—all of which describe potential *future* risks—were material or misleading.

2. The Complaint also falls far short of pleading that any Defendant acted with scienter (*i.e.*, an intent to defraud) in making the challenged statements. To satisfy the PSLRA's stringent pleading requirements, Plaintiffs must plead particularized facts that support a *strong* inference that Defendants intended to deceive the public or acted with severe recklessness when they made the challenged statements. A "strong inference" must be "at least as compelling as any opposing inference one could draw." *Cozzarelli* v. *Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). Plaintiffs do not plead a single particularized fact suggesting that any Defendant was aware of information that contradicted his statements, as required to support a strong inference of scienter.

Plaintiffs instead rely on various circumstantial arguments that courts have consistently rejected. They assert that the Individual Defendants must have known about any safety or quality issue at the Company because they held senior positions, received unspecified reports about safety, and were focused on the "critical" issues of safety and quality. Without particularized allegations

explaining what specific information the Individual Defendants received and how that information supposedly contradicted their statements, Plaintiffs' general allegations cannot support a strong inference of scienter.  Plaintiffs also point to a series of accusations by "confidential witnesses" and "whistleblowers."  But those allegations likewise do not link any of the Individual Defendants to information that contradicted their statements.

Plaintiffs' remaining scienter theories are, if anything, even more counterintuitive. Plaintiffs argue that an intent to defraud can be inferred from the safety and quality-control incentives included in the compensation of Boeing officers, but they cannot plead a strong inference of scienter merely by arguing that this compensation structure "incentivized" Defendants to focus on safety and quality control.  Plaintiffs vaguely contend that scienter also can be inferred from Boeing's purported failure to provide unspecified "documents" to investigators after the Alaska Airlines incident, but plead no facts that rebut Boeing's later clarification that the requested documents do not exist or that suggest that Boeing's CEO and CFO had anything to do with that production process.  Plaintiffs further point to the retirements (or *future* retirement) of three Defendants from Boeing, but never explain how those departures—including the anticipated retirement later this year of Boeing's 67-year-old CEO—support a strong inference that Defendants intended to defraud investors.  Lastly, Plaintiffs point to the existence of ongoing investigations, but courts have consistently rejected the notion that mere investigations raise a strong inference of scienter.

3.  Plaintiffs also fail to plead loss causation—indeed, they barely try to do so.  Having apparently identified every negative news event they could find during the proposed class period, Plaintiffs never even attempt to link their 22 alleged corrective disclosures to any of the 75 alleged misstatements those disclosures purportedly corrected.  Instead, Plaintiffs simply identify 22

negative news stories in 2024 that coincided with declines in Boeing's stock price (however small) and baldly assert that those stories revealed the "truth" about the alleged misstatements.

## BACKGROUND

### A.    The Boeing Company

Boeing is "one of the largest and most well-known global aircraft manufacturers, producing some of the world's most frequently flown commercial aircraft."  AC ¶ 42.  During the proposed class period, the 737 MAX—the aircraft primarily at issue here—was Boeing's bestselling aircraft, and was built and assembled at Boeing's manufacturing and production facility in Renton, Washington.  AC ¶¶ 46–47.

### B.    The 737 MAX Accidents in 2018 and 2019

On October 29, 2018, Lion Air Flight 610, a 737-8 MAX, tragically crashed shortly after takeoff.  Five months later, Ethiopian Airlines Flight 302, another 737-8 MAX, tragically crashed as well.  Both accidents resulted in the deaths of all people on board.  Later investigations determined that a software system on the 737 MAX called MCAS erroneously activated on both flights.  *See* AC ¶¶ 54–57.

Following the Ethiopian Airlines accident, the FAA issued an order grounding the entire 737 MAX fleet.  AC ¶ 59.  Several government investigations followed, along with civil litigation. AC ¶ 58.  Two of those civil lawsuits asserted claims for securities fraud based on allegations, among others, that Boeing's CEO Dennis Muilenburg and its CFO Gregory Smith had falsely touted the safety of the 737 MAX.  *See In re Boeing Co. Aircraft Sec. Litig.*, No. 19-cv-02394 (N.D. Ill.) (class action); *Coll. Ret. Equities Fund* v. *Boeing Co.*, No. 22-cv-3845 (N.D. Ill.) (individual action).  The courts in both actions rejected the large majority of the challenged statements on the pleadings and, of particular relevance here, held that *all* of the alleged misstatements related to safety were immaterial as a matter of law. *Coll. Ret. Equities Fund*, 2023

WL 6065260, at *7, 15–16; *In re Boeing*, 2022 WL 3595058, at *9, 13, 18–19.  Those plaintiffs'

claims were allowed to proceed based on only a limited number of statements unrelated to safety

and on only two alleged corrective disclosures.  As limited, the putative class period in the class

action runs from March 11, 2019 to December 16, 2019, thus overlapping with the proposed class

period here (which begins on September 30, 2019) by more than two months.[1]

Following the two accidents, Boeing took many steps to address safety concerns.  AC

¶¶ 97–144.  In April 2019, Boeing's CEO announced that the Company had established a

Committee on Airplane Policies and Processes, which made recommendations Boeing's Board of

Directors adopted.  AC ¶¶ 98–100.  In September 2019, Boeing's Board created an Aerospace

Safety Committee of directors to "oversee and ensure the safe design, development, manufacture,

production, operation, maintenance and delivery of the company's aerospace products and

services."  AC ¶ 104.  In January 2020, Boeing's Form 10-K filed with the SEC disclosed several

new codes of conduct:  (i) the Code of Ethical Business Conduct for the Board of Directors, (ii) the

Code of Conduct for Finance Employees, and (iii) the Code of Conduct for all employees.  AC

¶¶ 132, 637–640.  Later in 2020, Boeing issued a revamped set of company values prioritizing

"safety, quality, integrity and sustainability," and began implementing a Safety Management

System or "SMS."  AC ¶¶ 134–144.

Boeing cooperated with all government investigations and inquiries after the two accidents.

On November 18, 2020, following a "comprehensive and methodical safety review process that

---

[1] This overlap creates significant tension between the claims in those two cases and the claims
Plaintiffs assert here.  For example, one of the two alleged corrective disclosures that survived
dismissal in the other cases is Boeing's December 16, 2019 press release announcing a halt in
production of the 737 MAX.  *In re Boeing*, 2022 WL 3595058, at *29; *Coll. Ret. Equities Fund*,
2023 WL 6065260, at *24.  While the plaintiffs in those cases allege that the press release
announcing the production halt revealed the "truth," Plaintiffs here allege that the same press
release was false and misleading.  AC ¶¶ 615–616.

took 20 months to complete," the FAA recertified the 737 MAX, clearing the way for the plane to resume flights. AC ¶ 74. The 737 MAX resumed service in the United States in December 2020 and resumed service globally in 2021. AC ¶ 76. Boeing also entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice ("DOJ") on January 6, 2021. AC ¶ 81. The DPA recognized that the underlying "misconduct" involving two employees' deception of the FAA group responsible for pilot training about MCAS "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." DPA ¶ 4(a), (h), *United States* v. *The Boeing Co.*, No. 21-cr-00005 (N.D. Tex. Jan. 7, 2021), ECF No. 4. The DPA also acknowledged that "the Company disclosed MCAS's expanded operational scope to [the] FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." *Id*. ¶ 4(h). In September 2022, Boeing and its former CEO Muilenburg, without admitting any findings or liability, entered into a settlement with the SEC based on two statements related to the 737 MAX not at issue here. AC ¶¶ 87–90.

### C. This Action

On January 5, 2024, Alaska Airlines Flight 1282, a 737-9 MAX, made an emergency landing after a door plug in the fuselage detached shortly after takeoff. AC ¶ 365. The crew landed the plane safely, and no one was seriously injured. Following the incident, Boeing's stock declined by 8% over the next two trading days, AC ¶ 371, and Plaintiffs filed this action, ECF No. 1.

In an attempt to manufacture a securities fraud claim from that stock-price decline, Plaintiffs have rummaged through nearly five years of Defendants' public statements, principally to find all references to "safety." Plaintiffs spend more than 430 of the Complaint's 1,027 paragraphs challenging 75 different groups of statements made between September 30, 2019 and April 5, 2024 in a wide variety of settings, including SEC filings, press releases, earnings calls,

investor conferences, stockholder meetings, live media appearances, and other public documents and reports. The challenged statements fall into six broad categories: (i) general statements about safety and quality; (ii) aspirational statements related to Boeing's codes of conduct and other policies; (iii) statements of opinions, beliefs, and future intentions; (iv) statements about the FAA's process for recertifying the 737 MAX after it was grounded; (v) statements about Boeing's rate of production and deliveries of the 737 MAX after the FAA recertified it; and (vi) general risk factors disclosed in Boeing's quarterly SEC filings. AC ¶¶ 568–999. In attempting to plead scienter, Plaintiffs point to the Individual Defendants' senior positions, testimony from "whistleblowers," and allegations attributed to "confidential witnesses" who supposedly expressed concerns about Boeing's manufacturing processes, quality control, safety measures, and culture. AC ¶¶ 190–364. Plaintiffs do not allege, however, that any of these whistleblowers or confidential witnesses raised their concerns with any senior Boeing executive, let alone with any of the Individual Defendants.

Based on these allegations, Plaintiffs assert a Section 10(b) claim against Boeing and the four Individual Defendants: (i) current CEO David Calhoun, (ii) former CEO Dennis Muilenburg, (iii) current CFO Brian West, and (iv) former CFO Gregory Smith. AC ¶¶ 1016–1022. Plaintiffs also assert a Section 20(a) claim against those four individuals. AC ¶¶ 1023–1027. Plaintiffs seek to represent a class of investors who purchased Boeing stock between September 30, 2019 (the first alleged misstatement) and May 14, 2024 (the last alleged corrective disclosure). AC ¶ 1007.

ARGUMENT

I.      **Plaintiffs Do Not Adequately Plead a Materially False or Misleading Statement**.

      A.      **Plaintiffs fail to satisfy the requirements of Rule 9(b) and the PSLRA**.

Plaintiffs' kitchen-sink approach to pleading false or misleading statements fails to comply with the heightened requirements of Rule 9(b) and the PSLRA. In addition to Rule 9(b)'s particularity requirement for fraud allegations, the PSLRA requires a securities plaintiff to "specify

-8-

each statement alleged to have been misleading" and state with particularity "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

By purporting to challenge vast swaths of lengthy statements, the Complaint does not satisfy those requirements.  Rather than specify particular statements alleged to be misleading and state with particularity the reasons why, the Complaint offers 176 pages and more than 430 paragraphs of extended quotations, often in the form of long block quotes, with only rote explanations of why these statements are supposedly misleading.  *See* AC ¶¶ 568–999.  Although Plaintiffs purport to identify the false and misleading portions using bold and italics, AC ¶ 568, they frequently bold and italicize all or substantially all of their block quotes, which at times are pages long.  *See, e.g.*, AC ¶¶ 576–577, 581–586, 588, 601–604, 635, 724, 730, 741, 852, 884, 915, 918, 920, 923, 998.  And Plaintiffs simply assert that the statements are false or misleading for one or more of ten copied-and-pasted, boilerplate reasons.  Each of these ten reasons is repeated verbatim at least a dozen times, with two repeated more than 40 times.

This pleading approach does not satisfy the particularity requirements of Rule 9(b) and the PSLRA.  As one court stated in criticism that applies with even greater force here:

> The Complaint includes 76 pages of block quotes of nearly every public statement made by ESI during the Class Period, with the statements alleged to be misleading in bold and italics.  Interspersed throughout these block quotes are vague allegations purporting to explain how and why the bolded and italicized portions are misleading.  However, Plaintiff's bolding and italicizing does little to satisfy the PSLRA's specificity requirement.  This is because Plaintiff highlights more than half of the text in the giant block quotes ….

*In re ITT Educ. Servs.*, 859 F. Supp. 2d at 577–78.  As that court correctly concluded, such "[v]ague and disorganized allegations, no matter how voluminous, do not satisfy the PSLRA."  *Id*. at 578; *see also, e.g., Tabor* v. *Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiffs['] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading[,] are not sufficient to

satisfy the heightened pleading requirements."). Plaintiffs here have gone even further, offering a hundred *more* pages of long block quotes and other lengthy quotations, large portions of which are bolded and italicized. Such pleadings do not satisfy the requirements of Rule 9(b) and the PSLRA.

**B.      Plaintiffs fail to plead that any of the 75 alleged misstatements are materially false or misleading**.

Although Plaintiffs' sprawling 176 pages of lengthy misstatements make it impossible as a practical matter for Defendants to address each challenged statement individually, the attached Appendix A attempts to list each of the challenged statements and identify one or more of six different reasons why each is not actionable. App. A. Those six reasons are explained below.

**1.      General statements about safety and quality are not actionable**.

The large majority of challenged statements are general statements about the value Boeing places on safety and quality. For instance, Plaintiffs challenge statements that "[s]afety is at the core of who we are at Boeing," AC ¶ 576; that Boeing "has to stick to its core values around safety, quality, and integrity," AC ¶ 607; and that Boeing resumed production of the MAX "with a focus on safety, quality and operational excellence," AC ¶ 684. Under settled case law, such general statements about safety and quality are immaterial as a matter of law.

As the Sixth Circuit has explained, these kinds of statements are "best characterized as loosely optimistic statements" that are immaterial because they are "insufficiently specific for a reasonable investor to find them important to the total mix of information available." *City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). General statements about "a product in terms of 'quality'" are "too squishy," and "too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.*; *see Marsh Grp.* v. *Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002) ("[T]he statements … are not guarantees and lack the factual specificity necessary

-10-

to make them actionable in this circuit."); *see also In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (statements are immaterial if "incapable of objective verification").

In two securities cases brought against Boeing after the 2018 and 2019 accidents, the courts rejected *all* of the safety-related statements for precisely this reason.  *See Coll. Ret. Equities Fund*, 2023 WL 6065260, at *7 ("[O]nly unreasonable investors would find Muilenburg and Boeing's simple affirmations of safety and general references to Boeing's core values meaningful to the total mix of information."); *In re Boeing*, 2022 WL 3595058, at *19 ("Muilenburg's statements about Boeing's 'core values' and similar affirmations of safety are just that kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information.").  The statements rejected in those other Boeing cases as immaterial are indistinguishable from those at issue here—indeed, many are identical.  *Compare In re Boeing*, 2022 WL 3595058, at *30 ("Boeing Appendix") ("Safety is at the core of who we are at Boeing") *with* AC ¶ 576 (same quote); *compare* Boeing Appendix ("Safety is a core value at Boeing for as long as we have been building airplanes") *with* AC ¶¶ 607, 660, 661, 702, 734, 736, 737, 740, 786, 827, 830, 914, 997, 998 (safety is a "core value"); *compare* Boeing Appendix ("The airplane is safe.  We know how to fly it safely.") *with* AC ¶ 606 ("We're going to make sure the airplane is safe.").[2]

As those courts recognized, the statements challenged here are "the kind of puffery and generalizations that reasonable investors could not have relied upon when deciding whether to buy stock."  *Longman*, 197 F.3d at 685 (statements about "clean and conveniently located stores" not

---

[2] Plaintiffs note that the SEC alleged in its cease-and-desist order against Boeing that one safety-related statement not challenged here ("the 737 MAX is as safe as any airplane that has ever flown the skies") was materially misleading.  AC ¶¶ 88–89.  In the other two Boeing securities cases that have ruled on the matter, however, the courts rejected claims based on that same statement because it was immaterial as a matter of law—and one did so fully aware of the SEC order.  *See Coll. Ret. Equities Fund*, 2023 WL 6065260, at *7 & n.3, *15; *In re Boeing*, 2022 WL 3595058, at *30.

material).  There is no way to verify or measure the accuracy of general statements that Boeing is "driving safety, quality and operational excellence into all that we do every day."  AC ¶ 670.

Finally, Plaintiffs' own allegations show that many of the challenged safety-related statements are demonstrably true.  For instance, Plaintiffs challenge various statements about Boeing's SMS—such as "[w]e commit to a Safety Management System to advance our goals for safety, quality and compliance," AC ¶ 852—but elsewhere acknowledge that Boeing did in fact implement an FAA-approved SMS and made numerous changes as a result.  AC ¶¶ 137–140.  While Plaintiffs argue that Boeing "did not fully implement" its SMS, AC ¶ 578, that argument does not undermine Boeing's statement that it had "commit[ted]" to such a system to advance its "goals for safety, quality and compliance," AC ¶ 852.  Indeed, while claiming that Defendants' statements about the importance of safety were false, Plaintiffs simultaneously allege in attempting to plead scienter that Defendants "understood that safety and quality management was the most important priority to the Company."  AC ¶ 491.  Plaintiffs cannot have it both ways.

In sum, "[f]ederal courts everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity … that no reasonable investor could find them important to the total mix of information available."  *In re Boeing*, 2022 WL 3595058, at *19.  This Court likewise should find that general statements about safety and quality are immaterial as a matter of law and thus cannot support a claim for securities fraud.

**2.    Aspirational statements related to codes of conduct are not actionable**.

Plaintiffs challenge statements in Boeing's codes of conduct about its non-retaliation policy, as well as statements about that and other company policies.  AC ¶¶ 637–640.  But courts widely recognize that statements in corporate codes of conduct are immaterial because they are

aspirational "statements of a company's ideals rather than representations of past or present fact." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at \*19 (D. Md. Feb. 4, 2020); *see also Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) ("Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."); *Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) ("[A] code of conduct is a declaration of corporate aspirations."). The code-of-conduct statements challenged here are aspirational on their face. *E.g.*, AC ¶ 638 ("Directors shall continue to promote ethical behavior and take steps to ensure that the Company continues to (a) encourage employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourage employees to report violations of laws, rules, regulations or the Company's Ethical Business Conduct Guidelines to appropriate personnel; and (c) inform employees that the Company will not allow retaliation for reports made in good faith."); AC ¶ 639 ("Boeing expects all employees and stakeholders to report potential misconduct promptly so that it can be appropriately addressed."). The other challenged statements about those codes or policies simply repeat or describe them without making any representation about compliance. *E.g.*, AC ¶¶ 680, 916. Such aspirational statements are immaterial as a matter of law.

### 3. Statements of opinions, beliefs, and future intentions are not actionable.

Plaintiffs challenge numerous statements expressing the speaker's opinions or describing Boeing's future intentions regarding the 737 MAX and further improvements to safety and quality control. Plaintiffs do not adequately allege that any of these statements are materially false.

Many of the challenged statements are classic opinions. *E.g.*, AC ¶ 597 ("*I think* both the FAA and ourselves will look hard at these."); AC ¶ 626 ("*We believe* we're going to deliver the

-13-

safest airplane in the sky."); AC ¶ 887 ("*I'm confident* we'll be – we'll have a safe product lineup that continues to position us for decades while we continue to work the emerging technologies that will enable the next generation.") (emphases added).    Opinion statements "may often be recognized by their wording"—"the prefatory 'I believe' or 'I think,' for example, conveys that a speaker is sharing a personal belief, not warranting facts." *Boykin* v. *K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022).    Because they are "inherently subjective and uncertain assessments," opinions are not false or misleading merely because the assessments turn out to be wrong.  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Plaintiffs instead must allege that opinion statements were both "not honestly believed and lack[ed] a reasonable basis" when made.  *Emps.' Ret. Sys. of Baton Rouge & Par. of E. Baton Rouge* v. *MacroGenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023).  Plaintiffs allege neither.

Statements expressing future intentions likewise "are generally not actionable" for the same reasons, so long as they "are not worded as guarantees."  *Paradise Wire & Cable Defined Benefit Pension Plan* v. *Weil*, 918 F.3d 312, 321 (4th Cir. 2019); *see In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *7 (D. Md. Aug. 5, 2021) ("*Omnicare*'s standard for assessing … opinion statements has been applied to opinions on future events.").  Several of the challenged statements here articulate what Boeing *intended* to do in the future, even when using the present tense.  *Boykin*, 54 F.4th at 184 (statements like "positions us well" or "are on track" are forward-looking because they "refer[] to … future prospects" and "[t]he present tense does not always evince a present fact").  For example, Plaintiffs challenge statements made before the FAA's recertification of the 737 MAX that "[w]e're going to learn from these accidents" and that "[w]e are focused on returning the 737 MAX to service safely."  AC ¶¶ 624, 783.  Plaintiffs similarly challenge statements made after the MAX was recertified that "[w]e are focused on safely

-14-

returning the 737 MAX to service for all of our customers." AC ¶ 783; *see also* AC ¶¶ 760, 802. None of these statements are worded as "guarantees," and Plaintiffs plead no particularized facts demonstrating that the speakers did not genuinely believe that Boeing would learn from the accidents and focus on safely returning the 737 MAX to service.

Plaintiffs also challenge statements about Boeing's ongoing efforts to eliminate so-called "traveled work"—work that is completed at a different stage or location in the manufacturing process than originally planned. AC ¶ 220. The challenged statements, however, do not represent that "traveled work" had, in fact, been eliminated; they describe Boeing's intention to "*strive to eliminate*" traveled work in the future. AC ¶ 682 (emphasis added); *see also* AC ¶¶ 690, 769, 856. Plaintiffs do not allege that Boeing was not "striving" to eliminate traveled work in the future, only that it had not done so yet. *E.g.*, AC ¶ 691. That does not contradict the challenged statements.

Many of these forward-looking statements are not actionable because they are protected by the PSLRA's safe harbor, which protects forward-looking statements if (i) they are accompanied by "meaningful cautionary" language, or (ii) the plaintiff fails to plead that the statements were made with "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(1). Here, the challenged forward-looking statements in press releases, SEC filings, and earnings calls were accompanied by "meaningful cautionary language" and thus are fully protected. *See, e.g.*, App. B at July 29, 2020 Earnings Tr. (cautioning that "any projections, estimates, and goals we include in our discussions this morning are likely to involve risks"); *see also* App. B. Even if cautionary language had not accompanied those statements, they would still be protected because Plaintiffs do not allege specific facts showing that they were made with actual knowledge of falsity. *See infra* § II.

### 4.  Statements about the FAA's recertification process are not actionable.

Plaintiffs contend that numerous statements referencing the FAA's process for recertifying the 737 MAX were false or misleading because "Boeing improperly limited the scope of the

-15-

recertification … to address only MCAS, rather than additional unsafe features of the airplane." *E.g.*, AC ¶¶ 578, 587. But Plaintiffs do not plead any facts that support their assertion that Boeing somehow improperly limited the scope of the *FAA's* recertification process to MCAS.

Instead, Plaintiffs challenge these statements based solely on the Congressional testimony of Joe Jacobsen, who worked at the FAA from 1995 to 2023. AC ¶¶ 272–276. But Jacobsen never said that the FAA's recertification process was limited to "only" MCAS—rather, he claimed that the FAA "primarily" focused on MCAS. AC ¶ 275. In fact, the Complaint makes clear that the recertification process was *not* limited. AC ¶ 73 (citing "seven safety issues" identified); AC ¶ 74 (recertification "followed a 'comprehensive and methodical safety review process that took 20 months to complete'"); AC ¶ 75 (FAA "specified 'design changes that must be made before the [737 MAX] aircraft return[ed] to service'"). And even Jacobsen acknowledged that, "[d]uring the re-certification of the MAX, FAA leadership supported Boeing's effort to narrow the scope to primarily focus on MCAS," AC ¶ 275, undermining any suggestion of impropriety.

This argument is also inconsistent with Plaintiffs' liability theory. Plaintiffs' safety allegations relate to Boeing's *manufacturing* process, not the *design* of the 737 MAX. AC § IV.G ("Following the Crashes—and Contrary to Defendants' Misrepresentations—Boeing's Airplanes Were Still Not Manufactured Safely."). By contrast, the FAA's recertification process focused on the "design changes that must be made" before the 737 MAX could return to service. AC ¶ 75.

### 5. Statements about Boeing's rate of production are not actionable.

After the FAA recertified the 737 MAX in November 2020, Boeing reported in each of its quarterly earnings releases and earnings calls the production rate and deliveries of the 737. *E.g.*, AC ¶ 789 ("The 737 program is currently producing at a rate of 19 per month and continues to progress towards a production rate of 31 per month in early 2022."). Plaintiffs claim these statements were false, but do not allege that the reported production and delivery numbers were

inaccurate in any way—*i.e.*, that the 737 program was not actually producing and delivering at the stated rates.  Plaintiffs instead simply repeat a boilerplate assertion that those statements were "materially false and misleading" because Boeing's production and delivery "efforts depended on practices … that sacrificed aircraft safety and quality in favor of production speed and profits." *E.g.*, AC ¶¶ 718, 751, 773, 793, 807, 840, 869, 876, 891, 900, 931, 949, 961.  That conclusory assertion does not come close to satisfying Plaintiffs' burden to plead with particularity facts showing that accurate statements about Boeing's production and delivery rate were nonetheless somehow materially misleading.  *Cozzarelli*, 549 F.3d at 630 (plaintiffs must plead "credible explanations of the falsity" to satisfy Rule 9(b)).

### 6.    Risk factors in Boeing's SEC filings are not actionable.

Plaintiffs challenge certain general risk factors—*i.e.*, known material risks that companies must identify in SEC filings—disclosed in Boeing's Form 10-Ks and 10-Qs over a five-year period on the ground that "Defendants noted only *potential* risks" without disclosing that those risks were "*presently existing* conditions that the Company was already facing." *E.g.*, AC ¶¶ 589, 636, 725, 818, 906, 985.  As the Fourth Circuit has recognized, warnings of risks that could occur "*might* be misleading to a reasonable investor," but only if "the defendant knew that those risks had materialized" and "the risk disclosures speak entirely of as-yet-unrealized risks and contingencies." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 904 (4th Cir. 2022) (emphasis added).  Construing every warning of future risks as an implicit representation about *current* conditions, as Plaintiffs suggest, would discourage companies from disclosing such risks in the first place.

Plaintiffs challenge two sets of disclosures:  (i) general risks related to "operational challenges" inherent in the business of aircraft manufacture, *e.g.*, AC ¶ 724; and (ii) risks related to compliance with government requirements, *e.g.*, AC ¶¶ 721–722.  But they fail to plead with the required particularity that either was materially false or misleading.

-17-

Plaintiffs argue that the first set of risk factors—pulled from Boeing's SEC filings over a period of five years—is false and misleading because, "at the time of the statements," operational challenges "were ongoing and *presently existing* conditions." *E.g.*, AC ¶ 589. But the risk factors Plaintiffs challenge consist of generic disclosures about operational challenges that Boeing (or any large manufacturing company) could face in the future. Because the disclosures are "intended to educate the investor on *future* harms"—and thus by nature do not speak to *current* events—"a reasonable investor would be unlikely to infer anything regarding the current state of [Boeing's] … operations," rendering the disclosures immaterial. *Bondali*, 620 F. App'x at 491; *see also Marriott*, 31 F.4th at 904 n.2 (same and citing *Bondali*).

Plaintiffs also fail to plead that the risk factors are false or misleading. Rather than specify conditions that existed at the time of any particular statement that rendered the risk factor misleading, Plaintiffs assert that every risk disclosure in every quarterly and annual SEC filing over the more than four-year putative class period was materially false and misleading for the same rote reasons. *E.g.*, AC ¶¶ 635, 675, 692, 700. Such copy-and-paste allegations come nowhere close to pleading with particularity any operational challenges that Defendants knowingly failed to disclose at the time of each statement. *E.g.*, AC ¶ 636 (identical allegations); AC ¶ 725 (identical allegations). Plaintiffs' inability to allege with particularity why the disclosures were purportedly misleading makes sense given the timing and context of the challenged disclosures, the earliest of which came more than seven months into the global grounding of the MAX. By that time, Boeing had disclosed, and the market clearly understood, that Boeing faced "operational challenges." *E.g.*, AC ¶¶ 59, 74 (737 MAX was grounded for more than a year); AC ¶ 615 ("global regulatory authorities determine the timeline for certification").

The second set of risk factors relates to ongoing government inquiries and settlements.

Beginning with the January 7, 2021 announcement of Boeing's DPA with the DOJ, Boeing's SEC filings described the existence of the DPA, as well as other "government inquiries," and identified risks that could arise depending on the outcome of those inquiries. *E.g.*, AC ¶¶ 721–722. Many of the challenged statements simply state that Boeing had entered into the DPA and note the existence of other government inquiries. *E.g.*, AC ¶¶ 708, 721, 726, 730, 756, 758, 779, 781, 800, 815, 819, 823, 846, 872, 877, 881, 903, 907, 936, 955, 969, 982, 986. Plaintiffs contend that these disclosures were false and misleading because Boeing allegedly "failed to comply with the FAA mandate requiring Boeing to implement an SMS" and "failed to comply with the terms of the DPA." *E.g.*, AC ¶¶ 710, 723, 727, 731, 757, 759, 780, 782, 799, 801, 816, 820, 824, 847, 873, 876, 882, 904, 908, 937, 956, 970, 972, 983, 986. But the challenged statements were not false— none of them makes any representations about Boeing's compliance with the DPA or predicts the outcome of other government inquiries beyond stating that Boeing was "cooperating with U.S. government investigations related to the 737 MAX." *E.g.*, AC ¶¶ 721, 755, 778, 797, 814. And there is no allegation that Defendants were aware of the outcomes of those investigations in advance. Paragraph 710 demonstrates the problems with Plaintiffs' theory: that paragraph alleges that Boeing's January 2021 press release announcing its entry into the DPA was "materially false and misleading when made" because Boeing did not disclose that, in the years to come, it allegedly would "fail[] to comply with the terms of the DPA"—a complete chronological disconnect. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout *contemporaneous* falsity, there can be no fraud."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

## II.     Plaintiffs Do Not Plead Particularized Facts Raising a Strong Inference of Scienter.

Plaintiffs' claims should also be dismissed for the independent reason that the Complaint fails to plead that the speakers of the challenged statements acted with scienter. To plead scienter under Section 10(b), a plaintiff must allege "either 'intentional misconduct' or such 'severe

recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli*, 549 F.3d at 623. The PSLRA "imposes a heightened pleading standard for scienter, requiring plaintiffs to state with particularity facts giving rise to a *strong inference* of scienter." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 751 (4th Cir. 2021). "A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw." *Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Taking the same kitchen-sink approach as they do in alleging misstatements, Plaintiffs rely on eight different scienter arguments that courts have repeatedly rejected as insufficient. Plaintiffs plead *no* facts—not one—demonstrating that the speakers of the challenged statements were aware of specific information that contradicted their statements. Whether considered alone or in combination, Plaintiffs' scienter theories fall far short of pleading the required strong inference.

A. **The Individual Defendants' positions and access to information do not support a strong inference of scienter**.

Plaintiffs first attempt to plead scienter by alleging that the Individual Defendants, based on their positions at Boeing, were "responsible for oversight" of safety and quality and received periodic reports on those topics, and thus must have been aware of "quality control and safety issues at Boeing" that supposedly contradicted their statements. AC ¶¶ 477–478, 480, 483, 486. But courts routinely reject the notion that a plaintiff can plead scienter based simply on an individual's position and access to information. *See Yates* v. *Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *see also Iron Workers Loc. 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) (claims that defendant "must have known" statement was false "because of his or her position" are "the types of inferences which [courts], on numerous occasions, have determined to be inadequate"). Allegations that do not specify what information

-20-

company executives purportedly received and how that information would have made clear that their statements were false or misleading are insufficient under the PSLRA. *See In re PEC Sols. Sec. Litig.*, 2004 WL 1854202, at \*14 (E.D. Va. May 24, 2004) (a court cannot "simply infer or imply knowledge of material facts based upon conclusory allegations").

As a result, Plaintiffs' general allegations that "Muilenburg and Calhoun, in their role as [Boeing's CEO], would receive 'safety reports,'" AC ¶ 480, and that Boeing's "senior management … were required to receive reporting on safety and quality management issues," AC ¶ 483, fall well short. Plaintiffs do not plead with particularity what those unidentified "reports" were, much less what information they supposedly contained that creates a strong inference that the Individual Defendants knew, or were severely reckless in not knowing, that their statements were false. *See Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (no scienter where plaintiff has not "specifically identified any reports" containing "contradictory information"). Plaintiffs instead ask this Court simply to assume that some unidentified information was reported up to Boeing's CEO and CFO in unidentified ways that put those individuals on notice that their public statements were false or misleading. A plaintiff "may not stack inference upon inference to satisfy the PSLRA's pleading standard." *Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).

**B.     The importance of safety and quality control at Boeing does not support a strong inference of scienter.**

Plaintiffs next claim that this Court should infer fraudulent intent because "safety and quality management" were "absolutely critical" to Boeing after the 737 MAX accidents. AC ¶ 487. Defendants agree that safety and quality management have been, and always will be, critical to Boeing's business, but that does not relieve Plaintiffs of their obligation to plead "detailed allegations establishing defendants' actual exposure to the [alleged] problem" that supposedly

-21-

contradicted their statements. *Yates*, 744 F.3d at 890.

Plaintiffs' allegations that safety and quality were "critical" issues, AC ¶¶ 487–496, is a variation of the so-called "core operations" theory—the claim that defendants are "more likely to know that their statements were false" when they concerned "core" issues. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021). But the courts of appeals that have addressed this theory, including the Fourth Circuit, have rejected it as an independent basis for pleading scienter. *See Yates*, 744 F.3d at 890 ("[W]e reject plaintiffs' contention that the individual defendants must have acted intentionally or recklessly … merely because … the LIHTC Funds represented a core business of the Company."). The theory is particularly inapt here, where Plaintiffs seek to infer knowledge not of all information bearing on a particular business line or product, but of broad concepts like "safety" and "quality." "Without particularized allegations regarding Defendants' knowledge of shortcomings" that contradicted their statements, Plaintiffs are ultimately "asking [this Court] to assume scienter because" quality control and safety are important issues. *KBC*, 19 F.4th at 612. The PSLRA precludes such assumptions.

### C. Defendants' statements that they were closely monitoring safety and quality do not support a strong inference of scienter.

Plaintiffs further contend that scienter should be inferred based on the Individual Defendants' "admissions" that they were paying "close attention to product safety and the quality of the manufacturing process at Boeing." AC ¶ 497. That contention suffers from the same fundamental defect: it is unsupported by particularized allegations showing any Individual Defendant's "actual exposure" to specific information that would have rendered his statements false or misleading. *Yates*, 744 F.3d at 890. Not a single one of the statements quoted by Plaintiffs, AC ¶¶ 499–526, links any of the speakers to information that would undercut their general statements about safety and product quality. *See Knurr* v. *Orbital ATK Inc.*, 272 F. Supp. 3d 784,

-22-

801 (E.D. Va. 2017) (no strong inference of scienter from "regular monitoring" and "frequent public statements" where plaintiffs "failed to allege with particularity that the individual defendants were privy to information … but concealed this information from the public").

What makes this theory even more puzzling is that, while Plaintiffs rely on these "admissions" in attempting to plead scienter, they elsewhere claim that these same statements were false. AC ¶¶ 576, 581–582, 584, 591–594, 612, 628, 644, 652, 661, 705, 741, 747, 791, 810, 829, 837, 884, 993. Plaintiffs cannot have it both ways: they cannot simultaneously contend that Boeing's commitment to safety and quality control shows that the Individual Defendants must have known about all safety and quality issues at the Company, while also contending that their statements about Boeing's commitment to safety and quality were false. *See Knurr*, 272 F. Supp. 3d at 801 ("Contrary to plaintiffs' position, rather than supporting an inference of scienter, this regular monitoring of the Lake City Contract suggests diligence.").

### D. Allegations by whistleblowers and confidential witnesses with no connection to the Individual Defendants do not support a strong inference of scienter.

Plaintiffs get no closer to satisfying their pleading burden by arguing that the allegations attributed to "public whistleblowers and confidential former employees … [are] additional indicia of Defendants' scienter." AC ¶ 532. That is because "[n]ot one of Plaintiffs' [whistleblowers or] confidential witnesses provides any information about how the individual Defendants were involved … or how each Defendant knew of the purported fraud." *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 474–75 (M.D.N.C. 2004).

Plaintiffs' confidential witnesses purport to describe (in varying degrees of detail) conduct they supposedly observed while employed at Boeing, but *none* of these witnesses suggests that the Individual Defendants—Boeing's current and former CEOs and CFOs—were ever made aware of what the witnesses describe. For example, CW-6 describes a single instance of alleged retaliation

by his manager after a disagreement over how to present a potential safety concern to the FAA, but does not specify when this incident supposedly occurred or who allegedly was involved. AC ¶¶ 353–354. CW-2 alleges that he held an unspecified "leadership role on the 737 MAX from 2019 to 2021" and witnessed "numerous unsafe practices" during his tenure. AC ¶¶ 228–229. The only practice he describes is "traveled work," which he claims "continued" until his departure in 2021. AC ¶ 234. Aside from the generality of these allegations, CW-2 never states that he passed information to Boeing's senior management, much less to one of the Individual Defendants. Similarly, CW-4, a "Manufacturing Manager" at Boeing's Renton, Washington facility, claims that he witnessed instances of "out-of-sequence" work and that unspecified "leadership" at the facility "was aware that this was happening but chose to ignore it." AC ¶¶ 264–265, 269. But he never contends that any Individual Defendant was aware of what he describes. CW-7 allegedly worked in "SMS customer support," AC ¶ 299, but never even mentions any Individual Defendant.

Other witnesses are even further removed. CW-5 and CW-8 were contractors at a Kansas location of one of Boeing's suppliers, each for a year or less, and neither suggests that any of the problems he or she experienced were shared with any Individual Defendant. AC ¶¶ 246–257. CW-1 asserts that a Ring camera video "captured Boeing Quality Inspectors discussing doing cocaine outside his home," but never suggests that Boeing's CEO and CFO had access to his Ring video. AC ¶ 287. CW-3 did not even work at Boeing during the putative class period. AC ¶ 235.

Plaintiffs also highlight the public testimony of Sam Salehpour, a quality engineer who asserts that Boeing's process in "late 2020" for "shimming" gaps in components for the 787 aircraft—an entirely different type of airplane than the 737 MAX—was not "industry standard[]," and claims to have clashed with his superiors on this issue. AC ¶¶ 193–208. To the extent even relevant here, Salehpour never connects any of his allegations to the Individual Defendants. The

-24-

far more plausible inference from Salehpour's allegations is that he and his managers disagreed over Salehpour's concerns, and the discussions ended there—not that this information was reported to Boeing's CEO and CFO, who then intentionally lied to the public. *See Yates*, 744 F.3d at 887 ("The more plausible inference is that there was an honest disagreement over the proper application of a challenging new accounting standard.").

In the few instances where witnesses even reference Boeing leadership, they do so only in conclusory terms. CW-3 asserts, with no factual support, that "the CEO and management [were] 'cooking the books.'" AC ¶ 239. Ed Pierson argues that "Boeing's corporate leaders continue to conceal the truth" and "mislead and deceive the public about the safety of their airplanes," but provides no support for those conclusory assertions and did not even work at Boeing during the proposed class period. AC ¶¶ 317, 322. And Roy Irvin claims that inexperienced employees received promotions at Boeing's South Carolina facility after "executive leadership" instituted a policy requiring managers to "spend time in quality," citing two promotions he believed were undeserved. AC ¶¶ 325–329. But Irvin never explains how Boeing's CEO and CFO would have known about those two promotions, much less that the policy requiring managers to gain experience in quality was purportedly resulting in less-qualified candidates receiving promotions.

None of these allegations raises a strong inference of scienter because the employees "do not allege that they passed their concerns on to" any Individual Defendant or that the Individual Defendants "were otherwise aware of the problems alleged." *KBC*, 19 F.4th at 609. Plaintiffs also never explain how these allegations supposedly show that any Defendant was aware that any of his particular statements were false or misleading.

### E. Boeing's incentive compensation does not support a strong inference of scienter.

Plaintiffs next try to manufacture an inference of scienter based on Boeing's executive

compensation program, which includes "metrics … tied to product safety and quality."  AC ¶ 533.

According to Plaintiffs, these metrics "incentivized" Defendants "to make themselves aware of

Boeing's practices with respect to safety and quality."  AC ¶ 539.  As an initial matter, "the

motivation[] to … increase one's own compensation [is] common to every company and thus

add[s] little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627–28 (rejecting scienter allegation

that executive had "an incentive to puff up the outlook of Study 109 falsely because her

compensation was tied to the company's performance").  Plaintiffs never explain how allegedly

misleading the *public* about Boeing's commitment to safety and quality would benefit the

Individual Defendants, particularly when the cited incentives were tied to *internal* operational

goals determined by the Board's Compensation Committee.  AC ¶¶ 535–538.  Nor can Plaintiffs

plead a strong inference of scienter simply by arguing that Boeing's compensation structure

"incentivized" Boeing executives to focus on safety and quality.  Indeed, Plaintiffs have it

backward.  The incentive to focus on safety and quality suggests that the speakers believed their

statements about the importance of safety and quality; it does not raise a strong inference that they

were aware of specific facts that contradicted these statements.

> **F.  Allegations about Boeing's document productions to the government do not support a strong inference of scienter**.

Plaintiffs argue that Boeing "did not turn over important records to investigators" at the

National Transportation Safety Board ("NTSB") in March 2024 after the Alaska Airlines incident.

AC ¶¶ 540–541.  Although Plaintiffs acknowledge that Boeing later explained that the requested

"documents do not exist," AC ¶ 543, they argue that this supposed withholding of documents

"strongly indicates Defendants' scienter" stretching back to November 2019, AC ¶ 546.  Leaving

aside this chronological disconnect, Plaintiffs never plead any facts connecting Boeing's CEO and

CFO to the Company's document productions to the NTSB earlier this year.  The Complaint never

specifies what is in the purportedly withheld documents or why failing to produce them to the NTSB would raise a strong inference that the Individual Defendants made any of the challenged statements going back to 2019 with scienter.  Plaintiffs' insistence that Boeing must be lying when it said that the documents do not exist is based on the testimony of a former employee who claims that the "documentation exists because [he] personally passed it to the FBI."  AC ¶ 544.  But the Complaint fails to explain why an employee who left Boeing in August 2018, AC ¶ 317, would be in possession of documents related to an incident that occurred years later in January 2024.

Plaintiffs further argue that scienter can be inferred from the statement in the January 2021 DPA that Boeing "did not 'timely and voluntarily disclose to the [DOJ] the offense conduct described in the Statement of Facts'" and that Boeing's cooperation was "delayed."  AC ¶ 545. But the Complaint does not allege what Boeing did not initially disclose or when, let alone explain how that delayed disclosure relates to any of Defendants' statements.  Plaintiffs thus plead no facts to justify their conclusion that this issue "strongly indicates Defendants' scienter."  AC ¶ 546.

### G.    Three of the Individual Defendants' retirements from Boeing do not support a strong inference of scienter.

Continuing to reach for a viable scienter theory, Plaintiffs contend that the resignations of Defendants Muilenburg and Smith and the announced, future retirement of Defendant Calhoun "support an inference of scienter" because "these resignations were temporally connected to significant events."  AC ¶ 547.  As the Fourth Circuit has observed, "executive departures are, at best, weak evidence of scienter."  *San Antonio Fire & Police Pension Fund* v. *Syneos Health Inc.*, 75 F.4th 232, 244 (4th Cir. 2023).

Here, the inference of scienter is particularly weak because Plaintiffs plead no facts linking these departures to any of the challenged statements or to any knowledge suggesting that the three individuals knowingly made false or misleading statements.  Muilenburg announced his departure

from Boeing in December 2019, just two months into the proposed class period.  AC ¶ 548. Plaintiffs plead no facts "refuting the reasonable assumption" that Boeing's Board, following the two 737 MAX crashes and the grounding of the plane since March 2019, determined that a leadership change was necessary to "restore confidence." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); AC ¶ 551.  Although Plaintiffs claim that Smith's retirement after ten years as Boeing's CFO was a surprise, they plead no facts suggesting that his decision to retire after the MAX had returned to service was anything but "a benign one."  *Zucco Partners*, 552 F.3d at 1002.  And Calhoun announced in March—just before turning 67—that he would "step down as CEO at the end of 2024" but would "continue to lead Boeing through the year to complete the critical work underway."  AC ¶ 554.  Calhoun's decision to retire at age 67 after finishing the year is hardly evidence that he made public statements with an intent to deceive investors.

### H.     Ongoing investigations do not support a strong inference of scienter.

Plaintiffs last try to meet their pleading burden by arguing that "the multiple investigations currently ongoing by government agencies and regulators support a strong inference of … scienter."  AC ¶ 557.  But "[i]nferring scienter from the mere existence of an investigation would be an end-run around the stringent pleading requirements of the PSLRA, entitling every plaintiff who brought suit against a company under investigation access to discovery."  *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007), *aff'd in part and rev'd on other grounds*, *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009).

A close look at Plaintiffs' allegations shows just how little they say.  Plaintiffs contend that scienter should be inferred because the DOJ has asserted that Boeing "violated the provisions of the DPA."  AC ¶ 558.  But the Complaint never specifies the basis for the DOJ's assertion, when the relevant conduct occurred, or how the purported violations supposedly relate to any of Defendants' statements.  Plaintiffs also cite two FAA reports identifying "deficiencies" in the

Company's safety and quality control processes, AC ¶¶ 560–562, but they never plead any facts that raise a strong inference that the Individual Defendants were aware of these alleged deficiencies and sought to mislead the public about them.  As to Plaintiffs' allegations that the FAA and SEC are still investigating Boeing, those allegations are "too speculative to add much, if anything, to an inference of scienter." *Cozzarelli*, 549 F.3d at 628 n.2.

*        *        *

Plaintiffs' individual scienter theories are just as deficient when considered "holistically." *Tellabs*, 551 U.S. at 326.  Plaintiffs cannot "bootstrap their allegations into a strong inference of scienter through the additive effect of the individual allegations, [when] missing from the complaint is the one essential ingredient necessary to establish the strong inference—some indication that defendants acted with fraudulent intent or recklessness." *Svezzese* v. *Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003).  None of Plaintiffs' scattershot scienter theories includes any allegation linking any Individual Defendant to knowledge that contracted their statements.  Viewing Plaintiffs' various theories together does not remedy that fatal deficiency.  As one court put it, "zero plus zero (plus zero plus zero plus zero) cannot equal one." *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021).

### III.    Plaintiffs Do Not Adequately Plead Loss Causation.

As a final, independent basis for dismissal, Plaintiffs fail to meet their burden of pleading that "the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 345–46 (2005).  To plead loss causation, Plaintiffs must allege facts showing that "when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." *In re Boeing*, 2022 WL 3595058, at *28.  Plaintiffs thus must plead that the disclosures of the "truth" to the market correcting the

-29-

prior false statements—referred to as corrective disclosures—caused a decline in Boeing's stock price. *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472–73 (4th Cir. 2011). Plaintiffs must allege this connection with "sufficient specificity to enable the court to evaluate whether the necessary causal link [between the alleged misstatements and the loss] exists," a standard "largely consonant with" Rule 9(b). *Id*. at 465–66, 471.

Plaintiffs do not even try to plead such a causal link here. In a Complaint spanning more than 300 pages, Plaintiffs' attempt to plead loss causation takes up only two paragraphs. AC ¶¶ 1000–1001. Plaintiffs simply assert that, "[a]s truthful information was revealed to the market," Boeing's "stock price declined" as "detailed … in Section IV.H." AC ¶ 1000. Section IV.H, in turn, purports to identify 22 separate corrective disclosures between January 5, 2024 and May 14, 2024 consisting of every piece of bad news about Boeing that coincided with a decline in Boeing's stock price, some less than one dollar. AC ¶¶ 365–472. Plaintiffs make no effort to plead with specificity a causal link between any of the 75 alleged misstatements and any of these 22 alleged corrective disclosures. Instead, they merely recite a litany of bad news over a five-month period that coincided with stock-price declines, no matter how small. In the other securities class action filed against Boeing, the court rejected most of the alleged corrective disclosures on this exact ground, holding that "the plaintiffs made no effort to connect specific statements to corrective disclosures." *In re Boeing*, 2022 WL 3595058, at *29 n.13. The Complaint's allegations here are equally (if not more) deficient under the Fourth Circuit's pleading standard for loss causation.[3]

## CONCLUSION

The Amended Complaint should be dismissed in its entirety and with prejudice.

---

[3] Because Plaintiffs fail to allege a primary violation of Section 10(b), they also fail to state a Section 20(a) claim against the Individual Defendants. *See KBC*, 19 F.4th at 614 n.4.

Dated:  June 21, 2024

Respectfully submitted,

/s/ Benjamin L. Hatch

Richard C. Pepperman II (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
peppermanr@sullcrom.com

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
T: (757) 640-3727
F: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Judson O. Littleton (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
littletonj@sullcrom.com

*Counsel for Defendants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

-31-

## CERTIFICATE OF SERVICE

I certify that on the 21st day of June, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch