UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| IN RE THE BOEING COMPANY SECURITIES LITIGATION | ) ) ) ) | Case No. 1:24-cv-00151-LMB-LRV Hon. Leonie M. Brinkema |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

I.     Deadly 737 MAX Plane Crashes Prompt "Enterprise-Wide" Restructuring......................3

II.    Defendants Falsely Assured Investors that Boeing Prioritized Safety Over Production Rate..............................................................................................................4

III.   A Door Plug Blows Off and Boeing's Stock Declines As the Truth Emerges....................5

ARGUMENT .......................................................................................................................7

I.     Defendants' Statements Were Materially False and Misleading.........................................7

       A.     Retaliation Against Employees and Safety Management System .........................8

       B.     Unsafe Traveled and Out-of-Sequence Work and Production Rates....................11

       C.     Assurances that Boeing Prioritized Safety and Quality .......................................13

       D.     737 MAX Recertification ....................................................................................18

       E.     Regulatory Compliance and Risk Factors............................................................18

       F.     Particularized Pleading .......................................................................................19

II.    The Allegations Raise a Strong Inference of Scienter .......................................................20

       A.     The Individual Defendants Affirmed Their Personal Involvement in Monitoring Safety Concerns, a Subject of Critical Importance to Boeing, and Alarming Safety Deficiencies Were Raised Internally .................................21

       B.     Additional Scienter Allegations...........................................................................26

       C.     Boeing's Corporate Scienter ...............................................................................28

III.   The Complaint Properly Pleads Loss Causation................................................................29

CONCLUSION....................................................................................................................30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................. *passim*

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .......................................................................11

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ...............................................................................8

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)...........................................................10, 16

*Cambridge Ret. Sys. v. Jeld-Wen Hldg., Inc.*,
  496 F. Supp. 3d 952 (E.D. Va. 2020) ........................................................8, 27, 28

*City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ..............................................................................18

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
  683 F. Supp. 3d 120 (D. Mass. 2023) ................................................................11

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805
  (N.D. Ill. Feb. 13, 2013)....................................................................................15

*College Ret. Equities Fund v. Boeing Co.*,
  2023 WL 6065260
  (N.D. Ill. Sept. 18, 2023) ...................................................................................17

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ..............................................................................26

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................29

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016).....................................................................25

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)..................................................................................8

**Page**

*Hall v. Johnson & Johnson*,
2019 WL 7207491
(D.N.J. Dec. 27, 2019) ...................................................................................................16

*Howard v. Arconic Inc.*,
2021 WL 2561895
(W.D. Penn. June 23, 2021) ...........................................................................................16

*In re 2U, Inc. Sec. Class Action*,
2021 WL 3418841
(D. Md. Aug. 5, 2021).....................................................................................................8

*In re AppHarvest Sec. Litig.*,
684 F.Supp.3d 201 (S.D.N.Y. 2023).............................................................................20

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)...........................................................8, 16, 19, 29

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058
(N.D. Ill. Aug. 23, 2022)...................................................................................17, 18, 30

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...........................................................10, 25, 26

*In re Cree, Inc. Sec. Litig.*,
333 F. Supp. 2d 461 (M.D.N.C. 2004) ..........................................................................26

*In re Emergent BioSolutions Inc. Sec. Litig.*,
2023 WL 5671608
(D. Md. Sept. 1, 2023) .......................................................................................... *passim*

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)..........................................................................29

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ..............................................................8, 13, 21, 25

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)...........................................................................20

*In re James River Grp. Hldgs., Ltd. Sec. Litig.*,
2023 WL 5538218
(E.D. Va. Aug. 28, 2023)............................................................................................8, 25

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ......................................................................................18

**Page**

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D. W.Va. 2012)...................................................................2, 15, 25, 30

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................................27

*In re PEC Sols., Inc. Sec. Litig.*,
  2004 WL 1854202
  (E.D. Va. May 24, 2004)......................................................................................................26

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889
  (S.D.N.Y. Nov. 26, 2018) ....................................................................................................25

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 3d 221 (S.D.N.Y. 2019)..................................................................................11

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
  2020 WL 571724
  (D. Md. Feb. 4, 2020) ....................................................................................................11, 29

*In re Vale S.A. Sec. Litig.*,
  2020 WL 2610979
  (E.D.N.Y. May 20, 2020) .........................................................................................16, 19, 25

*In re ValuJet, Inc., Sec. Litig.*,
  984 F. Supp. 1472 (N.D. Ga. 1997) .....................................................................................16

*In re Willis Towers Watson plc Proxy Litig.*,
  937 F.3d 297 (4th Cir. 2019) .................................................................................................7

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ..................................................................................26

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2016 WL 3981236
  (D.S.C. July 25, 2016) .........................................................................................................25

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ................................................................................................26

*Kiken v. Lumber Liquidators Hldgs., Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) .......................................................................17, 25, 28

*Knurr v. Orbital ATK Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) ...................................................................................26

**Page**

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) .................................................................................8

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ...............................................................................26

*Marsh Grp. v. Prime Retail, Inc.*,
46 Fed. Appx. 140 (4th Cir. 2002)........................................................................18

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ...............................................................................28

*Meyer v. Jinkosolar Hldgs. Co.*,
761 F.3d 245 (2d Cir. 2014)............................................................................12, 19

*Nykredit Portefølje Admin. A/S v. Propetro Hldg. Corp.*,
2021 WL 9037758
(W.D. Tex. Sept. 13, 2021)...................................................................................11

*Ollila v. Babcock & Wilson Enters., Inc.*,
2018 WL 792069
(W.D.N.C. Feb. 8, 2018)..................................................................................13, 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................8

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) .................................................................................8

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) ...................................................................27

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)...................................................................26

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680
(E.D. Va. Mar. 24, 2021) ......................................................................................29

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ..............................................................................11

*Robinson v. Ladd Furniture, Inc.*,
995 F.2d 1064 (4th Cir. 1993) ..............................................................................18

*Salzman v. ImmunityBio, Inc.*,
2024 WL 3100274
(S.D. Cal. Jun. 20, 2024)......................................................................................13

**Page**

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  2024 WL 1898512
  (S.D.N.Y. May 1, 2024)............................................................................24, 25, 28

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
  75 F.4th 232 (4th Cir. 2023) ...........................................................................27

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ...................................................................... *passim*

*Svezzese v. Duratek, Inc.*,
  67 F. App'x 169 (4th Cir. 2003) .....................................................................26

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008)..............................................................20

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .....................................................................20, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................20, 21

*Yates v. Municipal Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .........................................................................26

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  §78j(b)..............................................................................................30
  §78t(a)..............................................................................................30

Federal Rules of Civil Procedure
  Rule 9(b) ............................................................................................20

Private Securities Litigation Reform Act of 1995 ........................................................20

**INTRODUCTION**

For years, The Boeing Company ("Boeing") and its most senior executives (together, "Defendants") misled investors about the safety and quality of Boeing's airplanes. After two devastating crashes in 2018 and 2019 (the "Crashes") exposed severe safety deficiencies at Boeing, Defendants assured the investing public that Boeing had turned a new page by prioritizing safety over production rate and enabling employees to raise safety concerns without fear of retaliation. Over and over again, Defendants emphasized the message that "safety dominates Boeing." But a January 2024 incident in which a door plug blew off a Boeing plane due to a manufacturing defect (the "Alaska Airlines Incident") and subsequent revelations made clear that Defendants' representations were materially false and misleading. Numerous whistleblowers, investigations, and other reports have revealed that Boeing continued to take dangerous shortcuts that jeopardized safety and quality, retaliated against employees who raised safety concerns, and in short, did not meet the safety commitments it had made to regulators, the flying public, and investors in the wake of the Crashes. As a result, Boeing's stock price plunged, causing enormous damages.

In response, Defendants advance the alarming propositions that: (1) their public assurances about Boeing's prioritization of safety and quality in airplane manufacturing were essentially meaningless; and (2) in any event, they had no way of knowing whether or not those assurances were true. Neither is consistent with the detailed facts alleged in the Complaint.

Defendants contend, for example, that their representations were nothing more than vague "aspirations." One can imagine the public outcry had Boeing announced that it merely "aspires" to make safe airplanes, and Boeing made no such announcement. Instead, Defendants repeatedly emphasized that Boeing had absorbed the lessons of the Crashes by prioritizing safety and quality control. These statements were highly material; as Defendants themselves acknowledged, safety is "the most important part of shareholder value" at Boeing. Defendants ignore the analyst reports

cited in the Complaint which observed, for example, that Boeing's statements after the Crashes "shifted dramatically to emphasize Boeing's renewed focus on safety, indicating to us that the company clearly wants shareholders to know its Board is again laser-focused on this." Decisions like *Massey Energy* found safety-related statements to be actionable in remarkably similar circumstances, as discussed below. Defendants have little to say about Boeing's pervasive culture of retaliation and widespread safety problems, ignoring their own admissions after the Alaska Airlines Incident that the unsafe practice of "traveled work" had become "embedded and normalized" at Boeing, and that "for years," Boeing's "leadership team" had "prioritized the movement of the airplane through the factory over getting it done right." And Defendants ignore the powerful testimony of Dr. Javier de Luis, a member of the Federal Aviation Administration ("FAA") expert panel that found a pervasive "'disconnect' between the words that are being said by Boeing management, and what is being seen and experienced by the technicians and engineers."

Defendants try to brush aside the confidential witness and public whistleblower testimony by positing that the Individual Defendants may have been unaware of Boeing's systemic safety deficiencies. In the aftermath of the Crashes, however, the Individual Defendants touted their personal involvement in monitoring the safety of Boeing's manufacturing, as required under a new safety reporting structure. At a minimum, even if the Individual Defendants defied their commitments after the Crashes by blinding themselves to safety concerns, they would have been severely reckless in repeatedly making safety-related assurances without a reasonable basis. Further, the allegations amply support a strong inference of Boeing's corporate scienter.

Finally, as to loss causation, Defendants ignore the numerous allegations, often backed by quotes from securities analysts, describing how the truth was revealed in stages, removing the artificial inflation caused and maintained by Defendants' misstatements.

- 2 -

For these reasons, the Complaint's detailed allegations that Defendants defrauded investors are more than sufficient to advance beyond the pleading stage.

## FACTUAL BACKGROUND

### I.    Deadly 737 MAX Plane Crashes Prompt "Enterprise-Wide" Restructuring

In October 2018 and March 2019, two Boeing 737 MAX airplanes crashed, killing everyone on board. ¶¶54, 57.[1] The Crashes implicated Boeing's Maneuvering Characteristics Augmentation System ("MCAS"), which forced down the nose of the airplanes and defeated the pilots' ability to maintain control. ¶55. Boeing concealed MCAS and its flaws from pilots, and lied about it to the FAA. ¶¶55-56, 60-61. Investigations involving both houses of Congress, the FAA, the National Transportation Safety Board ("NTSB"), the Department of Justice ("DOJ"), and the Securities Exchange Commission ("SEC") all reached the same conclusion: Boeing was at fault for the Crashes. ¶58. Boeing was criminally charged with defrauding the FAA, and entered into a three-year Deferred Prosecution Agreement ("DPA") with the DOJ contingent upon, among other things, enhanced compliance reporting. ¶¶81-85. Boeing also paid $200 million to settle SEC charges that it misled investors about the safety of the 737 MAX. ¶¶87-92.

After the Crashes, Boeing implemented a monitoring and reporting system that elevated all safety issues to senior executives at Boeing, including the CEO, and members of Boeing's Board of Directors (the "Board"). ¶¶100-18. Boeing was also required by federal law passed in response to the Crashes, and FAA regulation pursuant to that law, to adopt a Safety Management System ("SMS") containing a "confidential employee reporting system that includes non-punitive provisions through which employees can report hazards and safety concerns." ¶¶136-44.

---

[1] The "Complaint" and "¶" refer to the Amended Class Action Complaint (ECF 43). "MTD" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF 51). All capitalized terms that are not defined have the same meanings as in the Complaint. All emphasis is added and internal quotation marks and citations omitted unless otherwise specified.

## II.    Defendants Falsely Assured Investors that Boeing Prioritized Safety Over Production Rate

In the wake of the Crashes, and throughout the Class Period (September 30, 2019 to May 14, 2024), Defendants Boeing, CEOs Dennis Muilenburg and David Calhoun, and CFOs Gregory Smith and Brian West, repeatedly asserted that Boeing had made meaningful changes to prioritize safety and quality. Defendants claimed, for example, that safety was Boeing's "highest priority," that "[s]afety dominates Boeing," and that Boeing "do[es] not compromise these values for cost or schedule." ¶¶147-63. Defendants also asserted that Boeing did not tolerate retaliation against employees and "encourage[d] people to speak up" about safety concerns. ¶¶164-72. Defendants further claimed that Boeing was eliminating "traveled work," which involves moving airplanes down the line or between factories before critical work has been performed. ¶¶134-35, 163. Traveled work is "inherently unsafe" and "creates opportunities for failure" because it may never be properly completed, including because crews at the new workstation may not be trained to do so. ¶¶222, 232. Defendants also touted Boeing's aircraft production rate, ¶¶173-76, and asserted that Boeing was not relying on traveled work to increase that rate. ¶¶690, 856-57. Defendants further promised "a renewed commitment to full transparency, including effective and proactive communication with the FAA, other global regulators and [Boeing] customers." ¶¶180-86.

These assurances were materially false and misleading. Numerous whistleblowers and confidential witnesses ("CWs") allege that after the Crashes, serious safety and quality failures continued to pervade Boeing's commercial aircraft manufacturing. According to a current Boeing employee, Boeing's "737 production system" was "quite far from healthy," and faced such an "enormous volume of defects" that "it was inevitable something would slip through." ¶¶259-61. These problems extended far beyond the 737 program; for instance, a former Boeing Quality Engineer testified that production shortcuts and systemic failures to follow industry standards

compromised <u>thousands</u> of Boeing 777 and 787 airplanes. ¶¶190-218. Likewise, a former Boeing Quality Manager described immense pressure to keep production moving, resulting in unsafe manufacturing shortcuts. ¶¶333-34. Former Boeing employees described widespread practices that jeopardized safety, including untrained employees on the production line (¶¶277-82), employee misconduct that management ignored (¶¶283-92), and a failure to properly oversee the quality control of suppliers, which Boeing knew were delivering highly defective components (¶¶240-63).

In addition, numerous witnesses described a culture of fear, intimidation, and rampant retaliation at Boeing, and many were personally retaliated against for raising safety concerns. ¶¶338-55. As summarized by Senator Richard Blumenthal, Boeing whistleblowers "have suffered harassment, isolation, transfers, and even threats of physical violence." ¶341.

Likewise, unsafe traveled work remained deeply "embedded and normalized," ¶¶21, 226, 448, and managers relied on it to meet Boeing's unrealistic production targets. According to one former employee, Boeing "never really changed" and continued to travel work after the Crashes. ¶¶228-34, 293-96. Another explained that Boeing's production schedule made "abundant" traveled work a necessity. ¶¶235-39. And another described Boeing managers pushing teams to complete work out-of-sequence, creating safety problems to avoid slowing production. ¶¶264-71.

Boeing also continued to conceal safety issues from regulators and the public. For instance, Boeing purposefully narrowed the scope of the 737 MAX's recertification process to focus on the MCAS system, despite other known, unsafe features that were not addressed, and pushed "a false narrative" that the recertification was the "most comprehensive in the history of aviation." ¶275.

### III.    A Door Plug Blows Off and Boeing's Stock Declines As the Truth Emerges

The truth about Boeing's pervasive safety and quality deficiencies that Defendants had concealed began to emerge on January 5, 2024, when a door plug blew off the fuselage of an Alaska Airlines 737 MAX, requiring an emergency landing. ¶365. The incident resulted from

Boeing's failure to install plug door bolts due to unsafe traveled work performed improperly at Boeing's factory after supplier Spirit AeroSystems delivered a defective fuselage. ¶¶232, 440. Following the incident, the NTSB announced an investigation, the FAA temporarily grounded Boeing's 737 MAX 9 jets, and Boeing's stock plummeted $20 per share. ¶¶366-71.

Boeing's stock continued its freefall in response to subsequent revelations, including as the market learned facts about the Alaska Airlines Incident that further exposed the scope of Boeing's safety problems (¶¶372-76, 390-92, 400-01); news of the severe impacts of those issues on Boeing (¶¶378, 385-87, 402-04, 407-09); and investigations and findings further revealing Boeing's pervasive safety and quality issues, including FAA announcements (¶¶377, 379-84, 388-89, 393-99, 410-20, 427-29, 430-31, 435-39), whistleblower allegations (¶¶451-53), an SEC investigation (¶¶460-61), and the DOJ's criminal investigation and finding that Boeing had violated the DPA (¶¶428-29, 432-34, 462-72). Each revelation further exposed the falsity of Defendants' misstatements during the Class Period, and caused Boeing's stock price to decline substantially.

Experts and investigators confirm that Defendants' statements did not reflect reality. Dr. Javier de Luis of MIT testified that the FAA expert panel found "a 'disconnect' between the words that are being said by Boeing management, and what is being seen and experienced by the technicians and engineers." ¶458. Ed Pierson, Executive Director of the Foundation for Aviation Safety and a former Boeing 737 Program Senior Manager, explained that "nothing changed after the two MAX crashes. If anything, conditions have only worsened." ¶318. After extensive investigation, Pierson concluded: "Boeing's corporate leaders continue to conceal the truth. They continued to mislead and deceive the public about the safety of their airplanes." ¶322. The SEC has since launched another investigation into whether Boeing misled investors as to safety. ¶460.

Defendants' admissions after the Alaska Airlines Incident highlight the irreconcilable gap

between their Class Period statements and the reality at Boeing. Calhoun has admitted that Boeing's 737 MAX issues were "self-inflicted" in that traveled work was "<u>embedded and normalized</u> in our factory," ¶226, and West admitted that, "[f]or years, <u>we prioritized the movement of the airplane through the factory over getting it done right</u>," ¶225, even as Defendants were telling the market that Boeing was prioritizing safety, including by eliminating traveled work. Boeing has announced the upcoming departures of Calhoun and other senior executives. ¶449.

ARGUMENT

## I.     Defendants' Statements Were Materially False and Misleading

Defendants repeatedly, emphatically, and materially misled the investing public about the safety and quality of Boeing's airplane manufacturing. Defendants do not dispute that safety was material to Boeing's investors (*see* MTD at 21). Indeed, Calhoun has emphasized that safety is "<u>the most important part of shareholder value</u>," and that "<u>[w]ithout it, there is no shareholder value</u>." ¶¶11, 151, 617. Nor do Defendants seriously dispute that the Complaint alleges material safety and quality deficiencies that were concealed from investors. Rather, Defendants contend that their representations amounted to aspirational puffery and opinion that would have been meaningless to a reasonable investor. That argument cannot be squared with the facts alleged.

"Resolving a question of materiality against the plaintiff at the motion to dismiss stage is inappropriate unless no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019).[2] Indeed, "a complaint may not properly be

---

[2] *See also In re NII Hldgs., Inc. Sec. Litig.*, No. 1:14-cv-227 (E.D. Va.) (Brinkema, J.) (ECF 150) at 9:20-11:19 (Oct. 6, 2014 transcript) ("even with the heightened pleading requirements in these securities class action cases. . . You don't resolve cases at the pleading stage unless it's clear that what they've alleged just can't, does not allege a plausible cause of action . . . with the amount of detail that's in" the complaint, defendants have "a problem at this stage of the proceedings"; the Court "has to read the four corners" of the complaint and credit witness allegations).

- 7 -

dismissed on the ground that the alleged misstatements or omissions are not material unless they are <u>so obviously unimportant to a reasonable investor that reasonable minds could not differ</u> on the question of their importance." *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). Thus, "[w]hile opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999); *see Cambridge Ret. Sys. v. Jeld-Wen Hldg., Inc.*, 496 F. Supp. 3d 952, 964 (E.D. Va. 2020) ("the omissions are factual, material, and, therefore, actionable, even if the statements are opinion or puffery"). The inquiry is highly "fact-specific" and "context"-dependent. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). "While certain statements, 'viewed in isolation, may be mere puffery,' <u>when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors</u>." *Id*. An opinion that "omit[s] irreconcilable, material facts" is actionable. *In re James River Grp. Hldgs., Ltd. Sec. Litig.*, 2023 WL 5538218, at *8 (E.D. Va. Aug. 28, 2023).[3]

A.    **Retaliation Against Employees and Safety Management System**

Defendants made highly material misstatements relating to Boeing's purported implementation of a legally-required SMS founded on enabling employees to raise safety concerns

---

[3] Opinion statements are actionable, whether or not sincerely believed, if they did not "fairly align" with known facts. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015); *see Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) (opinions that "cannot be squared" with omitted material facts are actionable); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) ("excluded facts illustrate that [d]efendants lacked the basis" for opinions); *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *21 (D. Md. Aug. 5, 2021) (same). Here, not only did Defendants omit "irreconcilable, material facts," but the scienter allegations call into question Defendants' sincerity, and most of the misstatements are not even framed as opinions. By contrast, in *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 323 (4th Cir. 2019) (MTD at 14), projections were not actionable when it was "difficult to imagine more clear warning language" that "squarely address[ed] the allegations."

without fear of retaliation. For example, Calhoun asserted at Boeing's April 2023 Annual Shareholder Meeting: "We proactively advanced an enterprise-wide Safety Management System – or SMS – to embed safety into the way we design, build and support our products and our services." ¶923. Per Boeing's March 2022 proxy statement, "[f]oundational to Boeing's SMS is a positive safety culture, and our employee reporting channels enable everyone to 'speak up.'" ¶831. Likewise, Boeing's April 2023 Chief Aerospace Safety Officer Report represented that its SMS "is grounded in a positive safety culture that encourages employees to speak up and report hazards and concerns," and accordingly, "[t]he Company celebrates employees who speak up and ensures there is protection from retaliation when concerns are raised." ¶¶918-20. Defendants repeatedly emphasized that "[r]etaliation against employees who come forward to raise genuine concerns will not be tolerated." ¶¶133, 166, 637. In a July 2021 Sustainability Report, Boeing represented that it "enforces a strict non-retaliation policy, reinforced by annual training and recurrent employee communication," and that "retaliation against reporting parties is strictly prohibited, and appropriate action is taken against violators of anti-retaliation policies." ¶¶169, 764-65. And in an April 2022 earnings call, Calhoun touted that Boeing "did . . . build our safety management system in a different way with a different outlet, so that people could voice concerns . . . And it's worked." ¶842.[4] Far from merely "aspirational," MTD at 12-13, these statements assured investors that Boeing had in fact implemented an SMS that protected employees from retaliation for reporting safety problems. Analysts praised Boeing for "directly address[ing]" concerns that employees lacked adequate "channels to express safety concerns." ¶¶117, 172; *see also* ¶¶632, 959.

These assertions were deeply misleading. As explained in April 2024 by Dr. Javier de Luis, a member of the FAA's expert panel that investigated Boeing's "safety management policies,

---

[4] *See also, e.g.*, ¶¶133, 143, 165, 167, 171, 577, 601, 639-39, 657, 666, 680, 728, 821, 849, 852, 860, 885, 909, 915-16, 923, 942, 963, 988, 998.

processes, and activities" over the prior years, including during the Class Period (¶¶410-19):

> [T]here exists a "disconnect" between the words that are being said by Boeing management, and what is being seen and experienced by the technicians and engineers. They hear "safety is our number one priority", but they see that that is only true as long as you meet your production milestones. They hear "speak up if you see anything unsafe", but they see that when they do, there's little feedback, and if they insist, they may find themselves on the short end of the stick next time raises are distributed, or worse. We identified this disconnect based on our interviews and survey responses. It was present at almost all levels and almost all worksites that we visited. We heard it from technicians and engineers, as well as from [individuals] that are delegated by the FAA to conduct mandated inspection and tests . . . I believe it is safe to say, given our [February 26, 2024] findings, that the events of Jan 5 and the subsequent NTSB investigation identifying the missing bolts in the Alaska Air door did not really come as a surprise.

¶¶26, 456-58. The FAA expert panel determined that for employees who identified safety concerns at Boeing, "there was a very real fear of retribution and payback if you held your ground," which was "just not compatible with any sort of safety culture or SMS system." ¶459. Numerous witnesses have come forward with consistent accounts of retaliation. ¶¶338-55. Moreover, CW-7, the "most qualified and advanced person in SMS" at Boeing, detailed the reasons why Boeing's purported SMS was "ridiculous" and a "joke," including because managers had access to the names of employees who had been told they were reporting anonymously. ¶¶297-312, 355.

Courts have upheld similar claims based on representations that employees were protected from retaliation for raising safety concerns. For example, in *In re BP p.l.c. Sec. Litig.*, the plaintiffs properly "alleged facts directly contradicting BP's representations that it did not retaliate against workers for reporting safety concerns[.]" 843 F. Supp. 2d 712, 766 (S.D. Tex. 2012). Likewise, in *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, Transocean's "fail[ure] to disclose that it had retaliated against whistleblowers" who "voiced concerns about safety," and other safety deficiencies, rendered misleading the representation that an acquisition made using Transocean stock was "fair." 866 F. Supp. 2d 223, 230, 234 (S.D.N.Y. 2012).

Here, the misstatements concerning retaliation and Boeing's SMS were by no means

limited to Boeing's Code of Conduct, and in any event, courts have held statements in such codes, including regarding retaliation, to be material. *See City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 134 (D. Mass. 2023) (code of conduct statement actionable when it "describes with specificity a course of conduct that [the company] promised to abjure," and the "corporate culture . . . promoted and harbored precisely the kind of behavior that [the company] promised investors it would prohibit"); *Nykredit Portefølje Admin. A/S v. Propetro Hldg. Corp.*, 2021 WL 9037758, at *17-*18, *23 & n.2 (W.D. Tex. Sept. 13, 2021) ("statements in a code of conduct or ethics" that are "highly specific" and "directly related to the subject of the fraud . . . are actionable"); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 226, 230-31 (S.D.N.Y. 2019) (code of conduct statements, including regarding "[c]onfidential and anonymous mechanisms for reporting concerns," were actionable in light of retaliation and other misconduct).[5]

### B.      Unsafe Traveled and Out-of-Sequence Work and Production Rates

Defendants also represented that Boeing was eliminating the unsafe practice of traveled and out-of-sequence work. ¶163. For example, Defendants asserted that "eliminat[ing] traveled work" was a Boeing "Value," ¶682; that Boeing was performing "all the standard work in station" and would "not have traveled work" even as it increased its production rate, ¶¶690, 856-57; and that Boeing's "enhanced rigor" was allowing it to "eliminate traveled work." ¶769. Then, after

---

[5] Defendants' citations (MTD at 12-13) are inapposite. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276-77 (9th Cir. 2017) ("aspirational" and "vague" statements, *e.g.* "we make ethical decisions," not actionable; statements may be actionable when they "could [be] understood as at least promising specifically not to do what had been done"; noting "[t]he strongest statement alleged in the complaint—the suggestion of a zero tolerance policy for [code] violations—was made outside of the [c]lass [p]eriod"); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (statement would be "arguably false or misleading" had it been "made in a public filing or press release"); *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *19 (D. Md. Feb. 4, 2020) (statement that company "aim[ed] to succeed" in a way that was "fair and honest," not "unethical or illegal," was "aspirational"). Also, most statements labeled "Codes of Conduct" in Appendix A to the MTD do not quote or even refer to a Code of Conduct. *E.g.*, ¶¶656-57, 664-66, 728, 735, 821, 842, 848-49, 860, 915-16, 920, 928, 963.

traveled work caused the Alaska Airlines Incident, ¶223, Calhoun admitted that Boeing's 737 manufacturing disruptions were "self-inflicted" due to "the amount of traveled work, particularly as it relates to the fuselage that was embedded and normalized in our factory[.]" ¶¶21, 226, 448. Likewise, West admitted after the Alaska Airlines Incident:

> For years, we prioritized the movement of the airplane through the factory over getting it done right and that's got to change. The leadership team got it in the immediate aftermath of January the 5th [Alaska Airlines Incident]. We control how this happens, and it's about our resolve to get ahead and get after traveled work. And Dave [Calhoun] is in the factory, personally making sure that we do get control of it because once you do reduce traveled work, your quality gets better, your stability gets better and probably most importantly, the work of the mechanic gets better. . . . [T]his goes beyond the 737 program. All BCA [Boeing Commercial Airplanes] programs and factories have to deal with this and it's going to impact them in the near term as well. . . . In fact, starting on March 1 of this year, we no longer travel work[.]

¶¶21, 225, 447, 523. Witnesses likewise describe Boeing's pervasive, "inherently unsafe" practice of traveled and out-of-sequence work. ¶¶219-39, 264-71, 332. Defendants' attempt to highlight the word "strive," MTD at 15—which appears in only one of these statements, ¶682—cannot overcome the chasm between supposedly "eliminating" traveled work, and the undisclosed reality that traveled work was "embedded and normalized." "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Singer*, 883 F.3d at 440 (quoting *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Having raised the subject of traveled work, Defendants were obligated to "tell the whole truth"—not to wait until the Alaska Airlines Incident forced their hand.

Defendants' argument that these and other statements were forward-looking, and perhaps covered by the statutory safe harbor,[6] is wrong. Defendants' statements concerned Boeing's then-

---

[6] Defendants vaguely assert that "[m]any of these forward-looking statements" are subject to the safe harbor, MTD at 15, but do not specify which statements are supposedly covered. In any event, "actual knowledge" for both scienter and safe harbor purposes is addressed in §II below.

existing safety practices and prioritization, and were not forward-looking, as their "truth or falsity" was "discernible" when made. *Genworth*, 103 F. Supp. 3d at 787.[7] Even if some were "mixed present/future statement[s]," they are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* at 789. Further, "meaningful cautionary language" must be "substantive and tailored" to the challenged statements. *Id*. at 787, 789.[8] Defendants make no attempt to show this, and instead provide 91 unexplained pages of generic, untailored cautions.[9]

Defendants' statements concerning Boeing's aircraft production rates were also materially misleading,[10] because achieving those rates depended on unsafe practices such as traveled work, which Defendants stated Boeing was *not* relying upon to increase production rates. ¶¶690-91, 856-58. *See In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at \*13, \*17 (D. Md. Sept. 1, 2023) (statements that company "could rapidly manufacture vaccines in large quantities . . . misleadingly omitted known problems . . . that jeopardized large-scale manufacturing," and were "not puffery"); *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at \*12 (S.D. Cal. Jun. 20, 2024) ("a company suffering from severe and persistent manufacturing deficiencies must provide investors with some idea of the full picture if it chooses to boast of its manufacturing prowess").

### C. Assurances that Boeing Prioritized Safety and Quality

---

[7] Most statements ambiguously labeled "Opinion/Forward-Looking" in Appendix A to the MTD are, on their face, neither. *See, e.g.*, ¶¶646, 684, 740, 827-29, 848, 894, 915, 965, 974-75, 998.

[8] *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at \*5 (W.D.N.C. Feb. 8, 2018) ("the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss"). Also, the cautions listed in Appendix B to the MTD do not even purport to cover numerous misstatements from conferences, press releases, and other disclosures.

[9] *See* Appendix B to MTD. These cautions also refer to "risk factors" that are misleading, as alleged (§IE, *infra*), or that at best, per Defendants, are "generic disclosures about operational challenges that Boeing (or any large manufacturing company) could face in the future." MTD at 18.

[10] *See, e.g.*, ¶¶173-79, 717, 750, 772, 790, 806, 838-39, 863-68, 874-75, 887-90, 898-99, 929-30, 944-48, 958, 960.

Defendants' frequent assertions that, for example, "[s]afety is, simply put, our highest priority," ¶¶154, 735; that Boeing "do[es] not compromise these values [of quality and safety] for cost or schedule," ¶¶149, 503, 513, 582; that Boeing's "complete and total commitment to safety" means "no shortcuts, no corners cut," ¶894; that "[s]afety dominates Boeing," ¶¶159, 512, 884; and many others conveying the same message,[11] were materially false and misleading when made in light of Boeing's pervasive safety deficiencies and prioritization of production rate over safety.

After the Crashes, safety was "more important than ever" to Boeing's investors, and had become the "paramount factor in the industry." ¶¶7, 614 (quoting analyst report). Defendants emphasized to the public that their statements about prioritizing safety were meant to convey real substance, not meaningless puffery. After noting that the Crashes "remind us of our responsibility to ensure an unwavering focus on safety, quality, integrity and transparency in everything we do," Calhoun stated: "I often get asked if Boeing has a safety culture. The answer is yes. . . . It's more than just a desire to be safe. It's more than just a commitment to put safety ahead of operational goals. It is a set of organizing principles that is real work. It is real engineering. It is real program management, real systems management." ¶848. Similarly, when affirming that "[s]afety dominates Boeing," Calhoun cited "proof points about how serious we are on safety and quality." ¶¶159, 884.

Accordingly, securities analysts focused on Defendants' public statements to evaluate Boeing's response to safety problems in the wake of the Crashes. In April 2021, Bank of America observed: "Over the last two years the language in [Boeing's] proxy has shifted dramatically to emphasize Boeing's renewed focus on safety, indicating to us that the company clearly wants shareholders to know its Board is again laser-focused on this. The 2021 proxy even states 'Safety

---

[11] *See, e.g.*, ¶¶147-61, 503, 509, 512-13, 515, 576, 579, 582-86, 596, 601, 603-04, 606-07, 612, 617, 625, 628, 655-56, 660, 664-66, 672, 677-78, 687-88, 698, 702-03, 705-06, 734-35, 741, 747-48, 762, 808-10, 821, 831, 833, 835, 837, 848-49, 851-52, 862, 881, 884, 894-95, 899, 909, 913-16, 923, 927, 971, 976, 988, 991, 997-98.

is, simply put, our highest priority.'" The report added: "Boeing returned to a safety-focused culture in 2020." ¶¶156-57, 739. Other analyst reports likewise highlighted Defendants' safety-related assurances and praised Boeing for supposedly prioritizing safety.[12] That analysts gave weight to Defendants' misstatements refutes any notion that they were "so obviously unimportant to a reasonable investor that reasonable minds could not differ[.]" *Singer*, 883 F.3d at 440.[13]

Numerous courts have found safety-related representations to be actionable in similar circumstances. For example, in *In re Massey Energy Co. Sec. Litig.*, a coal mining company "sought to restore [its] reputation and image" after a tragic fire, and "build[] investor confidence . . . by stating its commitment to safety and affirming that its organization put the safety of its miners before its production[.]" 883 F. Supp. 2d 597, 604 (S.D. W.Va. 2012). A later explosion, followed by whistleblower revelations that the company was prioritizing "production over safety," *id.* at 606, demonstrated that these representations were misleading. Massey's repeated "affirm[ation] and restate[ment of] its commitment to safety," including "statements professing that safety was the 'first priority every day'" and that "'safety first' was 'not just a slogan'" were actionable, as their "truth or falsity . . . can be determined," and the defendants "closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements." *Id.* at 604, 617-18. Massey's "frequent communications about its 'enhanced safety protocols . . . lured the members of the [c]lass, who invested in Massey in reliance on public representations that the [c]ompany had turned a new leaf with regard to mine safety.'" *Id.* at 604-05. The parallels with Boeing are striking.

Likewise, "[c]ourts have held statements regarding safety to be material in industries

---

[12] *See, e.g.*, ¶¶150, 160, 172, 580, 631-32, 663, 674, 752, 893, 941, 950, 959.

[13] *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (analyst reactions supported materiality of product quality statement).

carrying high safety risks, and where the safety of the business is therefore related to the success of the business." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 217-18 (E.D. Pa. 2021). In *Energy Transfer*, when the defendants "affirmatively touted their commitment to and prioritization of safety" in the construction of gas pipelines, "[d]efendants themselves therefore made the subject of safety material." *Id.* at 218-19 ("Defendants' statements about safety," such as "[i]t is our priority to maintain and operate our assets to the highest safety standards, not just because it makes good business sense, but because it is the right thing to do," were actionable as they "implied an underlying prioritization of resources and attention.").[14]

Relatedly, the repetition of safety-related statements underscores their materiality. In *In re Vale S.A. Sec. Litig.*, "[w]hile Vale's statements about safety . . . may be generic," including that "safety is Vale's 'top priority,'" they were actionable when the company "repeatedly emphasized its commitment to such priorities[.]" 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020). Similarly, in *BHP Billiton*, "even if some of the statements are general enough that, had they been made in isolation, they might not be actionable . . . defendants allegedly made these representations about BHP's commitment to safety over and over and over. . . . By touting its commitment to safety to such a degree, BHP put the topic 'at issue' such that we cannot say that, as a matter of law, investors would not find these representations material." 276 F. Supp. 3d at 80.[15]

---

[14] *See also Transocean*, 866 F. Supp. 2d at 244 ("In an industry as dangerous as deepwater drilling, it is to be expected that investors will be greatly concerned about an operator's safety and training efforts. The Court cannot say, as a matter of law, that Transocean's representation that such efforts were extensive was 'obviously unimportant' to [counterparty's] shareholders."); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (statement that "quality and safety [is] our number-one priority in dealing with patients and consumers" actionable when defendants put that topic "in play"); *Howard v. Arconic Inc.*, 2021 WL 2561895, at *11, *13 (W.D. Penn. June 23, 2021) (similar); *In re ValuJet, Inc., Sec. Litig.*, 984 F. Supp. 1472, 1477-80 (N.D. Ga. 1997) (aviation safety statements were materially misleading due to known safety problems).

[15] Actionable misstatements in *BHP Billiton* included: (1) "[W]e maintain a relentless focus on the health and safety of our people and the communities in which we operate. . . . [O]ur efforts to

- 16 -

Further, Boeing's failure to ensure its suppliers produced safe, high-quality components, ¶¶240-63, is analogous to *Kiken v. Lumber Liquidators Hldgs., Inc.*, where statements about working with supplier mills to meet "high quality standards" were materially misleading when supplier problems resulted in product contamination. 155 F. Supp. 3d 593, 604-05 (E.D. Va. 2015).

Defendants' attempt to analogize the misrepresentations at issue to those dismissed in *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) and *College Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) (the "Illinois Matters") is misplaced. MTD at 11. In those cases, Boeing's "vague affirmations of safety" during the period between and immediately after the Crashes were held nonactionable. 2022 WL 3595058, at *9, *13, *18-*19.[16] This case, by contrast, concerns Defendants' years of representations that Boeing had turned a new page after the Crashes by prioritizing safety, including by eliminating traveled work and not tolerating retaliation. Indeed, a securities analyst observed that Boeing's communications concerning safety had "shifted dramatically," ¶¶156-57, 739, confirming that the representations at issue here are distinct from those in the Illinois Matters. Further, many of the allegedly omitted facts in the Illinois Matters, unlike here, were publicly known.[17] And during the

---

protect the health and safety of our people will be unrelenting."; (2) "We will continue to relentlessly identify and manage material health and safety risks to protect our people and communities."; and (3) "Our overriding commitment is to ensuring the safety of our people . . . This commitment informs everything we do and influences every aspect of our work." *Id.*

[16] Defendants' attempt to downplay the misstatements held to be actionable in the Illinois Matters as "unrelated to safety," MTD at 6, is wrong. Those courts found a strong inference that Muilenburg knowingly took "a gamble that he could cover up damning information" about the cause of the Crashes and the 737 MAX's return to service. *Boeing*, 2022 WL 3595058, at *27. Further, plaintiffs in the Illinois *Boeing* class action filed a second amended complaint reasserting numerous safety-related misstatements in light of evidence developed in discovery, and a motion to dismiss is currently pending. Case No. 1:19-cv-02394 (N.D. Ill.), ECF 278, 293, 305, 312.

[17] *See Boeing*, 2022 WL 3595058, at *12 ("Failing to reference a tragedy that was public knowledge is not securities fraud."); *id.* at *19 ("two closely related plane crashes, followed by an indefinite emergency grounding order from the FAA" were "public knowledge").

period relevant to those cases, Boeing had not yet implemented its new monitoring system that required safety reporting to Boeing's executives (rather than just business unit leaders), 2022 WL 3595058, at *10, so the inference of scienter is much stronger here. *See infra* §II.[18]

### D.   737 MAX Recertification

Defendants also misled investors by touting the "safe return to service" of the 737 MAX after a "rigorous certification" process,[19] while omitting that, as explained by a highly experienced FAA aerospace engineer, this was a "false narrative. . . . The confusing, non-compliant crew alerting system was off the table. Also, the unreliable backup manual trim system, malfunctioning autothrottle, and manufacturing defects. All these other items contributed to the [Ethiopian Airlines] crash, but only the MCAS threat was fixed." ¶¶272-75. Boeing executives personally intervened with the FAA to limit the recertification process, even though the 737 MAX "doesn't meet current design standards[.]" ¶276. Whether or not MCAS was the <u>exclusive</u> focus of the recertification process, MTD at 16, Defendants concealed their knowing failure to address other unsafe features—including "manufacturing defects"—that contributed to the Crashes. ¶275.[20]

### E.   Regulatory Compliance and Risk Factors

---

[18] Defendants' other citations (MTD at 10-11) do not support their position. *City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-74 (6th Cir. 2005) (statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires" actionable when made in "direct response" to safety concerns; "[t]he context of statements is often telling"); *Marsh Grp. v. Prime Retail, Inc.*, 46 Fed. Appx. 140, 146-47 (4th Cir. 2002) (forward-looking dividend projection not actionable, per statute); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) ("vague (if not meaningless) management-speak" not actionable, unlike more "concrete" statements).

[19] *See, e.g.*, ¶¶576, 584-85, 606, 610, 615, 621-22, 625, 642, 649-50, 668, 670-72, 684-85, 695, 697, 702-03, 705, 715, 740-41, 744-45, 760, 768, 802.

[20] *See* Appendix A hereto (additional testimony from same hearing, thus incorporated by reference in the Complaint, explaining how manufacturing defects contributed to the Crashes); *Robinson v. Ladd Furniture, Inc.*, 995 F.2d 1064, at *3 (4th Cir. 1993) (incorporation by reference applicable). Defendants' personal involvement and knowledge in this regard also establishes scienter.

Defendants also misled investors concerning Boeing's regulatory compliance by representing that, for example, Boeing was "fully cooperating with U.S. government investigations related to the accidents and the 737 MAX," "remain[ed] subject to compliance" with the DPA, had a "renewed commitment to full transparency" with regulators, and that such inquiries constituted an "unpredictable," hypothetical risk.[21] "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Singer*, 883 F.3d at 442 (quoting *Meyer*, 761 F.3d at 251, which held "technically true" regulatory risk factor statements were materially misleading, even when company "did not guarantee 100% compliance"); *see also Energy Transfer*, 532 F. Supp. 3d at 220 (statements that company was "committed to fully complying" with regulatory orders were actionable). Boeing concealed that it was not meeting its legal commitments to: (1) fully implement an SMS, as found by the FAA panel and confirmed by aviation safety expert Dr. Shawn Pruchnicki, ¶¶410-26; and (2) abide by the DPA, as confirmed by the DOJ. ¶¶462-71. Likewise, Defendants' description of "defects in supplier components," "out-of-sequence work," and related issues as hypothetical risks[22] was materially misleading due to then-existing, pervasive safety and quality deficiencies.[23]

### F.    Particularized Pleading

Defendants' critique of the particularity of the pleading is misplaced. The Complaint easily

---

[21] *See, e.g.*, ¶¶180-82, 814-15, 819, 823; ¶877 ("We've been on a turnaround. We've made very important progress with our regulators.").

[22] *See, e.g.*, ¶¶588, 635, 724, 817, 905, 984.

[23] *See, e.g.*, *Emergent BioSolutions*, 2023 WL 5671608, at *19-*20 ("The risk disclosure may have warned about the possibility that contamination could occur . . . but the omitted deficiencies substantially affect an assessment of how likely that scenario would be."); *Vale*, 2020 WL 2610979, at *14-*15 ("general warnings about operational risks . . . lull[ed] the reader into a false sense of security as to the strength of [] risk management and safety practices"); *BHP Billiton*, 276 F. Supp. 3d at 83 (though "cautionary disclosures . . . had some substance," they qualified risks as hypothetical and "did not alert investors to the very particular, concrete, and grave risks" at issue). Defendants cite inapposite cases where the risk disclosures matched the facts. MTD at 17-18.

satisfies Rule 9(b) and the PSLRA by specifying Defendants' misstatements and the reasons they were misleading. The Complaint's length is simply a product of the many times Defendants misled investors (contributing to materiality) and the pervasiveness of Boeing's safety deficiencies. *See In re AppHarvest Sec. Litig.*, 684 F.Supp.3d 201, 240 n.5 (S.D.N.Y. 2023) ("Although it is true that Plaintiff challenges numerous statements made by Defendants, the breadth of the [complaint] alone does not create the type of 'puzzle-like' complaint that warrants dismissal."). Further, "the amended complaint bolds and italicizes the specific alleged false or misleading statements, an approach used in other cases without criticism by this court," *Emergent BioSolutions*, 2023 WL 5671608, at *12, and is fully appropriate even when a substantial portion is misleading. And because the reasons repeated statements are misleading may overlap, even a single list of such reasons (an approach far less particularized than the Complaint) is "sufficient." *Id.*[24]

## II.      The Allegations Raise a Strong Inference of Scienter

To plead scienter, "a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with 'severe recklessness' regarding the danger of deceiving the plaintiff." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 183-84 (4th Cir. 2007). At issue is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Pleading motive is not required. *Id.* at 325. "The inference . . . need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences," and need only be "cogent and at least

---

[24] The cases Defendants cite (MTD at 9) involved vastly different situations. *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012) (unlike here, plaintiff "conced[ed] that it is not challenging many of the statements it has chosen to highlight" in bold and italics; court nonetheless substantively addressed the allegations); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008) (plaintiff failed to explain "which statements . . . were false" or "why such statements were false and misleading").

as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "[F]acts that constitute circumstantial evidence of either reckless or conscious behavior" are "sufficient to plead scienter[.]" *Genworth*, 103 F.Supp.3d at 783.

### A. The Individual Defendants Affirmed Their Personal Involvement in Monitoring Safety Concerns, a Subject of Critical Importance to Boeing, and Alarming Safety Deficiencies Were Raised Internally

The Complaint's detailed allegations are more than sufficient to plead a strong inference of scienter. No issue was more important to Boeing's success than manufacturing safe airplanes, ¶¶487-96, and following the Crashes, Boeing implemented a new reporting structure in which Boeing's senior management, including the Individual Defendants, were personally required to receive <u>all</u> "safety and potential safety reports." ¶¶108, 115, 481. This structure was tasked with monitoring "all aspects of product safety," including "cases of undue pressure and anonymous product and service safety concerns raised by employees." ¶¶105, 114, 478. The reporting lines included direct reports from Boeing's Chief Engineer to the CEO, ¶¶105-06, 108, 113-16, 481, and Boeing identified its CEO as being accountable for its "safety performance." ¶¶141, 485. Boeing's senior management, in turn, was required to report safety issues to the Aerospace Safety Committee of the Board. ¶¶105, 113-14, 482-83. Boeing claimed this structure would "<u>ensure safety reports from all levels of the company are reviewed by senior management</u>." ¶¶108, 115-16, 481. In addition, Boeing's Chief Engineer noted that weekly "Safety Review" meetings "have enabled us to identify risks more quickly and get them elevated to [CEO] Dave [Calhoun] and to our Board of Directors." ¶¶116, 481, 885. Thus, the manner in which safety reports were elevated to Boeing's executives is hardly "unidentified" (MTD at 21)—it was identified by Boeing itself.

The Individual Defendants affirmed that they were personally involved in monitoring the safety and quality of Boeing's airplane manufacturing. ¶¶497-526. For example, Calhoun asserted that, in connection with the "highest priority" of safety, Boeing's "global leadership team is

- 21 -

shifting <u>more time, more attention to getting as close as possible to our day-to-day work</u>," and that Boeing's "culture is focused on getting as close to our work as we possibly can <u>from the very top of the company</u>" to embed "safety and quality systems." ¶¶508-10. Calhoun also appealed to his "<u>many touchpoints inside Boeing</u>" to deny that Boeing "trade[d] safety against anything else" or concealed safety issues. ¶596. Smith indicated that monitoring safety answered the question: "where do you spend your time?" ¶516. Muilenburg likewise touted his attention to safety. ¶499.

Even more direct evidence of scienter is provided by West's March 2024 admission: "<u>[f]or years, we prioritized the movement of the airplane through the factory over getting it done right</u> and that's got to change. <u>The leadership team got it</u> in the immediate aftermath of January the 5th [Alaska Airlines Incident]. <u>We control how this happens, and it's about our resolve to get ahead and get after traveled work.</u>" ¶¶21, 225, 447, 523. In this admission, ignored in Defendants' brief, West directly linked Boeing's safety deficiencies to the "leadership team['s]" prioritization of production rate over safety and quality, during the same years-long period in which Defendants were telling the market the exact opposite. West also acknowledged the "control" that Boeing's "leadership team" had over such prioritization, including Boeing's unsafe reliance on traveled work—consistent with his further admission that traveled work was "<u>embedded and normalized</u>" at Boeing, as any executive receiving all safety reports would surely have known. ¶¶21, 226, 448.

Defendants' systematic prioritization of production rate over safety is corroborated by numerous witnesses and reports. ¶¶190-364. For example, when Boeing quality engineer Sam Salehpour "continuously appeal[ed] to Boeing management" warning of "extremely unsafe conditions" on Boeing's 787 aircraft that could result in "potentially catastrophic accidents and passenger fatalities," "senior managers . . . pressured [him] to stop raising these issues." ¶¶190-205. As Salehpour "escalate[d his] concerns further within the Company" and "continued to press

Boeing officials to hear and respond to the safety issues . . . the response from [his] supervisor and other managers became increasingly hostile." ¶206. "<u>The more [he] pushed for answers, the greater the retaliation became</u>," and he was moved from the 787 to the 777 program. ¶¶207-09. Salehpour then "witnessed severe misalignment" in 777 aircraft, including "people jumping on the pieces of the airplane to get them to align," due to a defective assembly system implemented "in another example of Boeing prioritization of speed over quality," and not addressed due to pressure on engineers to "work faster" rather than fixing defects. ¶¶210-18. When he raised concerns to "Boeing management," once again, "Boeing officials attempted to intimidate and retaliate" against Salehpour by "sidelining" him from his duties, "excluding" him from meetings, and even subjecting him to "threats of violence." ¶217. Thus, Defendants' claim that the "far more plausible inference from Salehpour's allegations is that he and his managers disagreed over Salehpour's concerns, and the discussions ended there" (MTD at 25) is refuted by Salehpour himself.[25]

Indeed, Boeing's systemic practice of retaliation for raising safety concerns is why nearly all the witnesses and public whistleblowers experienced it firsthand. ¶¶338-55. For example, CW-6 was demoted for refusing his manager's instruction to deceive the FAA by presenting a safety hazard as "less serious than it actually was," ¶¶350-54—much like the events that resulted in the Crashes. ¶¶61-68.[26] Similarly, Merle Meyers, a Boeing quality manager, was unfairly reprimanded for "notif[ying] corporate investigators" about unsafe manufacturing "shortcuts." ¶¶333-37, 342.

---

[25] *See also* Appendix A hereto (Salehpour took his concerns to Vice President of Engineering). Defendants' implausible inference, if accepted, would only demonstrate that Defendants' representations about Boeing's safety reporting system were materially false and misleading. In addition, that Salehpour was not referring to the 737 MAX, MTD at 24, is irrelevant, as this case concerns pervasive deficiencies across Boeing's commercial aircraft manufacturing.

[26] Defendants claim that the Complaint does not specify "when this incident . . . occurred," MTD at 24, but the Complaint alleges that it took place in "Fall 2019." ¶353. In a similar error, Defendants assert that the "only" unsafe practice CW-2 described was traveled work, MTD at 24, but CW-2 also detailed unqualified employees on the production line. ¶¶278-82.

- 23 -

Moreover, witnesses from Spirit AeroSystems allege that Boeing managers knew the 737 fuselages Spirit was delivering to Boeing were highly defective. ¶¶240-63. CW-8 "specifically warned Boeing's liaison to Spirit . . . about Spirit's quality issues, which the liaison acknowledged," and "observed" the Boeing liaison attending meetings where repairs were "accepted by inspectors . . . prior to full inspections being made, and in some cases, without the defects being repaired, so that production could continue." ¶256. Per CW-5, Boeing's 737 Manager acknowledged that "we all know" about Spirit's misconduct. ¶251. And according to a Boeing employee, Boeing's 737 production system suffered from such a "hideously high and very alarming number" of defects that "it was inevitable something would slip through." ¶¶258-63.

Defendants' conceit that they may have been unaware of *all* of this is absurd. Given the direct personal attention they purportedly devoted to monitoring safety pursuant to Boeing's safety reporting system, the reality of Boeing's pervasive safety and quality deficiencies, the concerns raised by employees that resulted in retaliation, and the "control" Boeing's "leadership team" exercised in setting corporate priorities in the first place, there is a strong inference that the Defendants knew their statements were materially false and misleading when made. And if the Defendants shirked their safety monitoring commitments and blinded themselves to those deficiencies, then they lied about their purported focus on safety, and were severely reckless in making baseless assurances about Boeing's supposed prioritization of safety over production rate, non-retaliation against employees raising safety concerns, elimination of traveled work, and so forth. As such, Defendants cannot evade their safety responsibilities, and there is no contradiction between Plaintiffs' falsity and scienter allegations, as Defendants wrongly suggest (MTD at 23).[27]

---

[27] *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *8 (S.D.N.Y. May 1, 2024) (defendants' monitoring supported scienter; "[i]f, on the other hand, [defendants] didn't monitor these topics but made definitive statements as if they did, they still

Courts have routinely held that a strong inference of scienter is pleaded when the misstatements concerned a critical subject[28] that defendants purportedly were monitoring closely. For example, in *Kiken*, there was a strong inference of scienter when executives represented that they were "personally involved" in reviewing suppliers' quality compliance, and the relevant operations were important to the company's success. 155 F. Supp. 3d at 606-07. In such circumstances, "smoking gun documentation" that individual defendants "explicitly knew of these issues" is not required. *Ollila*, 2018 WL 792069, at *2-*3 ("allegations supported by a host of confidential witnesses," including reports "regularly provided to senior management," showed scienter).[29] Here, as in *Massey*, the "stark contrast" between the misstatements and the safety deficiencies, and a safety reporting structure installed after an earlier incident, create a strong inference of scienter. 883 F. Supp. 2d at 620-22. Similarly, in *BP*, a CEO's assertions that he "took

---

might have been reckless"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *15 (S.D.N.Y. Nov. 26, 2018) ("Either Defendants' public statements about ongoing and real-time management were false, or Defendants knew of negative trends developing but did not disclose them. Either scenario supports an inference that Defendants acted recklessly.").

[28] That the misstatements concern Boeing's core operations "elevat[es] the plausibility that senior officers" knew the truth, and thus supports scienter. *James River*, 2023 WL 5538218, at *21.

[29] *See also James River*, 2023 WL 5538218, at *19 (Defendants' "personal involvement" in relevant issues supported strong inference of scienter); *Genworth*, 103 F. Supp. 3d at 784-85 (same); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (scienter as to "product quality" statements when "Individual Defendants themselves made statements about how involved they were in handling the issues"); *Emergent BioSolutions*, 2023 WL 5671608, at *22, *24 (scienter "[e]ven though the CWs do not allege that they personally informed the Individual Defendants of all the problems"; not requiring "'smoking-gun' evidence"); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-72 (D.S.C. 2016) ("Defendants' close monitoring of the Company's day-to-day business and corporate practices [and] accounts from Plaintiff's confidential sources regarding the business culture" support scienter); *Dentsply Sirona*, 2024 WL 1898512, at *9 ("Defendants' own statements suggest that they had access to—and reviewed—such information. Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to."); *Vale*, 2020 WL 2610979, at *17 (scienter when "executives were directly and intimately involved with dam safety"); *Energy Transfer*, 532 F. Supp. 3d at 228-33 (scienter when defendants "held [themselves] out to investors as knowledgeable," plus "severity and persistence" of deficiencies; no "smoking gun" required).

responsibility" for "safety efforts" and "focus[ed] on safety like a laser" weighed "strongly in favor

of the inference" that he "paid special attention" to those matters, or "at the least, was reckless in

not doing so[.]"[30] 843 F. Supp. 2d at 782-84. Like Calhoun, ¶¶506-07, 617-18, BP's CEO touted

the company's safety efforts upon gaining that position, and safety "determine[d] the success of

[his] tenure." *Id.* at 784. By contrast, "[t]he competing inference—that [the CEO] professed to be

focused on process safety but remained unaware of actual process safety concerns in BP's

operations on the ground—is far less compelling." *Id.* at 783. The same is true here.[31]

### B.   Additional Scienter Allegations

Other allegations further support a strong inference of Defendants' scienter as part of a

holistic analysis. First, investigations of Boeing, including a <u>DOJ finding that Boeing violated the</u>

---

[30] *See* ¶¶502, 517, 520, 584, 705, 837 (Defendants' references to "laser focus" on safety).

[31] Defendants' citations regarding scienter are inapposite. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) (no scienter "simply . . . because part of [company's] business plan was not going smoothly"); *Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 549 (4th Cir. 2017) (no scienter for "an executive's use of a single *possibly ambiguous* word on a live analyst call that purportedly mischaracterized an agreement that had historically accounted for approximately 4.1% of the company's annual revenue") (emphasis in original); *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014) ("Fundamentally, the . . . accounting error itself was not especially obvious, at least with respect to the Company's financial bottom-line."); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626, 630 (4th Cir. 2008) ("smoking-gun" "internal documents" or "other direct statements" proving scienter not required; plaintiffs "failed to provide any reason" why disclosure was misleading); *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003) ("Plaintiffs allege little more than accounting failures and breakdowns in the internal procedures necessary to maintain proper accounting practices."); *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 799 (E.D. Va. 2017) (rejecting allegations that "rest on little more than the individual defendants' positions as high-level corporate executives"); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299-300 (S.D.N.Y. 2010) (rejecting "accusations founded on *nothing more* than a defendant's corporate position"; "[n]otably, the [c]omplaint makes no reference" to "confidential sources discrediting [d]efendants' assertions"); *Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) ("holding an executive position *alone*" is insufficient); *In re PEC Sols., Inc. Sec. Litig.*, 2004 WL 1854202, at *14 (E.D. Va. May 24, 2004) (same); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004) (same).

<u>DPA</u>, FAA findings that Boeing did not implement a proper SMS, and an SEC investigation concerning whether Boeing or its executives misled investors, further support such an inference. ¶¶557-67. *See Energy Transfer*, 532 F. Supp. 3d at 233 ("an investigation can represent a 'piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter'").[32]

Second, Boeing's refusal to produce documents to the NTSB concerning the Alaska Airlines Incident evinces an intent to hide the falsity of the misstatements at issue. ¶¶540-46. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 641 (E.D. Va. 2000) ("attempts at covering-up the truth . . . further tip the balance of inferences . . . in favor of scienter"). Boeing insists these documents do not exist, yet Ed Pierson <u>testified under oath</u> he delivered them to the FBI. ¶544.[33]

Third, the resignations of Muilenburg, Calhoun, and Smith in the wake of negative news further "support[] a strong inference of scienter[.]" *Emergent BioSolutions*, 2023 WL 5671608, at *26 n.18; *see also Jeld-Wen*, 496 F. Supp. 3d at 967 (considering resignation in "holistic analysis"). Because the Complaint alleges "suspicious circumstances"—including proximity of each resignation to key events (¶¶547-55), that Smith's resignation was a surprise (¶¶552-53), and that Calhoun's announcement was a response to the revelation of Boeing's safety issues (¶555)—it "differentiate[s] between a suspicious change in personnel and a benign one." *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 894 (N.D. Ill. 2023).[34]

Fourth, the Individual Defendants' incentive compensation was based in part on a "quantitative and qualitative" determination that Boeing had met safety and quality goals. ¶535.

---

[32] Further, after the Complaint was filed, Boeing agreed to plead guilty to conspiracy to defraud the United States in connection with the events resulting in the Crashes. *See* Appendix B hereto.

[33] Defendants' questions about how Pierson obtained those documents (MTD at 27) are premature, but in any event, he received them from an "internal whistleblower." *See* Appendix A hereto.

[34] *Cf. San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 244 (4th Cir. 2023) (plaintiff "failed to raise an inference of scienter through any other means") (MTD at 27).

Boeing's executives would have been hard-pressed to claim they met those goals had they publicly revealed the safety and quality deficiencies that made their public statements false and misleading. ¶¶533-39; *see Dentsply Sirona*, 2024 WL 1898512, at *7 ("Defendants might have been motivated to sweep issues under the rug . . . to secure the specific bonuses[.]"). At a minimum, this compensation structure gave them further reason to be aware of Boeing's actual safety practices, which they knew or should have known were incompatible with their public statements.[35]

### C.    Boeing's Corporate Scienter

Although Boeing is a Defendant, Defendants do not contest <u>Boeing's</u> scienter. "The Fourth Circuit has held that 'it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.'" *Jeld-Wen*, 496 F. Supp. 3d at 966 (quoting *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009)). Plaintiffs may do so by "alleg[ing] facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation[.]" *Kiken*, 155 F. Supp. 3d at 606 (quoting *Hunter*, 477 F.3d at 184). Here, such agents include, but are not limited to, the Individual Defendants.[36] The Complaint details Boeing's safety reporting structure which required all safety issues to be elevated to senior management and Board members, ¶¶98-116; 476-86; witness allegations that Boeing's leaders ignored internal warnings, concealed severe safety problems, and fostered a culture of deception and retaliation, ¶¶190-364; and FAA findings of a pervasive "disconnect" between "the words that are being said by Boeing management" and reality. ¶¶26,

---

[35] In any event, compensation "tied to *internal* operational goals" in no way "suggests that the speakers believed their statements" to the public. MTD at 26 (emphasis in original).

[36] Boeing also directly made misstatements in press releases, SEC filings, and other documents. *E.g.*, ¶¶615, 637-39, 661, 682, 684, 703, 721-30, 735-37, 744, 764-65, 828-31, 834, 851-52, 914-16, 942, 998. *See Energy Transfer*, 532 F. Supp. 3d at 237 (corporate scienter "particularly appropriate" for "unattributed statements . . . made *ex cathedra*, on behalf of the corporation, and where there is ample evidence that high-ranking corporate officials were personally engaged").

410-19, 456-59. The Complaint thus raises a strong inference that at least one corporate agent of Boeing acted with scienter. *See Sinclair Broad. Grp.*, 2020 WL 571724, at *17 (corporate scienter where "CW statements describe a widespread understanding among . . . employees" of the truth).[37]

### III.    The Complaint Properly Pleads Loss Causation

Loss causation may be pleaded by alleging that "the 'exposure' of the defendant's misrepresentation or omission . . . resulted in the decline of [the company's] share price." *Singer*, 883 F.3d at 445; *id.* at 446 ("the truth may have gradually emerged through a series of partial disclosures" consisting of corrective disclosures or the materialization of a concealed risk); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (requiring only "some indication of the loss and the causal connection that the plaintiff has in mind").[38]

Here, the Complaint details a series of revelations which exposed "Boeing's systemic failure to maintain quality in its manufacturing processes, in stark contrast to Defendants' public statements[.]" ¶365. Because each correction "relate[s] back" to the misstatements, Plaintiffs "'need not precisely identify the misrepresentation or omission' about which the plaintiff complains[.]" *Singer*, 883 F.3d at 446. Defendants ignore that, as to each corrective disclosure and materialized risk, the Complaint describes the exposure of previously-concealed information and the resulting stock price decline. For example, news of safety problems and the resulting consequences caused Boeing's stock to decline as they "revealed . . . that Defendants mislead the

---

[37] *See also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019) (corporate scienter where "employees warned 'management' of the deficient state of the company's cybersecurity"); *BHP Billiton*, 276 F. Supp. 3d at 90-91 (corporate scienter where executives "had access to information that revealed the statements and omissions to be misleading").

[38] *See also Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *38 (E.D. Va. Mar. 24, 2021) (loss causation allegations need only be "not facially implausible").

market about [] safety."[39] *Massey*, 883 F. Supp. 2d at 626. In addition, news of investigations and regulatory findings further revealed the scope of Defendants' misstatements.[40] Analysts' reactions, for example that these corrections exposed "less than expected progress on improving execution," ¶382, and made investors "increasingly skeptical of Boeing's ability to manage [] quality issues," ¶437, further indicate that the corrections removed artificial inflation from Boeing's stock price.[41]

## CONCLUSION

Defendants' motion[42] should be denied in its entirety.[43]

---

[39] *See, e.g.*, ¶¶367 ("The Alaska Airlines Incident started to reveal . . . pervasive manufacturing and quality issues"); 372 (market learned that problems "affected more than a single aircraft"); 386 ("investors learned that Boeing's pervasive quality issues persisted and were interfering with deliveries to the critical Chinese market"); 388 (news that problems affected additional aircraft models); 391 (report "offered important evidence" that Alaska Airlines Incident resulted from an error at Boeing's factory); 401 (news of "convincing evidence of the role of manufacturing process failures at Boeing in causing the Alaska Airlines Incident"); 404 (market learned quality issues were "impacting the certification of Boeing's other airplanes"); 407-409 (Boeing announced "due to investigations into [] quality issues, Boeing's 737 production rate would be slower"); 452-53 (whistleblower allegations "rais[ed] questions about the company's manufacturing practices").

[40] *See, e.g.*, ¶¶380 (FAA "further disclosed the extent of Boeing's failure of oversight in assuring quality and safety"); 396 (FAA "further confirmed to the market the scope and severity of Boeing's quality control deficiencies"); 420 (FAA expert panel report "further uncovered the pervasive manufacturing quality issues"); 429 (market learned of "deadline for Boeing to create a quality control plan, and the DOJ's criminal investigation"); 430 (FAA "further laid bare the scope and extent of manufacturing quality problems at Boeing"); 428 (initial report of DOJ investigation "focused" investors on Boeing's problematic safety culture); 433 (confirmation of "DOJ's investigation further contributed to a tide of revelations exposing the scope and extent of Boeing's manufacturing quality deficiencies"); 436 ("new information concerning the scope of quality and safety issues"); 460 (SEC probe "further disclosed to the market the truth that Defendants' statements . . . were false and misleading"); 470 (news of DPA violation "further revealed to the market the extent of Boeing's failure to implement and enforce a compliance and ethics program").

[41] *E.g.*, ¶¶368-70, 373-74, 381-83, 386, 391, 397-98, 403, 408, 419, 428, 433, 436-38. "By including several analyst statements showing concern about this revelation, the plaintiffs have plausibly alleged that the [news] revealed the falsity of Boeing's previous statements[.]" *Boeing*, 2022 WL 3595058, at *29 (corrections "need not be 'mirror images'" of the misstatements).

[42] Because Defendants' only response to the Section 20(a) claim is that there is no primary liability, MTD at 30 n.3, that claim should be upheld along with the Section 10(b) claim.

[43] If the Court rules in Defendants' favor, Plaintiffs respectfully request leave to amend, including to plead facts set out in Appendix B hereto that have come to light since the filing of the Complaint.

DATED:  July 22, 2024

/s/ Carol C. Villegas

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Jake Bissell-Linsk
David Saldamando
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissel-linsk@labaton.com
dsaldamando@labaton.com

*Lead Counsel for Co-Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Class*

/s/ Chad Johnson

**ROBBINS GELLER RUDMAN & DOWD LLP**
Chad Johnson
Noam Mandel
Jonathan Zweig
Desiree Cummings
Brent Mitchell
420 Lexington Ave., Suite 1832
New York, NY 10170
Tel: (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com
bmitchell@rgrdlaw.com

*Lead Counsel for Co-Lead Plaintiff Local #817 IBT Pension Fund and the Class*

/s/ Steven J. Toll

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Va. Bar No. 15300)
S. Douglas Bunch
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Co-Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Class*

/s/ Craig C. Reilly

**THE OFFICE OF CRAIG C. REILLY**
Craig C. Reilly (Va. Bar No. 20942)
209 Madison Street, Suite 501
Alexandria, VA 22314
Tel: (703) 549-5354
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*Liaison Counsel for Co-Lead Plaintiff Local #817 IBT Pension Fund and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic copy of the foregoing to all counsel of record in this case.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Steven J. Toll*
Steven J. Toll