**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE THE BOEING COMPANY SECURITIES LITIGATION | ) Case No. 1:24-cv-00151-LMB-LRV<br>) Hon. Leonie M. Brinkema<br>) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................................... 3

        A.      Deadly 737 MAX Plane Crashes Prompt Safety Reporting Changes .................... 3

        B.      Defendants Falsely Assured Investors That Boeing Prioritized Safety .................. 4

        C.      Boeing's Stock Declines as the Truth Emerges ...................................................... 6

        D.      This Action and the Proposed Class Representatives .............................................. 7

III.    ARGUMENT ............................................................................................................... 7

        A.      Legal Standards for Class Certification .................................................................. 7

        B.      The Requirements of Rule 23(a) Are Satisfied ...................................................... 8

                1.      The "Numerosity" Requirement Is Satisfied ............................................... 8

                2.      The "Commonality" Requirement Is Satisfied ............................................ 9

                3.      The "Typicality" Requirement Is Satisfied ................................................ 10

                4.      The "Adequacy" Requirement Is Satisfied as to the Proposed Class
                        Representatives ........................................................................................... 11

                5.      The "Adequacy" Requirement Is Satisfied as to Lead Counsel and
                        Lead Counsel Should Be Appointed as Class Counsel .............................. 13

        C.      The Requirements of Rule 23(b)(3) Are Satisfied ................................................ 15

                1.      The "Predominance" Requirement Is Satisfied ......................................... 15

                        a.      Reliance Does Not Pose Predominating Individualized
                                Issues as to Purchasers of Boeing Stock ........................................ 16

                                i.      *Cammer* Factor 1: Trading Volume Supports a
                                        Finding of Market Efficiency ............................................. 18

                                ii.     *Cammer* Factor 2: Analyst Coverage Supports a
                                        Finding of Market Efficiency ............................................. 19

iii.     *Cammer* Factor 3: Market Making and Similar Activity Support a Finding of Market Efficiency ..............20

iv.     *Cammer* Factor 4: SEC Form S-3 Eligibility Supports a Finding of Market Efficiency...........................20

v.     *Cammer* Factor 5: Boeing's Stock's Reaction to Company-Specific News During the Class Period Supports a Finding of Market Efficiency...........................21

vi.     The *Krogman* Factors .........................................................22

b.     Reliance Does Not Pose Predominating Individualized Issues as to Those Trading Boeing Options...................................24

c.     Damages Do Not Pose Predominating Individualized Issues and Can Be Assessed Class-Wide Using a Common Methodology ................................................................................27

2.     The "Superiority" Requirement Is Satisfied .............................................28

IV.     CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..........................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)......................................................................................16, 17

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................2, 16, 24

*In re BearingPoint, Inc. Sec. Litig.*,
232 F.R.D. 534 (E.D. Va. 2006) ................................................................ *passim*

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) ................................................................................8

*Boyce v. Wachovia Sec., LLC*,
2010 WL 1253737 (E.D.N.C. Mar. 29, 2010) ......................................................7

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................18, 19, 20, 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................22

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484............................................................................................23

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (D.S.C. 2010) ..................................................................19, 20, 29

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
322 F. Supp. 3d 676 (D. Md. 2018)......................................................................14

*Clark v. Trans Union, LLC*,
2017 WL 814252 (E.D. Va. Mar. 1, 2017)........................................................8, 12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................27

*In re Comput. Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) ....................................................................10, 19

*Deutschman v. Beneficial Corp.*,
 841 F.2d 502 (3d Cir. 1988)..................................................................................25

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
 529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................................25

*Fariasantos v. Rosenberg & Assocs., LLC*,
 303 F.R.D. 272 (E.D. Va. 2014) ............................................................................12

*In re Forcefield Energy Inc. Sec. Litig.*,
 2015 WL 4476345 (S.D.N.Y. July 22, 2015) ........................................................24

*Första AP-Fonden v. St. Jude Med., Inc.*,
 312 F.R.D. 511 (D. Minn. 2015)............................................................................22

*Gariety v. Grant Thorton, LLP*,
 368 F.3d 356 (4th Cir. 2004) ...........................................................................16, 18

*Gibbs v. Stinson*,
 2021 WL 4812451 (E.D. Va. Oct. 14, 2021)...........................................................8

*Gunnells v. Healthplan Servs., Inc.*,
 348 F.3d 417 (4th Cir. 2003) ............................................................................7, 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)......................................................................................... 16, 17

*In re Jeld-Wen Holding, Inc. Sec. Litig.*,
 2021 WL 1186326 (E.D. Va. Mar. 29, 2021).......................................... 8, 11, 14, 29

*Kelly v. Nationstar Mortg., LLC*,
 2014 WL 12917984 (E.D. Va. Apr. 2, 2014) ........................................................12

*Knurr v. Orbital ATK, Inc.*,
 220 F. Supp. 3d 653 (E.D. Va. 2016) ....................................................................14

*Krogman v. Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) .................................................................... 22, 23

*Lienhart v. Dryvit Sys., Inc.*,
 255 F.3d 138 (4th Cir. 2001) ...................................................................................9

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
 341 F.R.D. 128 (D. Md. 2022)................................................................................13

*McIntire v. China MediaExpress Holdings, Inc.*,
 38 F. Supp. 3d 415 (S.D.N.Y. 2014)........................................................... 22, 23, 25

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) ...................................................................................12

*Minter v. Wells Fargo Bank, N.A.*,
  279 F.R.D. 320 (D. Md. 2012) ...............................................................................10, 29

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ...................................................................................22

*Morris v. Wachovia Sec., Inc.*,
  223 F.R.D. 284 (E.D. Va. 2004) ...................................................................................10

*In re NeuStar, Inc. Sec. Litig.*,
  2015 WL 5674798 (E.D. Va. Sept. 23, 2015) .......................................................8, 9, 14

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) (Brinkema, J.) ............................................... *passim*

*Paulino v. Dollar Gen. Corp.*,
  2014 WL 1875266 (N.D. W. Va. Feb. 24, 2014) ...........................................................13

*Peters v. Aetna Inc.*,
  2 F.4th 199 (4th Cir. 2021) ............................................................................................9

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ...................................................................................23

*Pitt v. City of Portsmouth*,
  221 F.R.D. 438 (E.D. Va. 2004) ...................................................................................13

*In re Priceline.com Inc.*,
  236 F.R.D. 89 (D. Conn. 2006) .....................................................................................25

*In re Red Hat, Inc. Sec. Litig.*,
  261 F.R.D. 83 (E.D.N.C. 2009) .....................................................................................28

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *R&R adopted*, 2019 WL
  7020349 (S.D. Tex. Dec. 20, 2019) ...............................................................................25

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
  2012 WL 4482032 (D.N.J. Sept. 25, 2012) ............................................................... 12-13

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) ....................................................................22, 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) .......................................................................................................2

*Thorpe v. Va. Dep't of Corr.*,
  2023 WL 5038692 (W.D. Va. Aug. 8, 2023) ........................................................................30

*In re Under Armour Sec. Litig.*,
  631 F. Supp. 3d 285 (D. Md. 2022) ............................................................................... *passim*

*Valerino v. Holder*,
  283 F.R.D. 302 (E.D. Va. 2012) ........................................................................................11

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ........................................................................................19

*Ward v. Dixie Nat'l Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) ............................................................................................13

*Weisfeld v. Sun Chem. Corp.*,
  84 F. App'x. 257 (3d Cir. 2004) ..........................................................................................7

*In re Willis Towers Watson PLC Proxy Litig.*,
  2020 WL 5361582 (E.D. Va. Sept. 4, 2020).......................................................................27

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018).....................................................................20

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  7 F.4th 227 (4th Cir. 2021) .................................................................................................8

**Statutes & Rules**

Securities Exchange Act of 1934 §10(b), 15 U.S.C. § 78j(b)............................................10, 11, 16

Securities Exchange Act of 1934 §20(a), 15 U.S.C. § 78t(a) ................................................10, 11

Fed. R. Civ. P. 23............................................................................................................. *passim*

SEC Rule 10b-5, 17 C.F.R. 240.10b-5 ...................................................................................10, 16

**Docket Entries**

*In re Apple Inc. Sec. Litig.*,
  No. 4:19-cv-02033-YGR, ECF Nos. 114, 352 (N.D. Cal.)......................................................7

Lead Plaintiffs, the State of Rhode Island Office of the General Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Local #817 IBT Pension Fund (the "IBT Pension Fund," and together with Rhode Island, "Plaintiffs"), by their counsel, respectfully move this Court (the "Motion") for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing Plaintiffs as Class Representatives; (iii) appointing Lead Counsel Labaton Keller Sucharow LLP ("Labaton") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller," and together with Labaton, "Proposed Class Counsel") as Class Counsel; and (iv) appointing Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and The Office of Craig C. Reilly ("Reilly") as Liaison Counsel for the Class.

In support of the Motion, Plaintiffs submit this memorandum of law; the Declaration of Christine M. Fox ("Fox Decl."); the Expert Report of Chad Coffman ("Coffman Rpt.," Fox Decl. Ex. A); the Declaration of Eileen K. Cheng, General Counsel for Rhode Island ("Cheng Decl.," Fox Decl. Ex. B); the Declaration of Thomas J. O'Donnell, Chairman of the IBT Pension Fund ("O'Donell Decl.," Fox Decl. Ex. C); and [Proposed] Order (Fox Decl. Ex. D).

## I.    INTRODUCTION

Throughout the Class Period, The Boeing Company ("Boeing") and several of its executives (the "Individual Defendants")[1] misrepresented the most important aspect of Boeing's business: the safety of its commercial airplane manufacturing.  Specifically, in the wake of two devastating crashes of Boeing 737 MAX airplanes in 2018 and 2019, Defendants assured investors that Boeing had changed its ways by prioritizing safety, eliminating specific unsafe manufacturing practices, and enabling employees to raise concerns without fear of retaliation.

---

[1] The Individual Defendants are (i) former President and Chief Executive Officer ("CEO") David L. Calhoun, (ii) former President and CEO Dennis A. Muilenburg, (iii) current Chief Financial Officer ("CFO") Brian J. West, and (iv) former CFO Gregory D. Smith.

In reality, however, Boeing continued to prioritize short term financial performance at the expense of its safety practices.   Defendants' many misstatements artificially inflated and artificially maintained the price of Boeing's stock by concealing that dangerous reality.  The truth began to emerge on January 5, 2024, when a door plug blew off an Alaska Airlines 737 MAX due to a manufacturing defect.  That incident, and further revelations over the subsequent months, revealed that Defendants' assurances had been materially false and misleading, and as Boeing's stock price precipitously fell, due to this truth coming to light, investors suffered substantial losses.

Plaintiffs were among those investors who suffered such losses and seek certification of a class, pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), to represent other similarly situated investors.  Specifically, Plaintiffs move to certify a class (the "Class") consisting of:

> All persons and entities who or which, during the period from September 30, 2019 to May 14, 2024, inclusive (the "Class Period"), purchased or otherwise acquired publicly-traded Boeing common stock (NYSE:BA) or exchange-traded Boeing call options, or wrote exchange-traded Boeing put options, and were damaged thereby.[2]

Adjudicating federal securities claims through class actions is common and encouraged by the Supreme Court and courts in this Circuit.  *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 242-47 (1988) (facilitating securities class actions through fraud on the market doctrine); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318-22 (2007) (describing Congress' role in facilitating securities class actions, which are an "indispensable tool" for investors); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("[I]n light of the importance of the class action device in securities fraud suits, the requirements of Rule 23 are to be construed liberally.").

---

[2] References herein to Boeing's stock refer to its common stock.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Boeing during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

This is a textbook example of a case warranting class action treatment. The Class is believed to have thousands of members, rendering individualized actions impracticable, and class treatment a superior means to resolve the claims. Plaintiffs, like other Class members, were injured by a common course of misconduct: Defendants' false and misleading statements. The questions of law and fact relevant to the merits—*e.g.*, falsity, materiality, scienter, reliance, and loss causation—are the same as to every member of the Class. Plaintiffs are reputable institutional investors who have, and will continue to, vigorously prosecute this case to achieve the best result for the Class. The Proposed Class Counsel are highly experienced in litigating securities class actions. Finally, there are no predominating individualized issues—the reliance element of Plaintiffs' and the Class' claims will be satisfied by the fraud on the market doctrine, and damages will be measured using a common methodology consistent with the theory of liability.

## II.    FACTUAL BACKGROUND

### A.    Deadly 737 MAX Plane Crashes Prompt Safety Reporting Changes

In October 2018 and March 2019, two Boeing 737 MAX airplanes crashed (the "Crashes"), killing everyone on board. ¶¶54, 57.[3] The Crashes implicated critical defects in Boeing's Maneuvering Characteristics Augmentation System ("MCAS"), which Boeing had concealed from pilots and lied about to the FAA. ¶¶55-56, 60-61. Multiple government investigations concluded that Boeing was at fault for the Crashes. ¶58. Boeing was criminally charged with defrauding the FAA and entered into a Deferred Prosecution Agreement ("DPA") with the DOJ requiring, among other things, enhanced compliance reporting. ¶¶81-85. Boeing also paid $200 million to settle SEC charges for "misleading investors about the safety of the 737 MAX." ¶¶87-92.

---

[3] The "Complaint" and "¶_" refer to the Amended Class Action Complaint (ECF No. 43). All terms that are not defined herein have the same definition as in the Complaint. Unless otherwise specified, all emphasis has been added and all internal quotation marks and citations are omitted.

After the Crashes, Boeing touted a new monitoring and reporting system that elevated safety issues to senior executives at Boeing, including its CEO and members of its Board of Directors. ¶¶100-18. Boeing was also required by federal law (passed in response to the Crashes) and FAA regulation pursuant to that law, to adopt a Safety Management System including, among other things, a "confidential employee reporting system that includes non-punitive provisions through which employees can report hazards and safety concerns." ¶¶136-44.

**B.      Defendants Falsely Assured Investors That Boeing Prioritized Safety**

In the wake of the Crashes, and throughout the Class Period, Defendants repeatedly asserted that Boeing had made meaningful changes to prioritize safety and quality. Defendants claimed, for example, that safety was Boeing's "highest priority," that "[s]afety dominates Boeing," and that Boeing "do[es] not compromise these values for cost or schedule." ¶¶147-63. Defendants also asserted that Boeing did not tolerate retaliation against employees and "encourage[d] people to speak up" about safety concerns. ¶¶164-72. Defendants further claimed that Boeing was eliminating "traveled work," which involves moving airplanes down the line or between factories before work has been completed. ¶¶134-35, 163. Traveled work is "inherently unsafe" and "creates opportunities for failure." ¶¶222, 232. Defendants also touted Boeing's airplane production rate (¶¶173-76) and asserted that Boeing was not relying on traveled work to increase that rate. ¶¶690, 856-57. Defendants further promised "a renewed commitment to full transparency," including "proactive communication" with its regulators. ¶¶180-86.

These assurances were materially false and misleading. After the Crashes, serious safety and quality failures continued to pervade Boeing's commercial airplane manufacturing. For example, according to a Boeing employee, Boeing's "737 production system" was "quite far from healthy," and faced such an "enormous volume of defects" that "it was inevitable something would slip through." ¶¶259-61. These problems extended far beyond the 737 program.

- 4 -

For instance, a former Boeing Quality Engineer testified that production shortcuts and systemic failures to follow industry standards compromised *thousands* of Boeing's 777 and 787 airplanes. ¶¶190-218. Likewise, a former Boeing Quality Manager described immense pressure to keep production moving, resulting in unsafe manufacturing shortcuts. ¶¶333-34. Former Boeing employees also described widespread practices that jeopardized safety, including untrained employees on the production line (¶¶277-82), employee misconduct that management ignored (¶¶283-92), and a failure to properly oversee the quality control of suppliers, which Boeing knew were delivering highly defective components (¶¶240-63).

In addition, numerous witnesses described a culture of fear, intimidation, and rampant retaliation at Boeing, and many were personally retaliated against for raising safety concerns. ¶¶338-55. As summarized by Senator Richard Blumenthal, Boeing whistleblowers "have suffered harassment, isolation, transfers, and even threats of physical violence." ¶341.

Likewise, the unsafe practice of traveled work remained deeply "embedded and normalized" (¶¶21, 220, 226, 448), and managers relied on it to meet Boeing's unrealistic production targets. According to one former employee, Boeing "never really changed," and continued traveled work after the Crashes. ¶¶228-34, 293-96. Another former employee explained that Boeing's production schedule made "abundant" traveled work a necessity. ¶¶235-39. And another described Boeing managers pushing teams to complete work out-of-sequence, creating safety problems to avoid slowing production. ¶¶264-71.

Boeing also continued to conceal safety issues from regulators and the public. For instance, Boeing purposefully narrowed the scope of the 737 MAX's recertification process to focus on the MCAS system, despite other known, unsafe features that were not addressed, and pushed "a false narrative" that the recertification was the "most comprehensive in the history of aviation." ¶275.

## C.    Boeing's Stock Declines as the Truth Emerges

The truth about Boeing's safety and quality deficiencies that Defendants had concealed began to emerge on January 5, 2024, when a door plug blew off an Alaska Airlines 737 MAX, requiring an emergency landing. ¶365. The incident resulted from Boeing's failure to install door plug bolts due to unsafe traveled work performed at Boeing's factory. ¶¶232, 372, 440. Following the incident, the NTSB announced an investigation, and the FAA temporarily grounded Boeing's 737 MAX 9 jets—Boeing's stock plummeted $20 per share. ¶¶366-71.

Boeing's stock price continued falling in response to subsequent revelations, including as the market learned facts about the Alaska Airlines Incident that further revealed Boeing's safety problems (¶¶372-76, 390-92, 400-01); news of the impacts of those issues on Boeing (¶¶378, 385-87, 402-04, 407-09); and investigations and findings further revealing pervasive safety and quality issues, including FAA announcements (¶¶377, 379-84, 388-89, 393-99, 410-20, 427-29, 430-31, 435-39), whistleblower allegations (¶¶451-53), an SEC investigation (¶¶460-61), and the DOJ's investigation and finding that Boeing had violated the DPA (¶¶428-29, 432-34, 462-72).

Each revelation further exposed the falsity of Defendants' misstatements throughout the Class Period and caused Boeing's stock price to decline substantially.[4]  Defendant Calhoun has now admitted that Boeing's 737 MAX issues were "self-inflicted," in that traveled work was "embedded and normalized in our factory" (¶226), and Defendant West admitted that, "[f]or years, we prioritized the movement of the airplane through the factory over getting it done right." ¶225.

---

[4] Experts and investigators confirm that Defendants' statements did not reflect reality. Dr. Javier de Luis of MIT testified that an FAA expert panel found "a 'disconnect' between the words that are being said by Boeing management, and what is being seen and experienced by the technicians and engineers." ¶458. Ed Pierson, Executive Director of the Foundation for Aviation Safety and a former Boeing 737 Program Senior Manager, explained that "nothing changed after the two MAX crashes. If anything, conditions have only worsened." ¶318. After extensive investigation, Pierson concluded: "Boeing's corporate leaders continue to conceal the truth. They continued to mislead and deceive the public about the safety of their airplanes." ¶322.

**D.    This Action and the Proposed Class Representatives**

This case was initiated by Rhode Island on January 30, 2024.  ECF No. 1.  On April 22, 2024, this Court appointed Rhode Island and the IBT Pension Fund as Lead Plaintiffs, Labaton and Robbins Geller as Lead Counsel, and Cohen Milstein and Reilly as Liaison Counsel.  ECF No. 26.  On May 22, 2024, Plaintiffs filed the operative Complaint.  ECF No. 43.  Motion to dismiss briefing followed, and on September 6, 2024, the Court denied Defendants' motion to dismiss in its entirety.  ECF Nos. 62-63.  Plaintiffs now seek certification of this case as a class action,[5] appointment to serve as Class Representatives, appointment of Labaton and Robbins Geller as Class Counsel, and appointment of Cohen Milstein and Reilly as Liaison Counsel for the Class.

**III.    ARGUMENT**

**A.    Legal Standards for Class Certification**

To obtain class certification, a party must satisfy the requirements of Rule 23(a) and (b). "[I]n securities fraud suits, the requirements of Rule 23 are to be construed liberally. . . . [and] any doubts about the propriety of certification should be resolved in favor of certification." *BearingPoint*, 232 F.R.D. at 538; *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (explaining, in securities class case, that "courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application"); *Boyce v. Wachovia Sec., LLC*, 2010 WL 1253737, at *6 n.7 (E.D.N.C. Mar. 29, 2010) (securities claims "are particularly well suited for class action . . . Rule 23 is to be construed liberally to effectuate that end").

---

[5] The proposed Class definition is stated *supra* at p. 2.  It differs from the definition in the operative complaint through the inclusion of Boeing options.  As discussed in Sections III(B)(3)-(4) and III(C)(1), these options traders have substantively the same claims as the stock purchasers.  *See Weisfeld v. Sun Chem. Corp.*, 84 F. App'x. 257, 259 (3d Cir. 2004) ("A court is not bound by the class definition proposed in the complaint.") (citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)); *e.g.*, *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR, ECF Nos. 114, 352 (N.D. Cal.) (certifying class, where options were added to class definition in motion to certify class).

### B.      The Requirements of Rule 23(a) Are Satisfied

Under Rule 23(a), plaintiffs must establish that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the class representatives' claims are typical of the class' claims; and (4) the class representatives will fairly and adequately protect the interests of the class.   *See* Rule 23(a); *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015).

### 1.      The "Numerosity" Requirement Is Satisfied

Rule 23(a)(1)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable."   Courts typically recognize that this requirement is satisfied where a class has more than forty members.  *Gibbs v. Stinson*, 2021 WL 4812451, at *13 (E.D. Va. Oct. 14, 2021) ("joinder usually becomes impracticable where the class exceeds forty members"); *Clark v. Trans Union, LLC*, 2017 WL 814252, at *7 (E.D. Va. Mar. 1, 2017) (same); *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (recognizing the "presumption of impracticability of joinder" as to classes of "40 or more members") (*quoting* 1 Newberg on Class Actions § 3:12 (5th ed. 2021)).

The numerosity requirement is "rarely disputed in securities fraud class actions." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015) (Brinkema, J.).  Indeed, "a showing that a large number of shares were outstanding and traded during the relevant period would prove that joinder is impractical." *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *3 (E.D. Va. Sept. 23, 2015); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 300 (D. Md. 2022) (finding proposed class sufficiently numerous in light of substantial trading volume during putative class period); *In re Jeld-Wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *3 (E.D. Va. Mar. 29, 2021) (class potentially including thousands of investors satisfies the numerosity requirement).

- 8 -

Throughout the Class Period, there were approximately 562.8 million shares of Boeing stock outstanding, which traded on the NYSE with a weekly average volume of 64.88 million. Coffman Rpt. ¶¶28,69; *cf. id.* ¶83 (describing sizable options market). As a result, Plaintiffs believe that the proposed Class would have thousands of members. Even narrowly looking at large institutions required to disclose their holdings in public filings, there were over 4,678 investors in Boeing stock during the Class Period. *Id.* ¶74. As a result, joinder of all putative Class members would be impracticable and the numerosity requirement is satisfied.

### 2. The "Commonality" Requirement Is Satisfied

Rule 23(a)(2)'s "commonality" requirement is met if "there are questions of law or fact common to the class." Even "a single common question" may satisfy this requirement if it weighs on the "validity" of class members' claims. *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021). In "securities case[s]," satisfying this requirement is "not a heavy burden," because class members "are especially likely to share common claims." *NeuStar*, 2015 WL 5674798, at *3 (quoting *BearingPoint*, 232 F.R.D. at 539); *see generally Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 147 (4th Cir. 2001) (commonality is less "stringent" than Rule 23(b)(3)'s predominance element).

The core factual and legal issues in this case concern whether Defendants defrauded the investing public, and these issues pose questions that are common to the putative Class, including:

- whether Defendants violated the federal securities laws by their acts and omissions alleged in the Complaint;
- whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;
- whether, and to what extent, the market price of Boeing common stock was artificially inflated or maintained during the Class Period because of the material misstatements or omissions alleged in the Complaint;
- whether Defendants acted with the requisite level of scienter; and
- whether the members of the Class have sustained damages as a result of the conduct complained of in the Complaint, and if so, the proper measure of such damages.

- 9 -

This Court has found commonality satisfied by similar questions, because "[d]efendants' conduct alone is relevant to their proof." *NII Holdings*, 311 F.R.D. at 406 (quoting *NeuStar*, 2015 WL 5674798, at *6); *see Under Armour*, 631 F. Supp. 3d at 301 (commonality satisfied by similar questions, noting that investors were allegedly "defrauded by the same misrepresentations and omissions over the same period of time, and suffered losses as a result"); *BearingPoint*, 232 F.R.D. at 539 (commonality satisfied where defendants' conduct was "at the center of th[e] case").

### 3. The "Typicality" Requirement Is Satisfied

Rule 23(a)(3)'s "typicality" requirement is met where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." It probes whether the representatives' claims "are of the same sort as other members of the proposed class." *NII Holdings*, 311 F.R.D. at 407. Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 117 (E.D. Va. 2012).

Even where there are "[f]actual differences," typicality is satisfied if "plaintiff's claim is predicated on the same course of conduct and legal theory as the claims of the class." *Minter v. Wells Fargo Bank, N.A.*, 279 F.R.D. 320, 325 (D. Md. 2012); *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 295 (E.D. Va. 2004) (differences "do not defeat typicality, as long as the class claims are generally based on the same . . . theory"). Plaintiffs' claims and the Class' claims are based on the same legal theory: Defendants' liability under §10(b), SEC Rule 10b-5(b), and §20(a). The claims are also based on the same factual allegations: Defendants made intentional or reckless misrepresentations concealing manufacturing safety and quality control deficiencies, which artificially inflated Boeing's stock price and resulted in losses for investors when the truth came to light. Thus, because Plaintiffs and the Class' claims are "predicated on the same course of conduct and legal theory" typicality is satisfied. *Minter,* 279 F.R.D. at 325.

- 10 -

Indeed, courts in the Fourth Circuit routinely find typicality satisfied in securities actions because the claims at issue focus on the same factual and legal theories regarding defendants' wrongful conduct. *See, e.g.*, *id.* at 251-52; *Jeld-Wen*, 2021 WL 1186326, at \*3 (typicality satisfied where plaintiffs' §10(b) and §20(a) claims arise from defendants' public statements concealing anti-competitive behavior); *Under Armour*, 631 F. Supp. 3d at 302 (typicality satisfied where plaintiff and the class both allege that they purchased defendant's stock at "inflated price because the defendants lied" and allege the "same information" was fraudulently concealed).

### 4. The "Adequacy" Requirement Is Satisfied as to the Proposed Class Representatives

Rule 23(a)(4)'s inquiry into the "adequacy" of class representatives is satisfied where the proposed representatives will "fairly and adequately protect the interests of the class." This requirement probes both whether the proposed representatives will vigorously prosecute the case and whether there are conflicts of interest between them and the other members of the class. *Valerino v. Holder*, 283 F.R.D. 302, 318 (E.D. Va. 2012). Both inquiries are firmly satisfied here.

As to vigorous prosecution, both Plaintiffs have taken their roles and obligations to the putative Class seriously and have acted in the best interests of the Class. They intend to continue to do so. Through counsel, Plaintiffs have investigated and filed the Complaint, successfully opposed a motion to dismiss the Complaint, pursued discovery, and responded to discovery requests. Cheng Decl. ¶6; O'Donnell Decl. ¶¶4-5. The Plaintiffs will provide deposition testimony as appropriate and would appear at trial if called to testify. Cheng Decl. ¶6; O'Donnell Decl. ¶5. Plaintiffs have both remained informed as to the litigation and will continue to be involved in overseeing the litigation and any settlement discussions. Cheng Decl. ¶4; O'Donnell Decl. ¶4.

Additionally, both Plaintiffs are the sort of sophisticated institutional investors that Congress envisioned as particularly appropriate to serve as class representatives in securities cases.

Cheng Decl. ¶2; O'Donnell Decl. ¶2; *Under Armour*, 631 F. Supp. 3d at 308 (noting, in analyzing adequacy, that "[p]laintiffs are institutional investors, precisely the type of litigant Congress intended to serve as class representative"). Moreover, the Plaintiffs each purchased thousands of shares of Boeing stock during the Class Period, and allege substantial losses from those purchases, meaning their interests in seeing this action prosecuted appropriately is directly aligned with that of the Class. *See* Cheng Decl. ¶3; O'Donnell Decl. ¶2; ECF Nos. 43-1, 43-2.

Plaintiffs have also demonstrated their adequacy here by retaining and supervising experienced and competent counsel, as discussed in Section III(B)(5). *See Fariasantos v. Rosenberg & Assocs., LLC*, 303 F.R.D. 272, 276 (E.D. Va. 2014) (crediting choice of adequate counsel as supporting class representative's adequacy); *Kelly v. Nationstar Mortg., LLC*, 2014 WL 12917984, at *1 (E.D. Va. Apr. 2, 2014) (adequacy satisfied because proposed representative was "motivated to pursue the case and he has retained good counsel"); *Clark*, 2017 WL 814252, at *14 (proposed class representative deemed adequate where they had "general knowledge" of the matter and relied on adequate counsel); *cf. In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 109 (E.D. Va. 2009) ("A class representative is allowed to rely on counsel to keep him abreast of developments and make strategic decisions in a class action lawsuit.").

There are no conflicts of interest between the Plaintiffs and the Class. Plaintiffs are aligned with the Class in seeking the best possible recovery in this case and, as discussed in Section III(B)(3), they are pursuing the same legal theory based on the same facts as all Class members. *See Under Armour*, 631 F. Supp. 3d at 308 ("[F]or the same reasons the typicality requirement is met . . . the representatives' interests are in alignment with the proposed class.").[6]

---

[6] Plaintiffs are purchasers of Boeing's stock, and the proposed Class includes options traders. This does not raise any adequacy or typicality concerns. The options traders' claims are fundamentally identical to the stock purchasers' claims. *See* Section III(C)(1)(b)-(c); *see generally In re*
*(Footnote continued on next page…)*

Even in cases where there are actual or potential conflicts of interest, this only raises adequacy concerns where the conflict is "fundamental," and a conflict is not fundamental if the representative and the class "share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). Additionally, for a conflict to defeat adequacy it may not merely be "speculative or hypothetical." *Id.* Here, where there are no known conflicts of any sort, the adequacy requirement is clearly satisfied.

### 5. The "Adequacy" Requirement Is Satisfied as to Lead Counsel and Lead Counsel Should Be Appointed as Class Counsel

Inquiry into "adequacy" also probes the "competency and conflicts of class counsel." *Pitt v. City of Portsmouth*, 221 F.R.D. 438, 451 (E.D. Va. 2004).[7]

There are no conflicts between Proposed Class Counsel and the Class. As discussed above, even where (unlike here) potential conflicts exist, they only challenge adequacy when they are both "fundamental" and not merely "speculative or hypothetical." *Ward*, 595 F.3d at 180.

Competency of class counsel is evaluated with reference to the factors articulated in Rule 23(g)—in summary, counsel's (i) work on the case; (ii) experience handling class actions; (iii) knowledge of applicable law; and (iv) commitment of resources to the case. *See* Rule 23(g)(1)(A); *see generally Paulino v. Dollar Gen. Corp.*, 2014 WL 1875266, at *10 (N.D. W. Va. Feb. 24, 2014) ("In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to prosecute vigorously . . . on behalf of the class."). The Proposed Class Counsel firmly satisfy the adequacy requirement, including each of these factors.

---

*Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *9-10 (D.N.J. Sept. 25, 2012) (stock purchaser was adequate to represent options traders).

[7] Courts vary as to whether this inquiry sits under Rule 23(a)(4) or solely under Rule 23(g). *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 150 n.28 (D. Md. 2022) (subsequent history omitted). That distinction has no bearing on the analysis here.

As Lead Counsel, Labaton and Robbins Geller have conducted an extensive investigation into Defendants' conduct and have successfully opposed Defendants' motion to dismiss. *See* ECF Nos. 50, 51, 53, 55, 60, 62. Since defeating Defendants' motion to dismiss, Labaton and Robbins Geller have actively engaged in discovery, participated in hearings, and continued developing the case. Both firms have and will continue dedicating the resources needed to advance this action to achieve the best result for the Class, including through adequately staffing the matter with an appropriate mix of partners, associates, and other attorneys, retaining and expending the necessary resources on experts, and paying other expenses that may arise while prosecuting this case.

Labaton and Robbins Geller are both highly experienced and accomplished in pursuing class action litigation—and in particular, securities class action cases like this one. *See* Firm Résumé of Labaton (Fox Decl. Ex. E) and Firm Résumé of Robbins Geller (Fox Decl. Ex. F). Indeed, as this Court previously stated, Labaton is "highly-experienced in litigating these types of actions and have a proven track record in prosecuting complex securities actions." *NII Holdings*, 311 F.R.D. at 408; *NeuStar*, 2015 WL 5674798, at *13 (finding Labaton "satisfies the requirements of Rule 23(g)(1)(A) and 23(g)(4)"). Similarly, courts in this Circuit have recognized that "Robbins Geller has been appointed class counsel in hundreds of securities class actions and has competently met its obligations under Rule 23 in those cases." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 693 (D. Md. 2018); *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 663 (E.D. Va. 2016) ("There is no question that Robbins Geller is qualified to litigate this class action lawsuit – it has a long record of success in these types of cases."); *Jeld-Wen*, 2021 WL 1186326, at *4 (finding Labaton and Robins Geller to have adequate experience in class actions and security fraud cases).

In light of the firms' competence and the absence of conflicts between the firms and the Class, the Court should find Plaintiffs' adequate, and honor Plaintiffs' choice of counsel by appointing Labaton and Robbins Geller as Class Counsel.[8]

### C.      The Requirements of Rule 23(b)(3) Are Satisfied

Upon meeting the prerequisites of Rule 23(a), the proposed Class must also satisfy Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) class action treatment is superior to other methods of adjudication.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  These requirements are satisfied here.

### 1.      The "Predominance" Requirement Is Satisfied

Rule 23(b)(3)'s "predominance" requirement is satisfied where the proposed class is "sufficiently cohesive to warrant adjudication by representation."  *Id*. at 623.  Securities fraud cases "are particularly appropriate candidates for treatment under Rule 23(b)(3) given that the elements of the cause of action generally relate to the acts or omissions of the defendants . . . ." *NII Holdings*, 311 F.R.D. at 408.

Because the Class' claims are based on a single wrongful course of conduct by Defendants, the core factual matters at issue do not differ between Class members.  Plaintiffs allege that Defendants' misstatements caused Boeing's stock to trade at artificially inflated prices, and when the truth came to light, the stock price fell, causing losses to those who purchased Boeing stock or call options (or sold Boeing put options) at inflated prices.  *See* ¶¶365-472, 569, 1000-01, 1003, 1018, 1021.

---

[8] Additionally, Plaintiffs have retained Cohen Milstein and Reilly as Liaison Counsel, based, *inter alia*, on their experience litigating before this Court.  The Court previously endorsed their role as Liaison Counsel (*see* ECF No. 26), and they have remained actively involved in that role.  Both firms are qualified and experienced in prosecuting class actions.  *See* Firm Résumé of Cohen Milstein (Fox Decl. Ex. G) and the Firm Résumé of Reilly (Fox Decl. Ex. H).  While Rule 23 does not discuss Liaison Counsel, Plaintiffs request such appointment to avoid any ambiguities.

The Class' claims are also based on common legal issues. To establish liability under §10(b) and SEC Rule 10b-5, "a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Gariety v. Grant Thorton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *NII Holdings*, 311 F.R.D. at 408 ("[C]ourts must concentrate on the issue of liability rather than damages, 'and if the liability issue is common to the class, common questions are held to predominate over individual ones.'") (quoting *BearingPoint*, 232 F.R.D. at 542). The Supreme Court has held that whether a defendant knowingly and/or recklessly made material misstatements (*i.e.*, the scienter, falsity, and materiality elements of a §10(b) claim) and whether the revelations of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element) are each common questions of law and fact that may predominate over individualized ones. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467-70, 475 (2013).

The only elements of a §10(b) claim that could theoretically vary among class members are reliance and damages, but neither pose predominating individualized issues here.

### a.    Reliance Does Not Pose Predominating Individualized Issues as to Purchasers of Boeing Stock

"Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic*, 485 U.S. at 243. In securities class actions, reliance is most often satisfied by the "fraud on the market" presumption that was established by *Basic*. *Id.* at 246-47. Where, like here, the presumption applies, it obviates any need for individualized proof of reliance, generally enabling class treatment of securities claims. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").

"The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458. Once properly invoked, it is a defendant's burden to rebut the fraud on the market presumption. *See Halliburton II* at 268-69. To invoke the doctrine, a plaintiff must demonstrate: (1) the security traded in an efficient market; (2) the alleged misrepresentations were publicly known; (3) they were material; and (4) the plaintiff traded the security after the misrepresentations were made and before the truth was revealed. *Id.* at 268. None of these requirements pose any obstacle to Plaintiffs' invocation of the fraud on the market doctrine, and the only one warranting substantial attention is the issue of market efficiency, which is addressed below.[9]

A market is deemed "efficient" if it is "generally efficient in incorporating publicly available information into a security's market price." *Amgen*, 568 U.S. at 462; *see also Halliburton II*, at 272 (*Basic* "based the presumption on the fairly modest premise that market professionals **generally** consider **most** publicly announced material statements about companies, thereby affecting stock market prices."). Establishing market efficiency is not onerous, and indeed, "most courts agree that [a] listing [on the NYSE or NASDAQ] is a good indicator of efficiency." *NII Holdings*, 311 F.R.D. at 410. Courts typically consider the following non-exhaustive factors—known as the "*Cammer* factors"—to assess whether stock trades in an efficient market:

---

[9] As for the other three requirements: it is undeniable that each alleged misstatement was made in a public filing, public earnings call, or a conference or other public setting that was broadcasted or transcribed in a publicly available form. *See* ¶¶568-999. While the materiality of the alleged statements is a prerequisite to utilizing the fraud on the market presumption, the Supreme Court has held that analysis of materiality "should be left to the merits stage because it does not bear on the predominance requirement." *Halliburton II*, 573 U.S. at 282; *Amgen*, 568 U.S. at 455 (finding "[p]roof of materiality is not a prerequisite to certification of a securities-fraud class action"). Lastly, Plaintiffs purchased Boeing stock during the Class Period, before the truth was revealed. *See* Cheng Decl. ¶3 and ECF No. 43-1; O'Donnell Decl. ¶2 and ECF No. 43-2.

> (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.

*Gariety*, 368 F.3d at 368 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)); *see NII Holdings*, 311 F.R.D. at 409-12 (considering *Cammer* factors). Courts also often consider the following so-called "*Krogman* factors:" (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread. *NII Holdings*, 311 F.R.D. at 412-13 (citing *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)). "[N]o one factor is more important than another" because assessing market efficiency is a "holistic and fact-intensive inquiry." *Id.* at 409.

Boeing's stock undoubtedly traded in an efficient market during the Class Period. Plaintiffs submit the expert report of Mr. Coffman, which details his analysis of Boeing's stock and explains his conclusion that the market for Boeing stock was efficient throughout the Class Period. Coffman Rpt. ¶¶6, 20-80. The analysis below describes Mr. Coffman's application of the *Cammer* and *Krogman* factors. Mr. Coffman's analysis as a whole supports his finding of market efficiency, and his report provides substantially more detail on the points below, as well as additional analysis supporting his finding of market efficiency. *Id.*[10] Mr. Coffman's opinion and analysis should be credited—indeed, in *NII Holdings*, this Court credited similar analysis by Mr. Coffman in finding market efficiency was established. 311 F.R.D. at 413.

### i.    *Cammer* Factor 1: Trading Volume Supports a Finding of Market Efficiency

A large weekly trading volume "suggests there is an efficient market . . . because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286.

---

[10] For example, he performed an "autocorrelation" analysis, which tests whether past stock price moves can predict future moves. *Id.* ¶¶75-78. The absence of sustained high autocorrelation supports a finding of market efficiency, because it is consistent with the notion that the market rapidly adjusts to relevant news. *Id.* (Mr. Coffman not finding sustained high autocorrelation).

Throughout the Class Period, Plaintiffs' expert economist, Mr. Coffman, found that Boeing's stock traded on the NYSE with an average weekly trading volume of approximately 64.88 million shares and an average weekly trading volume of 11.22% of shares outstanding. Coffman Rpt. ¶28. This high volume of trading strongly supports a finding of market efficiency, and it substantially exceeds the 2% or more of the outstanding shares that *Cammer* held "would justify a strong presumption that the market for the security is an efficient one." *Comput. Scis.*, 288 F.R.D. at 119 (quoting *Cammer*, 711 F. Supp. at 1285-87); *NII Holdings*, 311 F.R.D. at 410 (same); *see, e.g.*, *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (weekly trading volume of 2.61% of total shares outstanding over a class period supported a finding that the stock traded on an efficient market).

### ii. *Cammer* Factor 2: Analyst Coverage Supports a Finding of Market Efficiency

Analyst coverage indicates that the stock is "closely watched by investment professionals, who in turn inject their views on the company and the security into the market," contributing to market efficiency. *NII Holdings*, 311 F.R.D. at 410; *Cammer*, 711 F. Supp. at 1286.

Mr. Coffman found that during the Class Period at least 20 different analyst firms covered Boeing, and analysts issued at least 2,650 reports about Boeing, including major firms such as Barclays, Bank of America, and J.P. Morgan. Coffman Rpt. ¶34. These reports disseminated public information along with commentary, analyses, and recommendations about Boeing. *Id*. Such substantial analyst coverage supports a finding that Boeing traded in an efficient market. *See, e.g.*, *NII Holdings*, 311 F.R.D. at 410 (coverage by eighteen firms supported finding of efficiency); *Sonoco*, 270 F.R.D. at 256 (same as to six analysts); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (same as to fifteen analysts; noting coverage by as few as three analysts may support finding of efficiency).

### iii.    *Cammer* Factor 3: Market Making and Similar Activity Support a Finding of Market Efficiency

"[T]he existence of market makers indicates that a security is liquid and that relevant information is disseminated and appropriately assimilated into the price." *NII Holdings*, 311 F.R.D. at 410; *cf. Cammer*, 711 F. Supp. at 1286-87 (Market makers ensure the price "react[s] swiftly" to news "by buying and selling stock and driving it to a changed price level").

Mr. Coffman found that Boeing's stock was listed on the NYSE during the Class Period, where trading was conducted by a highly developed network of brokers, overseen by a "Designated Market Maker," and facilitated by at least 192 market makers. Coffman Rpt. ¶¶40-42. Such a sizable quantity of market makers supports a finding that Boeing's stock traded in an efficient market. *Id*. *See, e.g.*, *Cammer*, 711 F. Supp. at 1293 ("Ten market makers . . .would justify a substantial presumption" of market efficiency); *NII Holdings*, 311 F.R.D. at 413 (100 market makers supported finding of market efficiency); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *1 (S.D.N.Y. Aug. 13, 2018) (noting that just six market makers can support market efficiency).

In addition to considering formal market makers, Mr. Coffman also considered the existence of institutional investors more generally, as they play a similar role to market makers in facilitating the market's ability to incorporate information into the stock's price. Coffman Rpt. ¶74. During the Class Period, more than 4,678 institutional investors held Boeing stock, holding on average 56.54% of public float. *Id.* This analysis further supports a finding that Boeing traded in an efficient market. *Id.*; *see, e.g.*, *Sonoco*, 270 F.R.D. at 256 (high percentage of institutional ownership supported market efficiency).

### iv.    *Cammer* Factor 4: SEC Form S-3 Eligibility Supports a Finding of Market Efficiency

SEC Form S-3 registration eligibility is indicative of market efficiency because the filing requirements ensure that information is publicly available and likely examined by the market. *See*

*Cammer*, 711 F. Supp. at 1284-85.  Mr. Coffman explained that a company is eligible for Form S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has an outstanding float above a certain sizable value.  Coffman Rpt. ¶44.  Mr. Coffman further found that Boeing met both requirements and filed Form S-3ASR registrations throughout the Class Period.  *Id*. ¶45.  This supports a finding that Boeing traded in an efficient market.  *See, e.g.*, *Cammer*, 711 F. Supp. at 1287; *NII Holdings*, 311 F.R.D. at 411.

**v.      *Cammer* Factor 5: Boeing's Stock's Reaction to Company-Specific News During the Class Period Supports a Finding of Market Efficiency**

*Cammer* recognized that "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  711 F. Supp. at 1291.

Mr. Coffman conducted a thorough event study and statistical analysis ("Event Study") to determine whether Boeing's stock price moved in response to new, material, value-relevant information about the Company.  *See* Coffman Rpt. ¶¶46-67.  In an efficient market, it would be expected that the price of a stock would respond to news.  *Id.* ¶47.  An event study is a multi-step process to test this response.  As more fully explained in the Coffman Report, the Event Study compared Boeing's stock price moves (after accounting for market and industry moves) on days with Company-specific news and days with less or no Company-specific news.  If the movements on days with Company-specific news were significantly different than on the least news days, this is evidence that Boeing's stock was responsive to value relevant Company-specific news.

Here, Mr. Coffman found that there was evidence of such a cause-and-effect relationship, as he found that Boeing's earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.  Coffman Rpt. ¶¶49-67.  Such findings

- 21 -

support a finding that Boeing traded in an efficient market.  *Id.*; *see, e.g.*, *NII Holdings*, 311 F.R.D. at 411 (finding highly similar event study analysis performed by Mr. Coffman to satisfy the fifth *Cammer* factor); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 385-86 (N.D. Ga. 2019) (finding cause and effect relationship based on similar event study methodology); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 521 (D. Minn. 2015) (finding statistically significant price reaction to 36.4% of the events studied); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (finding statistically significant price reaction to 42% of the events studied).

### vi.    The *Krogman* Factors

As discussed above, Courts also often consider the so-called "*Krogman* factors," when analyzing market efficiency.  *See, e.g., NII Holdings*, 311 F.R.D. at 412-13.  Mr. Coffman found that those factors further supported a finding that the stock traded in an efficient market.

**Market Capitalization**.  A large market capitalization is indicative of market efficiency because larger market capitalizations are associated with greater investment activity.  *See Krogman*, 202 F.R.D. at 478.  Mr. Coffman found that Boeing's average market capitalization during the Class Period was $121.9 billion, which was greater than 99% of all stocks traded on the combined NYSE and NASDAQ exchanges.  Coffman Rpt. ¶69.  This strongly supports a finding of market efficiency.  *See Krogman*, 202 F.R.D. at 478 (market capitalization as low as bottom 40% of sampled group weighed in favor of market efficiency); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (market capitulation of $5 billion, within top 33% of peers, weighed "heavily" in favor of market efficiency); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (market capitalization from $500 million to $3.2 billion weighed in favor of market efficiency).

**Public Float**.  A high public float is indicative of market efficiency because the availability of publicly traded shares supports the market's ability to incorporate information into the stock's price.  *See Krogman*, 202 F.R.D. at 478.  Throughout the Class Period, Mr. Coffman found that Boeing had an average public float of 93.11% of shares outstanding, meaning insiders only held about 6.89%.  Coffman Rpt. ¶73.  Such a large public float supports a finding that Boeing traded in an efficient market.  *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 433 (finding public float as low as 43%-51% weighed in favor of market efficiency); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 357 (C.D. Cal. 2015) (float of 87.4% weighed in favor of efficiency).

**Bid-Ask Spread**.  A narrow bid-ask spread—essentially, the difference in the price to buy or sell a share—is indicative of market efficiency because it suggests a liquid market in which information is easily incorporated into the stock price.  *See* Coffman Rpt. ¶71; *Krogman*, 202 F.R.D. at 478.  Mr. Coffman found that the average bid-ask spread of Boeing's stock in each month of the Class Period ranged from 0.002% to 0.029%, which was narrower than the average and median bid-ask spread of a random sample of 100 other stocks trading on the NASDAQ and NYSE in October 2022 (the full month when Boeing had the widest bid-ask spread during the Class Period).  Coffman Rpt. ¶72.  Such a narrow bid-ask spread supports a finding that Boeing traded in an efficient market.  *See, e.g.*, *NII Holdings*, 311 F.R.D. at 413 (spread narrower than 42% of sample weighed in favor of finding market efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (2.44% average daily relative bid-ask spread weighed in favor of finding market efficiency as it was "significantly lower than the high bid-ask price of 5.6% found to suggest market inefficiency in *Krogman*").

- 23 -

**b.      Reliance Does Not Pose Predominating Individualized Issues as to Those Trading Boeing Options**

The proposed Class includes those who purchased Boeing call options or wrote (*i.e.*, sold) Boeing put options during the Class Period.  *See* Coffman Rpt. ¶¶81-83 (explaining relevant options).[11]  Like stock purchasers, options traders will satisfy the reliance element of their claims through the fraud on the market doctrine.  This doctrine applies for two related reasons.

**First**, the fraud on the market doctrine is available to those trading in options for stock that trades in an efficient market because they rely on that stock price (and any fraud incorporated therein) when trading options.  This follows from the logic of *Basic*, which focuses on the commonsense notion that all traders presumably rely on the market price.  *See Basic*, 485 U.S. at 246-47; *In re Forcefield Energy Inc. Sec. Litig.*, 2015 WL 4476345, at *4 (S.D.N.Y. July 22, 2015) ("fraud-on-the-market theory depends on the existence of an efficient market whose price signals may be relied upon to inform an investor's choices," not whether one trades at the market price or on the exchange).  Courts recognize that, just as one who trades stock presumably considers the stock's market price, one who trades options presumably also considers the **stock's** market price:

> The relevant question is not whether [plaintiff] has established that the market for [] put options was itself efficient.  Rather, the question is whether a seller of put options is entitled to **rely on the stock market** to accurately reflect the value of the **underlying** stock upon which the put option is sold. . . . [A] put options seller, upon proof of market efficiency in the underlying stock, is generally entitled to a rebuttable presumption of reliance. . . . [B]y betting that the stock price will maintain or increase, the put option seller generally relies—in like fashion to a stock purchaser—on the integrity of the price of the **underlying** stock.

*Sci.-Atlanta*, 571 F. Supp. 2d at 1329-30 (emphasis added).

---

[11] Class members who bought call options acquired the right to purchase Boeing common stock at a particular price, and Class members who sold put options gave another investor the right to sell Boeing common stock to those Class members at a particular price.  Both of these groups of options investors, like Class members who purchased Boeing common stock, suffered damages when the truth emerged and Boeing's common stock price decreased.

Courts routinely hold that options traders may rely on the fraud on the market presumption based on the market efficiency of the underlying stock. *See McIntire*, 38 F. Supp. 3d at 434 (holding that options traders were entitled to presumption that they relied on "the market for [underlying] stock [which] was efficient"); *In re Priceline.com Inc.*, 236 F.R.D. 89, 100 (D. Conn. 2006) (similar); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006) (similar); *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988) (presumption available to options traders because material misstatements affecting the market price of the stock affect the "necessarily related market price of the option contract"); *Rougier v. Applied Optoelectronics, Inc.,* 2019 WL 6111303, at *14 (S.D. Tex. Nov. 13, 2019), *R&R adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) ("[A] finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock.").

Without question, investors trading Boeing options would have considered Boeing's stock price. Indeed, Mr. Coffman analyzed Boeing options and found that price changes in those options were almost entirely a function of changes in Boeing's stock price. Coffman Rpt. ¶¶91-95. Using a put-call analysis, Mr. Coffman was able to derive an implied (*i.e.*, "synthetic") stock price from Boeing options prices on each day of the Class Period. *Id*. Mr. Coffman then analyzed the correlation between Boeing's real stock price and the synthetic prices and found that the average ratio of actual common stock price to synthetic common stock price is 1.001, meaning that they were nearly perfectly correlated. *Id.* (also explaining the directionality of the correlation further supported finding of market efficiency). Thus, because the price of Boeing options was almost entirely correlated with Boeing's stock price, the notion that options traders would consider the stock price—which was traded in an efficient market (*see* Section III(C)(1)(a))—is eminently reasonable.

- 25 -

**Second**, the same analysis described above establishes that Boeing options themselves traded in an efficient market. Because Boeing options prices were almost entirely a function of Boeing's stock price, one can conclude that *the* Company-specific material information relevant to the options' prices was Boeing's stock price. Thus, because the options prices promptly incorporated changes in that stock price, the market for those options was itself necessarily efficient. Coffman Rpt. ¶84. In other words, any fraud would be promptly incorporated into the stock price (since Boeing's stock trades in an efficient market) and thus would promptly be incorporated into Boeing options' prices because they are a function of the stock price. *Id.*

In addition, Mr. Coffman also performed a put-call parity analysis to test the efficiency of the Boeing options market. *Id.* ¶¶86-90. This analysis tests whether the options prices and stock prices are consistent with each other, by considering potential arbitrage opportunities subject to a well-accepted test. *Id.* Coffman found less than 10% of observations resulted in a violation of put-call parity, and found that this result was consistent with a finding of market efficiency. *Id.*

Mr. Coffman also explained that direct application of the *Cammer* factors to the analysis of options is imperfect—as those factors are not tailored to analysis of options. *Id.* ¶86 n.108. For example, options do not have a "market capitalization," and while analyst reports about a common stock issuer may be highly relevant to options traders, those reports are rarely *specifically* about options. However, Mr. Coffman found that the analysis concerning the correlation between Boeing options and Boeing's stock price provided strong evidence of a cause-and-effect relationship, as relevant to *Cammer* factor 5. *Id.* ¶¶91-95. In light of his analysis, Mr. Coffman did not separately conduct a *Cammer* factor analysis of Boeing options and concluded that the analysis explained in his report demonstrated Boeing options traded in an efficient market. *Id.* ¶¶81-95.

c.    **Damages Do Not Pose Predominating Individualized Issues and Can Be Assessed Class-Wide Using a Common Methodology**

"[D]ifferences in damages among the potential class members do not generally defeat predominance." *BearingPoint*, 232 F.R.D. at 542; *Gunnells*, 348 F.3d at 429 ("The possibility [of] individualized inquiry into . . . damages . . . does not defeat the class action because common issues nevertheless predominate."). At the class certification stage, Plaintiffs must merely identify a common methodology for the calculation of damages that matches their theory of liability, and they need not fully elaborate on the intricacies of the methodology. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013) (requiring that damages theory match liability theory, but noting that these "[c]alculations need not be exact"); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *10 (E.D. Va. Sept. 4, 2020) (damages issues do not pose predominance concerns where they may be resolved by a "damages model" and "common evidence"); *Under Armour*, 631 F. Supp. 3d at 312 ("[I]individualized damages calculations do[] not vitiate predominance.").

Mr. Coffman has provided such a common methodology—the "out of pocket" methodology. Coffman Rpt. ¶¶96-97. Damages would be equal to the artificial inflation at the time of purchase reduced by the artificial inflation at the time of sale if the security was sold before the fraud was fully revealed (otherwise, damages are merely the artificial inflation at the time of purchase).[12] *Id.* This approach matches Plaintiffs' theory of liability and does not depend on individualized inquiries, besides processing simple trading data from Class members. While the task of assessing the amount of artificial inflation throughout the Class Period is a merits issue to be elaborated upon at a later time, Mr. Coffman explains that inflation can be assessed using an

---

[12] Mr. Coffman also explains how a conceptually identical methodology would be used for options traders, requiring modest mechanical adjustments to account for the economics of those securities and a slightly different approach to measuring artificial inflation, which would be premised on the artificial inflation in Boeing's stock price. *Id.* ¶¶101-05.

- 27 -

event study, subject to any appropriate adjustments, which would not require any individualized inquiry. *Id.* ¶¶98-100.

Indeed, this Court previously held that the assertion that the typical out-of-pocket damages methodology would be used to calculate damages was sufficient to establish that damages were not an impediment to class certification in *NII Holdings*. 311 F.R.D. at 413-14. The Court's reasoning in that opinion applies equally well here:

> [Lead Plaintiffs] point to the standard formula for assessing damages under Rule 10b-5, which is the artificial inflation at the time of purchase reduced by the artificial inflation at the time of sale if the security was sold before the fraud was revealed, or otherwise merely the artificial inflation at the time of purchase. . . . [T]he Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage. . . . Lead Plaintiffs provide adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day. The method offered by Lead Plaintiffs is widely accepted as the traditional measure of damages for Rule 10b-5 actions. There is no convincing demonstration by the defendants that this damages theory does not closely hew to Lead Plaintiffs' theory of liability or that such a theory could not be applied class-wide. Accordingly, Lead Plaintiffs' damages model supports a finding of predominance.

*Id.*

### 2. The "Superiority" Requirement Is Satisfied

Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Allowing this case to proceed as a class action is plainly a superior method for resolving Plaintiffs' and the Class' claims and will provide the most efficient and fair adjudication. As noted above, courts in this Circuit recognize that class actions are favorably viewed for adjudicating securities fraud cases. *In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009); *supra* pp. 2-3,7-8. Indeed, "[s]ecurities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and

- 28 -

because individual damages might be too paltry to justify bringing individual cases." *BearingPoint*, 232 F.R.D. at 542; *see also NII Holdings*, 311 F.R.D. at 408 (same).

To assess the issue of "superiority," Rule 23(b)(3) sets forth the following factors:

> (A) the class members' interests in individually controlling the prosecution
> . . . of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by . . . class members; (C) the desirability . . .
> of concentrating the litigation of the claims in the particular forum; and (D)
> the likely difficulties in managing a class action.

In this case, the Class members' interests in individually controlling the prosecution of separate actions are minimal due to the actions' costs and expenses as compared to the potential individual recoveries. *See Sonoco*, 270 F.R.D. at 257 ("[T]he costs associated with bringing individual actions would be prohibitive when weighed against the potential individual recoveries."); *Jeld-Wen*, 2021 WL 1186326, at *9 ("[A] class action serves the interests of economy and efficiency."). Moreover, Plaintiffs are not aware of any other pending individual securities fraud actions raising these same issues against the same Defendants. *See Minter*, 279 F.R.D. at 330 ("Allowing [p]laintiffs to proceed as a class action meets the requirement of superiority because it promotes justice by providing class members, who would not have sufficient incentive to pursue their claims individually, access to the courts to seek vindication of their rights."). Here, Plaintiffs have committed to, and have every incentive to, seek the maximum recovery possible for the Class. Cheng Decl. ¶4; O'Donnell Decl. ¶6. The Class members' interests would thus be best furthered if their claims are litigated as a class action.

Additionally, the Parties and this Court have a strong interest in this litigation proceeding in a single forum, as to prevent inconsistent rulings and promote judicial economy. Boeing's global headquarters is located in this District (¶35) and Boeing transacts substantial business in Virginia, including in this District (¶32). *See Under Armour*, 631 F. Supp. 3d at 313

- 29 -

("[C]entralizing litigation in the district where [corporate-defendant] is headquartered will eliminat[e] the risk of inconsistent adjudication and promot[e] the fair and efficient use of the judicial system."). Moreover, the Court has already expended judicial resources in this action for months, including in considering and denying Defendants' motions to dismiss (ECF No. 62). Accordingly, the Eastern District of Virginia is the most desirable forum for this case.

Finally, this case does not present any unique difficulties related to the management of the litigation. Proposed Class Counsel has handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well established. In addition, "management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members." *BearingPoint*, 232 F.R.D. at 544-45. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties should they arise. *See* Rule 23(c), (d). Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would be superior to any other available method for fairly and efficiently adjudicating the controversy.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3);[13] (ii) appoint Plaintiffs Rhode Island and IBT Pension Fund as Class Representatives; (iii) appoint Lead Counsel Labaton and Robbins Geller as Class Counsel pursuant to Rule 23(g); and (iv) appoint Cohen Milstein and Reilly as Liaison Counsel for the Class pursuant to Rule 23(g).

---

[13] To the extent the Court finds any deficiency in this Motion that could be cured through a modified class definition, Plaintiffs respectfully request the Court grant class certification with such modified class definition. *See Thorpe v. Va. Dep't of Corr.*, 2023 WL 5038692, at *3 (W.D. Va. Aug. 8, 2023) (recognizing authority of court to "modify class definitions").

DATED:  December 13, 2024

*/s/ Carol C. Villegas*

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Christine M. Fox
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
jbissel-linsk@labaton.com

*Lead Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Proposed Class*

*/s/ Chad Johnson*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Chad Johnson
Noam Mandel
Jonathan Zweig
Desiree Cummings
Brent Mitchell
420 Lexington Ave., Suite 1832
New York, NY 10170
Tel: (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com
bmitchell@rgrdlaw.com

*Lead Counsel for Lead Plaintiff Local #817 IBT Pension Fund and the Proposed Class*

*/s/ Steven J. Toll*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Va. Bar No. 15300)
S. Douglas Bunch
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Proposed Class*

*/s/ Craig C. Reilly*

**THE OFFICE OF CRAIG C. REILLY**
Craig C. Reilly (Va. Bar No. 20942)
209 Madison Street, Suite 501
Alexandria, VA 22314
Tel: (703) 549-5354
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*Liaison Counsel for Lead Plaintiff Local #817 IBT Pension Fund and the Proposed Class*