UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

———————————————————

)
)
IN RE THE BOEING COMPANY )    Case No. 1:24-cv-151-LMB-LRV
SECURITIES LITIGATION )
)    Hon. Leonie M. Brinkema
)
)

———————————————————

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Richard C. Pepperman II (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
peppermanr@sullcrom.com

Judson O. Littleton (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
littletonj@sullcrom.com

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
bhatch@mcguirewoods.com

*Counsel for Defendants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

January 21, 2025

# TABLE OF CONTENTS

*Page*

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................6

    A.    Plaintiffs' Claims and Proposed Class ......................................................6

    B.    The Starkly Evolving Circumstances Between 2019 and 2024 ...............................7

ARGUMENT ....................................................................................................................9

I.    Plaintiffs Have Not Presented a Methodology Capable of Measuring Damages on a Classwide Basis Consistent with Their Theory of Liability ...........................................10

    A.    Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model That Accounts for the Changing Mix of Information Related to Boeing During the Nearly Five-Year Class Period .............................15

    B.    Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model Consistent With Their Liability Theory That the Challenged Safety Statements Became Material Through Their Repetition Over Many Years ....................................................................................................19

    C.    Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model Consistent With Their Materialization-of-the-Risk Liability Theory That Would Not Improperly Overcompensate Class Members ....................................................................................................21

II.    To the Extent Any Class Is Certified, Plaintiffs Have Not Satisfied Their Evidentiary Burden for Their Massive Proposed Class ....................................................25

    A.    Plaintiffs Should Not Be Permitted to Expand the Class to Include Options Traders ....................................................................................................25

    B.    The Class Period Should Not Begin Until January 7, 2021, at the Earliest ..........27

    C.    The Class Period Should End on January 5, 2024, or, at the Latest, January 8, 2024 ....................................................................................................28

CONCLUSION ....................................................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................................................................................23

*Acticon AG* v. *China Ne. Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)..................................................................................2, 12

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .........................................................28, 30

*Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) .....................................................................................24

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ..............................................7, 28, 30

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ....................................................................20

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) .......................................................5, 20

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) ........................................................22

*Brown* v. *Electrolux Home Prods., Inc.*,
817 F.3d 1225 (11th Cir. 2016) ..............................................................................10

*Bustillos* v. *Bd. of Cnty. Comm'rs*,
310 F.R.D. 631 (D.N.M. 2015)...............................................................................28

*Career Counseling, Inc.* v. *AmeriFactors Fin. Grp., LLC*,
91 F.4th 202 (4th Cir. 2024) ..................................................................................10

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)........................................................................................ *passim*

*Coppel* v. *SeaWorld Parks & Entm't, Inc.*,
347 F.R.D. 338 (S.D. Cal. 2024) ............................................................................25

*In re EpiPen Litig.*,
2020 WL 1180550 (D. Kan. Mar. 10, 2020) ..........................................................26

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)........................................................30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)........................................................28

*In re Ford Motor Co.*,
    86 F.4th 723 (6th Cir. 2023) ........................................................10

*Glickenhaus & Co.* v. *Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ........................................................12

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*,
    594 U.S. 113 (2021)........................................................27

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)........................................................1, 10

*Hayes* v. *MagnaChip Semiconductor Corp.*,
    2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................29

*Howard* v. *Liquidity Servs. Inc.*,
    322 F.R.D. 103 (D.D.C. 2017)........................................................14

*Ind. Pub. Ret. Sys.* v. *AAC Holdings, Inc.*,
    2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ........................................................24

*Johansson* v. *Nelnet, Inc.*,
    2022 WL 6232089 (D. Neb. July 21, 2022) ........................................................25

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ........................................................30

*Loritz* v. *Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................14

*Ludlow* v. *BP, PLC*,
    800 F.3d 674 (5th Cir. 2015) ........................................................2, 5, 23, 24

*Miller* v. *Asensio & Co.*,
    364 F.3d 223 (4th Cir. 2004) ........................................................13

*In re NII Holdings, Inc. Sec. Litig.*,
    311 F.R.D. 401 (E.D. Va. 2015) ........................................................3

*In re Nissan N. Am., Inc. Litig.*,
    122 F.4th 239 (6th Cir. 2024) ........................................................11

*OPERS* v. *Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ....................................................13

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ..............................................................................30

*Slaughter* v. *Uponor, Inc.*,
   2009 WL 10693807 (D. Nev. Nov. 19, 2009) ......................................................25

*Stafford* v. *Bojangles' Rest., Inc.*,
   123 F.4th 671 (4th Cir. 2024) ........................................................................1, 10

*Teachers' Ret. Sys. of La.* v. *Hunter*,
   477 F.3d 162 (4th Cir. 2007) .......................................................................23, 30

*Ward* v. *Apple Inc.*,
   784 F. App'x 539 (9th Cir. 2019) .......................................................................11

*Weisfeld* v. *Sun Chem. Corp.*,
   84 F. App'x 257 (3d Cir. 2004) ..........................................................................25

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   7 F.4th 227 (4th Cir. 2021) ...............................................................................11

**Rule**

Fed. R. Civ. P. 23 ............................................................................... *passim*

## INTRODUCTION

Plaintiffs hope this Court will simply rubber-stamp their request to certify a class of all investors that either purchased Boeing stock or traded Boeing options over the nearly five-year period between September 30, 2019, and May 14, 2024, by overlooking their burden to "*prove— not simply plead*—that the proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). Plaintiffs' generic motion papers and supporting expert report do not come close to proving by a preponderance of the evidence that their massive proposed class should be certified. In an attempt to reverse-engineer a securities fraud class action that will enable them to claim "billions of dollars" in damages, ECF No. 43 ("AC") ¶ 29, Plaintiffs allege that an error on the factory floor in Renton, Washington that caused a door plug to detach from a 737 MAX 9 airplane during an Alaska Airlines flight rendered fraudulent literally *hundreds* of different statements by Defendants over a nearly five-year period. They then contend that any investor that purchased Boeing stock over that lengthy period can recover astronomical damages from Boeing based on the decline in Boeing's stock price on 20 different dates over a four-month period in 2024 after the Alaska Airlines accident. Not content with the already massive class alleged in the Complaint, Plaintiffs' motion also attempts to inflate the potential damages further by improperly expanding the class to include traders of Boeing options, even though Plaintiffs themselves never traded options. The combined effect of these tactics is to "ratchet liability to potentially ruinous levels and force [Boeing] to settle or bet the store." *Stafford* v. *Bojangles' Rest., Inc.*, 123 F.4th 671, 678 (4th Cir. 2024).

Plaintiffs have not satisfied their evidentiary burden under Rule 23 because they fail to provide a methodology for calculating damages on a classwide basis that is consistent with their sprawling liability case, as required by Rule 23(b)(3)'s predominance requirement. *See Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013). As their sole evidentiary support, Plaintiffs rely on the

expert report of Chad Coffman, who devotes only about five pages to his discussion of a damages methodology for both Boeing common stock and Boeing put and call options.  Mr. Coffman's report merely describes in highly general terms various valuation techniques that often can be used to calculate damages in securities cases without making any effort to devise a damages methodology consistent with Plaintiffs' liability theory *in this case*.  In the securities action filed against BP after the Deepwater Horizon explosion in 2010—a case that involved the same liability theory Plaintiffs pursue here—Mr. Coffman's flawed approach to calculating damages resulted in the denial of class certification.  As in this case, the *BP* plaintiffs contended that the defendants' statements about safety led the market to believe that the risk of an accident was lower than it actually was and that this understated risk materialized when a tragic accident occurred.  *See Ludlow* v. *BP, PLC*, 800 F.3d 674, 689-91 (5th Cir. 2015).

In *Comcast*, the Supreme Court held that a plaintiff seeking class certification must establish through "evidentiary proof" that "damages are capable of measurement on a classwide basis" using a methodology "consistent with [their] liability case."  569 U.S. at 33-35.  Plaintiffs and their expert make no serious effort to make that showing.  Instead, Mr. Coffman simply states that "out-of-pocket damages" are usually the appropriate measure of damages in a securities case.  ECF No. 105-1 ("Coffman") ¶ 96.  That is not expert opinion; it is a reference to the measure of damages "[t]he Supreme Court adopted" for Section 10(b) claims.  *Acticon AG* v. *China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).  Mr. Coffman then speculates that he will be able to figure out at a later date how to develop a methodology to measure out-of-pocket damages on a classwide basis consistent with Plaintiffs' liability case.  Coffman ¶¶ 99-100.  Such general hand-waving contravenes *Comcast*'s requirement of evidentiary proof.  Mr. Coffman's perfunctory discussion of damages contrasts starkly with the 100-plus pages of economic analysis

-2-

offered by Defendants' expert, Dr. René Stulz, whom Mr. Coffman acknowledges is a "well-respected" economist.  Ex. 1 ("Coffman Tr.") 120:22-24.  Applying the preponderance-of-the-evidence standard, there can be no question in which direction the balance of the economic evidence tilts in this case given the disparity in analysis.

To be sure, other courts have held that *Comcast* does not present a particularly high hurdle to class certification in the typical securities case involving a limited number of alleged misstatements over a shorter class period that later are directly corrected by the defendants.  *See, e.g.*, *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413-14 (E.D. Va. 2015).  But that is not this case.  Plaintiffs here allege that investors were misled over a staggering 1,164 trading days by hundreds of different statements related to Boeing's efforts to improve safety and that they were injured when Boeing's stock price dropped after the supposedly understated risk materialized in 2024.  Mr. Coffman does not even begin to explain what classwide methodology he would use to quantify the impact of the hundreds of alleged misstatements on the price of Boeing's stock and options on each of those 1,164 trading days.  As one Plaintiff told this Court last year in seeking appointment as Lead Plaintiff, lumping together all purchasers of Boeing stock between 2019 and 2024 into a single class "defies not only common sense, but basic logic," given the fundamentally "altered state of affairs at Boeing" during that lengthy time period.  ECF No. 19 ("IBT Mem.") 9. To the extent it can be extrapolated from his report, Mr. Coffman's approach of using price declines in 2024 to calculate the supposed inflation in Boeing's stock price induced by hundreds of different statements over the preceding four years does not satisfy *Comcast*'s requirement for class certification for at least three reasons.

First, given the "dramatically altered state of affairs at Boeing" between 2019 and 2024, *id*. at 7, the impact of Defendants' alleged misstatements on Boeing's stock price, to the extent

-3-

there was any, varied significantly over the 1,164 trading days encompassed by Plaintiffs' proposed class.  As Lead Plaintiff IBT acknowledged, it is "simply implausible" that Defendants' pre-2021 statements while the 737 MAX remained grounded and before the "substantive changes" implemented by Boeing as part of its January 2021 deferred prosecution agreement ("DPA") with the Department of Justice ("DOJ") "could properly be considered in the same manner . . . as allegedly false statements made thereafter."  *Id.* at 7-8.  Yet Mr. Coffman does not even begin to explain how he would develop a classwide methodology to measure damages throughout the entire class period that takes into account the evolving situation at Boeing between 2019 and 2024.

Second, Mr. Coffman appears to assume that the declines in Boeing's stock price in 2024 after the Alaska Airlines accident can be used to measure the inflation in Boeing's stock price dating back to the first alleged misstatement in September 2019.  *See* Coffman ¶¶ 99-100.  In opposing Defendants' motion to dismiss, however, Plaintiffs argued that Defendants' safety-related statements were material to investors because Defendants repeated them numerous times over a period of multiple years.  ECF No. 53 ("Pls.' MTD Opp'n") 1, 2, 4, 7, 8, 16-17.  Plaintiffs contended that "[w]hile certain statements, viewed in isolation, may be mere puffery, <u>when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors</u>."  *Id*. at 8 (internal quotation omitted; underline in original).  Plaintiffs' argument that it was "Defendants' <u>years</u> of representations that Boeing had turned a new page" on safety that made the alleged misstatements material means that the alleged inflation in Boeing's stock price cannot be attributed to the first alleged misstatement on September 30, 2019.  *Id*. at 17 (underline in original).  But Mr. Coffman simply ignores this problem.  In *BP*, the court rejected Mr. Coffman's approach to damages in this exact circumstance because there was a fatal "disconnect[] between

-4-

damages and liability" given the plaintiffs' liability theory that "the repetition of certain statements" had a "cumulative inflationary effect." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*BP I*").

Third, Mr. Coffman's approach of calculating inflation based on the aggregate declines in Boeing's stock price after the Alaska Airlines accident would confer an impermissible windfall on most, if not all, class members. In *BP*, the plaintiffs similarly alleged that BP's statements about its "safety procedures" created the inaccurate impression that "the risk of a catastrophic failure was lower than it actually was." *Ludlow*, 800 F.3d at 689-90. The court there recognized that any measure of damages must compensate investors only for the inflation that resulted from the understatement of the risk of an accident. Mr. Coffman's damages methodology, however, attempted to calculate the inflation in BP's stock price based on the decline in the stock price "following the materialization of the catastrophic event"—the Deepwater Horizon explosion. *Id.* In that circumstance, the court held, Mr. Coffman's damages calculation "would prov[ide] a windfall" to class members unless the plaintiffs proved that every class member would not have purchased BP stock at all if they had known of the increased risk of an accident—an individualized question that would overwhelm all common questions and thus preclude class certification. *Id.*

Even if the Court were inclined to certify a class here, Plaintiffs' proposed class is vastly overbroad. To start, Plaintiffs improperly try to expand the already-massive class alleged in the Complaint through their class-certification motion. The Complaint here expressly limits the class to purchasers of Boeing "common stock." AC ¶ 1007. Without leave to amend, Plaintiffs' motion now attempts to add to the class all traders of Boeing options during the class period. ECF No. 104 ("Pls.' Mem.") 2. Plaintiffs should not be permitted to expand the size of the class—in a transparent attempt to inflate the potential damages—at this late date given the compressed case

schedule and Mr. Coffman's cursory discussion of damages for Boeing put and call options.

In addition, Plaintiffs cannot certify a class stretching all the way back to September 30, 2019. In 2019 and 2020, the circumstances at Boeing were very different: in the aftermath of the two 737 MAX accidents, the 737 MAX was still grounded, and Boeing had halted its production. Given those circumstances, it is not surprising that Mr. Coffman's event study shows that there was *no* statistically significant increase in Boeing's stock price on any of the 22 days in 2019 and 2020 when alleged misstatements were made. The absence of a statistically significant price increase on those dates belies Plaintiffs' theory that those statements had a price impact, as required to support a presumption of reliance, by convincing investors that Boeing "had changed its ways" after the two 737 MAX accidents and was now prioritizing safety. AC ¶ 12. It was these very different circumstances in 2019 and 2020 that led Lead Plaintiff IBT to tell the Court that the "proper [class] period [should] begin[] after the DPA was announced" on January 7, 2021. IBT Mem. 15. As IBT stated, "it is simply implausible that Boeing's 2019 statements to investors concerning the grounded and uncertified 737 MAX . . . could properly be considered in the same manner—let alone in the same case—as allegedly false statements made thereafter." *Id*. at 8.

Nor can Plaintiffs certify a class that extends beyond January 5, 2024 (the date of the Alaska Airlines accident) or, at the latest, January 8, 2024 (the date another airline reported loose bolts on a 737 MAX 9) because that is when the allegedly misstated risk materialized. All of the later declines in Boeing's stock price—only six of which are associated with a statistically significant decline according to Mr. Coffman's event study—simply reflected the consequences of the Alaska Airlines accident, not the correction of any prior alleged misstatements.

## BACKGROUND

### A.    Plaintiffs' Claims and Proposed Class

On the evening of Friday, January 5, 2024, Alaska Airlines Flight 1282, a 737 MAX 9,

made an emergency landing after a door plug in the fuselage detached shortly after takeoff.  AC ¶ 365.  The crew landed the plane safely, and no one was seriously injured.  Boeing's stock declined by 8% on the next trading day, Monday, January 8, 2024, AC ¶ 371, and Plaintiffs filed this action shortly thereafter, ECF No. 1.

In asserting a securities fraud claim that seeks to recover the declines in Boeing's stock price after the Alaska Airlines accident, Plaintiffs rummaged through nearly five years of Defendants' public statements, principally to find all references to "safety."  The Complaint challenges *hundreds* of different statements made by Defendants between September 30, 2019, and April 5, 2024.  AC ¶¶ 568-999.  Even though the class alleged in the Complaint was limited to purchasers of Boeing common stock, Plaintiffs now seek to represent a class of both purchasers of Boeing stock and traders of Boeing put and call options between September 30, 2019 (the first alleged misstatement) and May 14, 2024 (the last alleged corrective event).  Notwithstanding the "dramatically altered state of affairs at Boeing" in 2019 and 2020, Plaintiffs chose to begin the class period in 2019 because that period "coincide[d] with [one Lead Plaintiff's] handful of late 2019 purchases."  IBT Mem. 9-10.  As Lead Plaintiff IBT explained, the other Lead Plaintiff in this case "tailored" the proposed class period to "amplify[] [its] loss."  *Id.* at 11.  At his deposition, IBT's designated representative testified that IBT "stands behind" all of the statements made in its earlier brief seeking to be appointed Lead Plaintiff.  Ex. 2 at 45:17-25.

**B.    The Starkly Evolving Circumstances Between 2019 and 2024**

***March 2019 (grounding of 737 MAX).***  After the second tragic accident involving a 737 MAX 8 airplane,[1] the FAA issued an order in March 2019 grounding the entire 737 MAX fleet.

---

[1] Another class action asserting securities fraud claims based on allegations that Boeing made false safety-related statements was filed in 2019 and remains pending in Chicago.  *See In re Boeing Co. Aircraft Sec. Litig.*, No. 19-cv-02394 (N.D. Ill.) ("*Boeing I*").  The class period there runs from March 11, 2019, to December 16, 2019, and thus overlaps with the proposed class period here.

AC ¶ 59.  Safety regulators in approximately 42 other countries also prohibited 737 MAX flights.  *Id.*  Thus, at the beginning of the proposed class period on September 30, 2019, the 737 MAX was grounded around the globe, and it did not resume service until December 2020.  *Id.* ¶ 76.  As Lead Plaintiff IBT observed, it is hard to see "how Boeing investors were misled during a time period in which . . . the 737 MAX was still grounded."  IBT Mem. 6.  Consistent with that observation, Mr. Coffman's event study shows that none of the alleged misstatements in 2019 and 2020 is associated with a statically significant increase in Boeing's stock price.  Ex. 3 ("Stulz") ¶ 88.

*December 2019 (737 MAX production halt).*  On December 16, 2019, Boeing announced that it was suspending production of the 737 MAX, and that production halt remained in effect until May 2020.  AC ¶ 153; Ex. 4 (12/16/2019 8-K).  On December 23, 2019, Boeing announced that its CEO, Dennis Muilenburg, was stepping down, stating that "a change in leadership was necessary to restore confidence in the Company moving forward."  AC ¶ 71.

*March 2020 (onset of COVID-19 pandemic).*  The COVID-19 pandemic had profound effects on the entire aviation industry, lessening near-term demand for aircraft and creating extreme stress on Boeing's supply chain.  Stulz ¶¶ 140-152.  Because of the impact of the pandemic, Boeing offered early retirement to certain employees, which changed the composition of its workforce.  *Id.* ¶¶ 146-148.  With airlines deferring or canceling deliveries of airplanes due to low demand for air travel, Boeing ended up with a large inventory of completed but undelivered aircraft.  *Id.* ¶ 149.  Those planes had to be preserved and maintained in long-term storage and later removed from storage and prepared for delivery when demand for air travel began to recover, adding complexity to Boeing's manufacturing process.  *Id.*  Boeing's SEC filings clearly warned investors of these risks.  *See, e.g.*, Ex. 5 (2021 10-K) at 7.

*November 2020 (recertification of 737 MAX).*  On November 18, 2020, after a

"comprehensive and methodical safety review process that took 20 months to complete," the FAA recertified the 737 MAX.  AC ¶ 74.  The 737 MAX resumed service in the United States in December 2020 and resumed service globally in 2021.  *Id*. ¶ 76.

*2019-2020 (Boeing's enhancement of safety controls).*  In September 2019, Boeing's Board of Directors created an Aerospace Safety Committee of directors.  *Id*. ¶¶ 98-100, 104, 575.  In January 2020, Boeing also announced several new codes of conduct.  *Id*. ¶¶ 132, 637-640.  In July 2020, Boeing issued a revamped set of company values prioritizing "safety, quality, integrity and sustainability," and it began implementing a Safety Management System in the second half of 2020.  *Id*. ¶¶ 134-144.  The market understood that Boeing would need time to make progress on these safety initiatives.  Stulz ¶¶ 49-52, 67-75.

*January 2021 (Boeing's DPA with DOJ).*  On January 7, 2021, Boeing announced that it had entered into a DPA with the DOJ.  AC ¶ 708.  The DPA "result[ed] in substantial changes at Boeing concerning safety."  IBT Mem. 10.

*2021 (787 Dreamliner issues and other challenges at Boeing).*  In May 2021, Boeing halted deliveries of the 787 Dreamliner to customers following the FAA's request for additional information about self-reported manufacturing issues unrelated to product safety.  Stulz ¶ 110.  In December 2021, analysts noted that Boeing faced issues recruiting senior engineers.  *Id*. ¶ 79.

*2022–2023 (unprecedented levels of air travel).*  Consumer demand for air travel grew sharply in 2022 and 2023.  This return to pre-COVID levels of consumer demand required Boeing to return to pre-COVID levels of manufacturing output in order to meet airline demand for airplanes.  *Id*. ¶¶ 167-169.  At the same time, one of Boeing's main suppliers, Spirit AeroSystems ("Spirit"), experienced widely reported issues.  *Id*. ¶¶ 177-184.

## ARGUMENT

Plaintiffs' effort to portray class certification in securities actions as routine ignores the

Supreme Court's directive that certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met, including that "common questions predominate over individual ones." *Comcast*, 569 U.S. at 33-34. As the Supreme Court held, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies" Rule 23. *Halliburton II*, 573 U.S. at 275. Plaintiffs' contention that "any doubts about the propriety of certification should be resolved in favor of certification," Pls.' Mem. 7, is also "clearly wrong." *In re Ford Motor Co.*, 86 F.4th 723, 729 (6th Cir. 2023).[2] Because class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only" and "can ratchet liability to potentially ruinous levels and force companies to settle or bet the store," *Stafford*, 123 F.4th at 678, 683, "[t]he party seeking class certification must present evidence and demonstrate compliance with Rule 23," *Career Counseling, Inc.* v. *AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024). Plaintiffs have not presented evidence here that satisfies *Comcast*'s requirement for class certification.

I.     **Plaintiffs Have Not Presented a Methodology Capable of Measuring Damages on a Classwide Basis Consistent with Their Theory of Liability.**

In *Comcast*, the Supreme Court held that a plaintiff cannot satisfy Rule 23(b)(3)'s requirement that common issues predominate over individual issues without "evidentiary proof" of a classwide damages methodology consistent with the plaintiff's theory of liability. 569 U.S. at 33, 35. Plaintiffs' suggestion that the Court should focus on whether common liability issues predominate is incorrect (and, in any event, they do not, for many of the same reasons they do not predominate with respect to damages). *See* Pls.' Mem. 16, 27. "Predominance also applies to

---

[2] *See Brown* v. *Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) ("[T]he district court misstated the law when it said that it 'resolves doubts related to class certification in favor of certifying the class.' The party seeking class certification has the burden of proof. And the entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, 'the party with the burden of proof loses.'") (citations omitted).

damages because the efficiencies of the class action mechanism would be negated if questions of individual damage calculations overwhelm questions common to the class." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021) (quotations and alterations omitted).

To satisfy *Comcast*'s requirement for class certification, a plaintiff's expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future." *Ward* v. *Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019); *see In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253-54 (6th Cir. 2024) (expert's "bald statement alone" cannot "prove" that Rule 23 prerequisites "have been met"). Yet Mr. Coffman does just that here, merely asserting that "[t]here is a standard and well-accepted method for calculating classwide damages in cases under Section 10(b)"—the out-of-pocket measure—without explaining how that measurement of damages can be applied here consistent with Plaintiffs' theory of liability. Coffman ¶ 96. Beyond saying that he would apply the out-of-pocket measure of damages, Mr. Coffman offers no model for actually calculating damages in this case. Instead, he punts all the hard questions to a later date, stating that developing a model that determines "how inflation per share may have evolved over a class period" and that "disaggregates corrective and confounding information" requires a "case-specific" analysis that he has not done. *Id.* ¶¶ 99-100. Although Mr. Coffman admits that constructing such a model will require "a lot of work" and he promises to "do the best [he] c[an]," Coffman Tr. 155:13-156:7, 176:17-177:7, he never describes how he would create a model that both conforms with Plaintiffs' liability theory and takes into account the staggering breadth of Plaintiffs' allegations.

Mr. Coffman's bare assertion that he could use various different techniques to calculate out-of-pocket damages does not satisfy Plaintiffs' evidentiary burden to "present" a methodology "establishing that damages are capable of measurement on a classwide basis" in a manner "consistent with [their] liability case." *Comcast*, 569 U.S. at 34-35. Out-of-pocket damages is

-11-

simply the measure of damages that "[t]he Supreme Court adopted" for Section 10(b) claims, *Acticon*, 692 F.3d at 38, just like benefit-of-the-bargain damages is the measure of damages for breach-of-contract claims. Allowing a class to be certified based on an expert's promise to calculate at a later date out-of-pocket damages—the standard measure of damages in Section 10(b) cases—would "reduce Rule 23(b)(3)'s predominance requirement to a nullity" and make class certification automatic in every securities case. *Comcast*, 569 U.S. at 36. To certify a class under *Comcast*, Plaintiffs must explain how they intend to measure out-of-pocket damages on a classwide basis consistent with their theory of liability. On that question, Mr. Coffman is silent.

Plaintiffs' liability theory in this case is that Defendants misled investors by making hundreds of separate misstatements over four and one-half years that supposedly misstated the risk of a future accident, causing Boeing's stock to "trade at artificially inflated prices." Pls.' Mem. 15. To measure each class member's out-of-pocket damages, Plaintiffs must calculate the "difference between the stock price after [each] false statement [was made] and what it would have been had the statement reflected the truth." *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 417 (7th Cir. 2015). Given the sweep of Plaintiffs' allegations, that is a Herculean (if not impossible) task in this case. Even Mr. Coffman acknowledges the difficulty of the task ahead of him, conceding that his damages methodology ultimately must be capable of calculating the difference between Boeing's actual stock price and what it would have been if each of Defendants' statements reflected the truth on every one of the 1,164 trading days included in Plaintiffs' nearly five-year proposed class period. Coffman Tr. 123:17-25, 178:4-14.

Rather than take on that seemingly impossible task, Mr. Coffman simply describes various *potential* techniques for measuring inflation in securities cases, while reserving the right to use other unspecified approaches. Coffman ¶¶ 99-100; Coffman Tr. 124:17-23. The only common

element in these potential techniques is that they appear to start with the price declines in 2024 when the "relevant truth" supposedly was revealed through the "materialization" of the allegedly misstated risk and then "backcast" some or all of that supposed inflation to the beginning of the proposed class period. Coffman ¶¶ 96 n.125, 99-100. When a plaintiff's expert "simply asserts . . . that there are unspecified 'tools' available to measure damages"—which is all Mr. Coffman does here—"the model amounts to no damages model at all, and the class cannot be certified." *OPERS* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*19 (N.D. Ohio Aug. 14, 2018).

In fact, at his deposition, Mr. Coffman did not deny that he simply copied-and-pasted his report's brief discussion of damages nearly word-for-word from a "template" he uses for all of his class-certification reports. Coffman Tr. 82:19-87:20. Mr. Coffman admitted that he has recycled the same "virtually identical" language in every class-certification report he has submitted since at least 2020 (about 15 to 20 reports per year). *Id.* Mr. Coffman acknowledged that, as an expert here, he made *no* effort to devise a damages model that fits Plaintiffs' liability theory and the unique facts of this case, conceding that no part of his damages opinion is "specific to this case." *Id.* at 90:8-16. Even though he is not a lawyer, Mr. Coffman defends his lack of analysis by arguing that measuring "how inflation per share may have evolved over the class period" and removing stock-price movements caused by "confounding information" relate to the issue of "loss causation." Coffman ¶¶ 98-100. That is incorrect. To show loss causation, a plaintiff must prove that "the misrepresentation is one substantial cause of the [stock price's] decline." *Miller* v. *Asensio & Co.*, 364 F.3d 223, 233 (4th Cir. 2004). That inquiry is binary: either the misrepresentation was a substantial cause of the stock price's decline or it was not. The calculation of damages is different. "[A] plaintiff will be allowed to *recover* only damages actually caused by the misrepresentation," and thus, "*in determining recoverable damages*," all other "contributing

-13-

forces must be isolated and removed." *Id.* Regardless of whether Plaintiffs can show loss causation, they have not satisfied their evidentiary burden at class certification of presenting a model for calculating damages on a classwide basis consistent with their liability theory.

While it is true that some courts have accepted a general description of a damages methodology at class certification in "run-of-the-mill securities fraud case[s]" involving far fewer alleged misstatements and corrective events and a much shorter class period, *Howard* v. *Liquidity Servs. Inc.*, 322 F.R.D. 103, 140 (D.D.C. 2017), this is no run-of-the-mill case. Plaintiffs instead have cobbled together a sprawling liability theory that poses myriad complications for calculating damages on a classwide basis that Mr. Coffman fails to address: (i) Plaintiffs challenge literally hundreds of different statements made on more than 50 separate dates over a period of more than four years; (ii) Plaintiffs contend that Defendants' general safety-related statements became material to investors because they were repeated numerous times over a period of years; (iii) Plaintiffs seek to measure the amount of inflation in Boeing's stock price starting in 2019 based on the declines in Boeing's stock price on 20 different dates over the four-month period following the Alaska Airlines accident in January 2024; and (iv) Boeing experienced significant operational and market changes over the period in which Plaintiffs allege that Boeing's stock price was inflated. Mr. Coffman's failure to address these unique facts of this case is fatal to class certification. *See Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (rejecting expert's description of "general techniques for computing damages in securities fraud cases" where "(1) there are multiple alleged misrepresentations, (2) corrective information was allegedly disclosed at multiple times, (3) corrective information regarding different alleged misrepresentations was allegedly disclosed on the same day, and (4) some of the allegedly concealed facts arose or were made known to the company (and thus for the first time could have

-14-

been disclosed) during the class period").

A.    **Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model That Accounts for the Changing Mix of Information Related to Boeing During the Nearly Five-Year Class Period.**

As Lead Plaintiff IBT told the Court last year, "[p]erhaps the biggest deficiency in the allegations here is the failure to distinguish the dramatically altered state of affairs at Boeing in 2020 after the FAA's recertification of the 737 MAX and production resumed, not to mention the substantive changes Boeing implemented in connection with the Company's January 6, 2021 DPA with the DOJ." IBT Mem. 7. Given the "momentous and unprecedented events" at Boeing in 2019 and 2020, it is "simply implausible" that Boeing's 2019 and 2020 statements "to investors concerning the grounded and uncertified 737 MAX . . . could properly be considered in the same manner—let alone in the same case—as allegedly false statements made thereafter." *Id*. at 8. Plaintiffs' "failure to acknowledge or distinguish the altered state of affairs at Boeing defies not only common sense, but basic logic." *Id*. at 9. Even taking Plaintiffs' factual allegations as true, in view of the evolving state of affairs at Boeing and in the aviation industry generally, the notion that the market would have interpreted Defendants' statements exactly the same way between September 2019 and April 2024 is unsustainable.

Although he acknowledged the need to do so, Mr. Coffman does not even attempt to explain how he would develop a classwide damages model that adjusts for the changing mix of information about Boeing and its evolving efforts to address quality and safety during the nearly five-year class period. *See* Coffman Tr. 152:19-153:3, 186:11-24. As Defendants' expert, Dr. René Stulz, explains, because the inflation in Boeing's stock price allegedly introduced by Defendants' statements supposedly results "from the market over-valuing Boeing's safety efforts," that inflation at any point in time reflects the difference between (i) "the market's perception of Boeing's forward-looking plans to improve safety" based on the alleged misstatements, and

-15-

(ii) "Boeing's actual progress on those plans."  Stulz ¶ 34.  "Boeing's actual progress on safety initiatives, what the market learned about the implementation of those initiatives, and the market's perception of Boeing's progress on safety initiatives likely varied over time."  *Id.* ¶ 35. Mr. Coffman never explains how he would incorporate this evolving information about Boeing and its safety initiatives into a damages methodology, stating only that it "would be [an] important thing[] to consider," but "[h]ow it would ultimately impact the inflation, I don't have a view of right now."  Coffman Tr. 186:11-24.  What is clear, however, is that Mr. Coffman cannot rely on the "typical" approach he "most often" uses of simply assuming that the inflation in Boeing's stock price was constant, either in dollar amount or on a percentage basis, throughout the entire class period.  *Id.* at 138:6-140:12.  As Dr. Stulz explains, that approach is unworkable here given the changing mix of available information between 2019 and 2024.  *See* Stulz ¶¶ 25, 35-36, 104-185.

First, regardless of the substantial safety and quality initiatives undertaken by Boeing throughout this period, the market believed that those initiatives would take time to bear fruit.  *Id.* ¶¶ 49-52, 61-75.  As a result, any model that purports to measure the inflation introduced by Boeing's forward-looking statements about its commitment to safety would need to account for the market's assessment of "the perceived likelihood that Boeing would be able to successfully implement those initiatives"—an assessment that necessarily would have evolved over the five-year class period.  *Id.* ¶ 48.  Mr. Coffman never explains how he would account for this reality in measuring the effect of Defendants' statements on Boeing's stock price on each of the 1,164 trading days included in the class period.

Second, Boeing encountered an evolving regulatory environment during the class period. The 737 MAX was grounded for the first 14 months of the class period (from September 2019 until November 2020), and Boeing halted production of the 737 MAX from December 2019 until

-16-

May 2020.   As Dr. Stulz explains, "it is implausible to suggest that investors would have interpreted Boeing's statements regarding the safety of its airplanes in the same way during the period of time when the 737 MAX was grounded at the beginning of the Putative Class Period as they would have after the plane returned to service in November 2020, over a year later, or as they would two, three, and four years later in the Putative Class Period."  *Id*. ¶ 93.   But Mr. Coffman fails to "explain how any of the 'valuation techniques' he mentions could be applied to measure" this change in the regulatory environment.  *Id*. ¶ 95.   At his deposition, Mr. Coffman testified that he has no "view [] right now" on how to treat these concededly "important" events in calculating damages.  Coffman Tr. 186:11-24.   Similarly, Boeing agreed in January 2021 as part of the DPA with the DOJ to implement a number of "remedial measures."   Stulz ¶¶ 117-120.   Again, "it is implausible to suggest that investors would have interpreted Boeing's statements regarding its commitment to safety in the same way before and after the DPA in January 2021," *id*. ¶ 120, but Mr. Coffman offers no explanation how his damages methodology would address this change.

Third, the COVID-19 pandemic had an unprecedented impact on Boeing's business of manufacturing airplanes.   As Mr. Coffman acknowledges, Coffman Tr. 184:16-21, the supply chain disruptions and labor shortages caused by the pandemic resulted in "Boeing's suppliers struggl[ing] to keep up with production timelines, resulting in quality escapes," Stulz ¶ 140.   As a result of the near total cessation of air travel beginning in March 2020, Boeing also built up a large inventory of completed but undelivered aircraft.   Storing those aircraft and then later returning them to active status years later added further complexity and challenges for Boeing.  *Id*. ¶¶ 149-151.   The severe disruptions caused by the pandemic would have "change[d] the market's perception of the progress, timing, and/or success of Boeing's implementation of its safety initiatives."  *Id*. ¶ 140.   These disruptions were not only obvious consequences of the pandemic—

they also were appropriately disclosed and well-understood by the investment community, and a reasonable investor would necessarily have considered Boeing's public statements about safety and quality in light of those risks.  But Mr. Coffman fails to explain how his damages methodology will address these impacts of COVID-19.

Fourth, analysts identified a number of other critical issues involving Boeing and its airplanes during the class period that would have affected the market's perception of Boeing's progress on its safety initiatives.  Boeing relocated production of the 787 Dreamliner to South Carolina in October 2020 and moved its headquarters to Virginia in May 2022, both of which prompted analyst concern about the risk of quality-control lapses.  *Id.* ¶¶ 56-60.  The market learned of other operational challenges related to Boeing's progress on "manufacturing quality improvements," including manufacturing issues with the 787 Dreamliner that Boeing identified and disclosed to the FAA and that resulted in Boeing halting deliveries of that airplane in May 2021 after the FAA requested additional information.  *Id.* ¶¶ 104, 110-11, 177-184.  The market also knew of Boeing's difficulties hiring senior engineers, widely reported manufacturing quality issues at Boeing's main parts supplier, Spirit, and other assorted "[m]anufacturing issues" throughout 2022 and 2023.  *Id.* ¶¶ 79, 102-03.  These events undoubtedly affected the market's understanding and interpretation of Defendants' statements about Boeing's safety initiatives. Indeed, at various points in the class period, analysts "expressed skepticism about Boeing's ability to successfully implement its forward-looking plans to improve safety and safety culture."  Stulz ¶ 64; *see id.* ¶ 56 (quoting BofA report); *id.* ¶ 183 (quoting Bernstein, Wolfe Research, and JPMorgan reports discussing quality issues at Spirit).  While Boeing disagreed with the views expressed by analysts, Mr. Coffman does not begin to explain how he will address these issues.

Fifth, the contribution of Boeing's commercial airline segment to Boeing's overall

-18-

financial performance fluctuated over time, meaning that the market's perception of Boeing's ability to implement its safety initiatives for that segment would have affected Boeing's stock price differently throughout the nearly five-year class period. *Id.* ¶¶ 153-164. Mr. Coffman does not explain how he would address that complication either.

Under *Comcast*, Plaintiffs cannot make the necessary "evidentiary" showing simply by avoiding until a later date all the many difficult issues in this case. *See* 569 U.S. at 33-35.

### B.    Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model Consistent With Their Liability Theory That the Challenged Safety Statements Became Material Through Their Repetition Over Many Years.

Although he is noncommittal, Mr. Coffman states that he may calculate damages by assuming that the amount of inflation in Boeing's stock price, either in dollar amount or on a percentage basis, remained constant over the class period. Coffman ¶ 100. At his deposition, he admitted that he typically calculates damages that way. Coffman Tr. 140:6-12, 159:3-10. In this case, however, that damages methodology would be contrary to Plaintiffs' liability theory.

In opposing Defendants' motion to dismiss, Plaintiffs argued that Defendants' safety-related statements were material to investors because "Defendants *repeatedly* emphasized that Boeing had absorbed the lessons of the [737 MAX] Crashes by prioritizing safety and quality control," Pls.' MTD Opp'n 1 (emphasis added), and they further stressed that "the repetition of [these] safety-related statements underscores their materiality," *id*. at 16. According to Plaintiffs, while certain of the statements, "viewed in isolation, may be mere puffery, <u>when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors</u>." *Id.* at 8 (internal quotations omitted; underline in original). Plaintiffs thus distinguished the decision in the other pending Boeing class action holding that similar safety-related statements were immaterial by contending that "[t]his case, by contrast, concerns Defendants' <u>years</u> of

-19-

representations that Boeing had turned a new page after the crashes by prioritizing safety." *Id*. at 17 (underline in original). Indeed, the notion that the September 2019 statement that "[s]afety is at the core of who we are at Boeing" (AC ¶ 576) alone would have inflated Boeing's share price defies common sense. As Lead Plaintiff IBT argued, "only unreasonable investors would find [a] statement about Boeing's core values meaningful to the total mix of information" following two fatal crashes and the global grounding of the 737 MAX. IBT Mem. 7 (internal quotation omitted).

In avoiding dismissal, Plaintiffs analogized this action to the securities case filed against BP after the Deepwater Horizon explosion, arguing that like Boeing's CEO, "BP's CEO touted the company's safety efforts." Pls.' MTD Opp'n 26. In *BP*, the court rejected Mr. Coffman's damages methodology because of the clear "disconnect[]" between (i) any methodology that assumes constant inflation in BP's stock price throughout the class period and (ii) the plaintiffs' liability theory that "the repetition of [the] statements" had a "cumulative inflationary effect." *BP I*, 2013 WL 6388408, at *17. As in this case, the *BP* plaintiffs alleged that BP's CEO repeatedly made statements falsely "touting" BP's progress in instituting safety improvements. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012). In sustaining their complaint, the court concluded that "[a] repeated utterance, even on a promise of progress, can become misleading" as a result of the sheer repetition of the statement. *Id.* at 759. That liability theory, however, later proved fatal to the plaintiffs at class certification because Mr. Coffman offered a damages methodology that assumed that "inflation remain[ed] constant over the Class Period," which did not "track Plaintiffs' theory of liability" that the safety-related statements became material due to their repetition over time. *BP I*, 2013 WL 6388408, at *17.

That same logic applies to Mr. Coffman's generalized approach to damages in this case. *Comcast* requires Plaintiffs to present a classwide damages model that is "consistent with [their]

liability case" and that "measure[s] only those damages attributable to that theory." 569 U.S. at 35. Mr. Coffman appears to acknowledge this requirement by stating that "another approach" that departs from his typical approach "may be necessary" here, Coffman ¶ 100, but he does not even try to explain what that other approach would entail. Because Mr. Coffman does not offer a model that tracks Plaintiffs' theory that the challenged statements became material due to their repetition, Plaintiffs have not satisfied their evidentiary burden.

### C. Plaintiffs Fail to Address How They Plan to Develop a Classwide Damages Model Consistent With Their Materialization-of-the-Risk Liability Theory That Would Not Improperly Overcompensate Class Members.

Plaintiffs' central theory is that Defendants misstated Boeing's progress in improving its safety practices and thus understated the risk of another accident. Rather than develop a damages model that attempts to quantify the supposed inflation in Boeing's stock price because the market allegedly underestimated the risk of an accident, Mr. Coffman attempts to measure the inflation during the class period based on the declines in Boeing's stock price after an accident (the Alaska Airlines incident) had occurred and Boeing suffered the consequences of that accident. Coffman ¶¶ 99-100. That approach improperly assumes that statements reflecting the truth would have convinced the market that an accident like the Alaska Airlines accident was 100% certain to occur, which Plaintiffs do not allege. That approach is also incompatible with Plaintiffs' liability theory because it does not purport to measure damages equal to the inflation in Boeing's stock price at the time of each of the alleged misstatements—*i.e.*, the difference between the observed price and the "but-for" price had the challenged statements reflected the truth—before the materialization of the allegedly understated risk when the door plug detached from the Alaska Airlines flight in 2024. *See* Stulz ¶¶ 207-216.

Once again, the *BP* case is on point. The plaintiffs there alleged that the defendants' repeated statements about "safety improvements" had "lulled the market into believing that BP

was a safer company than it actually was." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *2 (S.D. Tex. May 20, 2014) ("*BP II*").    According to the plaintiffs, these false assurances "understated BP's exposure to catastrophic risk," *id.* at *3, and the "fraud was revealed when the Deepwater Horizon exploded," *id.* at *2.  The *BP* plaintiffs likewise retained Mr. Coffman as their class-certification expert, and as in this case, Mr. Coffman contended that classwide damages could be computed based on the decline in BP's stock price after the Deepwater Horizon explosion. *Id.* at *7-8 & n.6.   The court rejected Mr. Coffman's "backcasting" approach to calculating damages because it based damages "on total losses following the explosion, not on the distortion allegedly created by Defendants' misstatements before anyone knew that BP would suffer a deepwater well blow-out."   *Id.* at *4.   As such, Mr. Coffman's methodology improperly "overcompensate[d] investors for their harm."   *Id.* at *2.  As the court explained, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent," and the plaintiff did not, and could not, argue that risk of an explosion and oil spill was 100%.  *Id.* at *10.

After the plaintiffs were given another chance to develop a classwide damages methodology, the court again denied class certification because Mr. Coffman continued to backcast the decline in BP's stock price after the explosion, which improperly "inject[ed] individualized inquiries into what is supposed to be a classwide model of recovery."  *Id.* at *11. In affirming the denial of class certification, the Fifth Circuit stressed that the plaintiffs' theory that the "statements resulted in an 'investor being defrauded into taking a greater risk than disclosed,' taking away plaintiffs' 'opportunity to decide whether to divest in light of the heightened risk,' . . . hinges on a determination that each plaintiff would not have bought BP stock

*at all* were it not for the alleged misrepresentations—a determination not derivable as a common question, but rather one requiring individualized inquiry." *Ludlow*, 800 F.3d at 689-90. To illustrate the point, the Fifth Circuit posited a hypothetical in which the true risk of a disaster was 2%, while the misstatements falsely implied the risk was 0.5%. *Id.* at 690. A "low-risk pension fund" that could not invest in stocks with a risk of disaster "greater than 1%" would not have bought BP stock at all, making it "the type of plaintiff the materialization-of-the-risk theory is designed to compensate." *Id.* By contrast, a "high-risk fund" with a risk threshold higher than 2% "still might have purchased the stock, even had it known the 'true' risk, though presumably at a lower price that accounted for the increased risk," in which case "full materialization-of-the-risk damages would prove a windfall." *Id.* Because Mr. Coffman's model "lack[ed] the ability" to "separat[e] those two classes of plaintiffs," class certification was denied. *Id.*

The same reasoning applies here. As in *BP*, Plaintiffs allege misstatements over a period of years that described Boeing's ongoing efforts to improve "safety" and purportedly "assured the market of Boeing's ability to produce safe, high-quality airplanes." AC ¶ 804. Plaintiffs contend that those statements inflated Boeing's stock price by an amount equal to the price decline after an accident actually occurred. *See id.* ¶ 1000.[3] As in *BP*, Plaintiffs do not allege that the challenged statements concealed a 100% risk of an accident, nor do they contend that the market believed that the chance of an accident was 0%. Coffman Tr. 107:3-5 ("[T]he market understood that the

---

[3] This theory of damages is referred to as materialization of the risk. Rather than "identify a public disclosure that corrected the previous, misleading disclosure" (*e.g.*, an earnings restatement correcting a prior earnings release), Plaintiffs allege that "news of the materialized risk" that was concealed by the alleged misstatements "caused plaintiffs' loss." *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 187 n.3 (4th Cir. 2007). In other words, misstatements understating the risk of an accident were allegedly revealed to be false not through a correction of those statements, but through the "'materialization of [the] risk' concealed." *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020); *see Ludlow*, 800 F.3d at 680 ("The Pre-Spill plaintiffs' damages theory relied on a 'materialization of the risk' claim. In essence, that BP had understated the risk of catastrophe, and when that risk materialized, they could recover its resulting damages.").

probability of a safety-related incident was not zero.").  Mr. Coffman does not attempt to explain how he will address the problem of overcompensation that results from using the price decline upon the occurrence of an accident as the measure of inflation purportedly caused by the alleged misstatements.  Under Plaintiffs' liability theory, if the challenged statements had reflected the truth, the market would have understood that the risk of a safety event was incrementally higher than it incorrectly assumed due to Defendants' statements, but Boeing's stock price still would have declined by some amount after the Alaska Airlines accident even if Boeing had spoken truthfully.  Stulz ¶¶ 211-216; *see* Coffman Tr. 108:10-22 (agreeing that "[i]t's possible, yes"). Mr. Coffman does not even attempt to address these issues, which resulted in the denial of class certification in *BP*.  Instead, he admits that he "ha[s]n't considered at all" how he would determine the portion of the decline in Boeing's stock price following the Alaska Airlines accident, if any, attributable to the market learning that Boeing's statements made years earlier were untrue. Coffman Tr. 108:23-109:1.

In sum, any use of the decline in Boeing's stock price after the Alaska Airlines accident as the proxy for the inflation supposedly introduced by Defendants' earlier safety-related statements "stretches the 'back-end price drop equals front-end inflation' inference beyond its breaking point." *Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 100 (2d Cir. 2023).  As the Fifth Circuit held in *BP*—a case involving the same liability theory—any damages methodology that relies on a back-end price drop would permit class members to "travel to a place forbidden by *Comcast*." *Ludlow*, 800 F.3d at 688; *see Ind. Pub. Ret. Sys.* v. *AAC Holdings, Inc.*, 2023 WL 2592134, at *24 (M.D. Tenn. Feb. 24, 2023) (denying class certification in part because plaintiff's expert "omit[s] any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory").  Again, Mr. Coffman simply ignores this critical issue.

## II.    To the Extent Any Class Is Certified, Plaintiffs Have Not Satisfied Their Evidentiary Burden for Their Massive Proposed Class.

Even if the Court is inclined to certify some class here, Plaintiffs' proposed class is fatally overbroad in at least three fundamental ways:  (i) the class cannot also include traders of Boeing options, (ii) the class period cannot possibly begin before January 7, 2021, when Boeing announced its DPA with the DOJ, and (iii) the class period cannot possibly extend past January 5, 2024 (the date of the Alaska Airlines accident) or, at the latest, January 8, 2024 (the date on which another airline reported loose bolts on a 737 MAX 9).  These three obvious defects epitomize the overreach and evidentiary shortcomings plaguing Plaintiffs' deficient motion.

### A.    Plaintiffs Should Not Be Permitted to Expand the Class to Include Options Traders.

The class alleged in the Complaint is limited to purchasers of Boeing "common stock." AC ¶ 1007.  Rather than request leave to amend, Plaintiffs' motion for class certification improperly seeks to expand the already massive class to include purchasers of all call options and sellers of all put options on Boeing stock. Pls.' Mem. 2.  Unlike in the case they cite (*id*. at 7 n.5), Plaintiffs do not seek "to narrow the definition of the class in [their] motion for class certification." *Weisfeld* v. *Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004).  Nor do they seek to change the class definition based on newly discovered facts.  *See Slaughter* v. *Uponor, Inc.*, 2009 WL 10693807, at *7 (D. Nev. Nov. 19, 2009) (rejecting attempt to expand class where "request does not arise from recent discovery of previously undiscoverable facts").  Instead, Plaintiffs seek a significant expansion of the class alleged in the Complaint in a transparent attempt to drive up the alleged damages by potentially billions of dollars, even though Plaintiffs did not trade any options.

"[P]laintiffs cannot broaden the class definition" in their motion for class certification. *Coppel* v. *SeaWorld Parks & Entm't, Inc.*, 347 F.R.D. 338, 350 (S.D. Cal. 2024) (collecting cases); *see Johansson* v. *Nelnet, Inc.*, 2022 WL 6232089, at *5 (D. Neb. July 21, 2022) (rejecting

"'attempt[] to broaden the class'"); *In re EpiPen Litig.*, 2020 WL 1180550, at *26 n.29 (D. Kan. Mar. 10, 2020) ("The court will not expand the class definitions from the ones plaintiffs previously proposed."). Given the compressed schedule in this case, Plaintiffs' attempt to expand the class at this juncture to include an entirely different set of investors prejudices Defendants' ability to defend themselves. Plaintiffs' motion offers no valid explanation or justification for such a significant expansion of the class alleged in the Complaint at this late date.

In addition, Mr. Coffman does not propose a classwide damages methodology for Boeing options consistent with Plaintiffs' liability theory. Among many other reasons explained by Dr. Stulz, volatility of the underlying stock is an important input in options pricing because "underlying stock prices that are more volatile will be more likely to meet the strike price of any options series, thus increasing the value of the options." Stulz ¶ 277. Complicating matters further, "different options may require different expected volatility inputs." *Id.* Although Mr. Coffman states that his damages methodology for options will attempt to translate "the artificial inflation in the Common Stock . . . into an alternative 'but-for' price for the option," Coffman ¶ 103, he does not "explain how he would estimate the option-specific expected volatility that would have prevailed but for the alleged misrepresentations," which is necessary to quantify "the 'but-for' prices of individual options in order to estimate options damages." Stulz ¶ 277.[4]

---

[4] Plaintiffs also fail to prove that Boeing options traded in an efficient market. In attempting to show that Boeing options react to new value relevant information, Coffman ¶ 95, Mr. Coffman improperly "aggregates his analysis across option contracts with 216 unique strike prices ranging from $50 to $650, 261 unique maturity dates ranging from October 4, 2019 to December 18, 2026, and 17,947 pairs of call and put options with unique strike price-maturity combinations." Stulz ¶ 248. Each "individual option contract for Boeing is a unique and separate financial instrument," subject to "different trading behaviors and different market characteristics," and thus cannot be assumed to trade in a single market. *Id.* ¶¶ 248-266. Mr. Coffman's analysis "based on averages . . . obscure[s] the heterogeneity of the underlying options." *Id.* ¶ 254.

**B.      The Class Period Should Not Begin Until January 7, 2021, at the Earliest.**

If Plaintiffs' motion is not denied outright, the Court should not under any circumstances permit Plaintiffs to take the start date of the proposed class all the way back to September 30, 2019. Rather, as Lead Plaintiff IBT previously argued, the only "proper [class] period [should] begin[]" after the DPA was announced" on January 7, 2021.  IBT Mem. 15.  There can be no doubt that Plaintiffs have not satisfied their evidentiary burden in support of any proposed class period before that date.

First, Mr. Coffman's own event study refutes the notion that the alleged misstatements before 2021 inflated Boeing's stock price.  That event study shows *no* statistically significant increase in Boeing's stock price on any of the 22 dates when alleged misstatements were made in 2019 and 2020.  *See* Stulz ¶ 88.  The absence of a statistically significant price increase on any of those days defeats any possible claim that the pre-2021 statements had a price impact.  That is consistent with Lead Plaintiff IBT's previous observation that investors could not have been "misled during a time period in which:  (1) the 737 MAX was still grounded by the FAA (from March 2019 to December 2020) . . . ; and (2) 737 MAX production was suspended (from December 2019 to May 2020)."  IBT Mem. 6 (citation omitted).  Plaintiffs cannot argue that the pre-January 2021 statements had a price impact under an inflation-maintenance theory, which posits that "a misrepresentation causes a stock price 'to *remain inflated by preventing preexisting inflation from dissipating* from the stock price.'"  *Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 594 U.S. 113, 119-20 (2021) (emphasis added).  Plaintiffs do not allege—and cannot plausibly contend—that the alleged misstatements in 2019 and 2020 *maintained* safety-related inflation in Boeing's stock price that still existed in those years despite the two 737 MAX crashes in 2018 and 2019, the grounding of the 737 MAX in 2019 and 2020, and Boeing's halt of production of the 737 MAX in 2020.  Such a contention would defy reality.

Second, the class period in the other securities action pending against Boeing in Chicago extends through December 16, 2019 and thus overlaps with the proposed class period in this case. In ending their class period on December 16, 2019, the plaintiffs in that other case allege that Boeing's press release on that date announcing a halt in production of the 737 MAX partially revealed the "truth." *Boeing I*, 2022 WL 3595058, at *29. In contrast, Plaintiffs here allege that the same Boeing press release contained a misstatement that inflated Boeing's stock price. AC ¶¶ 615-616. As Lead Plaintiff IBT argued, the plaintiffs in the other class action assert that "the 'truth emerge[d]' . . . beginning in March 2019 and continuing through December 2019." IBT Mem. 5. Investors that bought Boeing stock between September 30, 2019, and December 16, 2019—and thus are members of both putative classes—should not be permitted to assert in this case that they were misled by Boeing's statements beginning in September 2019 while simultaneously asserting in the other case that the truth was revealed to them between March 2019 and December 2019. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure."). This is why "[s]ubsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims." *Bustillos* v. *Bd. of Cnty. Comm'rs*, 310 F.R.D. 631, 656-57 (D.N.M. 2015).

### C.    The Class Period Should End on January 5, 2024, or, at the Latest, January 8, 2024.

"'In the case of a securities fraud class action, *a class period ends when the truth has been disseminated to the market.*'" *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *7 (S.D. Tex. Feb. 9, 2024). Thus, "'courts are required to cut off the class period on the date of a statement or event that cures the market'"—that is, "when the market learned the truth . . . , not when the . . .

front-end price impact fully dissipated." *Id.* at *8 & n.2; *see Hayes* v. *MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016) ("The question is not, as Plaintiffs' argue, whether the March 2014 disclosure was 'fully corrective,' but whether it made further reliance on MagnaChip's earlier financial reports unreasonable.  The Court finds that it did.").

Here, Plaintiffs allege that the risk of an accident materialized when the door plug blew off the Alaska Airlines flight on January 5, 2024, which prompted the FAA to temporarily ground "171 Boeing 737 MAX 9 jets as it began safety inspections."  AC ¶ 366.  According to Plaintiffs, analysts interpreted the Alaska Airlines accident as "likely indicative of manufacturing quality issues at Boeing."  *Id*. ¶ 367.  Plaintiffs further allege that any doubt about whether the Alaska Airlines accident was a one-off event was removed on January 8, 2024, when "news reports emerged that United Airlines had discovered loose bolts in its door plugs when conducting an FAA-mandated investigation of its grounded 737 MAX 9 airplanes following the Alaska Airlines Incident."  *Id*. ¶ 372.  This news "confirmed for the market that the issue that caused the detached door plug in the Alaska Airlines Incident affected more than a single aircraft, further evincing serious issues with Boeing's manufacturing processes."  *Id*.

In a transparent effort to drive up the alleged damages, Plaintiffs nevertheless try to extend the class period by an additional four months to May 14, 2024, pointing to 20 additional events that supposedly revealed the truth after January 8, 2024.  *See id*. ¶¶ 377-472.  But Plaintiffs have not satisfied their burden of showing that the class period here should extend into May 2024.  Mr. Coffman's own event study shows a statistically significant decline in Boeing's stock price on only six of the 20 dates of alleged corrective events after January 8, 2024.  Stulz ¶ 196.  Far from revealing additional information that corrected Defendants' earlier statements, the information disclosed to the market on those six days reflected the consequences of the Alaska Airlines

-29-

accident:  (i) the FAA's increased oversight of Boeing's manufacturing and production processes (Jan. 12, 2024), AC ¶ 379; (ii) Chinese airlines' delaying acceptance of 737 MAX deliveries (Jan. 16, 2024), AC ¶ 385; (iii) the FAA's temporary halt of 737 MAX production (Jan. 25, 2024), AC ¶¶ 393-398; (iv) the DOJ's announcement of an investigation (Mar. 11, 2024), AC ¶ 432; (v) a news report of the FAA's audit of Boeing after the Alaska Airlines accident (Mar. 12, 2024), AC ¶ 435; and (vi) reports that the DOJ found a violation of the DPA (May 14, 2024), AC ¶¶ 462-464. Plaintiffs do not identify any additional corrective information that was disclosed on those days.

Contrary to Plaintiffs' suggestion, not "every announcement of bad news constitute[s] a corrective disclosure." *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 476 n.9 (4th Cir. 2011). Rather, information is corrective only if it "reveal[s] the falsity of [the] prior statement[s]." *Boeing I*, 2022 WL 3595058, at *29 n.13. Under Plaintiffs' theory of the case, the alleged fraud was revealed when the allegedly understated risk materialized on January 5 and 8, 2024. "[M]arket react[ion]" to news of the subsequent *consequences* of the Alaska Airlines accident does not correct any prior statements and thus cannot serve as a corrective event. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010); *see In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024) (shortening class period because "Plaintiffs do not contend that [later disclosure] is the first time the market learned about the manipulations themselves," only that "this is when the market learned about the FDA's reaction"); *Apache*, 2024 WL 532315, at *9 ("revealing the depths of Apache's financial struggles did not shed any new light on Apache's alleged misrepresentations"); *Hunter*, 477 F.3d at 188 (stock drop "more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations.").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Dated: January 21, 2025

Respectfully submitted,

|  |  |
|---|---|
| Richard C. Pepperman II (*pro hac vice*) | /s/ Benjamin L. Hatch |
| SULLIVAN & CROMWELL LLP | Benjamin L. Hatch |
| 125 Broad Street | MCGUIREWOODS LLP |
| New York, New York 10004 | 888 16th Street N.W. |
| Telephone: (212) 558-4000 | Suite 500 |
| Facsimile: (212) 558-3588 | Black Lives Matter Plaza |
| peppermanr@sullcrom.com | Washington, D.C. 20006 |
|  | T: (757) 640-3727 |
|  | F: (757) 640-3947 |
| Judson O. Littleton (*pro hac vice*) | E-mail: bhatch@mcguirewoods.com |
| SULLIVAN & CROMWELL LLP |  |
| 1700 New York Avenue, N.W. | *Counsel for Defendants The Boeing* |
| Suite 700 | *Company, David L. Calhoun, Dennis A.* |
| Washington, D.C. 20006 | *Muilenburg, Brian J. West, and Gregory D.* |
| Telephone: (202) 956-7500 | *Smith* |
| Facsimile: (202) 293-6330 |  |
| littletonj@sullcrom.com |  |

-31-

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 21st day of January, 2025, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all

counsel of record in this case.

                                       */s/ Benjamin L. Hatch*
                                        Benjamin L. Hatch