# Exhibit 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

-------------------------X

IN RE THE BOEING COMPANY          CIVIL CASE NO.

SECURITIES LITIGATION             1:24-cv-00151-LMB-LRV

-------------------------X

VIDEOTAPED DEPOSITION OF CHAD W. COFFMAN

New York, New York

Tuesday, January 14, 2025

9:29 a.m.

Reported by:

Jennifer Ocampo-Guzman, CRR, CLR

Page 2

January 14, 2025
9:29 a.m.

Videotaped Deposition of CHAD W. COFFMAN, held at the offices of Sullivan & Cromwell, 125 Broad Street, New York, New York, pursuant to notice, before Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public of the State of New York.

Page 4

APPEARANCES (Continued):

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
    125 Broad Street
    New York, New York 10004
BY:  RICHARD C. PEPPERMAN, II, ESQ.
    JACOB COHEN, ESQ.
    SAMANTHA BRIGGS, ESQ.

ALSO PRESENT:
    DEVERELL WRITE, Videographer

Page 3

A P P E A R A N C E S:

LABATON KELLER SUCHAROW LLP
Attorneys for Plaintiff Rhode Island
    140 Broadway
    New York, New York 1005
BY:  JAKE BISSELL-LINSK, ESQ.
    EMILY N. GAULT, ESQ.
    WILLIAM SHIELDS, ESQ.

ROBBINS GELLER RUDMAN & DOWD LLP
Attorneys for Plaintiff IBT Pension Fund
    420 Lexington Avenue
    New York, New York 10170
BY:  JONATHAN ZWEIG, ESQ.

Page 5

THE VIDEOGRAPHER:  We are going on the record at 9:29 a.m. on January 14, 2025.  This is media unit 1 of the video-recorded deposition of Chad Coffman, taken by counsel for the defendant, in the matter of In Re The Boeing Company Securities Litigations.  This case is filed in The United States District Court for the Eastern District of Virginia.

My name is Deverell Write, representing Veritext Legal Solutions.  The court reporter is Jennifer Ocampo-Guzman from Veritext Legal Solutions.

At this time, counsel please state your appearances.

MR. BISSELL-LINSK:  I'm Jake Bissell-Linsk for the plaintiffs.

MR. ZWEIG:  Jonathan Zweig for plaintiffs.

MS. GAULT:  Emily Gault for plaintiffs.

MR. SHIELD:  William Shield for plaintiffs.

2 (Pages 2 - 5)

Page 6

MR. PEPPERMAN: Rick Pepperman, from Sullivan & Cromwell, for the defendants.

MS. BRIGGS: Samantha Briggs, from Sullivan & Cromwell, for defendants.

MR. COHEN: And Jacob Cohen, from Sullivan & Cromwell, for defendants.

THE VIDEOGRAPHER: Will the court reporter please swear the witness.

C H A D   W.   C O F F M A N, called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. PEPPERMAN:

Q. Good morning, Mr. Coffman.

A. Good morning.

Q. I introduced myself to you before we started this morning, but let me do so again on the record. My name is Rick Pepperman, I'm one of the lawyers who's representing the defendants in this action, and I will be taking your deposition today on behalf of the defendants.

Could you please, sir, state your full name for the record.

Page 7

A. Sure. Chad William Coffman.

Q. And Mr. Coffman, if you recall, when did the plaintiffs first approach you about potentially serving as a testifying expert in this case?

A. It would have been sometime in 2024, but I don't recall specifically when that was.

Q. Do you recall a month or a season?

A. I don't.

Q. Do you recall when you were actually retained to serve as a testifying expert on behalf of the plaintiffs in this case?

A. I don't. I'm sure we have records of that, but I don't recall that, no.

Q. Now, Mr. Coffman, have you submitted an expert report on behalf of the plaintiffs in support of class certification in this case?

A. Yes, I filed a report. That's my understanding of what it's being used for.

MR. PEPPERMAN: Just so we have it, and we will make reference to it throughout the day, I am going to mark

Page 8

as Coffman Exhibit 1 a copy of a document titled, "Expert report of Chad Coffman, CFA, dated December 13, 2024." The first page of the document says, "Exhibit A," and that's because your expert report was included as Exhibit A in support of the plaintiffs' class certification motion.

THE WITNESS: Okay.

(Exhibit 1, Expert Report of Chad Coffman, CFA, [Exhibit A], marked for identification, this date.)

THE WITNESS: Thank you.

Q. And Mr. Coffman, at this point I have only one question about your report, which is whether Coffman Exhibit 1 is a copy of the expert report that you submitted in this case on December 13, 2024.

A. It appears to be a copy of that, yes.

Q. Mr. Coffman, what did you do to prepare for today's deposition?

A. I reviewed my report. I reviewed some of the support for the report, some of the underlying documents. I also met with

Page 9

counsel for plaintiffs. I think that's a fair summary.

Q. And the support that you reviewed, is that material, either the backup materials that were provided to us or the documents that you considered, listed in an appendix to your report?

A. Yes, that's correct.

Q. And when did you meet with plaintiffs' counsel?

A. I had a call last week, I believe it was Wednesday, it could have been Thursday, but a call last week, and then a meeting yesterday.

Q. And approximately how long was the call last week?

A. Maybe an hour.

Q. Approximately how long was the meeting yesterday?

A. Two to two and a half hours.

Q. Now, Mr. Coffman, in terms of your education, is it true that you hold a bachelor's degree in economics from Knox College and a master's of public policy from the University of Chicago?

3 (Pages 6 - 9)

Page 10

A. Yes.

Q. Is that the extent of your formal post-high school education?

A. Yes. I also hold a -- I'm also a CFA charter holder, but, yes, that describes my undergraduate and graduate education.

Q. And as best you can estimate, approximately how many times have you been retained as a testifying expert by the plaintiffs in a securities class action, as best you can estimate?

A. Yeah, I don't know an exact number, but it would be dozens of times.

Q. More than 100?

A. Probably, yes.

Q. More than 150?

A. That, I'm not sure of.

Q. And over what period of time have these retentions occurred, what year range?

A. Sure. I would say since 2008.

Q. Is it fair to say that you've spent much of your career analyzing how securities prices react to new information and evaluating damages in securities class actions?

Page 11

A. That's been a big part of my career, yes.

Q. Is it fair to say you've spent much of your career doing that?

A. Yes.

Q. Now, is Appendix B to your report, which hopefully is included in Exhibit 1, is Appendix B to your report a copy of your CV as of when you submitted your expert report on December 13, 2024?

A. Yes.

Q. Are there any updates to your CV since you submitted your expert report last month?

A. I recall filing a report in the PG&E matter. I don't recall anything else off the top of my head.

Q. Now, on page 2 of your CV, up towards the top under the bold, all cap setting "Professional Experience," it says that you've served as a testifying expert in numerous high profile class action security matters. Do you see that?

A. Yes.

Q. And that's an accurate statement,

Page 12

right?

A. Yes.

Q. And in the securities actions in which you served as a testifying expert, have you ever been retained by the defendants?

A. I've been retained. I don't think it actually got to a point where I gave testimony.

Q. And what case was that in which you were retained by the defendants?

A. I don't know that I can disclose that, because I was never disclosed at any point in that case.

Q. Were you a consulting expert or a testifying expert?

A. I did some consulting work. It was with an eye towards eventually testifying, but it never got to that stage.

Q. Did you submit a report?

A. No.

Q. With that one exception, is it accurate to say that your work as a testifying expert in securities class actions has been for the plaintiffs?

A. I think that's a fair statement,

Page 13

yes.

Q. And your CV, starting on page 2 and going on for a number of pages, identifies various matters in the last four years in which you've served as a testifying expert; is that correct?

A. It may go a little bit further than four years, but yes.

Q. And if I counted them correctly, it's a total of 62 matters. Does that sound about right to you?

A. I have no reason to dispute that.

Q. And would the PG&E matter be in addition to the matters listed on your CV?

A. No, I think that's already on the CV, it's just an additional report.

Q. Okay, additional report. Thank you.

Now, Mr. Coffman, what was your assignment in this case that brings us here today?

A. I was asked to evaluate whether the market for Boeing common stock and options were efficient, and whether or not damages could be calculated on a class-wide basis.

4 (Pages 10 - 13)

Page 14

Q.  Now, on that second assignment that you mentioned, whether damages could be calculated on a class-wide basis, was your assignment to form an opinion on whether damages in this particular action could be calculated on a class-wide basis using a common methodology that is consistent with the plaintiffs' theory of liability here?

A.  That's a more explicit statement of what I was asked, yes, I was trying to summarize.

Q.  Fair enough.

And approximately how much time did you spend in arriving at the opinion set forth in your report on the appropriate damages methodology for Boeing common stock?

THE WITNESS:  Could I have that question read back, please?

MR. PEPPERMAN:  If at any time I'm going too quickly, just --

THE WITNESS:  No, I just want to make sure I got the wording of it. Thank you.

MR. PEPPERMAN:  Sure.

(A portion of the record was read.)

Page 15

A.  Yeah, I don't know that I've separated out the amount of time that took, but I would say probably four or five hours. I mean again, the process for arriving at that opinion is really to understand the logic of plaintiffs' claims, and the nature of the alleged misstatements, and the nature of the alleged corrective disclosures, and whether plaintiffs are effectively telling an economically coherent story as to how the price was impacted and whether -- and then evaluating whether there was any reason the typical damages methodology that's used in 10b-5 securities litigation wouldn't apply in this case, and concluded that that methodology fit this case perfectly.  So that was the process by which I went through.  So probably four or five hours, I would estimate.

Q.  Four or five hours is your best estimate, sitting here today?

A.  Yes, that's my best estimate, yes.

Q.  Now, in arriving at your opinion on the appropriate damages methodology in this case, and you touched on this in part in your

Page 16

last answer, but what did you do in particular to familiarize yourself with plaintiffs' liability theory?

A.  I reviewed the complaint.  I had discussions with plaintiffs' counsel about what -- to make sure that the -- what I understood from the complaint was an accurate representation of how they thought about their case.  I did a very cursory review of the stock price history.  I would say that's probably a good summary.

Q.  Now, do paragraphs 12 and 13 of your report, and you should take a look at them, do those paragraphs summarize plaintiffs' allegations in this case insofar as they're relevant to the opinions contained in your report?

A.  Yes, I mean, obviously, plaintiffs' complaint stands for itself, but I attempted to provide my summary of how I think about their claims from a 10,000 foot level, yes.

Q.  Is Appendix A to your report, the other appendix, is that a list of all the documents you considered in arriving at the opinions set forth in your December 13th

Page 17

report?

A.  Yes, that's what it's intended to be.  Obviously, there are some line items here that are summaries.  I don't list every single document, there are things like thousands of analysts reports and thousands of news articles that went into my analysis that I summarize those materials, but it's meant to provide a summary of all the documents I considered, yes.

Q.  And since submitting your report on December 13th, have you considered any other documents that are relevant to the opinions set forth in your report?

A.  No.

Q.  The first category of documents listed in your Appendix A is "Court Documents," correct?

A.  Correct.

Q.  And only one document is listed under that heading, right?

A.  Yes.

Q.  And that's Plaintiffs' Amended Class Action Complaint, correct?

A.  Yes.

5 (Pages 14 - 17)

Page 18

Q. And is Plaintiffs' Amended Class Action Complaint the only court document that you considered in arriving at the opinions set forth in your December 13th report?

A. In terms of court documents from this case, yes.

MR. PEPPERMAN: Now, just so we have it, I am going to mark as Coffman Exhibit 2 a copy of Plaintiff's Amended Class Action Complaint.

(Exhibit 2, Amended Class Action Complaint for Violation of the Federal Securities Laws, marked for identification, this date.)

Q. Mr. Coffman, I apologize, given its length, it's binder-clipped.

A. No problem.

Q. We will proceed slowly enough that the pages don't go wondering around.

And my first question for you, sir, is simply going to be: Is Coffman Exhibit 2 a copy of the one court document that you considered in forming your opinions set forth in your December 13th report?

A. Yes, it appears to be.

Page 19

Q. And Coffman Exhibit 2 is a copy of Plaintiffs' Amended Class Action Complaint For Violations of the Federal Securities Laws?

A. That's how it's titled, yes.

Q. And have you read the entire amended complaint?

A. I have to admit, there's portions that I skimmed, I did not read every single word in the complaint.

Q. Not every single word of all 345 pages?

A. Correct.

Q. Is it fair to say that plaintiffs' allegations, as set forth in the amended complaint, focus exclusively on Boeing's commercial airlines airplane segment?

A. I didn't review the complaint with an eye towards to what extent it was limited to a particular segment. I mean I know there's lots of discussion of the commercial airlines and planes specifically for commercial airlines, but whether it could be characterized as completely unrelated to the other segments, that's just not -- I didn't

Page 20

review it in that way. So I don't have an opinion on that.

Q. Fair enough, fair enough.

Let me just ask you a couple of follow-up questions.

In your report, in paragraph 10 you note that Boeing's business is organized into three reportable segments in which you list as commercial airplanes, defense space, and security and global services. Do you see that?

A. Yes.

Q. Now, recognizing that you didn't read every word, do you recall any allegations in Plaintiffs' Amended Complaint about Boeing's defense space and securities segment or its global services segment?

A. As I sit here right now, I don't specifically recall any, but, again, it's a long document. It's not something I've read, you know, reviewed in depth in a while. So I, as I sit here right now, I just, I just don't recall.

Q. Mr. Coffman, have you read the briefs that the parties filed last year in

Page 21

connection with defendants' motion to dismiss plaintiff's amended class action complaint?

A. I don't recall reviewing those, no.

Q. Any reason why you did not review those?

A. I didn't think they were particularly relevant for the issues I was being asked about.

Q. Have you read the court's decision denying defendants' motion to dismiss?

A. No.

Q. Is that something you typically read as part of your expert work in securities class actions?

A. Sometimes I do, if it's provided to me. Again, it's not something I felt was necessary to analyze the questions I was given, but sometimes it's given to me, and if it is, I'll read it. I don't recall it being provided to me in this case.

Q. Is that the reason why you didn't review it, that it wasn't provided to you?

A. Correct.

Q. Were you aware that the court ruled from the bench on the defendants' motion to

6 (Pages 18 - 21)

Page 22

dismiss?

A. I was made aware of that at some point, yes.

Q. In your experience, is that unusual in a Section 10b case for the court to rule from the bench on a defendants' motion to dismiss?

A. I don't know that I can characterize that as usual or unusual.

Q. Has it happened in any of the other securities class actions in which you've been engaged as a testifying expert for the plaintiffs?

A. I don't have a specific recollection of that, but I don't know how frequent a thing that is.

Q. Now, in as far as you know, Mr. Coffman, approximately how many different statements do plaintiffs challenge as false or misleading in this case?

A. Well, I saw there were 75 different occurrences, like subsections where they describe a point in time in at which there were misstatements made, some of those had multiple misstatements underneath each one,

Page 23

but I didn't count exactly how many misstatements there were, but I -- based on my review, it was certainly over a hundred.

Q. In your reference to 75, 75 are the different dates on which allegedly false and misleading statements were made?

A. Again, I was referring to the number of -- some of them may have occurred on the same date, but I was referring to Section 6 where there is lettered identifiers for each source of a misstatement, some of those occur on the same date, so I don't know -- but I believe there were 75 of those sections.

Q. And those sections run from, from A through triple W?

A. Yes.

Q. And in reviewing Plaintiffs' Amended Complaint, your understanding is that within those subsections in some instances multiple statements were made.

A. Yes.

Q. And so -- have you attempted to count the total number of misstatements at issue in this case?

Page 24

A. I did not do that, no.

Q. But based on your review of the complaint, your understanding is that it's over 100?

A. Given the number of times I saw multiple statements within some of those sections, it would be hard for me to believe it's under 100, yes.

Q. Over 200?

A. Again, I didn't count, so I don't know.

Q. Have you ever previously been engaged as a testifying expert in a securities case that challenges over 100 statements?

A. I just don't recall. There have certainly been cases where there were numerous misstatements, but how many were over 100, I just don't know.

Q. Do you recall any that were over 100, sitting here today?

A. That's not a detail I recall from cases, far and right pass, so I just don't know.

MR. PEPPERMAN: Let me mark as

Page 25

Coffman Exhibit 3 a document that the defendants submitted to the court and labeled as "Appendix A." And this was submitted together with defendants' opening brief in support of their motion to dismiss in this action.

THE WITNESS: Okay.

(Exhibit 3, Document entitled, "Appendix A, Reasons Why Alleged Misstatements Are Not Actionable," marked for identification, this date.)

THE WITNESS: Thank you.

Q. Mr. Coffman, feel free to flip through Exhibit 3, but my first question for you is simply going to be: Have you seen this document before?

A. I have not, no.

Q. Mr. Coffman, as I said before I handed you Exhibit 3, defendants submitted this appendix with their motion to dismiss. And as you can see from the document, there's a column titled "Alleged Misstatement." Do you see that column?

A. Yes.

Q. And as it states in Footnote 1,

7 (Pages 22 - 25)

Page 26

that column quotes the bold and italicized excerpts of the statements alleged to be false and misleading in the amended complaint?

A. Okay.

Q. And do you recall, from reviewing the amended complaint, that the plaintiffs in the statements on the various dates included within the 75 subheadings bold -- bolded and italicized portions of those statements that the plaintiffs' claim were false and misleading?

A. I recall seeing bolded and italicized portions. Whether that's the extent of what they're alleging is misleading in total, I don't have a view on that, but I certainly recall seeing bolded and italicized portions.

Q. So the part quoted here, Mr. Coffman, in the column "Alleged Misstatement," are the excerpts from the statements in the 75 different subcategories that were bolded and italicized by plaintiffs.

A. Okay.

Page 27

Q. And as you can see, Mr. Coffman, the appendix quoting the bold and italicized portions of those statements goes on for some 70 pages. Do you see that?

A. Yes.

Q. Have you previously been involved as a testifying expert in a securities class action that challenges this volume of statements that fill up an appendix for some 70 pages?

A. That's not something I've ever sort of quantified. Certainly, I've been involved in numerous cases where there are many statements challenged. Whether any of them are this voluminous, I just don't recall.

Q. Can you recall any of the other prior cases, whether the challenge statements were this voluminous?

MR. BISSELL-LINSK: Objection, form.

A. I don't know that it was this voluminous, but in the Valiant case there was -- I certainly recall there being a very large number of alleged misstatements.

Q. Do you recall how many?

Page 28

A. I don't, off the top of my head, no. That's the one that comes to mind as having a voluminous number of misstatements. There certainly could have been others, but I just don't remember off the top of my head.

Q. Mr. Coffman, although in this section of the amended complaint that we discussed with the 75 different subheadings, the complaint there organizes the challenged statements chronologically, is it your understanding that the plaintiffs in this case allege different categories of misstatements as it relates to the subject matter of the statements?

A. Yes, I understand there are certain subcategories that they're sort of grouped into.

Q. And if you take just like one example, if you look at paragraph 12 of the Plaintiffs' Amended Complaint, paragraph 12 purports to divide the challenge statements into four different categories, correct?

A. Yes.

Q. And the different categories of misstatements alleged in the complaint start

Page 29

at different points in time during the class period; is that right?

A. That's not something I've analyzed specifically or have a view on.

Q. Let me just follow up and give you an example, see if this helps.

For example, the challenge statements about Boeing's compliance with regulatory requirements, which I think is encompassed in Category 4, in paragraph 12, that category of alleged misstatements starts after Boeing's entry into the deferred prosecution agreement with the Department of Justice in January of 2021, correct?

A. I don't know that as a matter of fact, that's not something I analyzed.

Q. If I'm right on that, and I respect that you haven't analyzed that, but if what I told you is correct, that that category of alleged misstatements starts on January 2021, roughly 14 or 15 months into the class period, is it fair to say that that category of alleged misstatements could not have introduced any artificial inflation into Boeing's stock price before January 2021 when

8 (Pages 26 - 29)

Page 30

the statements started to be made?

MR. BISSELL-LINSK: Objection, form.

A. I think it's fair to say that if what you're saying is correct, that -- my understanding that is there couldn't be liability for any of those particular statements prior to that date, how that might or might not interact with measures of artificial inflation, I just don't have an opinion on, as I sit here.

Q. And I recognize you don't have an opinion on that subject, I'm going to ask one follow-up question, nonetheless. As a matter of logic and, I guess, economic sense, although I'm not an economist, is it fair to say that a statement cannot have retroactive effect on the stock price for when it was trading before the statement was made?

MR. BISSELL-LINSK: Objection, form.

A. That's fair to say.

I think the issue I'm having with it is it may be that that category of misstatements, and, again, I'm not offering

Page 31

this opinion, but it may be that that category of misstatements is continuing to conceal the same information that plaintiffs are alleging had been concealed from the beginning of the class period. So it may be that plaintiffs' allegation isn't that those particular statements introduced additional inflation, but just provides another reason why the price was inflated and maintained whatever inflation was in the stock. So that's why it's -- I'm not suggesting it could have affected, sort of positively affected the stock price before the statement was made, but how it interacts with any artificial inflation is a much more difficult question to answer.

Q. Fair enough. What you're saying is that a category of alleged misstatements, once they're made, could serve to maintain inflation that was already existing in the stock price before they were made, correct?

A. As an economic matter, theoretically, that's possible. Whether that's the case or not or whether it introduces something new is obviously, it

Page 32

would be something that would have to be analyzed carefully, but it's theoretically possible.

Q. But the existing inflation, before this new category of misstatements, would be attributable to something else, not the new category of statements that are made, you know, 14 months, 16 months later.

MR. BISSELL-LINSK: Objection, form.

A. Again, in my hypothetical example, I think the inflation may have been first introduced by earlier statements, but that doesn't mean that these additional statements necessarily have nothing to do with the artificial inflation that exists in the stock going forward from that date.

So, yeah, I don't know how else to answer your question.

Q. I think you've answered it. Thank you.

Now, Mr. Coffman, the amended complaint also alleges in, I think, Section IV-H that the truth was revealed on 22 different dates in 2024; is that correct?

Page 33

A. Let me catch up with where you're at. Just a second.

Yeah, I see under "The Truth is Revealed," there's 22 different items listed there.

Q. And each of those listed items refer to a different date; is that your recollection?

A. I don't recall.

Q. Are -- do those 22 different subheadings there correspond to the date range January 5, 2024 through May 14, 2024?

A. Yes.

MR. PEPPERMAN: And, Mr. Coffman, for -- for ease today and hopefully assist you in answering the questions so you don't have to flip through, you know, what are like 30 different pages of the complaint, we've attempted to create an exhibit from the amended complaint that lists all of the alleged corrective events on a single page. And I'm just going to hand that to you now, and I guess I'm marking this as Exhibit 4.

9 (Pages 30 - 33)

Page 34

(Exhibit 4, Document entitled, "Dates On Which The 'Truth' Allegedly Was Revealed," marked for identification, this date.)

MR. BISSELL-LINSK:  Mr. Pepperman, this was created for the deposition?

MR. PEPPERMAN:  Created specifically for the deposition --

MR. BISSELL-LINSK:  Okay.

MR. PEPPERMAN:  -- by my good friend Ms. Briggs.  And it's just our attempt to put in one page from your complaint of different corrective events, and we included -- Ms. Briggs included in the right a reference to the relevant paragraphs of the complaint if Mr. Coffman wants to look at those.

MR. BISSELL-LINSK:  Thank you.

Q.   Mr. Coffman, I'm not going to ask you any specific questions about this, but just to orient you, I believe the column on the left under number, that corresponds to the 22 subcategories of Section IV-H in the amended complaint.  Then there's the dates and the description of the alleged corrective

Page 35

events.  To the extent possible, we tried to work from the subheadings in the complaint, although we edited them for brevity in a couple of places.  Then in the next column you have the alleged change in stock price, which we attempted to calculate from the amended complaint, not anything that we independently did.  Then the fourth column to the far right is the cited paragraphs of the amended complaint.

A.   Okay.

Q.   And if you see, Mr. Coffman, and I think you verified this by flipping through the amended complaint, the date range of the alleged corrective events goes from January 5, 2024, which was the date of the Alaska Airlines incident, through to May 14, 2024, which is the date that the DOJ found that Boeing had violated the DPA.  Do you see that?

A.   I see that, yes.

Q.   Have you previously been engaged as a testifying expert in a securities case that alleges that the truth was revealed on more than 20 different dates?

Page 36

A.   I certainly remember some that are close to that.  Whether it was actually over 20 or under 20, I don't recall, but I certainly recall a few cases where there was a substantial number of alleged corrective disclosures, yes.

Q.   And one of that you can recall, if you can remember?

A.   The DVI case I recall having a substantial number.  The Valiant case had a substantial number.  Those are the two that stand out in my mind, there may be others, but those stand out in my mind as having certainly more, from what I recall, more than a dozen alleged corrective disclosures.

Q.   And I mean if you can remember, and I know it's hard to keep all these dates in mind, what is the alleged class period in this case?

A.   September 30, 2019 through May 14, 2024.

Q.   And September 30, 2019 is the date of the first alleged misstatement; is that right?

A.   That's my understanding, yes.

Page 37

Q.   And May 14, 2024 is the date on which the -- is the last date on which the truth allegedly was revealed, according to the amended complaint; is that correct?

A.   That's my understanding, yes.

Q.   And that makes the proposed class period here four years and about seven and a half months; is that right?

A.   That sounds about right, yes.

Q.   And approximately how many trading days are included in the proposed class period in this case?

A.   I don't know an exact number, but it probably would be over a thousand.

Q.   Does the number 1,146 trading days sound about right?

A.   I have no reason to dispute that.

Q.   In how many securities cases in which you've been engaged as a testifying expert has the proposed class period been over four and a half years?

A.   I don't recall a specific number.

Q.   Any estimate?

A.   I can recall working on cases that had four- to five-year class periods, I just

10 (Pages 34 - 37)

Page 38

don't remember what they were off the top of my head.

Q. If you turn back, Mr. Coffman, to Appendix A to your report, that's the appendix that lists the documents considered...

A. Okay.

Q. And if you look at Appendix A to your report, Mr. Coffman, the second section under the heading, "Court Decisions and Securities Law," lists four court decisions that you considered in informing your opinions; is that correct?

A. Yes.

Q. And how did you select those four judicial decisions for consideration?

A. Well, these are cases that I've been familiar with for years that I list in every market efficiency report that I've filed recently as documents that speak to efficient market hypothesis and how it interacts with securities claims.

Q. And one of the decisions listed is the Halliburton case, correct?

A. Yes.

Page 39

Q. Were you the plaintiffs' expert in connection with class certification in Halliburton?

A. I certainly had a role in that case. I'm trying to remember if it was only on the merits or during class certification, as well. Yes, I believe it was during class certification, as well, yes.

Q. After the first Supreme Court decision in Halliburton, did the court hold an evidentiary hearing on class certification?

A. Yes.

Q. And did you testify at that hearing?

A. Yes.

Q. Now, the four judicial opinions that you list there, Basic, Cammer, Halliburton and Krogman, how did you consider those judicial opinions in forming your opinion?

A. Well, Cammer and Krogman are cases from a long time ago that identified factors to look at when analyzing market efficiency, so I've been aware of those and used the

Page 40

factors that are listed in those for many years. So it wasn't much of a decision, I just knew I wanted to analyze those factors.

The Basic case, my understanding is the first -- was the Supreme Court case that discussed the relevance of market efficiency to class action securities cases, so that's, again, a case I've cited many times for many years. So it wasn't really an independent decision to consider it in this case, it's something that I cite to regularly.

Q. And are you familiar with the Supreme Court's decision in Comcast Corp. versus Behrend?

A. I'm generally familiar with it, yes.

Q. Did you consider that decision, as well?

A. Not explicitly, I don't cite to it or anything. I mean it's certainly something that I have in my mind and in my experience, but I didn't reference it in any specific way in forming my opinion.

Q. The -- you're articulation of the question you were asked on damages, where I

Page 41

think we talked about this earlier, is there a common class-wide damages methodology that can be applied here consistent with plaintiffs' theory of liability, I mean, that is, in fact, an articulation of the Comcast standard, I mean as you understand it; is that correct?

A. I don't know if it's an articulation of it. My understanding is it's consistent with that. But, again, I didn't make specific reference to that, I was asked the specific question.

Q. But did you consider the Comcast decision in arriving at your opinions?

A. Not explicitly, no.

Q. And why not?

A. I didn't, I didn't believe there was a need to.

The out-of-pocket methodology that I'm articulating here is something that I've used in analyzing class-wide damages in 10b cases from well before the Comcast decision to after. It's never the -- the Comcast decision didn't alter my views as to the relevance of this methodology at all.

11 (Pages 38 - 41)

Page 42

Q. We, at the beginning of the deposition, we discussed briefly your formal education. Am I correct, Mr. Coffman, that you do not have a law degree?

A. That's correct.

Q. And do you intend to offer an opinion in this case on any legal issue?

A. No. I mean I understand my opinions as they're stated might be relevant to legal issues, but I'm not offering a legal opinion on any issue, no.

Q. And do you intend to offer an opinion on what the legal requirements are for class certification?

A. No.

Q. And do you intend to offer an opinion on which analyses are part of loss causation in a securities case?

A. Well, I have an understanding, as a matter of economics, what, in my view, constitutes loss causation analysis versus other types of analysis, so if I'm asked a question about that, I feel I could answer it. But I'm not, as I sit here right now, I mean I certainly in my report describe the

Page 43

types of analyses that go in broadly into loss causation analyses, so I think I've characterized that in my report. I don't -- so that's why I'm -- yeah, I will leave my answer there.

Q. Okay, but just to follow up, are you offering a legal opinion on which analyses fall within the loss causation bucket versus the bucket of quantifying damages?

MR. BISSELL-LINSK: Objection, form.

A. No, I'm not offering a legal opinion. I'm saying, I am saying, however, that based on my over 20 years of experience in performing analyses in these cases, I have a general understanding as a matter of economics how to delineate between what is a loss causation analysis and other types of analyses that I'm asked to engage in.

Q. But your understanding, I mean as you said, is as a matter of economics, not as a matter of law, correct?

A. That's a fair statement, yes.

Q. I think you still have Appendix A

Page 44

open in front of you --

A. Uh-huh.

Q. -- correct?

A. Yes.

Q. Now, Appendix A does not list any materials that have been produced in discovery in this case; is that correct?

A. That's correct.

Q. Did you consider any discovery materials in informing your opinions?

A. No. It wasn't necessary to reach the opinions I've given.

Q. Now, since submitting your report on December 13th, have you reviewed any documents produced in discovery in this case?

A. No.

Q. As of today's date, I think it's January 14, 2025, have you been retained by plaintiffs to offer opinions on loss causation and the calculation of damages?

MR. BISSELL-LINSK: You can answer the question, but I caution you not to reveal any privileged information about discussions we've had.

A. There's not been a formal separate

Page 45

retention. The retention agreement I already have with plaintiffs would probably cover that, if they ask me to perform that analysis.

Q. Have plaintiffs' counsel asked you to perform that analysis as of today's date?

A. I would be really careful not to give privileged information at this point. I think I can fairly say that I have not performed, yet performed any work on that and haven't reached any conclusions on that. I don't think I can say more than that.

Q. Fair enough, and I'm not going to push on that. I will just ask you one follow-up question. You said you haven't done any work on that, I take it to mean then that you have not analyzed any discovery materials as part of work on a potential loss causation or damages analysis; is that correct?

A. That's not something I've done, no.

Q. Now, let's look now at your report, and I just want to ask you a few questions about paragraphs 12 and 13 in your report. I touched on those paragraphs briefly a little

12 (Pages 42 - 45)

Page 46

bit earlier, and if you just first turn to paragraph 12 on page 7 of your expert report, which I earlier in the day marked as Exhibit 1...

A. Okay.

Q. Is paragraph 12 a high level summary of plaintiffs' allegations in this case?

A. Including Footnote 10, yes, it's a very high level summary.

Q. And then in paragraph 13, which is on the next page, page 8 and continues on to page 9, does paragraph 13 then provide greater specificity about plaintiffs' allegations?

A. It does. Again, it's summarizing over a 300-page complaint, so it's a very high level summary, but, yes, it provides more specificity about what the claims are.

Q. 345 page complaint, right?

A. I don't remember the exact number, but it's over 300 pages.

Q. And your paragraph 13, just to follow up with my question, it begins, "More specifically," comma; is that correct?

Page 47

A. Yes.

Q. And did you draft paragraph 13 based entirely on the allegations of plaintiffs' amended complaint?

A. I think it's probably based on a combination of reading the complaint and discussions with plaintiffs' counsel.

Q. The citations that you provide for the various statements in paragraph 13 are all citations to the complaint, correct?

A. Correct, yes.

Q. Now, the first sentence of paragraph 13 after -- where it says more specifically, the first sentence reads, "The claims at issue in this case concern defendants allege materially false or misleading statements regarding Boeing's manufacturing of safe airplanes"; do you see that?

A. Yes.

Q. And the safe airplanes there are commercial aircraft, correct?

A. Again, that's generally how I've understood it. Whether plaintiffs believe it may extend beyond commercial aircraft, I'm

Page 48

just not taking a position on, but as I read the complaint, that was -- my understanding is that the statements at issue relate to commercial aircraft, or at least my recollection was they related primarily to commercial aircraft. But I never read the complaint with an eye towards is it exclusively commercial aircraft.

Q. And then, Mr. Coffman, the next sentence of paragraph 13 states that following two deadly crashes of Boeing airplanes in 2018 and 2019, Boeing, quote, repeatedly emphasized that it was prioritizing safety in its aircraft manufacturing. Is that correct?

A. That's what it says, yes.

Q. And why did you note there that Boeing repeatedly made those statements?

A. Because that's my understanding of plaintiffs' claim is that there were numerous statements made emphasizing that it was prioritizing safety.

Q. So it's your understanding based on your review of the amended complaint that Boeing repeatedly over the class period made

Page 49

statements that it was prioritizing safety?

A. That's my understanding, yes.

Q. Now, how, if at all, is it significant, in your view, that Boeing made those statements repeatedly during the class period?

A. Significant in what sense, I guess?

Q. In any sense to you, I'm asking you, to you in your opinions. Is it significant in any way that the statements were made repeatedly?

A. As to my market efficiency opinion, no. As to my is there a class-wide methodology opinion, no. So in reaching the two opinions I'm giving now, whether it was repeatedly or not repeatedly makes no difference to me.

Q. Are you aware that the plaintiffs argued in opposing defendants' motion to dismiss that defendants' repetition of safety-related statements underscored their materiality?

A. I was not aware of that argument, no.

MR. PEPPERMAN: Let me just mark,

13 (Pages 46 - 49)

Page 50

as I think we're on Exhibit 5, a copy of the lead plaintiffs' opposition to defendants' motion to dismiss the amended complaint.

(Exhibit 5, Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint, marked for identification, this date.)

Q.  Have you seen this document before, Mr. Coffman?

A.  No.

Q.  And just, Mr. Coffman, if you look on page 16, the first sentence of the first full paragraph on page 16, you see where it says, quote, relatedly the repetition of the safety-related statements underscores their materiality; do you see that?

A.  I see that.

Q.  So I take it you don't have any independent knowledge of this, but this confirms that the plaintiffs argued in opposing to defendants' motion to dismiss that defendants' repetition of safety-related statements underscores their materiality.

Page 51

A.  Yeah, let me read it in a little more context.  Just give me a second.

Q.  Yes, please do.

A.  Okay.  All right, I've reviewed that.  Could you repeat whatever the question was?  I apologize.

Q.  Well, I asked you a question previously whether you were aware that the defendants had argued that the repetition of safety-related statements underscores the materiality, and you said you weren't aware.

A.  Correct.

Q.  And I just pointed you to that sentence in plaintiffs' opposition to defendants' motion to dismiss, and I think my question was simply whether that confirms that the plaintiffs did, in fact, argue that.

A.  It appears to be part of their argument for materiality, yes.

Q.  And just if you look on page 8 of plaintiffs' opposition, which is, what, eight pages back...

A.  Okay.

Q.  You see at the bottom of the carryover paragraph, there is a quotation

Page 52

from the court's opinion in the BHP Billiton securities litigation?

A.  Hold on, give me a second to find.  Okay, I see that cite.  Let me read this paragraph.  Give me just a second.
    Okay, I see that.

Q.  You see I'm referring to the end of that carryover paragraph on page 8.  The plaintiffs', quoting the court's decision in the BHP Billiton securities litigation, contend that, quote, that while certain statements viewed in isolation may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.
    Do you see that?

A.  Yes.

Q.  Is that quotation consistent with your understanding of the plaintiffs' theory of liability in this case?

    MR. BISSELL-LINSK:  Objection, form.

A.  I don't -- I don't know if it

Page 53

captures the entirety of their claims, but I don't see it as being inconsistent with their claims in this case.

Q.  It's part of their theory of liability, right, that the statements were made repeatedly and that's what made them material, correct?

A.  Again, I don't want to put words in plaintiffs' mouths, or plaintiffs' mouth, I certainly -- that they made, repeatedly, statements about safety is an element of what I understand is their claim, yes.

Q.  Are you aware that there is another securities class action pending against Boeing and some of the individual defendants in Chicago in which the proposed class period overlaps with the proposed class period in this case?

A.  I was not aware of that, no.

Q.  Is it unusual, in your experience, for there to be overlapping securities class actions against the same defendants?

    MR. BISSELL-LINSK:  Objection, form.

A.  It's not something I've seen often.

14 (Pages 50 - 53)

Page 54

I don't want to say I've never seen it, but it's not something I've seen often.

Q. Can you think of an instance when you've seen it?

A. Well, I've certainly seen examples within cases where there's two sort of independent theories of liability where the class period overlaps and the liability for those two separate things overlap, so that, I mean it could be thought of economically the same sort of thing. But as I sit here right now, I don't recall one off the top of my head where there were two separate actions over the same period. But, again, I'm trying to recall it off the top of my head without having investigated or reviewed, so I just don't recall one.

Q. In two separate actions asserting claims under Section 10b of the Federal securities laws, you recall an instance where two overlapping class actions like that?

MR. BISSELL-LINSK: Objection, form.

A. Again, as I sit here right now, I can't recall one.

Page 55

Q. Now, if you look at page 17 of Plaintiffs' Opposition To Defendants' Motion to Dismiss, which I've marked as Exhibit 5, and the second full paragraph, Mr. Coffman, on page 17, which starts with the sentence, "Defendants attempt to analogize the misrepresentations at issue to those in," and then is cites two other Boeing cases there.

Do you see that?

A. Yes.

Q. And I'll represent to you that the first cited Boeing case listed there, In Re Boeing Company Aircraft Securities Litigation, pending in the Northern District of Illinois, that's what I referred to earlier as the overlapping class action.

A. Okay.

Q. And just by chance, have you read the decisions on the motion to dismiss in that other Boeing case?

A. No.

Q. And then this paragraph of plaintiffs' opposition goes on to say, "In those cases," referring to the other Boeing cases, "Boeing's," quote, vague affirmations

Page 56

of safety, close quote, "during the period immediately between and immediately after the Crashes were held nonactionable." Do you see that?

A. I don't think you read that exactly right, but I see what you're referring to, yes.

Q. Even though I might not have read it exactly, was the gist of what I said accurate, or do you want me to read it again?

A. No, no, you don't need to read it again. I understand what it's saying.

Q. And then it goes on in the next sentence, I mean after the citation to say that "This case, by contrast, concerns Defendants' years" -- and plaintiffs underscored "years" -- "of representations that Boeing had turned a new page after the Crashes by prioritizing safety."

Do you see that?

A. Yes.

Q. And were you aware again that plaintiffs had previously argued that the challenge statements in this case were actionable in part because Boeing had

Page 57

repeated them over multiple years?

MR. BISSELL-LINSK: Objection, form.

A. I certainly saw arguments to that effect, but for purposes of the opinions I was offering hadn't particularly analyzed that aspect of their claim nor needed to.

Q. And that part of the plaintiffs' theory that the statements were made repeatedly is reflected in the amended complaint, right?

A. I think that's a fair statement, yes.

Q. Okay, let's go back to paragraph 13 of your expert report.

A. Okay. Okay.

Q. I'm going to read you a sentence that's in the middle of that paragraph, it starts, "The investigations found." Do you see where I am?

A. Yes.

Q. And that sentence reads, "The investigations found that Boeing was at fault for the crashes, and specifically the crashes were caused by a software defect in a system

15 (Pages 54 - 57)

Page 58

that Boeing concealed from pilots and the FAA."  Do you see that?

A.  Yes.

Q.  And your support for that sentence, if you look at the Footnote 14, is paragraph 6 of the amended complaint, right?

A.  Yes.

Q.  And the "Crashes" referred to there, those are the two accidents involving a 737 Max that occurred in 2018 and 2019?

A.  Yes.

Q.  And is it your understanding that those two crashes were caused by a software design defect rather than a manufacturing issue?

MR. BISSELL-LINSK:  Objection to form.

A.  I'm just describing what was in the complaint.  I have no factual basis to say which it was or to say it was only one and not the other, or some combination of the two.  I just don't have an opinion on that.

Q.  Are you aware of a finding or an allegation or anything that you've reviewed that suggests that the two 737 Max accidents

Page 59

in 2018 and 2019 were caused by a manufacturing issue on the factory floor at Boeing?

A.  This was nowhere close to what I was analyzing in this case, so, no, I've made no attempt to review or investigate whether that's true or not.

Q.  Your knowledge on that subject is limited to what you've read in the Plaintiff's Amended Complaint in this action, at least your knowledge at this time?

A.  Yes.

Q.  Then you go on --

A.  Well, let me take a step back.  I mean those incidents were certainly mentioned in things like the analysts' reports and things I've read, so I've seen mention of them and descriptions of them, but what exactly caused those crashes and whether it could be something to do with manufacturing or just software, that's simply not something I was investigating or was relevant to what I was answering.

Q.  And insofar as the statements in paragraph 13 of your expert report concern,

Page 60

the basis for those statements are the allegations in Plaintiffs' Amended Complaint.

A.  Correct, yes.

Q.  Okay.  And then you go on in the next sentence, which begins, "However, to state, Boeing assured the public that Boeing was changing its ways by prioritizing safety in the wake of the crashes."  Do you see that?

A.  Yes.

Q.  And what did you mean when you wrote that Boeing was changing its ways after the two crashes?

A.  Well, I was trying to convey what the theme that was in the plaintiffs' complaint.  Those aren't my words, I was trying to summarize what I understood plaintiffs were alleging.

Q.  And is it your understanding that the plaintiffs are alleging here that the alleged misstatements in this case attempted to assure the public after the crashes in 2018 and 2019 that Boeing was going to take steps going forward to reduce the risk of a future safety-related incident by

Page 61

prioritizing safety?

A.  That's consistent with my understanding of what they're alleging, yes.

Q.  Then the last two sentences of paragraph 13 state that the truth was revealed through a series of events beginning on January 5, 2024 when a door plug blew off an Alaska Airlines airplane manufactured by Boeing, correct?

A.  Yeah, those aren't the exact words I used, but, yes, that's the gist of what I'm stating there as what's alleged in the complaint.

Q.  And those events are the 22 different dates between January 5, 2024 and May 14, 2024 that we discussed earlier and that are summarized in Coffman Exhibit 4?

A.  That's my understanding, yes.

Q.  And what is your understanding, I mean if you have one, of the cause of the Alaska Airlines accident on January 25, 2024?

MR. BISSELL-LINSK:  Objection, form.

A.  Well, I mean, I have some very general understanding that it was caused by

16 (Pages 58 - 61)

Page 62

bolts not being in place, but, like, what the root cause of that was or anything like that, I have no idea. That's not something I investigated, nor was it necessary to form the opinions I'm giving.

Q. Is it your understanding that the cause of that accident on January 5, 2024 was a mistake on the factory floor in Renton, Washington?

A. I don't know with that level of specificity what the cause was.

MR. PEPPERMAN: Let's take a break now.

THE VIDEOGRAPHER: The time on the video monitor is 10:44 a.m. We're off the record. This ends media 1.

(A brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 10:54 a.m. This is the start of media 2.

Q. Mr. Coffman, in connection with your analysis of Cammer Factor 5, price reaction to new information, you performed an event study; is that correct?

Page 63

A. That was a component of what I did, yes.

Q. And an event study is a commonly used technique to measure the effect of new information on the market price of a company's securities, correct?

A. Yes.

Q. And the event study that you performed in this case attempted to determine whether there is a cause-and-effect relationship between new public information about Boeing and the market price of Boeing's stock by controlling for market and industry factors; is that correct?

A. That's a fair summary, yes.

Q. And to do that, you created a regression model; is that right?

A. That's part of the event study methodology, yes.

Q. And you attempted to control for market factors by using the S&P 500 Total Return as a market index; is that correct?

A. Yes.

Q. And why does an event study also need to control for industry factors?

Page 64

MR. BISSELL-LINSK: Objection, form.

Q. In this context.

A. Yeah, I don't know that it always needs to, but in this case it was, it's clear that the -- so it's my -- it's my regular practice when performing an event study to evaluate whether an industry index has explanatory power in a regression for explaining some portion of the returns of the subject security, and in this case I chose an industry index and the regression model confirmed that the industry index does have some explanatory power. And the whole economic rationale behind that is that companies in a particular industry may face some common economic forces that would tend to have their securities move together as new information comes out about factors impacting the industry.

Q. So you attempted to control for industry factors in your event study in this case by using an industry index; is that right?

A. Yes.

Page 65

Q. And the industry index that you used was the S&P 500 Aerospace and Defense Index?

A. It is based on the companies in that index, so I constructed my own index so I was able to remove Boeing from that index. So I constructed an equally weighted index of the companies that are in that index.

Q. And why did you use that particular index in your effort here to control for industry factors?

A. So my process in cases is to look at a number of factors: One is does the company itself specify an industry index to which it compares itself; two, are there third-party-constructed industry indices, in particular by S&P or others; and third, are there lists of companies that analysts regularly look to as the sort of closest competitors or industry constituents.

Here I identified this index as a third-party-constructed index that follows the aerospace and defense industry. I reviewed the constituents and the general business those constituents were in and

17 (Pages 62 - 65)

Page 66

determined that this was an appropriate index for this industry.

Q. Did you consider any other peer or industry indices in connection with your work on your event study in this case?

A. I don't recall having considered any other industry indices, no.

Q. Did you consider using a commercial airline index?

A. I did not.

Q. Do you agree that a properly constructed industry index for an event study must include firms that have similar businesses and are exposed to similar trends and risks as the company at issue?

MR. BISSELL-LINSK: Objection, form.

THE WITNESS: Could I have that read back, please?

(A portion of the record was read.)

A. I don't necessarily like the word "must" in that question, because in my experience there are often are companies that are fairly unique and it's very difficult to find industry, you know, comparable companies

Page 67

that fit that description, all aspects of that description. But in generally speaking, that's the intent of an industry index is to try to identify companies that face similar economic factors. I don't think there is one and only one way to do it. I think the industry index I selected was reasonable, but it's probably not the only reasonable one, and there are, I'm sure, other indices that arguably could be used, as well.

Q. Would you be more comfortable with the question I asked you if we substituted the word "should" for "must"?

A. Again, I think you're describe -- the best way I could say it is you're describing factors that you would want to think about in terms of is this a good index or not, but I don't think there is one and only one way to construct an industry index, and I believe the index I've selected is reasonable.

Q. Did you evaluate, Mr. Coffman, whether the constituent companies included in the S&P 500 Aerospace and Defense Index are comparable to Boeing?

Page 68

A. I guess the question is comparable on what dimension. I mean I considered, I certainly considered whether they were in the same general industry as Boeing and, therefore, would have some of the same economic forces on them. I wasn't looking for them to be comparable in some specific quantitative way.

Q. Other than looking at whether the constituent companies were in the same general industry as Boeing, what other factors did you look at in concluding that the constituent companies included in the S&P 500 Aerospace and Defense Index were reasonable comparators to Boeing?

A. Well, I reviewed the descriptions of those companies from their -- I'm trying to remember precisely where I got them from -- but I reviewed a company description for each one to see which -- what lines of business they described themselves as being in.

Q. And based on your review of descriptions of descriptions of the constituent companies, do you agree that the

Page 69

constituent companies included in the S&P 500 Aerospace and Defense Index have limited overlap with Boeing's commercial airplane segment?

A. I don't know that that's true, no.

Q. Based on your review of the descriptions of the constituent companies, do you agree that the S&P 500 Aerospace and Defense Index includes constituent companies that primarily focus on the defense business and do not have Boeing's exposure to the commercial aviation business?

A. That's not a conclusion I reached, no. I mean, certainly, some of those companies are involved in the defense industry, some of these companies are involved in commercial airlines, as well. For example, I know GE is a manufacturer of engines for the aerospace industry, including commercial aircraft. So I don't, I don't necessarily agree with your characterization of it.

Q. You did not include Airbus in your peer industry index, correct?

A. Correct.

18 (Pages 66 - 69)

Page 70

Q.  Do you agree that Airbus is Boeing's only meaningful competitor in the commercial aircraft market?

MR. BISSELL-LINSK:  Objection, form.

THE WITNESS:  Could I have that read back, please?

(A portion of the record was read.)

A.  I'm certainly aware they are a competitor.  Whether they're their only meaningful competitor, I don't recall having reached that conclusion.  It may be true or not, that's just not something I've studied.  You know, Airbus was not included because they don't have a US-traded security.

Q.  Is your understanding that the plaintiffs allege in this case that Airbus is Boeing's only meaningful competitor in the commercial aircraft market?

A.  I don't recall that specific characterization as I sit here.

Q.  Just so you're sure I'm not steering you wrong, let's take a look at paragraph 49 of the amended complaint.

A.  Okay.

Page 71

Q.  I mean, if you look at paragraph 49, does that confirm that plaintiffs do, in fact, allege that Airbus is Boeing's only meaningful competitor in the commercial aircraft market?

A.  I see that, yes.

Q.  Do you agree that Airbus is the closest peer to Boeing's commercial airplane segment?

A.  Based on what I know of Airbus and Boeing's business and their commercial segment, that would not surprise me.

Q.  And you testified earlier that you didn't include Airbus in your peer index because Airbus, Airbus does not have a US-traded security, correct?

A.  Correct.

Q.  Is there any other reason why you didn't include it, include Airbus in your peer index or industry index?

A.  No.

Q.  Do you agree that news about Airbus could affect Boeing's stock price?

A.  I certainly can't rule that out.

Q.  Did you do anything to control for

Page 72

that possibility that news about Airbus could affect Boeing's stock price?

A.  Again, to the extent that the economic factors affecting the industry generally are affecting Airbus, as well, it could be picked up by my industry index I'm using, but that doesn't eliminate the possibility that Airbus-specific news could impact Boeing, and I have not done an explicit control for that.

Q.  And your only implicit control for that would be, I guess, the market and industry indexes that you used, correct?

A.  Yes.

Q.  Now, in paragraph 51 of your report, you note that "Due to the onset of the COVID-19 pandemic, there was increased volatility for both Boeing common stock and the market as a whole"; is that correct?

A.  Yes.

Q.  And how did you account for that increase in volatility due to the onset of the COVID-19 pandemic in your regression model?

A.  So I created a separate estimation

Page 73

window for the highly volatile COVID period, and then -- so that I isolated the volatility during that period, and my statistical test during that period would directly account for that higher volatility.

Q.  And the separate estimation window for the highly volatile COVID period that you use is for the time period February 24, 2020 through April 14, 2020?

A.  Yes.

Q.  And how did you determine that date range, February 24, 2020 through April 14, 2020?

A.  I believe that's a period -- well, as I describe in paragraph 51, that's from the first market date that the VIX Index exceeded 20 until the VIX fell back below 40, and that's a period I believe I used in another matter, as well, to perform a separate estimation window.  So I was also attempting to be consistent with what I had done in another matter for identifying the period of higher volatility.

Q.  And what was the other matter, if you can recall?

19 (Pages 70 - 73)

Page 74

A. I don't recall off the top of my head.

Q. Did you do any statistical analysis to determine whether that date range was appropriate?

A. Exhibit 7 of my report shows the standard deviation of the errors, which is a measure of volatility after controlling for the market industry index, and it shows that that period certainly had a much higher volatility. And then by using a period after that, the volatility was much more consistent with where it was over a much longer period of time after the coming out of the COVID period. So those results are certainly reflect that it's reasonable. And then in terms of identifying that period also, Exhibit 5 plots the VIX, V-I-X, Index and shows that that period of high volatility does look very different than at any other period during. But I didn't perform any specific statistical tests around choosing the exact dates, other than reviewing the VIX Index and then seeing that the results of the analyses were reasonable.

Page 75

Q. And does Exhibit 5 to your report, which you just mentioned, show that there was higher-than-normal volatility due to the COVID-19 pandemic between February 23, 2020 and September 30, 2020?

A. Well, there was some heightened volatility there, and that's also consistent with what I measure in Exhibit 7. And so you see that sort of right after the very high volatility during that short window that there is a flat line on Exhibit 7 immediately after that, which means that I'm using a 120-day fixed window immediately following that, and consistent with that you see that that volatility is somewhat higher than at other times during the class period, but that's being accounted for within this model.

Q. We've been talking about this separate estimation window you used for the highly volatile COVID period. Did you consider using any other subperiods in your regression to account for changes during the proposed class period?

A. No, I didn't see any other evidence of a need to adjust the methodology at other

Page 76

points during the class period.

Q. Now, to analyze the cause-and-effect relationship between new public information about Boeing and the market price of Boeing's stock, you examined the price response of Boeing's stock to the 19 earnings announcements during the proposed class period, correct?

A. That's one part of the test. I then look -- that's what I would refer to as the treatment group, right, that's the days with clear, potentially value-relevant news being issued by Boeing, and then I compare how the price responds on those days to a group of days with the least amount of news.

Q. What I just asked you, that tracks exactly what you wrote in paragraph 59 of your report, right?

A. Right. I just think it's important to understand that that's one component of the analysis, yes, that I looked at the earnings announcements as days on which there was clearly potentially value-relevant Boeing news released.

Q. And of the 19 earnings

Page 77

announcements issued by Boeing during the proposed class period, your event study showed that six resulted in statistically significant price movements above the 95 percent confidence level, correct?

A. Correct.

Q. And why did you use a 95 percent confidence level there?

A. I would say that's the most often-used threshold for determining statistical significance, both in the literature in this context. Although I do note that both in the financial economics literature and in the context of analyzing securities litigation, many draw statistical inferences and refer to things as statistically significant if they cross the 90 percent threshold.

Q. Is it accurate to say that your event study showed that 31.6 percent of the earnings announcement during the proposed class period resulted in statistically significant price movements at a 95 percent confidence level?

A. Yes.

20 (Pages 74 - 77)

Page 78

Q. And conversely, 13 of the 19 earnings announcements during the proposed class period did not result in statistically significant price movements, according to your event study, above the 95 percent confidence level?

A. That's correct.

Q. And on all of those 13 dates, defendants made statements that plaintiffs allege were false and misleading; is that correct?

A. I don't recall lining up those specific dates and reaching that conclusion. I don't have any reason to dispute it, but that's not something I, I actually check to see if there were misstatements on each and every one of those days, or alleged misstatements.

Q. If you look at Footnote 76 of your report, which is on page 30, in that footnote you report on the results of your event study using 99 percent and 90 percent confidence levels?

A. Correct.

Q. And I think you mentioned to me

Page 79

earlier that your understanding is that some courts have found a statistical significance at a 90 percent confidence level?

MR. BISSELL-LINSK: Objection.

A. I don't know that I said "courts." I said that financial economists in the literature as well as those performing analyses in this context have concluded some things are significant at the 90 percent level. I don't recall what all courts have said or have in my memory what particular courts have said about the 90 percent level.

Q. And you referred in the text of your report to the 95 percent confidence level because that's the most commonly used level in the economic literature?

A. Yes, it's the most commonly used, but certainly not the only one.

Q. Now, does Exhibit 8 to your report summarize your event study analysis of Boeing's earnings announcements during the proposed class period?

A. Yes.

Q. And based on the number of asterisks is an indication of statistical

Page 80

significance at the 90 percent, 95 percent, and 99 percent levels?

A. That's correct, yes.

Q. And none of the Boeing earnings announcements during the proposed class period before July 28, 2021 resulted in statistically significant price movements above the 90 percent, 95 percent, or 99 percent confidence level, according to your event study; is that correct?

A. That's correct.

Q. Let's go to paragraph -- let's go to page 47 of your expert report, which begins your discussion of damages.

A. Okay.

Q. Are you there?

A. Yes.

Q. Now, I touched on this earlier, plaintiffs' counsel asked you to opine on whether per-share damages could be measured for all purchasers of Boeing common stock during the proposed class period using a common methodology that is consistent with plaintiffs' theory of liability, correct?

A. Yes.

Page 81

Q. And your opinion on that question is contained in Section IX-A of your report, correct?

A. For the common stock, yes, and summarized earlier, but yes, the more detailed discussion is in Section IX.

Q. That section of your report that relates to Boeing common stock is about three pages long, right?

A. Roughly, yes.

Q. And it consists of five paragraphs, correct?

A. Yes.

Q. Those paragraphs are paragraphs 96 through 100, right?

A. Yes.

Q. And how much time did you spend drafting Section IX-A of your report?

MR. BISSELL-LINSK: Objection to form.

A. Well, I've used almost all of this language in other matters because the damages methodology that's being proposed here is common to many, virtually all 10b-5 cases so long as the claims are consistent with my

21 (Pages 78 - 81)

Page 82

understanding of when this model can be used, so I did not spend a particularly long time drafting this section. So I don't know exactly is the answer, but it was not very long.

Q. You say it was not very long. What was your best estimate?

A. Well, I certainly reviewed the language and, again, I spent, you know, as I estimated before, four of five hours or so looking at specific plaintiffs' claims and thinking about plaintiffs' claims before reaching this opinion. There certainly are some case-specific references, for example, in paragraph 99, so I certainly spent some time drafting some additional language in this section, but I don't know, I don't have a particular estimate.

Q. So those five paragraphs, paragraphs 96 through 100, is it fair to say they're virtually identical to paragraphs you've included in expert reports in other cases describing the damages methodology for common stock?

MR. BISSELL-LINSK: Objection,

Page 83

form.

A. Absolutely, and that's exactly the point, which is that there is a well-accepted methodology for calculating classified damages in cases such as these where the allegation is that purchasers paid an inflated price as a result of misstatements and/or omissions.

Q. Now, I think you note this in paragraph 99, there is a reference to the Alaska Airlines incident and also to manufacturing and safety and quality deficiencies at Boeing, right?

A. Yes.

Q. So you have that reference in the text of paragraph 99, and then you have a citation in Footnote 129 to the amended complaint in this case, correct?

A. Yes.

Q. Now, other than that reference to the Alaska Airlines incident and manufacturing and safety and quality deficiencies at Boeing and the cite in Footnote 129, Section IX-A of your report does not discuss any other facts in this case

Page 84

or otherwise mentioned Boeing, correct?

A. I think those are the only Boeing-specific references that you mention.

Q. And do you agree that Section IX-A of your report is largely copied and pasted from reports you've submitted in other cases in connection with class certification?

MR. BISSELL-LINSK: Objection, form.

A. I don't know if "copied and pasted" is the right term, but there is certainly a template for this section that I use in many reports, precisely for the reason that this is a, in my view, a noncontroversial and well-accepted methodology for claims of when there is -- for claims that there's an inflated stock price as a result of misrepresentations and omissions. And so long as that's the gravamen of plaintiffs' claims and that their claims are economically coherent, I'm willing to give this opinion that this is the standard methodology for calculating damages in those matters. So, yes, this is -- this -- much of this language appears in other reports I've given for that

Page 85

precise reason.

Q. I think you testified earlier in my first question on this subject that you used almost all of this language in other matters, and I guess my question is: In preparing this section of your report, did you copy and paste that language or did you retype all the words?

A. Like I said, I think there is an existing template that was -- so I don't know if it was literally copied and pasted. Once I reached the opinion that this was -- that the -- that there is a common damages methodology and it's the standard out-of-pocket method that I've testified about many, many times, I asked for this, the template language to be put in the report. So I don't know exactly how it was done mechanically, but, yes, I did not retype all these words.

Q. So someone else took your standard template and either copied and pasted it, or they actually sat down and they retyped all the words, and then, you know, you then reviewed that output, correct?

22 (Pages 82 - 85)

Page 86

A. Yes.

Q. And then we referred to the specific reference in the Alaska Airline incident, and manufacturing and safety and quality deficiencies at Boeing in paragraph 99. Did you make any other specific changes to your standard template in connection with preparing this section of your expert report?

A. Upon reviewing it, I may have made small edits for clarity, but I don't remember making any substantive changes, no.

Q. Do you recall making any edits at all?

A. I don't have a specific recollection of any edit, but, again, every time I read this section of a report I might make a little change here and there, but I don't recall making it in this case.

Q. And in approximately how many different cases have you used a variation of these paragraphs in your expert report in connection with class certification?

A. I don't know an exact number, but it would be dozens of times.

Page 87

Q. Approximately how many reports do you submit each year that contain a variation of these five paragraphs?

MR. BISSELL-LINSK: Objection, form.

A. I think that would vary from year to year. I'm not sure.

Q. What's a range?

A. Maybe 10 to 15, sometimes less.

Q. And when did you start using a variation of these five paragraphs in your expert reports in connection with a class certification, in approximately what year?

A. I don't recall. I know I was asked this specific question in this specific way, or a very similar way at some point several years ago, but I don't remember exactly what year that was.

Q. At least going back to 2020, right?

A. That's probably fair, yes.

Q. And Section IX-A of your report, it provides an overview of techniques that might be used to calculate damages in a securities fraud class action, correct?

MR. BISSELL-LINSK: Objection,

Page 88

objection.

A. No. I would describe it as providing a very specific formula for calculating damages, and that I believe it gives an overview of potential methodologies for calculating the input, some of the inputs to that calculation, but it provides a very specific formula on how to calculate damages.

Q. And that formula is the out-of-pocket measure of damages.

A. Well, and as I define the formula, it's the artificial inflation at the time of purchase minus the artificial inflation at time of sale, or just the artificial inflation at the time of purchase if it's held until the end of the class period. And then I also note what I understand are limitations on damages, which is the total amount loss from the revelation of the corrective information as well as the application of the 90-day lookback rule. So I give very specific, a very specific formula and constraints on the calculation of per-share damages in the report.

Q. The first thing you said, the

Page 89

artificial inflation at the time of purchase minus the artificial inflation at the time of sale, that's the out-of-pocket measure of damages, correct?

A. That's how I refer to it, yes.

Q. And the formula that you describe in your report, and the potential methodologies for calculating the inputs to that formula, nothing about that is specific to the particular facts of this case, right?

MR. BISSELL-LINSK: Objection.

A. Well, it's specific to plaintiffs' theory of liability, which is that the alleged misstatements and omissions inflated the price of Boeing stock. So that's certainly taken into account in evaluating whether this is the appropriate damages methodology.

Q. But that theory, that the alleged misstatements or omissions inflated the price of a stock, I mean that's the plaintiffs' theory in every Section 10b case, correct?

A. There are some -- I've seen some variations on that over time, including in certain cases it's artificial deflation, in

23 (Pages 86 - 89)

Page 90

certain cases plaintiffs were seeking something beyond the artificial inflation per share in the way its conceived of here. But in virtually every case that I've been involved in, 10b case that I'm involved in, it involves claims of the stock price being inflated by misstatements or omissions.

Q. Is any part of the formula or methodology described in Section IX-A of your report specific to this case and different from what you've used in virtually all of the cases in which you've been retained as an expert?

A. No, precisely because it's the well-accepted methodology for these types of claims.

Q. Okay. I mentioned earlier the out-of-pocket measure of damages; do you recall that?

A. Yeah, I use that term, and you've used it, and I assume it to be referring to the formulas described in my report.

Q. And in particular, in paragraph 96 of your report, you describe the out-of-pocket measure of damages which you

Page 91

say is the standard method for calculating class-wide damages in Section 10b cases, correct?

A. I think that's a fair summary of what I say there, yes.

Q. And under the out-of-pocket measure, damages are equal to artificial inflation per share at the time of purchase minus artificial inflation per share at the time of sale, correct?

A. Yes.

Q. And I think you note that --

MR. PEPPERMAN: Withdrawn.

Q. And you also say, I think, in paragraph 96 that the out-of-pocket method has been applied in virtually every Section 10b case that you've observed or participated in as a consulting, testifying or neutral expert, correct?

A. Yes.

Q. In any of those cases that you observed or participated in as a consulting, testifying or neutral expert, was the out-of-pocket measure of damages not applied?

A. Again, I think I've seen a couple

Page 92

of alternatives. One is when there's an allegation of artificial deflation so the formula just sort of gets inverted, and that's actually true for the puts in this case. And then there have been several cases I can recall where plaintiffs were seeking beyond the out-of-pocket measure of damages.

Q. Some other consequential damages?

A. I don't know so much as consequential damages, but theories for why -- what I would -- what I would call legal theories as to why the recoverable loss could be greater than the amount by which the price was distorted at the time of the misstatements.

Q. Take a look at Footnote 125 of your report, which is on page 47 of your report, down at the bottom.

A. Okay.

Q. In Footnote 125 you state that the method for calculating damages, for calculating class-wide damages does not change in the event that an alleged disclosure is considered a materialization of the risk, correct?

Page 93

A. Correct.

Q. And by disclosure there, do you mean an event that reveals in full or in part the truth supposedly concealed by the alleged misstatements?

A. Yes.

Q. And what is your understanding of when an alleged disclosure is considered a materialization of the risk?

MR. BISSELL-LINSK: Objection.

A. Well, again, I want to be careful, because I've heard the term "materialization of the risks" used in a lot of different ways, in a lot of different contexts, and it could have different meaning. But what I'm referring to here specifically is if a disclosure is -- represents not something that could have literally been disclosed earlier but is where something that previously was a risk has now occurred and in some way the nature of that disclosure has to be taken into account in how it would have affected the price at an earlier point in time, such that it might not be that the full price decline would then be an appropriate

24 (Pages 90 - 93)

Page 94

measure of how the price, how much lower the price would have been earlier, and that one would have to take into account some measure of how the risk had changed over time, that's what that's generally referring to. But the out-of-pocket method can easily handle that sort of situation is the point I'm making in that footnote.

Q. Let me see if you agree with this: Do you agree that, as you understand it, the materialization of the risk theory applies when the plaintiff claims that the defendants materially misrepresented a risk faced by an issuer and then the truth is revealed by an event that represents the materialization of the improperly stated risk?

MR. BISSELL-LINSK: Objection, form.

A. That's one context in which I've seen this concept referred to, yes.

Q. And you, yourself, have stated exactly that in other cases, right?

A. That sounds consistent with language I've used, yes.

MR. PEPPERMAN: I am going to hand

Page 95

you what I believe is Coffman Exhibit 6, which is a copy of your expert report dated January 6, 2024 in "In Re BP plc Securities Litigation."

MR. BISSELL-LINSK: Can I ask, I don't see ECF stamping on this. Was this publically filed or obtained in some other way, or do you not recall right now?

MR. PEPPERMAN: I can answer your question. So excerpts of this were filed in the joint appendix in the Fifth Circuit in connection with the Rule 23(f) appeal. I was counsel for BP in this matter, so I had a copy. None of it was designated by, you know, either side as, you know, confidential under a protective order.

(Exhibit 6, Expert Report dated January 6, 2024 in In Re BP plc Securities Litigation, marked for identification, this date.)

Q. And my first question for you, Mr. Coffman, I recognize this is a lengthy document, and I'm going to refer you to

Page 96

specific paragraphs, you know, whenever I ask questions. But my first question is going to be: Is this a copy of an expert report that you submitted on January 6, 2014 on behalf of the plaintiffs in another securities class action, caption In Re BP plc Securities Litigation?

A. It appears to be a copy of that. I think the only thing I would note is I think some of these exhibits were probably had color associated with this, this appears to be a black-and-white copy, but other than that, yes, it seems to be a copy of a report I issued.

Q. And that's your signature on page 78, right?

A. Yes.

Q. And, Mr. Coffman, take a look at paragraph 7 of your January 6, 2014 expert report in the BP case, and I ask you to just, to yourself, you know, read that paragraph.

A. Okay.

Q. And in that paragraph, you state that a materialization of the risk theory is relevant when a plaintiff claims that a

Page 97

defendant intentionally or recklessly materially misrepresented a risk faced by the issuer of the security, and then rather than directly correcting the misstatement the truth is revealed by and investors are harmed by corrective events that represent materializations of the risk that was improperly disclosed.

Is that, not word for word, but essentially what that paragraph says?

A. Yes. And I just want to point out that this is an example of where I've seen the term "materialization of risk" theory used in different ways at different points in time. This is a specific case where I was specifically asked by counsel to consider a theory of materialization of the risk where the damages, in their view, damages could be realized well beyond what would be the traditional out-of-pocket methodology. And I make that very clear in paragraph 8 of this report, in the first sentence of paragraph 8 of this report where I'm saying that this type of claim, as described in 7, is distinguishable from other claims because

25 (Pages 94 - 97)

Page 98

the, quote/unquote, inflation used to quantify damages does not represent the difference between an observed price and a but-for price prior to the materialization -- sorry -- prior to the materialization of the risk.

So I'm specifically distinguishing this from what's typically thought of as the out-of-pocket methodology.

Q. Where inflation used to quantify damages is measured as the difference between the observed price in the actual world and the but-for price in a world where the alleged misrepresentations had not been made prior to the materialization of the risk.

A. Not quite. Very close.

It's not a but-for world where the misrepresentations had never been made, it's a but-for world where the misrepresentations were corrected at an earlier date.

Q. Gotcha, and thank you for that clarification.

Do you agree, however, with your description in the second and third sentences of paragraph 7 of when a materialization of

Page 99

the risk theory is relevant?

A. Well, in that sentence, when I'm saying "this theory," I'm referring to the specific theory that was being articulated in this particular case, and not in a broader way. I mean, I generally understand that. So I'm describing a very specific damages theory that I was being asked to consider by plaintiffs' counsel in this case, not something that's -- what's more generally referred to as materialization of the risk in other cases.

Q. Your description of that theory in the second and third sentences of paragraph 7 is stated, you know, with generality rather than tied to the specific facts of the case in which you've been retained, right?

A. There are some elements that are general there, yes. But again, these statements are being made in the context of a very specific case with a very specific claim that's different than the application of the usual out-of-pocket methodology.

Q. In the third sentence, what did you mean by "rather than directly correcting a

Page 100

misstatement"?

A. Meaning that the disclosure itself isn't the company coming out and correcting the misstatement as much as that there is an event that reveals the relevant truth of what's been concealed by the misstatements.

Q. Do you agree that under plaintiffs' liability theory in this case, the Alaska Airlines accident on January 5, 2024 revealed the truth allegedly concealed by defendants' statements because the accident represented the materialization of the risk that defendants' statements had improperly understated?

MR. BISSELL-LINSK: Objection, form.

A. So in your question when you refer to "this case," we're no longer referring to the document we were looking at, we're talking about the Boeing --

Q. The Boeing case that brings us here.

A. Yeah, okay.

Plaintiffs are certainly alleging that that incident revealed a portion of the

Page 101

relevant truth that had been concealed. Whether they want to call that materialization of the risk or a corrective disclosure or something else is not particularly relevant to my opinion at this point.

Q. Well, the Alaska Airline accident did not directly correct the alleged misstatements in the language that you used in paragraph 7 of the BP report, correct?

A. If by "directly correct" you mean that they essentially came out and said we didn't prioritize safety, we aren't following the DPA, like things of that nature, no, it didn't come out and directly say those things.

Q. And that's what you said you meant when you used the phrase directly correcting a misstatement, right?

A. Correct.

Q. Nor did the Alaska Airlines accident represent something that could have been disclosed earlier, right?

A. Correct.

Q. In that sense it was the

26 (Pages 98 - 101)

Page 102

materialization of a supposedly misstated risk, it represented the materialization of the risk that plaintiffs say defendants' statements improperly understated, right?

A. I see how one could view it that way, yes.

Q. And none of the events identified in the amended complaint on which the truth supposedly was revealed directly corrected the alleged misstatements, right?

MR. BISSELL-LINSK: Objection.

A. I don't think that's necessarily true, nor is it -- well, let me take a step back. Give me just a moment.

I don't -- I mean, certainly, the last statement or the last event that the DOJ finds that Boeing violated the DPA is pretty clearly corrective of a misstatement that they hadn't violated the DPA. Now, that's not a Boeing statement, but -- and I have not evaluated to what extent each and every one of these disclosures may or may not have been a direct disclosure of the misstatements; that wasn't part of my assignment. So it would be speculative for me to agree or

Page 103

disagree with that.

Q. Fair enough. May I ask you one last question on that?

Do you agree that the corrective events identified in the amended complaint either were the materialization of an allegedly understated risk or were the consequences of the materialization of that risk?

MR. BISSELL-LINSK: Objection, form.

A. I haven't analyzed each of these events enough to -- I would be speculating to say whether that's the case or not.

Q. Do you agree that under plaintiffs' liability theory, the alleged misstatements had the effect of making Boeing appear to the market that it was safer than it actually was?

A. I think that's consistent with plaintiffs' theory of the case, yes.

Q. And do you agree that the allegedly understated risk here of a safety-related accident was a known risk to the market?

THE WITNESS: Could I have that

Page 104

read back, please?

(A portion of the record was read.)

MR. BISSELL-LINSK: Objection, form.

A. I mean, I guess if you're asking me broadly does the market understand that there can potentially be safety incidents, yes. But when the market has been allegedly deceived about the safety of Boeing's manufacturing, that creates an unknown risk. So I don't agree with your characterization that that would then be properly considered a known risk.

Q. Okay, let me try again.

So is it your understanding that under plaintiffs' theory of liability, the market understands that there can be safety incidents but the alleged misstatements under plaintiffs' theory caused the market to underestimate the probability or likelihood or chance of such an incident?

MR. BISSELL-LINSK: Objection.

A. That might be a portion of -- I mean that's a portion of what I understand plaintiffs to be alleging. Again, I think

Page 105

the alleged misstatements -- I don't think of plaintiffs' alleged misstatements as solely related to a risk of safety incidents, though, safety-related incidents as much as it could reflect -- again, some of their claims are related to whether or not they were complying with, with certain regulations. Some are related to whether or not they could maintain a stable or growing ability to produce airplanes. So I don't think their entire claim is related to the safety incidents, at least that's not the way I read it. A portion of it is, as I read their allegations, but I don't see their claim as being the only way that the truth could come out as through actual safety incidents or accidents.

Q. Would you agree that the claims at issue in this case concern defendants' alleged materially false or misleading statements regarding Boeing's manufacturing of safe airplanes.

A. Yes.

Q. Now, in connection with preparing your report, I mean you considered or

27 (Pages 102 - 105)

Page 106

reviewed some Boeing Form 10-Ks that were filed during the proposed class period, correct?

A.  Yes.

Q.  And Boeing expressly warned investors in its Form 10-Ks of the complexities and uncertainties inherent in its manufacturing operations, correct?

A.  Those are long documents, I don't remember all the precise language, but I remember something along those lines.

Q.  And Boeing also warned investors that its commercial airlines business depends on its ability to ensure that every airplane in its production system conforms to Boeing's specifications, right?

A.  Again, I don't recall that specific language, but it wouldn't surprise me.

Q.  Now, do you think that defendants' alleged misstatements in this case caused the market to believe that the probability of an accident was zero?

A.  That's not my understanding of plaintiffs' claim, no.

Q.  And you said earlier that the

Page 107

market understood that there could be safety-related incidents, right?

A.  I think, I think the market understood that the probability of a safety-related incident was not zero.

Q.  And I'm going to ask you a hypothetical, and counsel can object and see if you can answer it.

I want you to assume that none of the challenged statements had been made, and the relevant truth was out in the market as you understand it to be.

Do you think the price of Boeing's stock still would have declined in that, in that but-for world following the Alaska Airlines accident on January 5, 2024?

A.  It's possible it still would have declined some, whether in the same amount, I don't know.

Q.  How would you go about attempting to estimate the size of the decline that still would have occurred in the but-for world that I described to you?

A.  I don't think --

MR. BISSELL-LINSK:  Sorry.

Page 108

Objection, form.

A.  My understanding is the but-for world you're laying out isn't the but-for world to consider in the context of this securities litigation case, at least that's not the but-for world that I understand plaintiffs are -- would be asking me to conceive of when performing a damages analysis.

Q.  I'm going to take your understanding of the but-for world that the plaintiffs would ask you to conceive of when performing a damages analysis.

In that but-for world, had the Alaska Airlines accident nevertheless occurred and the door plugs, you know, blew off in flight, would you expect that the price of Boeing stock still would have declined in that different but-for world?

MR. BISSELL-LINSK:  Objection, form.

A.  It's possible, yes.

Q.  And what would you do to estimate the size of that possible decline?

A.  I haven't considered all the

Page 109

possible ways to do that.  I mean one thing that comes to mind is to look to other similar incidents that didn't call into question manufacturing processes and safety. That's not something I've thought through, I don't know precisely, that's not a question I've confronted yet.  So I haven't thought through a methodology yet.

Q.  Now, I think you touched on this question I'm about to ask you earlier when we were talking about paragraph 7 and paragraphs 8 from your BP report.  I just want to ask you some follow-up, and it ties to what you say in Footnote 125 of your expert report in this Boeing case.

Is the out-of-pocket measure of damages applied in exactly the same way when a plaintiff relies on a materialization of the risk theory of damages?

MR. BISSELL-LINSK:  Objection, form.

A.  If the measure, again, in BP and what I describe in paragraphs 7 and 8 of BP is fundamentally different than the out-of-pocket measure of damages.

28 (Pages 106 - 109)

Page 110

What's referenced in the footnote you mentioned in my report is the fact that you can have disclosures that are materialization of risks and be consistent with the out-of-pocket measure of damages, it just requires a detailed loss causation analysis as to how to quantify the artificial inflation to be consistent with that.

Q. In the second part of Footnote 125 of your report in this case, you state in the second part of the that sentence that the formula can easily accommodate any changes due to a determination that an event is partially or fully the result of a materialization of the risk.

Do you see that?

A. Yes.

Q. And the formula to which you're referring there, that's the out-of-pocket measurement of damages, correct?

A. Right, so the formula -- yes, so the formula stays the same but the inputs might change based on some determination about whether something is a materialization of a risk. That's the point I'm trying to

Page 111

make there.

Q. And how might the formula inputs need to be changed due to a determination that a corrective event is partially or fully the result of a materialization of the risk?

A. Well, I think the easiest way to do that is through an example. So let's say we all agreed that there was an unknown risk, so the market would assume that the probability of this event occurring was either zero or sufficiently close to zero as be immaterial, and then in reality there was a 50 percent chance of this event occurring and causing, let's just say, a dollar per share of impact on the stock price. If this gets disclosed through the event actually happening and the stock price falls by a dollar, and the determination is made that this is just a materialization of a risk and that what, you know, the true misstatement is really only that there should have been a 50 percent chance of that risk occurring, then the artificial inflation could be computed as 50 cents, not the full dollar decline that happens at the -- on the corrective

Page 112

disclosure date.

So that's what I'm talking -- that's an example of how this could explicitly be taken into account in the loss causation analysis that the same exact class-wide damages formula is still applicable and can be used. That's obviously an extreme case and just a hypothetical example, but that's the sort of thing I'm referring to.

MR. PEPPERMAN: Okay, thank you. So I am going to ask you about an actual case.

I am going to mark as Exhibit 7 a copy of the declaration of Chad Coffman, CFA, dated June 3, 2014, in the case captioned "In Re BP plc Securities Litigation."

(Exhibit 7, Declaration of Chad Coffman, CFA, dated June 3, 2014, marked for identification, this date.)

Q. Mr. Coffman, I just want to let you know Exhibit 7 is just your declaration, which is only three and a half pages long. I did not include with this declaration copies

Page 113

of the various exhibits that you included with it, it would have made the -- otherwise would have made this very manageable four pages 179 pages, and my questions are going to be only about the declaration, but I just want to be clear that I did not include any of the exhibits.

A. Okay.

Q. And my first question for you, sir, is going to be: Did you submit this declaration in the BP Securities Litigation on approximately June 3rd of 2014?

A. Yes.

Q. And that's your signature on the fourth page, right?

A. Yes.

Q. And did this declaration also relate to class certification in the BP case?

A. I believe it was part of, I believe, a motion for reconsideration or something like that to the class certification decision, yes.

Q. A motion for reconsideration of the court's second class certification decision; is that right?

29 (Pages 110 - 113)

Page 114

A.  I don't recall all the details at that level of specificity, but I recall submitting this declaration after the court's decision.

Q.  And I ask you first to take a look at paragraph 4 of your declaration.  Do you see where I am?

A.  Yes.

Q.  And paragraph 4 reads, "I've reviewed the court's order dated May 20, 2014, including a discussion of the out-of-pocket measurement of damages."  Do you see that?

A.  Yes.

Q.  And that May 20, 2014 decision, that's the court's order that was the subject of the plaintiffs' motion for reconsideration, to the best of your recollection?

A.  I believe so, yes.

Q.  And you go on to state in paragraph 4 that the court held that if plaintiffs prevail in their pre-explosion claims, then the market was deprived of the opportunity to accurately price the risk that

Page 115

BP faced and all purchasers of BP stock in the pre-explosion subclass period arguably overpaid for their investment, but the amount they overpaid was the unpriced risk, not its consequences.  Do you see that?

A.  Yes.

Q.  And that's sort of analogous to the extreme example that you gave of the, you know, the 50 percent chance of an accident where, you know, the measurement of inflation is the 50 cents rather than the full dollar upon the occurrence of the accident, right?

A.  Yes.

Q.  And then you go on to say, "Based on the court's holding and the assumptions I've been provided, I've been asked by plaintiffs' counsel to calculate the inflation for the pre-explosion subclass using a but-for price for BP ADSs pursuant to the out-of-pocket measure of damages."

Do you see that?

A.  Yes, this is exactly the issue I was describing before, which is that as part of my earlier report I was not using the out-of-pocket measure, I was using a

Page 116

materialization of the risk measure.

Q.  And here you're -- in this declaration you're describing what the measure of damages would be using an out-of-pocket measure of damages rather than a materialization of the risk theory.

A.  As it was defined in that case, yes.

Q.  And what the court said in the BP case in its May 20th order is also true here, namely that if plaintiffs prevail on their claims based on defendants' safety-related statements, then the market was deprived of the opportunity to accurately price the risk that Boeing faced, and all purchasers of Boeing stocks allegedly overpaid for their shares, correct?

A.  Well, again, I understand that might be -- certainly in this case there's an allegation that plaintiffs overpaid as a result of artificial inflation.  I think it's clear that a part of that claim is that there might have been heightened risk of safety incidents, but I don't think that plaintiffs' claims are limited to that in this particular

Page 117

case.

Q.  And what is your basis for that understanding?

A.  The nature of what they're claiming was misstated.

Q.  And where the court said that the amount they overpaid was the unpriced risk, not its consequences, and then you said that's a description of what would be the out-of-pocket measure of damages, correct?

A.  Well, certainly, in this particular case, in BP, that was, that was certainly the case as to what the case was about, yes, and that, and that to convert to use the out-of-pocket method, one would have to apply what the undisclosed risk was of that sort of incident to calculate out-of-pocket damages.  That's what I'm saying in this declaration.

Q.  And for the safety-related statements in this case, you know, the claim that the safety-related statements understated the risk of another safety incident, you know, here, as in the BP case, the out-of-pocket measure would look to the unpriced risk that investor incurs, like, not

30 (Pages 114 - 117)

Page 118

the consequences of that unpriced risk if and when an accident occurs, right?

A. Well, again, I think what distinguishes this case, Boeing case from the BP case, is that it's not just the probability of an accident or a safety incident that could be the revelation of the truth. In other words, I think plaintiffs' claims in this case go well beyond that.

Q. But for the safety-related statements, I mean they do go directly to the question of the probability of another accident or safety-related incident, right?

A. But I think they go beyond that. I don't think it's solely related to that. I think that's one aspect of them.

Another is -- is whether or not they could maintain, as I understand plaintiffs' claims, whether or not they could maintain stable or growing output, or whether they were in violation of the DPA. There's a number of different ways that that relevant truth could have come to light and did come to light. So I don't think it was, I don't think their theory is based solely upon the

Page 119

probability of some particular safety incident.

Q. So let's look at paragraph 5 of your report where you write, "Consistent with my testimony at the class certification hearing, and with the marble example as presented in my reports and the Stulz report, the 'inflation' referred to in my prior reports can be converted to a measure of but-for inflation by multiplying the difference between the market's perceived probability of a loss of well control and the probability that would have been perceived absent the alleged misstatements."

Do you see that?

A. Yes.

Q. And did you testify live at the class certification hearing in the BP case?

A. I did.

Q. And you were innocently sitting in the gallery in the courtroom and Judge Ellison asked you to come up to the stand and swear you in?

A. I don't know about your characterization of innocently sitting there,

Page 120

but I was in the courtroom and was asked to come up and testify.

Q. Under oath. In your many years as an expert, going back to 2008, is that the only time where you were sitting in the gallery for oral argument in class certification and the judge asked you to take the stand and swear you under oath?

A. No, I was also called up in the Halli -- in the fairness hearing to approve the Halliburton settlement. I was in a similar situation.

Q. Do you still attend oral arguments on occasion?

A. On occasion I have.

Q. What is the Stulz' report to which you refer there?

A. He was an expert for defendants in that case.

Q. Is that Rene Stulz?

A. Yes.

Q. And what do you think of Rene Stulz as an economist?

A. He's a well-respected economist. I've agreed with him on numerous things at

Page 121

times and disagreed with him on numerous things at times.

Q. Now, the type of analysis that you describe in paragraph 5 where you calculate the but-for inflation by multiplying the difference between the market's perceived probability of a safety-related accident and the probability that would have been perceived absent the alleged misstatements, would that type of analysis be appropriate here, as well, based on what you know?

A. I don't know. I haven't made that determination in this case.

THE WITNESS: Can we take a break when you get to a reasonable stopping point? I don't need one right this second, but if...

MR. PEPPERMAN: This is a reasonable stopping point.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time on the video monitor is 12:17 p.m. We are off the record. This ends media 2.

(Lunch recess taken at 12:17 p.m.)

31 (Pages 118 - 121)

Page 122

AFTERNOON SESSION

(Time noted: 1:04 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 1:04 p.m. This is media 3.

CHAD COFFMAN, resumed.

EXAMINATION (Cont'd.)

BY MR. PEPPERMAN:

Q. Good afternoon, Mr. Coffman.

A. Good afternoon.

Q. Hope you had a good lunch.

A. Yes, thank you.

Q. So let me see, I'm going to resume with my questions about your damages methodology for Boeing common stock, and let me start here: Do you agree that to apply the out-of-pocket measure of damages, the amount of artificial inflation in each share of the relevant stock needs to be quantified for each trading day of the proposed class period?

A. Yes. So inflation per share would need to be specified on each day during the class period.

I don't know exactly what you mean

Page 123

by each stock, because the stock is fungible, but for --

Q. I said on each share, I meant like by one share.

A. Yes, per share inflation on each day of the class period, yes.

Q. And so here, you know, I think we said earlier the proposed class here includes, you know, over 1,000 trading days, right?

A. Yes.

Q. I think we counted it to be 1,146, but I mean you haven't done that kind of count yet, right?

A. I don't recall specifically how many days there are, no.

Q. Okay. As a result, if you're ultimately asked to calculate class-wide damages in this case, you will need to develop a model that quantifies the amount of artificial inflation per share in Boeing stock on each of the more than 1,000 trading days included in the proposed class period, correct?

A. Yes.

Page 124

Q. And whatever methodology you ultimately develop, if you're asked to do that, it also needs to be consistent with plaintiffs' theory of liability in this case, right?

A. Yes.

Q. And at this point, you know, sitting here on January 14, 2025, you have not determined how you would go about quantifying the amount of share in Boeing stock on each trading day of the proposed share class period, correct?

A. I don't really understand the question the way that was asked.

Q. Let me try again.

A. Okay.

Q. Now, at this point in time, today, at this point you have not determined specifically how you would go about quantifying the amount of inflation per share in Boeing stock on each trading day of the proposed class period, correct?

A. That's correct, I have not.

Q. And do you agree that the question of how to quantify the artificial inflation

Page 125

per share is an input to the damages methodology?

A. Yes. But it doesn't impact the formula I've provided in what I describe in my report, but it is an input to that, for sure, yes.

Q. In paragraph 98 of your report, on page 48, in the second sentence you write, "The quantification of the artificial inflation per share requires a detailed loss causation analysis." Do you see that?

A. Yes.

Q. And what is the basis for your understanding that the quantification of the artificial inflation per share is part of the loss causation analysis in a Section 10b case?

A. Because that requires evaluating the extent to which the price declines on any alleged corrective disclosures were caused by the corrective information, as opposed to other nonfraud-related information. And then it requires also evaluating to what extent those price client declines are reflective of how the price would have traded or how the

32 (Pages 122 - 125)

Page 126

price would have been different earlier in time.

Q. And based on your understanding, how does an analysis of loss causation differ from an analysis of damages?

A. Well, they're interrelated, but you need to do the loss causation analysis I just described to quantify the artificial inflation per share. Once that's determined, whether the finder of fact agrees with my calculation or opinion about what the artificial inflation per share is or some other quantification based on whatever evidence is put in front of them, whatever the artificial inflation per share is determined by the finder of fact, the same class-wide formula would then be used to calculate damages. So then the next step would be to take the actual trading records of claimants and apply the formula that's described in, in my report.

Q. Do you agree that whether the quantification of the artificial inflation per share is considered part of the loss causation analysis or part of calculating

Page 127

damages is a legal question as opposed to an economic question?

A. Well, I'm not opining to the extent it's a legal question, I'm just my describing my understanding as a matter of economics what the different processes are and how they differ and are distinct from one another, which I think I've articulated.

Q. Right, but whether those processes appropriately fall within the loss causation bucket or the calculation of damages bucket as a legal matter in a Section 10b case is ultimately a question for the court, right?

A. It may very well be, I'm just telling you based on my decades of experience in performing work in these cases how it's normally conceived of and thought about by economists and lawyers that I talked to, and I think it's consistent with court rulings I've seen, as well. But I certainly am not trying to tell the court what the legal distinction is.

Q. So if you take a look at Footnote 127 of your report, which is on page 48 --

Page 128

A. Uh-huh.

Q. -- you state that in your experience loss causation analyses are often informed by information learned in discovery. Do you see that?

A. Yes.

Q. Now, what kind of information learned in discovery are you referencing there?

A. Well, I don't know that I'm limiting it in any respect, I mean it could be essentially anything because the -- what I'm referring to, I'm referring to a couple of different things there. One is I understand that at the merits stage, whenever I'm doing a loss causation analysis I'm starting from the assumptions given to me by counsel as to what they expect to be able to prove, and what they expect to prove, or be able to prove may obviously be informed on all -- by all sorts of discovery that they learn in the discovery process.

Separate from that, there have certainly been numerous occasions where there have been corrective disclosures where

Page 129

performing a disaggregation analysis has been assisted by learning information in discovery and also in evaluating how inflation evolved over a class period. There's certainly examples where information learned in discovery helped in that process. So that's what I mean is that the loss causation analysis and the determination of the appropriate inflation per share, reasonable inflation per share can be informed by things learned in discovery.

Q. If you were asked tomorrow by plaintiffs' counsel to conduct a loss causation analysis, is there any particular piece of information from discovery that you would require to perform that analysis?

MR. BISSELL-LINSK: Objection.

A. I don't know, I would be speculating, because I haven't really thought through that question yet.

It would also depend on, again, the starting point of what I'm asked to assume, what -- what relevant information there may or may not be then once I'm asked that question. So I would be speculating at this

33 (Pages 126 - 129)

Page 130

point. As I sit here right now, I don't have some particular piece of information that I think would be necessary out of discovery.

Q. That's what I wanted to ask, and this could well be the only opportunity I have to ask you questions, but sitting here right now, can you think of any particular piece of information from discovery that you would require to conduct a loss causation analysis in this case if you were asked to do so?

A. Not as I sit here right now, but that's not something I've really thoughtfully considered yet, given that my analysis of that has not begun.

Q. And at the fourth sentence at paragraph 99 of your report, at the top of page 49, you state that "The most widely used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that reveal the relevant truth."

Do you see that?

A. Yes.

Q. And by "disclosures that reveal the

Page 131

relevant truth," you mean in this case that would be the alleged corrective events over the last four months of the class period that we summarized in Exhibit 4, right?

A. Well, those are the alleged disclosures, yes. I mean, certainly, if I were to perform a loss causation analysis, there certainly have been cases where I've identified additional disclosures that weren't originally alleged in the complaint that I believed qualified as corrective disclosures, and then there is often corrective disclosures that are alleged that for a number of reasons I might evaluate and decide aren't corrective disclosures. But, certainly, those are the types of disclosures that one would start from.

Q. In the instance -- would you conclude that an alleged corrective event is not a corrective disclosure if there was not a statistically significant decline in the issuer's stock price at a 95 percent confidence level on that date?

MR. BISSELL-LINSK: Objection to form.

Page 132

A. No, that's not how I would describe my process at all. I mean there can be information that's at least partially corrective that's revealed that might not impact the stock price in a significant way. That doesn't mean it's not corrective.

Q. What significance, if any, would you ascribe to a situation where corrective information is disclosed on a date and there is no statistically significant decline in the stock price associated with that disclosure?

A. Well, I think one would have to analyze carefully why that would be the case, and what conclusions one could or couldn't draw from that. I think that would be a highly fact-specific, context-specific question.

Q. Now, in this case the amended complaint alleges that there are 22 dates between January 5, 2024 and May 14, 2024 on which the relevant truth was revealed, right?

A. That's my understanding of how the complaint reads, yes.

Q. And in paragraph 99 you give as an

Page 133

example of a corrective event that supposedly reveal the relevant truth the Alaska Airlines accident on January 5, 2024 right?

A. Correct.

Q. And in Footnote 130 at the bottom of page 49, you state that the event study that you performed for this report, the report dated December 13, 2024, is for market efficiency purposes and is not an attempt at valuing artificial inflation, correct?

A. Correct.

Q. To value artificial inflation, would you need to make changes to the event study that you performed for your December 13th report?

A. I don't know that "changes" is the right word, but there is a lot more I would investigate. And again, I'm not saying this is the case with any of these particular disclosures, but, for example, my practice when looking at a corrective disclosure if I'm evaluating loss causation is to go well beyond just looking at the daily abnormal return, which is what I'm doing here. So I would look at things like whether there's any

34 (Pages 130 - 133)

Page 134

confounding information, whether the announcement came sort of in the middle of the day and so an intraday analysis would be appropriate, whether there is confounding information at some point later in the day so only a partial day should be used, whether there's evidence that the price reaction continued beyond one single day as, you know, analysts and news articles continued to analyze the event. So there's a lot more that would go into it, but I wouldn't call it a change as much as I would look much deeper into exactly what was causing the price movement.

Q. Let me ask a more precise question.

In order to determine whether there was a daily abnormal return, as you put it, would you need to make any changes or adjustments to the event study that you performed in your December 13th report?

A. No, I mean the calculations in my report provide an estimate of whether there was a statistically significant abnormal daily return on those days. What I'm saying is there would need to be a lot more done to

Page 135

actually try to draw a causal connection between that and any particular piece of news for the purposes of assessing dissipation of artificial inflation.

Q. There's more work that would need to be done beyond simply performing the event study.

A. Yes.

Q. Is there any reason you can think of today why the event study that you performed in connection with your December 13th report could not be used to quantify any daily abnormal return in Boeing stock price on the alleged corrective disclosure dates?

A. Well, again, it provides an estimate of the daily abnormal stock price movement. What I'm saying is in order to draw any conclusion, relevant economic conclusion about whether that says anything one way or the other about the dissipation of artificial inflation, there need would need to be more work.

So let me give you a hypothetical example. On a day where there was

Page 136

statistical significance, one would still have to analyze to what degree confounding information may have played a role. Even on days where there was not a statistically significant movement, one would have to evaluate whether there was confounding positive information or intraday evidence of the price having responded to the alleged corrective information.

So I agree with you that it's -- you can get a daily abnormal return and whether that daily abnormal return is significant or not from my event study, but it's -- without doing more work it's impossible to draw any economic conclusion about whether it actually supports or doesn't support an argument about loss causation.

Q. I think I understand, so let me be sure we're on the right page. I'm focusing solely on the calculation or the determination of whether there was a daily abnormal stock movement.

If that's all you were seeking to do in the context of, you know, valuing inflation as opposed to applying Cammer

Page 137

Factor 5, would you need to make any adjustments to the event study that you performed in connection with your December 13th report?

MR. BISSELL-LINSK: Objection, form.

A. As I sit here right now, I can't think of any changes that would need to be made to evaluating. I think I've put, I've presented a reasonable approach for calculating the abnormal price movement on each day during the class period and for the events I'm looking at. But to draw any further conclusion about causation one way or the other, one would have -- I would want to perform more analysis in terms of precisely what was causing the price movement or how much of it related to a misstatement or not or something else, that's the point I'm making.

Q. In cases where you are asked to quantify artificial inflation in a stock price, do you use the back end price reactions to the corrective events as the starting point for measuring the artificial

35 (Pages 134 - 137)

Page 138

inflation in the stock price earlier in the class period allegedly caused by the misstatements?

MR. BISSELL-LINSK: Objection, form.

A. Using the price reactions on the corrective disclosures is the typical starting point and probably what I've seen done most often and what I've done most often. It's by no means the only approach or the required approach, because that analysis can be very fact specific and context specific. So there have certainly been times that other metrics have come into play in terms of trying to estimate the artificial inflation per share.

Q. In the cases that you've been retained, what you've most often done is started with the price reactions to the corrective event as the starting point of your measurement of artificial inflation at points in time earlier in the class period.

A. It's usually the starting point, and then those values can often be adjusted over time as their back casted through the

Page 139

class period, based on case-specific information.

Q. What do you mean by the word "back casted" in that context?

A. Meaning that if -- when there's a corrective disclosure, let's just use an example, if there's a corrective disclosure and the loss causation analysis determines that there was a price decline of $3 per share that was caused by the corrective information, so there was dissipation of artificial inflation of $3 per share on that day, well, that provides some economic evidence as to what the artificial inflation per share was prior to that corrective disclosure. It might suggest immediately prior it was $3. Then that requires an analysis of how, you know, was that $3 present throughout the class period or is some other metric appropriate for evaluating how, how the inflation evolved over the class period.

So one often-used technique is called the constant dollar methodology, which would assume that that $3 is an appropriate

Page 140

or reasonable measure of how the stock price was inflated throughout the class period, and then you would, quote/unquote, back cast that $3 as the inflation throughout the -- throughout the class period.

Q. The constant dollar methodology that you mentioned, and I think it's referred to in your report, is that what you've used most often in allocating artificial inflation over a proposed class period?

A. It's probably what I've used most often, but it's certainly not the only thing I've done, and there have certainly been many cases where there were case-specific factors and assumptions that required me to do something different than that.

Q. I think you touched on this earlier, but to quantify artificial inflation, do you need to consider whether and to what extent confounding information contributed to the observed price movements on the dates of the alleged corrective events?

A. Yes.

Q. And in that context, what is

Page 141

confounding information?

A. Confounding information would be anything that isn't a revelation of the relevant truth and is unrelated to the alleged fraud in the case.

Q. Now, to the extent that multiple pieces of company-specific information are disclosed simultaneously, an event study cannot separate the impact of those different pieces of information, correct?

MR. BISSELL-LINSK: Objection, form.

A. If it's literally simultaneously, the event study itself will not allow you to distinguish between those two. There would need to be further economic analysis to evaluate the relative contribution of those things.

Q. But an event study alone can't separate the impact of multiple pieces of company-specific information that are disclosed at the same time, right?

A. As long as we're talking about at exactly the same time, yes, I would say that's correct. I mean there certainly have

36 (Pages 138 - 141)

Page 142

been cases where multiple pieces of information have been released on the same day but at different times, then an event study analysis can help you. But if they're literally released contemporaneously and so there's no time difference, then the event study methodology itself doesn't allow you to distinguish between the factors that caused the price movement.

Q. One of the alleged corrective events in this case when Boeing's then CEO, Mr. Calhoun, stated during Boeing's fourth quarter 2023 earnings call made a statement about the Alaska Airlines accident, that corrective event also coincided with Boeing's fourth quarter 2023 earnings release, correct?

A. Can you repeat the date that you were mentioning there?

Q. Right. So I mentioned that the corrective event -- hold on. An astute follow-up question to ask me about these dates. Let me be sure I get them right.

Take a look at paragraph 405 of Plaintiffs' Amended Complaint, which I think

Page 143

I marked earlier as Exhibit 2.

A. Okay.

Q. And you see this is, this is alleged corrective event 10 of 2022, and paragraph 405 states that Defendant Calhoun discussed the Alaska Airlines incident on Boeing's January 31, 2024 fourth quarter 2023 earnings call. Do you see that?

A. Yes.

Q. Now, if it's true, and Mr. Calhoun made that statement that's alleged to be a corrective event during Boeing's earnings call, do you agree that an event study would not be able to disaggregate the price impact of the new information in Boeing's earnings release that's unrelated to Mr. Calhoun's statement?

MR. BISSELL-LINSK: Objection, form.

A. I don't know for certain.

I can recall a case where there was an earnings call that was long enough and different statements were made that we were able to look at aftermarket pricing even during the time of the call and see what

Page 144

reaction there might have been to a particular statement. So I don't know is the answer. I would have to look at these details very carefully before I was willing to make that conclusion.

Q. What you need to know, and correct me if I get this wrong, is whether the release of the information was sufficiently separated in time that you could do a reliable analysis of intraday stock price movements?

A. Correct. And I'm not suggesting that could be done here, but I'm not willing to concede that it can't be.

Q. Right, because based on paragraph 405, you can't know that the timing of Mr. Calhoun's statement versus the timing of when the fourth quarter 2023 earnings were actually released, and when it happened during the call relative to disclosure of other information, you would have to get way, way, way deeper into the weeds to do that kind of analysis or determine whether that kind of analysis is possible.

A. Yes.

Page 145

Q. Do you agree that in a Section 10b case in calculating damages it's necessary to remove the price impact of any company-specific information disclosed on an alleged corrective disclosure date that's unrelated to the plaintiffs' allegations and therefore is not part of the revelation of the relevant truth?

A. Yes.

Q. Have you determined in this case whether there is confounding information on any of the alleged corrective disclosure dates?

A. That's not an analysis I performed, no.

Q. That's not something you've looked at thus far.

A. Correct.

Q. Now, because an event study alone cannot separate the impact of multiple pieces of company-specific information disclosed at the same time, in those instances you would need to use other tools to disaggregate the impact of the simultaneously disclosed pieces of company-specific information, correct?

37 (Pages 142 - 145)

Page 146

A. Yes.

Q. Are those the other valuation techniques that you describe in paragraph 99 of your report?

A. I make reference to some techniques that might be used for that purpose, yes.

Q. And you say in that paragraph, in about the middle of it, that if there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Do you see that?

A. Yes.

Q. Now, in this case have you attempted to disaggregate the price impact of allegedly corrective information from any confounding information released on the alleged corrective disclosure dates?

A. No.

Q. But that's something you would ultimately need to do if you were asked to calculate class-wide damages?

A. If I were asked to perform a loss causation analysis and attempt to quantify

Page 147

the artificial inflation that would flow into the damages calculation, yes.

Q. Sitting here right now -- you make the reference in your report it may depend on information learned from discovery -- but sitting here right now, is there any specific information from discovery that comes to mind that you would require to disaggregate the price impact of corrective information from confounding information in this case?

A. No, I haven't made that determination yet.

Q. And you further state in the paragraph that the appropriate valuation technique to be used to disaggregate corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances, correct?

A. Yes.

Q. And that's a true statement, right?

A. Yes.

Q. And then paragraph 99 then goes on to identify examples of valuation techniques that might be used in this case, correct?

Page 148

A. That could be used, or that I've seen used in the past to disaggregate corrective from confounding information. So these are the types of methodologies I've seen used for that sort of analysis.

Q. So the valuation techniques that you go on to list, and you provide some examples in the remainder of the paragraph, 99, those are examples of valuation techniques that you've seen used in other Section 10b cases?

A. Either that I've used or seen other people used, yes.

Q. Now, how would you determine which valuation technique would be appropriate to disaggregate the impact of confounding information in this case?

A. It would depend on what the nature of the confounding information is versus the nature of the corrective information and what type of information would inform a reasonable way to disaggregate them. So I can't really specify that without knowing what the confounding information is and what the corrective information is.

Page 149

Q. Sitting here right now, did you have any view of which of the valuation techniques identified in paragraph 99 might be appropriate to use in this case?

A. No, it's not clear to me that any of them would need to be used yet in this case 'cause I haven't evaluated whether there is confounding information or not.

Q. And you said that these are examples of valuation techniques that either you've used or you've seen used in other securities cases, correct?

A. Correct.

Q. Which of these valuation techniques identified in paragraph 99 are techniques that you, yourself, have used in cases, in securities cases in which you've been engaged as a testifying expert?

A. I can recall applying each one of these methods at some point in time. The hesitancy I'm having is whether each of them was used as a, as part of a testifying engagement or as a consulting engagement or, you know, in the context of mediation or something like that. But I can recall a

38 (Pages 146 - 149)

Page 150

circumstance of using each of these methods at least once.

Q. Are there circumstances where one technique is preferable to another?

A. Well, I can -- I mean I could certainly give certain examples. I don't think I can give, like, something that covers all possibilities.

But, for example, thinking about price-to-earnings versus price-to-EBITDA multiples, in many cases where a company doesn't have positive earnings but they have positive EBITDA, that would lean towards using an EBITDA multiple.

For early stage companies where growth and revenue is really the driving factor of value, then the price-to-revenue multiples might be a more appropriate use than price to EBITDA or something like that.

If there's an example of a disclosure or a part of a disclosure where the cash flow implications of some part of that disclosure are easily identifiable, either because there aren't any cash flow implications or it's a one time in nature,

Page 151

then sort of a DCF method usually would be preferable.

If there are -- with respect to the last example I give here, I can remember cases where analysts had performed valuations of different aspects of the company and the company's businesses, and so those valuation methodologies in the securities analysts' reports themselves provided what I thought was the most reasonable way to value certain types of information.

So it really is a very case-specific, context-specific analysis, but those are a couple of examples of why I would lean towards one or another method in certain circumstances.

Q. And just to be sure our record is clear, when you referred to the last example, you're referencing other available valuations from securities analysts?

A. Or made available through discovery, but, yes. And certainly I can recall using internal valuations that companies had made of certain business segments or business opportunities as a -- as

Page 152

an input to those calculations.

Q. Could all of the valuation techniques that you reference there in paragraph 99 be feasibly applied in this case?

MR. BISSELL-LINSK: Objection, form.

A. I don't know, because it depends on the nature of the corrective information and the nature of the confounding information.

So for example, if the confounding information really had nothing to do with immediate earnings, then it might rule out some of these methodologies as appropriate in that particular circumstance. So it really depends on the nature of what's confounding and what -- and the nature of what's corrective.

Q. Now we've been talking about quantifying artificial inflation. Now a separate but related question: To quantify the alleged artificial inflation in the price of Boeing stock on each day of the class period, you would also need to analyze how, if at all, per-share inflation may have

Page 153

evolved or changed during the class period, correct?

A. Correct.

Q. And in paragraph 100 of your report, you state that this analysis, how inflation per share may have evolved over the class period, is also an intensely factual and case-specific, and also may depend on information learned through discovery, right?

A. Correct.

Q. Now, is there any particular piece of information to be obtained from discovery that you can think of right now that you would need to know if you were asked to analyze, you know, whether inflation per share evolved over the proposed class period?

A. I'm not aware of anything specific as I sit here, but that's the sort of thing I would, I would start considering once I was engaged in doing a loss causation analysis is starting from the assumptions given to me about what plaintiffs expect to prove, and the time periods over which different statements were relevant. What type of -- what would come out of that analysis is

39 (Pages 150 - 153)

Page 154

starting to think through how, you know, is there any information that might be learned through discovery that would be relevant. But as I sit here, no, I haven't.

Q. And I think I asked you earlier, you haven't at this point in time begun such a loss causation analysis; is that right?

A. I have not.

Q. And then you go on in paragraph 100 to give examples of several different approaches that could be used to calculate daily per-share inflation over the duration of the class period, right?

A. Well, I think I mentioned a couple of different methodologies, and also say that it would still vary, you know, based, potentially based on information that's learned in the process of doing the work. So I certainly give a couple of examples of ways I've done it in the past, and there have certainly been cases where I've deviated from those because there was case-specific information that allowed me to do so, but I have not done any of that work yet in this case.

Page 155

Q. And you haven't formed an opinion as to what the best approach is in this case for determining that, right?

A. In terms of whether it would be something like constant dollar inflation or constant percentage or some variant of that, no, I have not.

Q. And what else would you need to know to determine the appropriate approach for, in this case, for analyzing inflation over the duration of the proposed class period?

A. Well, I would need to know a lot. I mean, again, I would need to know what plaintiffs expect they can prove. I would need to know what plaintiffs are alleging could have and should have been disclosed at different points in the class period, and maybe that differs over time. I would need to understand which statements had been made at each point in time that are alleged to have been false and misleading. I would need to take into account the general mix of information out in the market about Boeing and what analysts were saying about Boeing.

Page 156

Would need to take into account the nature of the corrective disclosures. Would need to evaluate to what degree each corrective disclosure can map back to different categories of alleged misstatements.

So there's a lot of work that would have to go into that.

Q. And you haven't started any of that work yet in this case, right?

A. I have not, no.

Q. Now, the first method that you mention in paragraph 100 is to assume constant dollar inflation throughout the class period, correct?

A. Correct.

Q. And under that approach, the artificial inflation per share is the same dollar amount on each day of the proposed class period, correct?

A. Or at least it might not be exactly the same, especially in a case where there's multiple corrective disclosures, like the inflation may come down over time. But prior to each corrective disclosure and in between the corrective disclosures it would be a

Page 157

constant dollar amount; that's the essence of that methodology.

And so for example, prior to the first corrective disclosure, it would be a constant dollar amount that reflects the inflation that had dissipated after that.

Q. But the dollar amount of inflation under the constant dollar inflation method doesn't change from the first alleged misstatement until the first alleged corrective disclosure, correct?

A. Under a plain, vanilla constant dollar methodology, that's right, correct. I mean there's certain scenarios where different misstatements might come in and only from that point forward some of the inflation comes in but it's still constant, you know, between different dates. But that's, I mean the essence of what you're saying is right is that on a day-by-day basis the inflation is not changing, it's held constant over periods of time.

Q. And in this case that would mean that the per-share dollar inflation would be held constant from September 30, 2019, the

40 (Pages 154 - 157)

Page 158

date of the first alleged misstatement, through January 5, 2024, the date of the first alleged corrective disclosure, right?

A. If you're doing a purely constant dollar methodology and then also making the assumption that there wasn't some interim event that introduced some of that inflation, then that's right. But again, I haven't determined that that's the appropriate method in this case.

Q. But if you were to determine that it is, that would mean that the per-share inflation, in a dollar amount, would remain unchanged for over four years, right?

A. Potentially, yes.

Q. Now, you say that the constant dollar inflation approach is an often-used method, correct?

A. Yes.

Q. In your experience as a testifying expert in Section 10b cases, have you most often used the constant dollar inflation approach to analyze artificial inflation over the class period in Section 10b cases?

A. Again, I would say it's the most

Page 159

often used, but it's certainly not something I've used exclusively.

Q. I'm not asking you whether you used it exclusively, I think you've been clear that you have not. My question is: Is that the -- is the constant dollar approach to analyzing artificial inflation over the class period the approach that you've most often used in Section 10b cases?

A. I think that's probably true, yes.

Q. Under what circumstances, in your experience, is it appropriate to assume constant dollar inflation?

A. I don't know that I can enumerate them all, but, certainly, if there's economic reasons to believe that the inflation wasn't changing in some material way over time, as long as that's a relevant conclusion. Certainly, any case where the economic evidence would suggest the artificial inflation was actually even higher than that at earlier points in time, then assuming constant dollar inflation is actually conservative and would be reasonable and appropriate in that circumstance. Certainly,

Page 160

if the nature of the alleged fraud wasn't really changing over time in any particular way and there's lack of economic evidence suggesting that the value of that concealed information was changing over time would support constant dollar inflation.

Again, there might be others, it's a very fact- and case-specific analysis whether that's an appropriate method or not. So I don't know that I can articulate all the times and ways in which it would be appropriate, but I'm trying to give you a fair summary.

Q. Do you agree that if a misstated risk became more severe over the class period, either because of the repetition of the alleged misstatements or because of the passage of time without a safety-related incident, or perhaps both, that then it would be inappropriate to assume constant dollar inflation?

MR. BISSELL-LINSK: Objection, form.

A. I mean, I guess that's theoretically possible, but whether it

Page 161

actually is true in a certain circumstances, then certain circumstances would require a detailed analysis. So I don't think I can sort of say that that's necessarily true in all circumstances.

Q. Let me ask you a slightly different question.

Do you agree that if a defendants' repeated alleged misstatements had a compounding influence over time on the market's perception of a risk because of the repetition of the misstatements, then the amount of artificial inflation earlier in the class period would be less than the amount of artificial inflation later in the class period?

MR. BISSELL-LINSK: Objection, form.

A. Again, I think that's theoretically possible. Is it necessarily true? No.

Q. In that scenario, assuming that that was the scenario, would you use Bayesian, a Bayesian updating model to assess how investors might update their beliefs about a company's risk or safety profile over

41 (Pages 158 - 161)

Page 162

time?

MR. BISSELL-LINSK:  Objection, form.

A.  That would be one methodology to consider.  Whether I would actually use it or not, or whether it was appropriate in that circumstance, I don't know.

Q.  If you chose to use it, how would Bayesian updating work in that context?

A.  Well, again, I think the way Bayesian updating works is you're suggesting that the market's beliefs about something are updating over time based on additional events or the lack of additional events, meaning that a lack of negative events, and, at least theoretically, you could try to model how that was changing over time.  Whether that's necessary or appropriate in this case, I haven't determined.

Q.  Have you, yourself, ever used a Bayesian updating before in assessing how artificial inflation may have changed over a class period?

MR. BISSELL-LINSK:  Objection, form.

Page 163

A.  Yes.

Q.  In what case, if you recall?

A.  The BP case.

Q.  Do you agree that Bayesian updating can be used to model how risk expectations evolved over a class period?

A.  In certain circumstances it could be, yes.

Q.  We looked earlier at arguments that the plaintiffs made in opposition to defendants' motion to dismiss that appeared to argue that it was a repetition of the safety-related statements, at least in part, that made them material to investors.

If that is plaintiffs' theory of liability, do you agree that the use of Bayesian updating might be appropriate in this case?

MR. BISSELL-LINSK:  Objection.

A.  Possibly, that's something I would -- I would want to consider.

Q.  If the plaintiffs here do contend that the market's assessment of Boeing's safety profile was incorrectly improving over the class period due to defendants' repeated

Page 164

misstatements about Boeing's safety practices, if that is plaintiffs' theory, do you agree that the constant dollar inflation method wouldn't work here?

MR. BISSELL-LINSK:  Objection.

A.  No, not necessarily.  I mean just because plaintiffs contend that doesn't mean it's true.  I would need to assess whether I agree with that assessment or not.

Q.  If you did agree with it, then do you agree that the constant dollar inflation methodology would not work here?

A.  That's something I would have to consider carefully.  I don't know for certain.

Q.  And you haven't thought about that yet in connection with your role in this case; is that fair?

A.  Correct.

Q.  Take a look at paragraph 13 of your January 6, 2014 expert report in the BP Securities Litigation, which I marked as Exhibit 6.

A.  You said paragraph 14?

Q.  Thirteen.  It starts at the bottom

Page 165

of page 7 and it starts, "Moreover."

A.  Okay.

Q.  Now, bear with me, just so we have a clear record, I'm just going to read that paragraph, and then I will have some follow-up questions for you about it.

Paragraph 13 of your January 6, 2014 report in the BP Securities Litigation reads: "Moreover, as in this case, if the misstatement of risk evolved and allegedly became more severe over time, then one could reasonably make an additional adjustment for how the severity of the misstatement changed over time rather than simply carrying the loss back in time using a constant dollar approach.  I describe how a linear progression of inflation over time from zero to its ultimate level just before the explosion must be conservative relative to a 'Bayesian Updating' model that describes how rational investors would update their beliefs about BP's safety profile over time.  (I call this linear inflation I*).  Because the alleged misstatements and omissions are discrete events, as opposed to a continuous

42 (Pages 162 - 165)

Page 166

linear progression, I only increase the inflation per share along this linear progression each time an additional misrepresentation or omission occurs. As a result, the inflation takes a 'staircase' shape as depicted in Exhibit 1. (I refer to this 'staircase' inflation as 'I**'). By constructing inflation in this manner, it is responsive to Plaintiffs' theory of liability that BP's repeated assurances to the market over time concerning its process safety management capability resulted in stock price inflation and also responsive to whether liability is found for each alleged misstatement."

Do you see that?

A. Yes.

Q. And again, you were the plaintiffs' expert at class certification in the BP case, right?

A. I was.

Q. And the report that I read from you submitted in the BP case in support of plaintiffs' motion for class certification in the BP case, right?

Page 167

A. Yes.

Q. And in that case, the BP case, the plaintiffs allege that BP's repeated assurances to the market concerning its process safety management capability resulted in stock price inflation, correct?

A. Yes.

Q. And, similarly, here, as we saw in plaintiffs' opposition to defendants' motion to dismiss, plaintiffs allege that defendants' repetition of safety-related statements resulted in the price inflation, right?

MR. BISSELL-LINSK: Objection.

A. I don't know that I read their claim to be that each repetition caused incremental artificial inflation. I think what we read earlier was that their belief that their repetition was some indication of materiality of the statements, but whether or not it introduced incremental inflation over time was not something that was clear to me from what we read of their claims. But overall the misstatements in total, they're certainly alleging introduced artificial

Page 168

inflation.

Q. Right, but in saying that the repetition of the statements underscores their materiality, doesn't that mean that if there had only been a single safety-related statement, meaning just one, the one made on September 30, 2019, then that one statement standing alone might not be material to investors and, therefore, have any effect on the stock price, whether in terms of creating inflation or maintaining inflation, right?

MR. BISSELL-LINSK: Objection.

A. I don't necessarily read that economic meaning into it. I think they're making the observation that the repeated nature of the statements provides some evidence of their materiality. I don't know that their -- I don't read into their claim explicitly that each statement had some incremental impact on the level of artificial inflation or that each individual statement had a particular -- particularized value.

Q. But these questions I'm asking you about whether the statements had a compounding effect on inflation and whether

Page 169

Bayesian updating might be appropriate, those are not questions that you've thought about so far in connection with this case, right?

A. Correct.

Q. One more question about constant dollar inflation, and then we could take a short break.

Do you agree that if a misrepresentation understates a known risk, so you had a, you know, had an extreme example where the market's perceived risk was zero percent and then the alleged misstatements made it seem like it was 50 percent, I'm not talking about, like, a zero-risk situation but a situation where a misrepresentation understates a known risk, in that scenario, do you agree that using the full stock price decline on the date on which that known risk materialized as your constant dollar inflation would overcompensate investors?

MR. BISSELL-LINSK: Can you just hold one sec? I just want to make sure I'm following the question.

MR. PEPPERMAN: It was long. I

43 (Pages 166 - 169)

Page 170

thought it was pretty good, but it was long.

MR. BISSELL-LINSK: You could answer.

I think it would be helpful to clarify what you mean by known risk, but I don't want to make an objection.

Q. By known risk I mean a non-zero risk, a risk that the market knows is a positive risk, is some percentage greater than zero.

A. Right. I don't think that changes the economics of it at all in the sense that if there's -- so let's just go back to that same example. If prior to the misstatement or absent a misstatement the market would assume there's a 20 percent chance of that risk happening, and then the misstatement leads the market to continue to believe there's only a 20 percent risk of that happening, but in reality there's a much higher percentage, so it's not as if the risk is completely unknown, but the market is already assessing some risk related to that, whether the full decline is appropriate or

Page 171

not depends on what the market would assess had the truth been known, right? So had the truth been known that there was near certainty that something like that was going to happen, then the full stock price decline is still relevant because the market is already pricing in the 20 percent risk. So I don't think it really -- so then you're just measuring on the playing field from 20 percent to 100 percent instead of from zero to 100 percent, the market already understands the 20 and has priced that in. So I don't think it changes the economics of the situation at all.

Q. In this case, I mean to the extent that you know, is it plaintiffs' theory that had the truth been disclosed, that the market would have concluded that there was a near certainty of an accident like the Alaska Airlines accident?

A. I don't know if that's their contention or not.

MR. PEPPERMAN: Okay. Let's take a break.

THE VIDEOGRAPHER: The time on the

Page 172

video monitor is 2:07 p.m. We're off the record. This ends media 3.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time on the video monitor is 2:17 p.m. This is the beginning of 4.

Q. Mr. Coffman, let's go back and look at paragraph 100 of your expert report, which is marked as Exhibit 1, and the part I asked you about is on page 50.

A. Okay.

Q. And after your discussion of constant dollar inflation, you go on to state in paragraph 100 that in certain circumstances it may be reasonable to apply constant percentage inflation, correct?

A. Yes.

Q. And what do you mean when you say there that constant percentage inflation implies that the price was inflated by a constant percentage in the absence of additional disclosures?

A. So that in certain cases, for example, prior to the first corrective

Page 173

disclosure, let's say as of the first corrective disclosure that there was -- that the stock price was 30 percent inflated, let's say, that in certain circumstances it may be more reasonable to assume that the inflation at earlier points in time was not a constant dollar amount but a constant 30 percent of the stock price.

Q. And under what circumstances, in your experience, is it appropriate to apply constant percentage inflation?

A. Sure. So the stylized examples where that would be most appropriate would be, for example, if a company misstated its productive capacity in some proportionate way. So again, using a highly stylized example, if the company said, you know, we have five operating factories when they really only had four, you know, that might suggest that their productive capacity was being overstated by 20 percent or something like that. Or another time where constant percentage inflation makes a lot of sense is where the misstatements have given the market a misperception of the growth rate by some

44 (Pages 170 - 173)

Page 174

constant amount. So in other words, the market may be based on everything a company had told the market, the market was assuming the company was going to grow at 4 percent, but instead it would be more reasonable if they had told the truth that the market would have assumed they were going to grow at 2 percent. In those circumstances something like constant percentage inflation would make more economic sense.

Q. And I appreciate the examples, thank you.

But, I mean, can you describe in more general terms when, in your experience, it's more reasonable to use constant percentage inflation than constant dollar inflation?

A. I think the example I just gave, which is an example where the misstatements really create a distorted view of the growth potential of a company by -- that would lead me more towards a constant percentage inflation rather than a constant dollar inflation.

Q. Have you applied constant

Page 175

percentage inflation in other cases?

A. I have.

Q. Any come to mind?

A. Valiant was one. I know there are a couple of others. That's the one that most recently comes to mind.

Q. In both scenarios, the constant percentage inflation scenario and the constant dollar inflation scenario, in both the inflation is held constant between the date of the first alleged misstatement and the date of the first alleged corrective disclosure, it's held constant either by the same dollar amount or by the same percentage, correct?

A. I think in its most plain vanilla form, that's true. There can be circumstances where other interim events might precipitate a change in those, if there was some specific fact or some specific event that would alter them, but in its most plain vanilla form, that's true.

Q. And then you next identify in paragraph 100 another approach that you say may be necessary if the artificial inflation

Page 176

evolved over the class period based upon the nature and timing of specific misstatements, correct?

A. Yes.

Q. Now, Mr. Coffman, have you formed any opinion in this case about which technique referenced in paragraph 100, the constant dollar inflation technique, the constant percentage inflation technique, or the third approach, which of those would be most reasonably used to calculate the daily inflation in each share of Boeing stock over the duration of the proposed class period?

A. I have not formed an opinion on that. That would require a detailed loss causation analysis.

Q. Now, had plaintiffs' counsel asked you to do what you call a detailed loss causation analysis, could you have done that analysis based on the information you have now?

MR. BISSELL-LINSK: Objection, form.

A. Well, I think it would require additional assumptions to be given to me by

Page 177

counsel that I don't have at this point. Whether I could do it, I mean I would do the best I could to do it based upon that, plus the public information that's available to me. Whether or not that would be better informed by discovery that's made available, I just don't know.

Q. And what additional assumptions would you need?

A. A clearer understanding of exactly -- or not exactly, but a clearer understanding of what plaintiffs are alleging could have and should have been disclosed at different points over the class period and how that might have evolved over the class period. It would require a better understanding of the information set that was available through the class period, and studying exactly how the misstatements, the chronology of the misstatements and how they might have evolved and differed over time. So those are the sorts of things that I would certainly need to consider that I haven't considered yet.

On top of, obviously, a very

45 (Pages 174 - 177)

Page 178

careful analysis of the alleged corrective disclosures and whether there are other dates that might have been corrective disclosures.

Q. Do you agree -- I'm attempting to follow up on your answer. Do you agree that the alleged inflation of Boeing stock price at any given point in time during the class period would depend in part on the nature of what the truthful but-for disclosures would have been at that time, I think you said, you know, what plaintiffs are alleging could have and should have been disclosed at any particular point in time?

A. Yes, it would require some understanding of what plaintiffs are alleging defendants would have been required to disclose at each point in time to have there not be misstatements.

Q. And the inflation at any given point in time during the class period also would depend in part on the total mix of information then available to the market, right?

A. That's something that would need to be considered, yes.

Page 179

Q. And I think in previous answer, I wrote it down, you referred to the general mix of information out into the market, or the general set of information that was available. And that's what you're getting at, that you would -- you need to consider the total mix of information that was available to the market at any particular point in time in determining inflation, right?

A. Yes.

Q. Have you considered in this case how the mix of information related to Boeing may have changed over the nearly five-year class period alleged in this case?

A. I mean, by reading a lot of analysts' reports, I have a sense of sort of how the -- what analysts considered important change over time, but I haven't performed that analysis, so exactly how that might influence an inflation per share calculation, I don't know at this point.

Q. And you haven't given any thought to that particular question, correct?

A. Correct.

Page 180

Q. And I think you covered this, you agree that the artificial inflation in a stock price can evolve over time.

A. That's theoretically possible, yes.

Q. If you conclude that the amount of inflation involved over time, you would need to apply a time-varying inflation ban, right?

A. Potentially, yes.

Q. And you did that in the BP case, right?

A. I've done that in a number of cases, but BP was one of them, yes.

Q. And have you given any thought as to whether that would be appropriate here?

A. I have not given any detailed thought to that, no. It was not necessary to answer the questions I've been asked to date.

Q. And you agree that the full price decline upon a corrective event is not always the best measure of how the stock price would have reacted at some earlier point in time in the absence of the alleged misstatements.

A. It's not always the best measure, no. Sometimes it is. It's certainly relevant economic evidence. But using the

Page 181

full price decline is not always the most reasonable thing to do; I agree with that.

Q. Sometimes it's necessary to make adjustments to that full price decline, right?

A. For a variety of reasons, yes.

Q. And one of those reasons would be if you make adjustments to the full price decline to take into account, you know, what the price would have been at some earlier point in time in the but-for world.

A. Yes.

Q. And do you know whether it's necessary to make an adjustment like that in this case?

A. It will ultimately be necessary to evaluate that question, but I have not -- whether any adjustment is necessary or not, I have not drawn any conclusion yet, no.

Q. You told me a little while ago that you, you know, reviewed a number of Boeing analysts' reports as part of your work in this case so far, correct?

A. Correct.

Q. And we touched on this in the

46 (Pages 178 - 181)

Page 182

beginning, you didn't list all of those analysts' reports individually in your appendix that list the documents that you considered; you referred to more of a general categorical level, right?

A. Correct, yes.

Q. I mean, sitting here today, if you can, can you give me an estimate of approximately how many Boeing analysts' reports you reviewed as part of your work in this case?

A. Well, in terms of the number I considered for analyzing the Cammer Factor, it was --

Q. Is it in a footnote somewhere?

A. Yeah, give me just a moment. Exhibit 3 shows that I note the existence, at least, of 2,650 analysts' reports. I certainly didn't review all of those, but I certainly reviewed a number over the class period.

Q. My question, do you have an estimate of that number?

A. I would say 50 to 100 would be my best guess, and I'm basing that off of there

Page 183

were 19 earnings announcements. I looked at a number of the analysts' reports around the earnings announcements. So that certainly would have led me to look at at least 50 and probably more.

Q. And based on your review of those 50 or more Boeing analysts' reports during the proposed class period, do you agree that the circumstances surrounding Boeing changed over the nearly five years that make up the proposed class period in this case?

A. Certainly, some elements of their circumstances changed over time, yes.

Q. Well, during the first 14 or so months of the proposed class period, the 737 Max, Boeing's best-selling airplane, was grounded globally, correct?

A. I don't remember the exact dates, but I do remember that there was a period of time over which that's true, yes.

Q. The class period in this case begins on September 30, 2019, correct?

A. Correct.

Q. And the FAA recertified the 737 Max in November of 2020; is that correct?

Page 184

A. I don't, I don't recall that date.

Q. You recall that the 737 Max resumed flights in December of 2020?

A. I just, off the top of my head, I don't remember the timing of those facts. I am not disputing that's true, I just don't know those facts off the top of my head.

Q. And because of the grounding, Boeing also halted production of the 737 Max between December 2019 and May 2020; is that right?

A. Again, I don't remember the specific dates. I remember seeing reference to the manufacturing being stopped for a period of time, yes.

Q. And I take it from the analysts' reports that you saw that COVID-19 disrupted Boeing's supply chain, workforce, and production processes in 2020 and 2021, correct?

A. That's a fair statement, yes.

Q. And it also suppressed consumer demand for air travel; is that right?

A. That's consistent with my understanding, yes.

Page 185

Q. And Boeing also entered into a deferred prosecution agreement with the United States Department of Justice in January of 2021, right?

A. Again, I don't remember the specific timing, but I do remember them entering into that agreement, yes.

Q. And in addition, and I think you may have seen this in the analysts' reports, the market became aware of various production issues at Boeing during the class period, including in connection with the manufacturing of the 787 Dreamliner, right?

A. I remember the analysts' reports discussing various production issues. I don't have a specific recollection of that particular issue or when it occurred.

Q. And do you agree that consumer demand for air travel surged at the end of the proposed class period?

A. I recall demand for air travel increasing over certain portions of the class period, again, I just don't remember off the top of my head exactly what the timing of the start of that was.

47 (Pages 182 - 185)

Page 186

Q.  In fact, at the end of the proposed class period, in 2023 into 2024, consumer demand for air travel reached historic levels; isn't that right?

A.  For the opinions I was being asked to offer in this case at this time, focusing on that element of the details of that element of their business was not necessary, so I just don't recall if that fact is true or not.

Q.  Do you need to account for when these changed circumstances that I mentioned, the global grounding of the 737 Max, the halt in production of the 737 Max, the COVID-19 disruptions of Boeing's business, Boeing's DPA with the Department of Justice, you know, the level of consumer demand for air travel, do you need to account for those changes if you were to attempt to value inflation over the course of the class period in this case?

A.  I think those would be important things to consider.  How it would ultimately impact the inflation, I don't have a view of right now.

Q.  And at the end of 2019, and I think

Page 187

I asked you about this before and you said you weren't certain of the dates, but at the end of 2019, the 737 Max was still grounded by the FAA and Boeing also had suspended production of the 737 Max; is that correct?

THE WITNESS:  Could I have that read back, please?

(A portion of the record was read.)

A.  Again, I remember both of those things being issues that Boeing was confronting.  I don't remember the exact time periods over which that was occurring.

MR. PEPPERMAN:  Fair enough.

Let me show you what I've marked as Exhibit 7, and this will be our last exhibit today -- is it 8?  Okay, Exhibit 8.

Exhibit 8, which is a copy of a court document -- let me say what it is and then I will give it to you -- a court document that was filed in this case back in April of 2024 titled, "Memorandum of Law in Support of the Motion of Local Number 817 IBT Pension Fund For Appointment As Lead Plaintiff

Page 188

and For Approval of Selection of Counsel."

(Exhibit 8, Memorandum of Law in Support of the Motion of Local #817 IBT Pension Fund For Appointment As Lead Plaintiff and For Approval of Selection of Counsel, marked for identification, this date.)

Q.  My first question for you, Mr. Coffman, is going to be, have you seen this document before?

A.  No.

Q.  Now, the entity that filed this document, Local Number 817 IBT Pension Fund, I mean that entity is also one of the lead plaintiffs in this action on whose behalf you submitted your report, correct?

A.  I've seen that name, yes, in connection with this case, yes.

Q.  And that plaintiff is, you know, is Mr. Zweig's client, who is here with us today, right?

A.  That's my understanding, yes.

Q.  And if you look at page 7 of this memorandum submitted by IBT, and I understand

Page 189

that you haven't seen this document before, but on page 7 IBT told the court, quote, Perhaps the biggest deficiency in the allegations here is the failure to distinguish the dramatically altered state of affairs at Boeing in 2020 after the FAA's recertification of the 737 Max and production resumed, not to mention the substantive changes Boeing implemented in connection with the company's January 6, 2021 DPA with the DOJ resolving the MCAS system safety-related issues.

Do you see that?

A.  I see that.

Q.  And do you agree with IBT that the state of affairs at Boeing changed dramatically during the first year or so of the proposed class period in this case?

A.  That's not something I've formed a particular opinion on.

Q.  If that's true, do you need to account for that dramatic changes in measuring inflation over the course of the class period?

A.  I think if there were dramatic

48 (Pages 186 - 189)

Page 190

changes in the state of the company over time, that's something that would be important to consider. How it would impact the artificial inflation, if at all, I think would depend on that analysis.

Q. And you haven't done that analysis thus far.

A. That's correct.

Q. If you look at the bottom of page 8, the next page of this document, IBT tells the court, quote, Given these momentous and unprecedented events, it is simply implausible that Boeing's 2019 statements to investors concerning the grounded and uncertified 737 Max, which are encompassed in the Boeing one class period, and predate the DPA, could properly be considered in the same manner, let alone in the same case as allegedly false statements made thereafter.

Do you see that?

A. I see that.

Q. And based on the work you've done in this case so far, including your review of more than 50 analysts' reports, do you agree with that statement by lead plaintiff IBT?

Page 191

A. That seems like a legal conclusion to me, which I have no view on.

Q. No view on one way or another.

A. Correct.

Q. Have you, based on the work you've done so far, formed any view about whether you need to treat the inflationary effect of the alleged misstatements earlier in the class period differently than you do the later alleged misstatements?

A. I haven't formed a specific opinion about that, no.

Q. Have you formed a general opinion?

A. Well, my general approach is to consider carefully how the circumstances of a company may have changed over time during the relevant class period, so that will be important to consider. I haven't formed a specific conclusion or opinion as to what or how that may or may not affect the inflation per share.

Q. But you do agree that if you're ultimately asked to determine the inflation per share over the course of class period, you will need to consider how the

Page 192

circumstances and information surrounding Boeing changed over the proposed class period.

A. That would be important to consider, yes.

Q. Moving on from this, you can put this to one side. In providing us the backup materials for your report, plaintiffs' counsel advised us that you discussed matters relevant to your report with Professor Don Chance; is that accurate?

A. Only with respect to the options portion of my opinion, yes.

Q. That's what I thought. Let me ask you: What did you discuss with Professor Chance?

A. We discussed the methodology that's outlined in my report and how it was -- the reasons it was a powerful approach to evaluating market efficiency of options generally, including Boeing options.

Q. Did you discuss with Professor Chance the methodology for evaluating efficiency of options, the methodology for calculating damages with options, or both?

Page 193

You said you discussed with him the methodology outlined in your report. I want to be clear on what specific methodology that is.

MR. BISSELL-LINSK: Can you just hold it for one second?

You can answer that question. I think the conversations he had also involved counsel. I think you can answer that question, but I will just caution before answering subsequent questions for me to think about certain --

MR. PEPPERMAN: We will take it question by question.

A. Our discussions involved evaluating the methods for evaluating the efficiency of options, not damages.

Q. Professor Chance wrote a paper on options, right, a well-known paper?

MR. PEPPERMAN: Let me withdraw that.

A. Yeah, yeah.

Q. I can't think of the title of it. I don't want to put you on the spot.

49 (Pages 190 - 193)

Page 194

Why did you reach out to Professor Chance to discuss this topic with him, why did you pick him among all the capable economists there are?

A. My understanding is he had been engaged by plaintiffs' counsel, and they thought it made sense for me to have a discussion with him about methods for evaluating the efficiency of options.

Q. Engaged by plaintiffs' counsel in this case.

A. Correct.

Q. And your discussions with Professor Chance, were they in person, over the phone, via Zoom?

A. Over the phone and via Zoom.

Q. How many were there?

A. I can't be absolutely certain, but I think three, to the best of my recollection.

Q. In what timeframe were they?

A. In the weeks leading up to me filing the report.

Q. And was plaintiffs' counsel present for those discussions you had with Professor

Page 195

Chance?

A. Yes.

Q. And did you rely on your discussions with Professor Chance in forming any of the opinions contained in your December 13th expert report in this case?

MR. BISSELL-LINSK: Objection to form.

A. I would say there is nothing he said or did that I relied upon. I think the discussions that we had lead me to conclude independently that the method he discussed and that we discussed together was a powerful way to analyze the market efficiency for options generally and in this case in particular. But I didn't take any work product of his and rely on it in any way, shape or form.

Q. If you look at Footnote 122 of your report, which is on page 47, which I believe is hung off of the tail end of your discussion of efficiency for options, let me know when you're there.

A. Okay.

Q. Do you see Footnote 122?

Page 196

A. Yes.

Q. And you write in that footnote that the methodology set forth in this report to test for cause and effect in Boeing options is far more robust than the methods I've used in prior expert reports. Do you see that?

A. Yes.

Q. And did you develop that new, more robust methodology set forth in your report based in part on your discussions with Professor Chance?

A. Well, the idea came from the discussions with Professor Chance, yes, but I didn't rely on, again, on any work product of his. It was more of a theoretical discussion of how methodologies in which -- by which one can test the efficiency of options, and he described a methodology along the lines of what I'm using in this report, and I agreed with him that that was a very powerful methodology.

Q. When you say the idea came from discussions with Professor Chance, what did you mean by idea in that context?

A. Of using this particular

Page 197

methodology that's outlined in my report to evaluate market efficiency of options generally.

Q. And were you aware of the methodology set forth in your report before you consulted with Professor Chance?

A. I had not come across this particular methodology before, no.

Q. Let's discuss your damages methodology for Boeing call and put options.

And you discussed that methodology in Section IX-B of your report, which begins on page 50, correct?

A. Correct.

Q. And in paragraph 103 on page 51, you state in the first sentence, "Just as with the common stock, the task of measuring inflation in the option prices starts from observing the abnormal price change in the option at the time of the release of corrective information."

Do you see that?

A. Yes.

Q. And would you estimate the abnormal price change for options based on the results

50 (Pages 194 - 197)

Page 198

of the same event study that you used for Boeing common stock?

A. Short answer, yes, although, again, what I testified to earlier is that the regression, or the event study analysis, even for the common stock, might need to be more tailored than just looking at a daily return like I've already done for this purpose. But conceptually, it would start from whatever the relevant event study is for the common stock which establishes an expected portion of the stock price movement versus an unexpected portion of the stock price movement. You can use that expected portion of the stock price movement to infer how the option price also would have moved based on that expected price movement.

So you would use as an input to -- in other words, to calculate the abnormal movement for the option, you would make use of how much of an expected price movement there was in the stock based on -- for the stock. So one would inform the other.

Q. And have you done any of that work here so far, for options?

Page 199

A. Give me just a moment.

So in Appendix C, where I perform an alternative method of analyzing cause and effect for the options, I am using the daily regression that I used for cause and effect on the common stock to inform what the abnormal movement is of each of the options on each day that I'm testing. So I have done that form of calculation using the daily event study I've already performed. Whether that precise regression on a daily basis would ultimately be what's used for loss causation later is an open question as we described earlier. So, but I have performed that sort of calculation using the daily events I had already performed, at least with respect to the earnings announcements and the days with the least amount of news.

Q. Okay. Now, further down in paragraph 103, in about the middle, you write, "One could use a theoretical option pricing formula, such as the well-known and accepted Black-Scholes model, or the binomial model to translate that into an alternative but-for price for the option on every day

Page 200

during the class period in which the option existed."

Do you see that?

A. Yes.

Q. And is the "that" there a reference to the determination of artificial inflation in the underlying stock?

A. Yes.

Q. And what inputs would you need to apply those theoretical option pricing formula, as you describe there in paragraph 103, what inputs would you need?

A. I think it's possible to do that where the only input you really need is the inflation per share in the underlying common stock. The rest of the inputs can be either directly observed or inferred when applying the option pricing model.

Q. Let's just take the Black-Scholes model that you cite there as an example.

The Black-Scholes model depends on six different factors, right?

A. Uh-huh.

Q. You have to answer yes or no.

A. I'm sorry. Yes, yes.

Page 201

Q. I mean it depends on the current price of the underlying stock, the strike price of the option, the time to maturity of the option, the expected volatility of the underlying stock, the risk-free rate of interest, and the expected dividends for the underlying stock, right?

A. Correct.

Q. So to use the Black-Scholes model as your theoretical options pricing formula, you would need to know each of those six factors, right?

A. Yes, and -- but most of those are either directly observable or can be derived from the actual option price you're observing.

Q. One of the factors that I listed is expected dividends, correct?

A. Correct.

Q. And during the class period, there was substantial uncertainty about Boeing's dividend policy, correct?

A. Yes.

Q. And for purposes of your efficiency analysis, you assumed zero dividends,

51 (Pages 198 - 201)

Page 202

correct?

A. After they had suspended their dividend. Prior to that I did not, I used the dividend rate that had been occurring up until that point. But after they suspended their dividend, I assumed zero, yes.

Q. Why did you assume zero dividends after Boeing suspended its dividends?

A. Well, they never reinstated their dividend, but I acknowledged that certain investors may have assumed that they would resume their dividends to some degree at some point in time, so that's why I talk about there being uncertainty. But for purposes of my analysis, I just assume that dividends would be zero.

Q. You recognize in making that assumption that the assumptions that the dividends would be zero was not a perfect assumption, correct?

MR. BISSELL-LINSK: Objection, form.

A. I agree with that, it's not a perfect assumption, it's a simplifying assumption.

Page 203

Q. And you said in paragraph 88 that it was not a perfect assumption, correct?

A. I remember making that statement. I don't remember if it was in paragraph 88, but, yes, that is where I said that.

Q. If you were to use the Black-Scholes model to estimate inflation for Boeing options, how would you account for the uncertainty surrounding Boeing's dividend during the period after Boeing suspended the dividend?

A. Well, one simplifying assumption is that whatever the dividend assumption was that the market was using, regardless of what it was, that that wouldn't have been different just based on the change in the price between the observed price and the but-for price of Boeing underlying common stock.

Q. And how would you determine the dividend assumption that the market was using, I mean given your observation that there was substantial uncertainty about Boeing's dividend policy?

A. Well, again, I think even if you in

Page 204

performing the calculation you could continue to assume the dividend was zero, and reprice the option holding that assumption constant, and so long as the dividend assumption wouldn't have been materially different, the change in the option valuation wouldn't be sensitive to that dividend assumption. In other words, as long as the dividend assumption itself isn't changing, there would be no reason to believe that the estimate of the inflation you were getting would be biased in a particular way.

Q. Do you agree that each individual option contract could be affected by the same information differently based on option specific characteristics of the contract like the strike price and the time to maturity?

A. Yes.

Q. And how many different Boeing option contracts, if you recall, you know, were traded during the nearly five-year proposed class period?

A. I think I note in paragraph 83 that there were 16,113 call option series and 15,722 put option series that had nonzero

Page 205

trading volumes during the class period.

Now, for a damages analysis, there would probably be many, many less relevant to that, but that's how many at least traded over the class period.

Q. Even for a damages analysis, it would be a big number, right?

A. I don't know about what you mean by "a big number." I mean the fact that the number is -- I mean these issues can be dealt with programmatically. So the fact that there's thousands of different series doesn't mean that the analysis is -- that each one needs to be analyzed in some different way theoretically.

Again, the benefit of there being theoretical option pricing formulas is you can get a reasonable estimate of how the price of the option would have changed as a result of artificial inflation by just plugging a new underlying stock price into the formula.

Q. Right, but I think what you said, that you also need to take into account in terms of the value of the option not just the

52 (Pages 202 - 205)

Page 206

underlying price of the stock, but the strike price, and the option contract, the time to maturity, those sort of contract-specific factors, correct?

A. Correct, but that's easily dealt with as part of a formula and as part of the writing a computer program that would analyze that and take that into account explicitly.

Q. That's what I want to ask. How would you account in your damages model programmatically, as you said, for differences in strike price and time to maturity for different options contracts?

A. The calculation of the degree to which any option was inflated would use the Black-Scholes formula, which explicitly takes those things into account. So for every given option, I would take into account exactly what its time to maturity was and exactly what its strike price was.

Q. And at that time the expected volatility of the underlying stock, the risk-free rate of interest, the price of the underlying stock and also be the expected dividends, right?

Page 207

A. Correct, and the expected volatility could be inferred from the actual observed prices of the options, holding the other variables constant and, yes, an assumption would have to be made about the dividends. But as I described, I think so long as the dividend expectations, whatever they were, weren't changing, you would still get an unbiased estimate of the artificial inflation per share.

Q. And in how many of the cases in which you've been retained as a testifying expert in securities cases have you calculated damages in a Section 10b case for options? Your best estimate.

MR. BISSELL-LINSK: Objection to form.

A. There have been a few. Whether it's, you know, five or more, I'm not sure, but there have been a few. It's not the majority of them, for sure, but there have certainly been a few cases where I've opined on option damages.

Q. And taking a step back, do you agree that an investor's option trading

Page 208

strategy might be based on the relationship between the option strike price and the price of the underlying stock?

A. That might play some role in their strategy, sure.

Q. And if the price of the underlying stock would have been different in the but-for world, could that potentially affect the behavior of the option trader?

A. I guess theoretically, but I also -- I mean my understanding of how to think about that sort of issue in 10b-5 matters is that whatever transactions are present in the real world are the transactions to consider, and transaction causation isn't really anything I've ever been asked to evaluate. So why one would start assuming alternative transactions; that seems inconsistent with how I've always been asked to assume is what, what I've been asked to assume is relevant for calculating damages in a 10b matter. But, you know, theoretically could changes in the underlying have induced changes in trading strategies? That's true of the common stock purchasers as

Page 209

well as option purchasers, sure.

Q. I'm moving away from options. For Boeing common stock, your damages methodology, if you're asked to prepare one at some later date, would attempt to calculate the artificial inflation in each share of Boeing stock over the class period, the per-share inflation, right?

A. Correct, yes.

Q. If you're asked to calculate damages in this case, you would not intend to calculate what the aggregate damages would be for the entire proposed class, right?

MR. BISSELL-LINSK: You can answer the question.

MR. PEPPERMAN: Let me ask you it a different way.

Q. You know, in terms of expert reports you've done in these cases on damages, do those reports attempt to calculate per-share inflation in the stock?

A. I've certainly done that on numerous occasions, yes.

Q. Do your expert reports also sometimes attempt to calculate what the

53 (Pages 206 - 209)

Page 210

aggregate damages are that the entire class could recover?

A. I've done that on a couple of occasions, not very often.

Q. You've done it on a couple of occasions.

A. Yes.

Q. And you've previously served as a neutral expert for mediators?

A. That's correct.

Q. And are two of those mediators Dan Weinstein and Jed Melnick?

A. Yes.

Q. And have you ever served as a neutral expert for a mediator in connection with a Section 10b case?

A. Yes.

Q. Are you aware, based on your experience as a neutral expert or otherwise, that securities settlements are typically negotiated based on estimates of aggregate damages to the class?

A. My experience is that settlements are negotiated based on numerous factors. Estimates of aggregate damages are one of

Page 211

those.

Q. Now in -- and you can describe this to me at a high level, it doesn't have to be deeply granular. But in instances where you've been asked to calculate aggregate damages, whether it was in connection with expert reports in a few of the cases that you mentioned, or in connection with the mediation in a securities case, how do you go about calculating aggregate damages for a securities case for the class?

A. Usually involves employing some form of trading model to try to estimate how many shares were purchased and sold on each day, and the length of time over which people held. So it usually involves some form of trading model.

Q. And those are referred to as like a one-trader model or two-trader models?

A. Those are two models that are out there and are referred to. It's not the only models.

Q. Is there a particular model that you, yourself, use when you are asked to do that?

Page 212

A. It depends on data availability and a number of other factors surrounding the nature of the claims in the class period. But I mean I would say that the default methodology I use is to incorporate both institutional holdings, and where institutional holdings are not available to then use some form of, like, two-trader model as you mentioned. But again, that varies from case to case depending on circumstances and date of availability.

Q. And have you attempted to calculate the aggregate damages for the plaintiffs' proposed class in this particular case?

A. I have not been asked to form an opinion on aggregated damages in this case.

Q. I mean without regard to whether you've been asked to form an opinion, have you attempted to calculate what the aggregate damages are for plaintiffs' proposed class in this case?

MR. BISSELL-LINSK: I'm going to object on privileged grounds.

So don't -- I'm instructing you not to answer the question.

Page 213

MR. PEPPERMAN: Let me try it a different way and see if plaintiffs' counsel objects.

Q. Do you have a sense, based on your experience in your work of this case, what the aggregate damages would be for plaintiffs' proposed class?

A. No.

Q. Now, the market capitalization for Boeing's common stock averaged about $121.9 billion during the proposed class period, correct? I think I got that number from paragraph 69 or Exhibit 10. You can check.

A. What was the particular figure you used?

Q. I said that the market capitalization for Boeing's common stock averaged about $121.9 billion during the proposed class period?

A. That seems roughly consistent with the exhibits I'm looking at. I didn't refer to the specific paragraph you're referring to, but, yes, that looks about right.

Q. I think the number that I used was

54 (Pages 210 - 213)

Page 214

the number that you used in paragraph 69 at the top of page 35.

A.   Okay, yes, I agree with that.

Q.   And the plaintiffs alleged in their amended complaint in this case that investors, quote, suffered billions of dollars in losses and damages under the Federal Securities Laws.  Do you recall that?

A.   I don't remember that specific line, but I certainly don't disagree that it's there.

Q.   Let's take a look at paragraph 29 of the amended complaint.

A.   Okay, I see that.

Q.   And is that figure given there by plaintiffs, billions of dollars in losses and damages, does that, you know, based on your experience and knowledge about this case, seem like a reasonable estimate to you?

A.   I haven't formed any opinion about whether any of the disclosures that are alleged as corrective are not corrective; I just haven't performed that analysis.

If one were to assume that the corrective events that they allege in the

Page 215

complaint are corrective, and somehow those drops were to extend all the way back to the beginning of the class period, it would not surprise me at all that those numbers would be in the billions.

Q.   And if you were to make that assumption that you just described then, would it seem to you reasonable that the aggregate damages for plaintiffs' proposed class would be more than $10 billion?

A.   I don't know.

Q.   You don't know one way or another?

A.   No.

MR. PEPPERMAN:  Okay, all the questions I have.

MR. BISSELL-LINSK:  So, we have one thing we'd like to clarify, and then you may or may not have additional questions.  There's an error in the report.

MR. PEPPERMAN:  Go for it.

MR. BISSELL-LINSK:  Chad, do you want to point us to it?

THE WITNESS:  Sure.  So Exhibit 16 of my report --

Page 216

MR. PEPPERMAN:  Hold on a second while I find it.

THE WITNESS:  There was some sort of very strange printing error.  I think if you go to the backup material, you will find that this exhibit actually has the right dates at the bottom, but the printing here created dates somehow that are the wrong years.  It appears to be off by 50 years exactly.

MR. PEPPERMAN:  But it goes from 1959 to 1964?

THE WITNESS:  Yes, correct.  That should obviously be covering 2019 to 2024.  And, again, so, you know, I don't know how you want to handle it, but that is obviously just a printing problem, and I think in the backup material if you observe this chart, it's actually correct.

The other is in Appendix C.

MR. PEPPERMAN:  Hold on a second.  Let me find it.

THE WITNESS:  And Exhibit A within Appendix C.

Page 217

MR. PEPPERMAN:  Got it.

THE WITNESS:  So there's a chart here, again, purely a printing problem.  In line 11, if you see about five or six columns over under "Series Statistically Significant and 90 Percent," there's just a blank there.  That number should be 20.  All the numbers and percentages calculated based off of that are correct, and I think in the backup material that number 20 is there.  For some reason in the printing the PDF, it did not show up here.

MR. PEPPERMAN:  These corrections are going to open up hours of questioning.  How much time do I have left before the seven hours?

I have no further questions.

I guess I should have asked you before, are there any other corrections that you would like to make to your report, or the exhibits, or the appendices, based on your subsequent review of your report in connection with preparing for today's deposition?

55 (Pages 214 - 217)

Page 218

THE WITNESS:  No, those were the only two things I noted.

MR. PEPPERMAN:  So I have no further questions.

MR. BISSELL-LINSK:  We have no questions.

THE VIDEOGRAPHER:  We are going off the record at 3:14 p.m.  This concludes today's testimony by Chad William Coffman.  The total number of media units was four and will be retained by Veritext Legal Solutions.

Thank you, we're off the record.

(Time noted:  3:14 p.m.)

Page 219

IN RE THE BOEING COMPANY SECURITIES LITIGATION

1/14/2025 - CHAD W. COFFMAN

ACKNOWLEDGEMENT OF DEPONENT

I, CHAD W. COFFMAN, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

CHAD W. COFFMAN          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Page 220

C E R T I F I C A T E

STATE OF NEW YORK  )

: ss.

COUNTY OF NEW YORK )

I, Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That CHAD W. COFFMAN, the witness whose deposition is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of January 2025.

*J. Ocampo-Guzman*

_____

JENNIFER OCAMPO-GUZMAN, CRR, CLR

Page 221

-------------- I N D E X -----------------

WITNESS       EXAMINATION BY       PAGE

CHAD W. COFFMAN   MR. PEPPERMAN       6

--------------- EXHIBITS --------------------

EXHIBITS                    FOR I.D.

Exhibit 1, Expert Report of Chad     8
Coffman, CFA, [Exhibit A]

Exhibit 2, Amended Class Action     18
Complaint for Violation of the
Federal Securities Laws

Exhibit 3, Document entitled,     25
"Appendix A, Reasons Why Alleged
Misstatements Are Not Actionable"

Exhibit 4, Document entitled,     34
"Dates On Which The 'Truth'
Allegedly Was Revealed"

Exhibit 5, Lead Plaintiffs'     50
Opposition to Defendants' Motion to
Dismiss the Amended Class Action
Complaint

Exhibit 6, Expert Report dated     95
January 6, 2024 in In Re BP plc
Securities Litigation

Exhibit 7, Declaration of Chad     112
Coffman, CFA, dated June 3, 2014

Exhibit 8, Memorandum of Law in     188
Support of the Motion of Local #817
IBT Pension Fund For Appointment As
Lead Plaintiff and For Approval of
Selection of Counsel

56 (Pages 218 - 221)

Page 222

IN RE THE BOEING COMPANY SECURITIES LITIGATION

1/14/2025 - CHAD W. COFFMAN

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

CHAD W. COFFMAN          Date

57 (Page 222)

[& - 2019]                                                                                          Page 1

| **&** | **10170** 3:14 | 48:10 57:14 | **1959** 216:12 |
|---|---|---|---|
| **&** 2:13 3:11 4:3 6:2,5,7 | **103** 197:15 199:20 200:12 | 59:25 61:5 78:1,8 133:8 164:20 165:7 | **1964** 216:12 |
| **0** | **10:44** 62:15 | **130** 133:5 | **1:04** 122:2,5 |
| **00151** 1:5 | **10:54** 62:20 | **13th** 16:25 | **1:24** 1:5 |
| **1** | **10b** 15:14 22:5 41:21 54:19 | 17:12 18:4,24 44:14 133:15 | **2** |

**&** 2:13 3:11 4:3
6:2,5,7

**0**

**00151** 1:5

**1**

**1** 5:3 8:1,10,16
11:7 25:25
46:4 62:16
166:6 172:10
221:7
**1,000** 123:9,22
**1,146** 37:15
123:12
**1/14/2025**
219:2 222:2
**10** 20:6 46:9
87:9 106:1,6
143:4 213:13
215:10
**10,000** 16:21
**100** 10:14 24:4
24:8,14,19,21
81:15 82:20
153:4 154:9
156:12 171:10
171:11 172:9
172:15 175:24
176:7 182:24
**10004** 4:6
**1005** 3:6

**10170** 3:14
**103** 197:15
199:20 200:12
**10:44** 62:15
**10:54** 62:20
**10b** 15:14 22:5
41:21 54:19
81:24 89:22
90:5 91:2,17
125:16 127:12
145:1 148:11
158:21,24
159:9 207:14
208:12,22
210:16
**11** 217:4
**112** 221:19
**12** 16:12 28:19
28:20 29:10
45:24 46:2,6
**120** 75:13
**121.9** 213:11,19
**122** 195:19,25
**125** 2:13 4:5
92:16,20
109:14 110:9
**127** 127:24
**129** 83:17,24
**12:17** 121:22
121:24
**13** 8:3,18 11:10
16:12 45:24
46:11,13,23
47:2,9,13

48:10 57:14
59:25 61:5
78:1,8 133:8
164:20 165:7
**130** 133:5
**13th** 16:25
17:12 18:4,24
44:14 133:15
134:20 135:12
137:4 195:6
**14** 1:12 2:8 5:2
29:21 32:8
33:12 35:17
36:20 37:1
44:18 58:5
61:16 73:9,12
124:8 132:21
164:24 183:14
**140** 3:5
**15** 29:21 87:9
**15,722** 204:25
**150** 10:16
**15th** 220:20
**16** 32:8 50:14
50:15 215:24
**16,113** 204:24
**17** 55:1,5
**179** 113:4
**18** 221:9
**188** 221:21
**19** 72:17,23
75:4 76:7,25
78:1 183:1
184:17 186:14

**1959** 216:12
**1964** 216:12
**1:04** 122:2,5
**1:24** 1:5

**2**

**2** 11:18 13:2
18:9,11,21
19:1 62:21
121:23 143:1
174:7 221:9
**2,650** 182:18
**20** 35:25 36:3,3
43:15 73:17
114:10,15
170:17,20
171:7,10,12
173:21 217:8
217:11 219:17
**200** 24:9
**2008** 10:20
120:4
**2014** 96:4,19
112:16,20
113:12 114:11
114:15 164:21
165:8 221:20
**2018** 48:12
58:10 59:1
60:23
**2019** 36:20,22
48:12 58:10
59:1 60:23
157:25 168:7

**[2019 - 737]**                                                Page 2

183:22 184:10
186:25 187:3
190:13 216:14
**2020**   73:8,9,12
73:13 75:4,5
87:19 183:25
184:3,10,19
189:6
**2021**   29:14,20
29:25 80:6
184:19 185:4
189:10
**2022**   143:4
**2023**   142:13,16
143:7 144:18
186:2
**2024**   7:7 8:3,18
11:10 32:25
33:12,12 35:16
35:18 36:21
37:1 61:7,15
61:16,21 62:7
95:3,20 100:9
107:16 132:21
132:21 133:3,8
143:7 158:2
186:2 187:22
216:15 221:18
**2025**   1:12 2:8
5:3 44:18
124:8 220:21
**20th**   116:10
**22**   32:25 33:4
33:10 34:23

61:14 132:20
**23**   75:4 95:14
**24**   73:8,12
**25**   61:21
221:11
**28**   80:6
**29**   214:12
**2:07**   172:1
**2:17**   172:6

**3**

**3**   25:1,8,14,19
112:16,20
122:5 139:9,12
139:17,18,25
140:4 172:2
182:17 221:11
221:20
**30**   33:18 36:20
36:22 75:5
78:20 157:25
168:7 173:3,8
183:22
**300**   46:17,22
**31**   143:7
**31.6**   77:20
**34**   221:13
**345**   19:12
46:20
**35**   214:2
**3:14**   218:8,14
**3rd**   113:12

**4**

**4**   29:10 33:25
34:1 61:17
114:6,9,22
131:4 172:7
174:4 221:13
**40**   73:17
**405**   142:24
143:5 144:16
**420**   3:13
**47**   80:13 92:17
195:20
**48**   125:8
127:25
**49**   70:24 71:2
130:18 133:6

**5**

**5**   15:14 33:12
35:16 50:1,5
55:3 61:7,15
62:7,23 74:18
75:1 81:24
100:9 107:16
119:3 121:4
132:21 133:3
137:1 158:2
208:12 221:15
**50**   111:12,21,24
115:9,11
169:14 172:11
182:24 183:4,7
190:24 197:13
216:10 221:15

**500**   63:21 65:2
67:24 68:14
69:1,8
**51**   72:15 73:15
197:15
**5137**   220:23
**59**   76:17

**6**

**6**   23:10 58:6
95:1,3,19,20
96:4,19 164:21
164:23 165:7
189:10 221:3
221:17,18
**62**   13:10
**69**   213:13
214:1

**7**

**7**   46:2 74:6
75:8,11 96:19
97:24 98:25
99:14 101:10
109:11,23
112:14,19,23
165:1 187:15
188:24 189:2
221:19
**70**   27:4,10
**737**   58:10,25
183:15,24
184:2,9 186:13
186:14 187:3,5
189:7 190:15

**[75 - actually]**                                                      Page 3

| | | | |
|---|---|---|---|
| **75** 22:21 23:4,4 23:13 26:9,22 28:8 | **99** 78:22 80:2,9 82:15 83:10,16 86:6 130:17 132:25 146:3 147:23 148:9 149:3,15 152:4 | **accepted** 83:3 84:15 90:15 199:23 | **acknowledged** 202:10 |
| **76** 78:19 | **9:29** 1:13 2:9 5:2 | **accident** 61:21 62:7 100:9,11 101:7,22 103:24 106:22 107:16 108:15 115:9,12 118:2 118:6,13 121:7 133:3 142:14 171:19,20 | **acknowledge...** 219:3 |
| **78** 96:16 | | | **action** 6:21 10:10 11:22 14:5 17:24 18:2,10,11 19:2 21:2 25:6 27:8 40:7 50:7 53:14 55:16 59:10 87:24 96:6 188:16 220:15 221:9 221:16 |
| **787** 185:13 | **a** | | |
| **8** | **a.m.** 1:13 2:9 5:2 62:15,20 | | |
| **8** 46:12 51:20 52:8 79:19 97:21,22 109:12,23 187:16,17,18 188:3 190:10 221:7,21 | **ability** 105:10 106:14 | **accidents** 58:9 58:25 105:17 | |
| | **able** 65:6 128:18,20 143:14,24 | **accommodate** 110:12 | **actionable** 25:10 56:25 221:12 |
| **817** 187:24 188:4,14 221:21 | **abnormal** 133:23 134:17 134:23 135:13 135:17 136:11 136:12,22 137:11 197:19 197:24 198:19 199:7 | **account** 72:21 73:4 75:22 89:16 93:22 94:3 112:4 155:23 156:1 181:9 186:11 186:18 189:22 203:8 205:24 206:8,10,17,18 | **actions** 10:25 12:3,23 21:14 22:11 53:22 54:13,18,21 |
| **83** 204:23 | | | |
| **88** 203:1,4 | | | **actual** 98:12 105:16 112:12 126:19 201:15 207:2 |
| **9** | | **accounted** 75:17 | |
| **9** 46:13 | **above** 77:4 78:5 80:8 | **accurate** 11:25 12:22 16:7 56:10 77:19 192:11 | |
| **90** 77:18 78:22 79:3,9,12 80:1 80:8 88:21 217:6 | **absence** 172:22 180:22 | | **actually** 7:12 12:7 36:2 78:15 85:23 92:4 103:18 111:16 135:1 136:16 144:19 159:21,23 161:1 162:5 |
| **95** 77:5,7,23 78:5 79:14 80:1,8 131:22 221:17 | **absent** 119:14 121:9 170:16 | | |
| **96** 81:14 82:20 90:23 91:15 | **absolutely** 83:2 194:18 | **accurately** 114:25 116:14 | |
| **98** 125:7 | | | |

**[actually - alleged]**                                    Page 4

| | | | |
|---|---|---|---|
| 216:6,19 | **affected** 31:12 | 169:8,17 178:4 | 133:2 142:14 |
| **addition** 13:14 | 31:13 93:23 | 178:5 180:2,18 | 143:6 171:20 |
| 185:8 | 204:14 | 181:2 183:8 | **airplane** 19:17 |
| **additional** | **affecting** 72:4,5 | 185:18 189:15 | 61:8 69:3 71:8 |
| 13:16,17 31:7 | **affirmations** | 190:24 191:22 | 106:14 183:16 |
| 32:14 82:16 | 55:25 | 202:23 204:13 | **airplanes** 20:9 |
| 131:9 162:13 | **aftermarket** | 207:25 214:3 | 47:18,21 48:12 |
| 162:14 165:12 | 143:24 | **agreed** 111:8 | 105:10,22 |
| 166:3 172:23 | **afternoon** | 120:25 196:19 | **alaska** 35:17 |
| 176:25 177:8 | 122:9,10 | **agreement** | 61:8,21 83:11 |
| 215:18 | **aggregate** | 29:13 45:1 | 83:21 86:3 |
| **additions** 219:6 | 209:12 210:1 | 185:2,7 | 100:8 101:7,21 |
| **adjust** 75:25 | 210:21,25 | **agrees** 126:10 | 107:15 108:15 |
| **adjusted** | 211:5,10 | **air** 184:23 | 133:2 142:14 |
| 138:24 | 212:13,19 | 185:19,21 | 143:6 171:19 |
| **adjustment** | 213:6 215:9 | 186:3,17 | **alexandria** 1:2 |
| 165:12 181:14 | **aggregated** | **airbus** 69:23 | **allegation** 31:6 |
| 181:18 | 212:16 | 70:1,14,17 | 58:24 83:6 |
| **adjustments** | **ago** 39:23 | 71:3,7,10,14,15 | 92:2 116:20 |
| 134:19 137:2 | 87:17 181:20 | 71:15,19,22 | **allegations** |
| 181:4,8 | **agree** 66:11 | 72:1,5,8 | 16:15 19:15 |
| **admit** 19:8 | 68:25 69:8,21 | **aircraft** 47:22 | 20:15 46:7,15 |
| **adss** 115:19 | 70:1 71:7,22 | 47:25 48:4,6,8 | 47:3 60:2 |
| **advised** 192:9 | 84:4 94:9,10 | 48:14 55:13 | 105:14 145:6 |
| **aerospace** 65:2 | 98:23 100:7 | 69:20 70:3,19 | 189:4 |
| 65:23 67:24 | 102:25 103:4 | 71:5 | **allege** 28:12 |
| 68:14 69:2,8 | 103:15,22 | **airline** 66:9 | 47:16 70:17 |
| 69:19 | 104:11 105:18 | 86:3 101:7 | 71:3 78:10 |
| **affairs** 189:6 | 122:16 124:24 | **airlines** 19:17 | 167:3,10 |
| 189:16 | 126:22 136:10 | 19:22,23 35:17 | 214:25 |
| **affect** 71:23 | 143:13 145:1 | 61:8,21 69:17 | **alleged** 15:7,8 |
| 72:2 191:20 | 160:14 161:8 | 83:11,21 100:9 | 25:9,22 26:2 |
| 208:8 | 163:4,16 164:3 | 101:21 106:13 | 26:20 27:24 |
| | 164:9,10,11 | 107:16 108:15 | 28:25 29:11,20 |

**[alleged - analyze]**                                           Page 5

| | | | |
|---|---|---|---|
| 29:23 31:18 | 146:17 165:10 | 60:2 70:24 | 128:16 129:1,8 |
| 33:21 34:25 | 190:19 221:14 | 83:17 102:8 | 129:14,16 |
| 35:5,15 36:5 | **alleges**  32:23 | 103:5 132:19 | 130:10,14 |
| 36:15,18,23 | 35:24 132:20 | 142:25 214:5 | 131:7 134:3 |
| 60:21 61:12 | **alleging**  26:15 | 214:13 221:9 | 137:16 138:11 |
| 78:17 89:14,19 | 31:4 60:18,20 | 221:16 | 139:8,18 |
| 92:23 93:4,8 | 61:3 100:24 | **amount**  15:2 | 141:16 142:4 |
| 98:14 101:8 | 104:25 155:16 | 76:15 88:19 | 144:10,23,24 |
| 102:10 103:16 | 167:25 177:12 | 92:13 107:18 | 145:14 146:25 |
| 104:18 105:1,2 | 178:11,15 | 115:3 117:7 | 148:5 151:13 |
| 105:20 106:20 | **allocating** | 122:18 123:20 | 153:5,20,25 |
| 119:14 121:9 | 140:9 | 124:10,20 | 154:7 160:8 |
| 125:20 131:2,5 | **allow**  141:14 | 156:18 157:1,5 | 161:3 176:16 |
| 131:10,13,19 | 142:7 | 157:7 158:13 | 176:19,20 |
| 135:14 136:8 | **allowed**  154:23 | 161:13,14 | 178:1 179:20 |
| 140:22 141:5 | **alter**  41:24 | 173:7 174:1 | 190:5,6 198:5 |
| 142:10 143:4 | 175:21 | 175:14 180:5 | 201:25 202:15 |
| 143:11 145:5 | **altered**  189:5 | 199:18 | 205:2,6,13 |
| 145:12 146:19 | **alternative** | **analogize**  55:6 | 214:23 |
| 152:22 155:21 | 199:3,24 | **analogous** | **analysts**  17:6 |
| 156:5 157:9,10 | 208:18 | 115:7 | 59:16 65:18 |
| 158:1,3 160:1 | **alternatives** | **analyses**  42:17 | 134:9 151:5,8 |
| 160:17 161:9 | 92:1 | 43:1,2,8,16,20 | 151:20 155:25 |
| 165:24 166:14 | **amended**  17:23 | 74:25 79:8 | 179:17,18 |
| 169:12 175:11 | 18:1,9,11 19:2 | 128:3 | 181:22 182:2,9 |
| 175:12 178:1,6 | 19:7,15 20:15 | **analysis**  17:7 | 182:18 183:2,7 |
| 179:15 180:22 | 21:2 23:19 | 42:21,22 43:19 | 184:16 185:9 |
| 191:8,10 214:4 | 26:3,7 28:7,20 | 45:4,6,19 | 185:14 190:24 |
| 214:22 221:11 | 32:22 33:20 | 62:23 74:3 | **analyze**  21:17 |
| **allegedly**  23:5 | 34:24 35:7,10 | 76:21 79:20 | 40:3 76:2 |
| 34:2 37:3 | 35:14 37:4 | 108:9,13 110:7 | 132:14 134:10 |
| 100:10 103:7 | 47:4 48:24 | 112:5 121:3,10 | 136:2 152:24 |
| 103:22 104:8 | 50:4,7 57:10 | 125:11,16 | 153:15 158:23 |
| 116:16 138:2 | 58:6 59:10 | 126:4,5,7,25 | 195:14 206:7 |

[analyzed - arriving]                                                    Page 6

analyzed 29:3
  29:16,18 32:2
  45:17 57:6
  103:12 205:14
analyzing
  10:22 39:24
  41:21 59:5
  77:14 155:10
  159:7 182:13
  199:3
announcement
  77:21 134:2
announcements
  76:7,22 77:1
  78:2 79:21
  80:5 183:1,3
  199:17
answer 16:1
  31:16 32:19
  42:23 43:5
  44:21 82:4
  95:10 107:8
  144:3 170:4
  178:5 179:1
  180:17 193:7
  193:10 198:3
  200:24 209:14
  212:25
answered
  32:20
answering
  33:16 59:23
  193:11

apologize 18:15
  51:6
appeal 95:14
appear 103:17
appearances
  4:1 5:17
appeared
  163:11
appears 8:19
  18:25 51:18
  84:25 96:8,11
  216:9
appended
  219:8
appendices
  217:23
appendix 9:6
  11:6,8 16:22
  16:23 17:17
  25:3,9,20 27:2
  27:9 38:4,5,8
  43:25 44:5
  95:12 182:3
  199:2 216:21
  216:25 221:11
applicable
  112:7
application
  88:21 99:22
applied 41:3
  91:16,24
  109:17 152:4
  174:25

applies 94:11
apply 15:14
  117:15 122:16
  126:20 172:16
  173:10 180:7
  200:10
applying
  136:25 149:19
  200:17
appointment
  187:25 188:5
  221:22
appreciate
  174:11
approach 7:3
  137:10 138:10
  138:11 155:2,9
  156:16 158:17
  158:23 159:6,8
  165:16 175:24
  176:10 191:14
  192:19
approaches
  154:11
appropriate
  14:15 15:24
  66:1 74:5
  89:17 93:25
  121:10 129:9
  134:4 139:20
  139:25 147:14
  148:15 149:4
  150:18 152:14
  155:9 158:9

159:12,25
  160:9,12 162:6
  162:18 163:17
  169:1 170:25
  173:10,13
  180:14
appropriately
  127:10
approval 188:1
  188:6 221:22
approve 120:10
approximately
  9:15,18 10:8
  14:13 22:18
  37:10 86:20
  87:1,13 113:12
  182:9
april 73:9,12
  187:22
arguably 67:10
  115:2
argue 51:17
  163:12
argued 49:19
  50:22 51:9
  56:23
argument
  49:23 51:19
  120:6 136:17
arguments
  57:4 120:13
  163:9
arriving 14:14
  15:4,23 16:24

**[arriving - availability]**                                                Page 7

18:3 41:14
**articles**  17:7
134:9
**articulate**
160:10
**articulated**
99:4 127:8
**articulating**
41:20
**articulation**
40:24 41:5,9
**artificial**  29:24
30:10 31:15
32:16 88:12,13
88:14 89:1,2
89:25 90:2
91:7,9 92:2
110:7 111:23
116:21 122:18
123:21 124:25
125:9,15 126:8
126:12,15,23
130:19 133:10
133:12 135:4
135:22 137:22
137:25 138:15
138:21 139:12
139:14 140:9
140:18 147:1
152:20,22
156:17 158:23
159:7,20
161:13,15
162:22 167:17

167:25 168:20
175:25 180:2
190:4 200:6
205:20 207:9
209:6
**ascribe**  132:8
**asked**  13:22
14:10 21:8
40:25 41:11
42:22 43:20
45:5 51:7
67:12 76:16
80:19 85:16
87:14 97:16
99:8 115:16
119:22 120:1,7
123:18 124:2
124:14 129:12
129:22,24
130:10 137:21
146:22,24
153:14 154:5
172:10 176:17
180:17 186:5
187:1 191:23
208:17,20,20
209:4,10 211:5
211:24 212:15
212:18 217:19
**asking**  49:8
104:5 108:7
159:3 168:23
**aspect**  57:7
118:16

**aspects**  67:1
151:6
**asserting**  54:18
**assess**  161:23
164:8 171:1
**assessing**  135:3
162:21 170:24
**assessment**
163:23 164:9
**assignment**
13:20 14:1,4
102:24
**assist**  33:16
**assisted**  129:2
**associated**
96:11 132:11
**assume**  90:21
107:9 111:9
129:22 139:25
156:12 159:12
160:20 170:17
173:5 202:7,15
204:2 208:20
208:21 214:24
**assumed**  174:7
201:25 202:6
202:11
**assuming**
159:22 161:21
174:3 208:18
**assumption**
158:6 202:18
202:20,24,25
203:2,12,13,21

204:3,4,7,9
207:5 215:7
**assumptions**
115:15 128:17
140:15 153:21
176:25 177:8
202:18
**assurances**
166:10 167:4
**assure**  60:22
**assured**  60:6
**asterisks**  79:25
**astute**  142:21
**attempt**  34:12
55:6 59:6
133:9 146:25
186:19 209:5
209:20,25
**attempted**
16:19 23:23
33:19 35:6
60:21 63:9,20
64:21 146:16
212:12,19
**attempting**
73:21 107:20
178:4
**attend**  120:13
**attorneys**  3:4
3:12 4:4
**attributable**
32:6
**availability**
212:1,11

[available - bissell]                                                    Page 8

**available**
  151:19,21
  177:4,6,18
  178:22 179:5,8
  212:7
**avenue** 3:13
**averaged**
  213:10,19
**aviation** 69:12
**aware** 21:24
  22:2 39:25
  49:18,23 51:8
  51:11 53:13,19
  56:22 58:23
  70:9 153:17
  185:10 197:4
  210:18

**b**

**b** 11:6,8 197:12
**bachelor's** 9:23
**back** 14:18
  38:3 51:22
  57:14 59:14
  62:18 66:19
  70:7 73:17
  87:19 102:14
  104:1 120:4
  122:3 137:23
  138:25 139:3
  140:3 156:4
  165:15 170:14
  172:4,8 187:7
  187:22 207:24

  215:2
**backup** 9:4
  192:7 216:5,18
  217:10
**ban** 180:7
**based** 23:2 24:2
  43:15 47:3,5
  48:23 65:4
  68:23 69:6
  71:10 79:24
  110:23 115:14
  116:12 118:25
  121:11 126:3
  126:13 127:15
  139:1 144:15
  154:16,17
  162:13 174:2
  176:1,20 177:3
  183:6 190:22
  191:5 196:10
  197:25 198:16
  198:22 203:16
  204:15 208:1
  210:18,21,24
  213:4 214:17
  217:9,23
**basic** 39:18
  40:4
**basing** 182:25
**basis** 13:25
  14:3,6 58:19
  60:1 117:2
  125:13 157:20
  199:11

**bayesian**
  161:23,23
  162:9,11,21
  163:4,17
  165:20 169:1
**bear** 165:3
**beginning** 31:5
  42:1 61:6
  172:7 182:1
  215:3
**begins** 46:24
  60:5 80:14
  183:22 197:12
**begun** 130:15
  154:6
**behalf** 6:23
  7:13,18 96:4
  188:16
**behavior** 208:9
**behrend** 40:14
**belief** 167:18
**beliefs** 161:24
  162:12 165:21
**believe** 9:11
  23:13 24:7
  34:21 39:7
  41:17 47:24
  67:20 73:14,18
  88:4 95:1
  106:21 113:19
  113:20 114:20
  159:16 170:19
  195:20 204:10

**believed** 131:11
**bench** 21:25
  22:6
**benefit** 205:16
**best** 10:7,11
  15:20,22 67:15
  82:7 114:18
  155:2 177:3
  180:20,23
  182:25 183:16
  194:19 207:15
**better** 177:5,16
**beyond** 47:25
  90:2 92:7
  97:19 118:9,14
  133:23 134:8
  135:6
**bhp** 52:1,10
**biased** 204:12
**big** 11:1 205:7
  205:9
**biggest** 189:3
**billion** 213:11
  213:19 215:10
**billions** 214:6
  214:16 215:5
**billiton** 52:1,10
**binder** 18:16
**binomial**
  199:23
**bissell** 3:7 5:18
  5:19 27:19
  30:2,20 32:9
  34:5,9,18

**[bissell - broad]** Page 9

43:11 44:21
52:23 53:23
54:22 57:2
58:16 61:22
64:1 66:16
70:4 79:4
81:19 82:25
84:8 87:4,25
89:11 93:10
94:17 95:5
100:15 102:11
103:10 104:3
104:22 107:25
108:20 109:20
129:17 131:24
137:5 138:4
141:11 143:18
152:6 160:22
161:17 162:2
162:24 163:19
164:5 167:14
168:12 169:22
170:3 176:22
193:5 195:7
202:21 207:16
209:14 212:22
215:16,22
218:5
**bit** 13:7 46:1
**black** 96:12
199:23 200:19
200:21 201:9
203:7 206:16

**blank** 217:7
**blew** 61:7
108:16
**blood** 220:16
**boeing** 1:4 5:7
13:23 14:16
35:19 48:11,12
48:18,25 49:4
53:15 55:8,12
55:13,20,24
56:18,25 57:23
58:1 59:3 60:6
60:6,12,23
61:9 63:12
65:6 67:25
68:4,11,15
72:9,18 76:4
76:13,23 77:1
80:4,21 81:8
83:13,23 84:1
84:3 86:5
89:15 100:20
100:21 102:17
102:20 103:17
106:1,5,12
108:18 109:15
116:15,16
118:4 122:15
123:21 124:10
124:21 135:13
152:23 155:24
155:25 176:12
178:6 179:13
181:21 182:9

183:7,9 184:9
185:1,11 187:4
187:10 189:6,9
189:16 190:16
192:2,21 196:4
197:10 198:2
202:8 203:8,10
203:18 204:19
209:3,7 219:1
222:1
**boeing's** 19:16
20:7,16 29:8
29:12,25 47:17
55:25 63:12
69:3,11 70:2
70:18 71:4,8
71:11,23 72:2
76:5,6 79:21
104:9 105:21
106:15 107:13
142:11,12,15
143:7,12,15
163:23 164:1
183:16 184:18
186:15,15
190:13 201:21
203:9,24
213:10,18
**bold** 11:19 26:1
26:9 27:2
**bolded** 26:9,13
26:17,23
**bolts** 62:1

**bottom** 51:24
92:18 133:5
164:25 190:9
216:7
**bp** 95:3,14,20
96:6,20 101:10
109:12,22,23
112:17 113:11
113:18 115:1,1
115:19 116:9
117:12,23
118:5 119:18
163:3 164:21
165:8 166:19
166:23,25
167:2 180:9,12
221:18
**bp's** 165:22
166:10 167:3
**break** 62:12
121:14 169:7
171:24
**brevity** 35:3
**brief** 25:5
62:17 172:3
**briefly** 42:2
45:25
**briefs** 20:25
**briggs** 4:9 6:4,4
34:11,14
**brings** 13:20
100:21
**broad** 2:13 4:5

**[broader - case]**                                                    Page 10

| | | | |
|---|---|---|---|
| **broader** 99:5 | **calculating** | **cap** 11:19 | 39:5 40:4,5,8 |
| **broadly** 43:1 | 83:4 84:23 | **capability** | 40:10 42:7,18 |
| 104:6 | 88:4,6 89:8 | 166:12 167:5 | 44:7,15 46:8 |
| **broadway** 3:5 | 91:1 92:21,22 | **capable** 194:3 | 47:15 52:22 |
| **bucket** 43:9,9 | 126:25 137:11 | **capacity** | 53:3,18 55:12 |
| 127:11,11 | 145:2 192:25 | 173:15,20 | 55:20 56:15,24 |
| **business** 20:7 | 208:21 211:10 | **capitalization** | 59:5 60:21 |
| 65:25 68:21 | **calculation** | 213:9,18 | 63:9 64:5,11 |
| 69:10,12 71:11 | 44:20 88:7,23 | **caption** 96:6 | 64:23 66:5 |
| 106:13 151:24 | 126:11 127:11 | **captioned** | 70:17 82:14 |
| 151:25 186:8 | 136:20 147:2 | 112:17 | 83:18,25 86:19 |
| 186:15 | 179:21 199:9 | **captures** 53:1 | 89:10,22 90:4 |
| **businesses** | 199:15 204:1 | **career** 10:22 | 90:5,10 91:17 |
| 66:14 151:7 | 206:14 | 11:2,4 | 92:5 96:20 |
| **c** | **calculations** | **careful** 45:7 | 97:15 99:5,9 |
| | 134:21 152:1 | 93:11 178:1 | 99:16,21 100:8 |
| **c** 3:1 4:7 6:10 | **calhoun** 142:12 | **carefully** 32:2 | 100:18,21 |
| 6:10 122:6,6 | 143:5,10 | 132:14 144:4 | 103:14,21 |
| 199:2 216:21 | **calhoun's** | 164:14 191:15 | 105:19 106:20 |
| 216:25 220:1,1 | 143:16 144:17 | **carrying** | 108:5 109:15 |
| **calculate** 35:6 | **call** 9:11,13,16 | 165:14 | 110:10 112:8 |
| 87:23 88:8 | 92:11 101:2 | **carryover** | 112:13,16 |
| 115:17 117:17 | 109:3 134:11 | 51:25 52:8 | 113:18 116:7 |
| 121:4 123:18 | 142:13 143:8 | **case** 1:4 5:8 7:5 | 116:10,19 |
| 126:18 146:23 | 143:13,22,25 | 7:14,20 8:18 | 117:1,12,13,13 |
| 154:11 176:11 | 144:20 165:22 | 12:9,13 13:20 | 117:20,23 |
| 198:19 209:6 | 176:18 197:10 | 15:15,16,25 | 118:4,4,5,9 |
| 209:10,12,21 | 204:24 | 16:9,15 18:6 | 119:18 120:19 |
| 209:25 211:5 | **called** 6:10 | 21:20 22:5,20 | 121:13 123:19 |
| 212:12,19 | 120:9 139:24 | 23:25 24:14 | 124:4 125:17 |
| **calculated** | **cammer** 39:18 | 27:22 28:12 | 127:12 130:10 |
| 13:25 14:3,6 | 39:22 62:23 | 31:24 35:23 | 131:1 132:14 |
| 207:14 217:9 | 136:25 182:13 | 36:9,10,19 | 132:19 133:19 |
| | | 37:12 38:24 | 139:1 140:14 |

**[case - certainly]** Page 11

141:5 142:11
143:21 145:2
145:10 146:15
147:10,17,25
148:17 149:4,7
151:13 152:5
153:8 154:22
154:25 155:2
155:10 156:9
156:21 157:23
158:10 159:19
160:8 162:18
163:2,3,18
164:18 165:9
166:19,23,25
167:2,2 169:3
171:15 176:6
179:12,15
180:9 181:15
181:23 182:11
183:11,21
186:6,20
187:22 188:19
189:18 190:18
190:23 194:11
195:6,15
207:14 209:11
210:16 211:9
211:11 212:10
212:10,14,16
212:21 213:5
214:5,18
**cases** 24:17,23
27:13,17 36:4

37:18,24 38:17
39:22 40:7
41:22 43:16
54:6 55:8,24
55:25 65:12
81:24 82:23
83:5 84:6
86:21 89:25
90:1,12 91:2
91:21 92:5
94:22 99:12
127:16 131:8
137:21 138:17
140:14 142:1
148:11 149:12
149:16,17
150:11 151:5
154:21 158:21
158:24 159:9
172:24 175:1
180:12 207:11
207:13,22
209:19 211:7
**cash** 150:22,24
**cast** 140:3
**casted** 138:25
139:4
**catch** 33:1
**categorical**
182:5
**categories**
28:12,22,24
156:5

**category** 17:16
29:10,11,19,22
30:24 31:2,18
32:5,7
**causal** 135:1
**causation**
42:18,21 43:2
43:8,19 44:20
45:19 110:6
112:5 125:11
125:16 126:4,7
126:25 127:10
128:3,16 129:7
129:14 130:9
131:7 133:22
136:17 137:14
139:8 146:25
153:20 154:7
176:16,19
199:13 208:16
**cause** 61:20
62:2,7,11
63:10 76:3
149:7 196:4
199:3,5
**caused** 57:25
58:13 59:1,19
61:25 104:19
106:20 125:20
138:2 139:10
142:8 167:16
**causing** 111:13
134:13 137:17

**caution** 44:22
193:11
**cents** 111:24
115:11
**ceo** 142:11
**certain** 28:15
52:11 89:25
90:1 105:7
143:20 150:6
151:10,15,24
157:14 161:1,2
163:7 164:15
172:15,24
173:4 185:22
187:2 193:13
194:18 202:10
**certainly** 23:3
24:17 26:17
27:12,23 28:4
36:1,4,14 39:4
40:20 42:25
53:10 54:5
57:4 59:15
68:3 69:14
70:9 71:24
74:10,15 79:18
82:8,13,15
84:11 89:16
100:24 102:15
116:19 117:11
117:12 127:20
128:24 129:4
131:6,8,16
138:13 140:12

**[certainly - claim]**                                                                                      Page 12

140:13 141:25
150:6 151:22
154:19,21
159:1,15,19,25
167:25 177:23
180:24 182:19
182:20 183:3
183:12 207:22
209:22 214:10
**certainty** 171:4
171:19
**certification**
7:19 8:8 39:2,6
39:8,12 42:14
84:7 86:23
87:13 113:18
113:22,24
119:5,18 120:7
166:19,24
**certified** 2:16
220:6
**certify** 220:8,14
**cfa** 8:3,11 10:5
112:16,20
221:8,20
**chad** 1:10 2:11
5:4 7:1 8:2,10
112:15,19
215:22 218:9
219:2,4,13
220:9 221:3,7
221:19 222:2
222:24

**chain** 184:18
**challenge** 22:19
27:17 28:21
29:7 56:24
**challenged**
27:14 28:9
107:10
**challenges**
24:14 27:8
**chance** 55:18
104:21 111:13
111:22 115:9
170:17 192:11
192:16,23
193:19 194:2
194:14 195:1,4
196:11,13,23
197:6
**change** 35:5
86:18 92:23
110:23 134:12
157:9 175:19
179:19 197:19
197:25 203:16
204:6 222:4,7
222:10,13,16
222:19
**changed** 94:4
111:3 153:1
162:22 165:13
179:14 183:9
183:13 186:12
189:16 191:16
192:2 205:19

**changes** 75:22
86:7,12 110:12
133:13,16
134:18 137:8
170:12 171:13
186:18 189:9
189:22 190:1
208:23,24
219:7
**changing** 60:7
60:12 157:21
159:17 160:2,5
162:17 204:9
207:8
**characteristics**
204:16
**characterizati...**
69:21 70:21
104:11 119:25
**characterize**
22:9
**characterized**
19:24 43:3
**chart** 216:19
217:2
**charter** 10:5
**check** 78:15
213:14
**chicago** 9:25
53:16
**choosing** 74:22
**chose** 64:11
162:8

**chronologica...**
28:10
**chronology**
177:20
**circuit** 95:13
**circumstance**
150:1 152:15
159:25 162:7
**circumstances**
147:18 150:3
151:16 159:11
161:1,2,5
163:7 172:16
173:4,9 174:8
175:18 183:9
183:13 186:12
191:15 192:1
212:10
**citation** 56:14
83:17
**citations** 47:8
47:10
**cite** 40:11,19
52:4 83:23
200:20
**cited** 35:9 40:8
55:12
**cites** 55:8
**civil** 1:4
**claim** 26:11
48:20 53:12
57:7 97:24
99:21 105:11
105:15 106:24

**[claim - coincided]**                                              Page 13

116:22 117:20 167:16 168:18

**claimants** 126:20

**claiming** 117:4

**claims** 15:6 16:21 38:22 46:19 47:15 53:1,3 54:19 81:25 82:11,12 84:15,16,20,20 90:6,16 94:12 96:25 97:25 105:6,18 114:24 116:12 116:25 118:9 118:19 167:23 212:3

**clarification** 98:22

**clarify** 170:6 215:17

**clarity** 86:11

**class** 7:19 8:7 10:10,24 11:22 12:23 13:25 14:3,6 17:24 18:1,10,11 19:2 21:2,14 22:11 27:7 29:1,21 31:5 36:18 37:6,11 37:20,25 39:2 39:6,7,11 40:7

41:2,21 42:14 48:25 49:5,13 50:7 53:14,16 53:17,21 54:8 54:21 55:16 75:16,23 76:1 76:8 77:2,22 78:3 79:22 80:5,22 84:7 86:23 87:12,24 88:16 91:2 92:22 96:5 106:2 112:6 113:18,21,24 119:5,18 120:6 122:20,24 123:6,8,18,23 124:12,22 126:17 129:4 131:3 137:12 138:2,22 139:1 139:19,21 140:2,5,10 146:23 152:23 153:1,7,16 154:13 155:11 155:18 156:14 156:19 158:24 159:7 160:15 161:14,15 162:23 163:6 163:25 166:19 166:24 176:1 176:13 177:14

177:15,18 178:7,20 179:15 182:21 183:8,11,15,21 185:11,20,22 186:2,20 189:18,24 190:16 191:9 191:17,24 192:2 200:1 201:20 204:22 205:1,5 209:7 209:13 210:1 210:22 211:11 212:3,14,20 213:7,11,20 215:3,10 221:9 221:16

**classified** 83:4

**clear** 64:5 76:12 97:21 113:6 116:22 149:5 151:18 159:4 165:4 167:22 193:3

**clearer** 177:10 177:11

**clearly** 76:23 102:18

**client** 125:24 188:21

**clipped** 18:16

**close** 36:2 56:1 59:4 98:16

111:11

**closest** 65:19 71:8

**clr** 1:23 220:24

**coffman** 1:10 2:12 5:5 6:15 7:1,2,17 8:1,3 8:11,14,16,21 9:21 13:19 18:8,15,21 19:1 20:24 22:18 25:1,13 25:18 26:20 27:1 28:6 32:22 33:14 34:17,19 35:12 38:3,9 42:3 48:9 50:11,13 55:4 61:17 62:22 67:22 95:1,24 96:18 112:15,20,22 122:9 172:8 176:5 188:10 218:10 219:2,4 219:13 220:9 221:3,8,20 222:2,24

**cohen** 4:8 6:6,6

**coherent** 15:10 84:21

**coincided** 142:15

**[college - concern]** Page 14

| | | | |
|---|---|---|---|
| **college** 9:24 | **common** 13:23 | **comparable** | 214:13 215:1 |
| **color** 96:11 | 14:7,16 41:2 | 66:25 67:25 | 221:9,16 |
| **column** 25:22 | 64:17 72:18 | 68:1,7 | **complete** 219:9 |
| 25:23 26:1,20 | 80:21,23 81:4 | **comparators** | **completely** |
| 34:21 35:4,8 | 81:8,24 82:24 | 68:15 | 19:24 170:23 |
| **columns** 217:5 | 85:13 122:15 | **compare** 76:13 | **complexities** |
| **combination** | 197:17 198:2,6 | **compares** | 106:7 |
| 47:6 58:21 | 198:10 199:6 | 65:15 | **compliance** |
| **comcast** 40:13 | 200:15 203:18 | **competitor** | 29:8 |
| 41:5,13,22,23 | 208:25 209:3 | 70:2,10,11,18 | **complying** |
| **come** 101:15 | 213:10,18 | 71:4 | 105:7 |
| 105:16 118:23 | **commonly** 63:3 | **competitors** | **component** |
| 118:23 119:22 | 79:15,17 | 65:20 | 63:1 76:20 |
| 120:2 138:14 | **companies** | **complaint** 16:4 | **compounding** |
| 153:25 156:23 | 64:16 65:4,8 | 16:7,19 17:24 | 161:10 168:25 |
| 157:15 175:3 | 65:18 66:23,25 | 18:2,10,12 | **computed** |
| 197:7 | 67:4,23 68:10 | 19:2,7,10,16,18 | 111:23 |
| **comes** 28:2 | 68:13,17,25 | 20:15 21:2 | **computer** |
| 64:19 109:2 | 69:1,7,9,15,16 | 23:19 24:3 | 206:7 |
| 147:7 157:17 | 150:15 151:24 | 26:4,7 28:7,9 | **conceal** 31:3 |
| 175:6 | **company** 1:4 | 28:20,25 32:23 | **concealed** 31:4 |
| **comfortable** | 5:7 52:16 | 33:19,21 34:13 | 58:1 93:4 |
| 67:11 | 55:13 65:14 | 34:16,24 35:2 | 100:6,10 101:1 |
| **coming** 74:14 | 66:15 68:19 | 35:7,10,14 | 160:4 |
| 100:3 | 100:3 141:7,21 | 37:4 46:17,20 | **concede** 144:14 |
| **comma** 46:25 | 145:4,21,25 | 47:4,6,10 48:2 | **conceive** 108:8 |
| **commercial** | 150:11 151:6 | 48:7,24 50:4,8 | 108:12 |
| 19:17,21,23 | 173:14,17 | 57:11 58:6,19 | **conceived** 90:3 |
| 20:9 47:22,25 | 174:2,4,21 | 59:10 60:2,16 | 127:17 |
| 48:4,6,8 66:8 | 190:1 191:16 | 61:13 70:24 | **concept** 94:20 |
| 69:3,12,17,20 | 219:1 222:1 | 83:18 102:8 | **conceptually** |
| 70:3,19 71:5,8 | **company's** | 103:5 131:10 | 198:9 |
| 71:11 106:13 | 63:6 151:7 | 132:20,24 | **concern** 47:15 |
| | 161:25 189:10 | 142:25 214:5 | 59:25 105:19 |

**[concerning - construct]**

| | | | |
|---|---|---|---|
| **concerning** 166:11 167:4 190:14 | **confirms** 50:22 51:16 | **conservative** 159:24 165:19 | 94:23 103:20 110:4,8 119:4 124:3 127:19 184:24 213:21 |
| **concerns** 56:15 | **conforms** 106:15 | **consider** 39:19 40:10,17 41:13 44:9 66:3,8 75:21 97:16 99:8 108:4 140:19 162:5 163:21 164:14 177:23 179:6 186:22 190:3 191:15,18,25 192:5 208:15 | **consists** 81:11 |
| **conclude** 131:19 180:5 195:11 | **confounding** 134:1,4 136:2 136:6 140:20 141:1,2 145:11 146:9,11,18 147:10,16 148:3,16,19,24 149:8 152:10 152:11,16 | | **constant** 139:24 140:6 155:5,6 156:13 157:1,5,8,12,17 157:22,25 158:4,16,22 159:6,13,23 160:6,20 164:3 164:11 165:15 169:5,19 172:14,17,20 172:22 173:7,7 173:11,22 174:1,9,15,16 174:22,23,25 175:7,9,10,13 176:8,9 204:3 207:4 |
| **concluded** 15:15 79:8 171:18 | | | |
| **concludes** 218:8 | | | |
| **concluding** 68:12 | **confronted** 109:7 | **consideration** 38:16 | |
| **conclusion** 69:13 70:12 78:13 135:19 135:20 136:15 137:14 144:5 159:18 181:19 191:1,19 | **confronting** 187:11 | **considered** 9:6 16:24 17:10,12 18:3,23 38:6 38:12 66:6 68:2,3 92:24 93:8 104:12 105:25 108:25 126:24 130:14 177:24 178:25 179:12,18 182:4,13 190:17 | |
| | **connection** 21:1 39:2 62:22 66:4 84:7 86:8,23 87:12 95:13 105:24 135:1 135:11 137:3 164:17 169:3 185:12 188:19 189:9 210:15 211:6,8 217:24 | | **constituent** 67:23 68:10,13 68:25 69:1,7,9 |
| **conclusions** 45:11 132:15 | | | |
| **conduct** 129:13 130:9 | | | **constituents** 65:20,24,25 |
| **confidence** 77:5,8,24 78:6 78:22 79:3,14 80:9 131:23 | | **considering** 153:19 | **constitutes** 42:21 |
| **confidential** 95:17 | **consequences** 103:8 115:5 117:8 118:1 | **consistent** 14:7 41:3,10 52:20 61:2 73:21 74:12 75:7,14 80:23 81:25 | **constraints** 88:23 |
| **confirm** 71:2 | **consequential** 92:8,10 | | **construct** 67:19 |
| **confirmed** 64:13 | | | |

**[constructed - correct]**                                                    Page 16

| | | | |
|---|---|---|---|
| **constructed** | **contexts** 93:14 | **convey** 60:14 | 91:3,10,19 |
| 65:5,7,16,22 | **continue** | **copied** 84:5,10 | 92:25 93:1 |
| 66:12 | 170:19 204:1 | 85:11,22 | 101:8,10,11,20 |
| **constructing** | **continued** 4:1 | **copies** 112:25 | 101:24 106:3,8 |
| 166:8 | 134:8,9 | **copy** 8:1,16,19 | 110:20 116:17 |
| **consulted** | **continues** | 11:8 18:9,22 | 117:10 123:24 |
| 197:6 | 46:12 | 19:1 50:1 85:6 | 124:12,22,23 |
| **consulting** | **continuing** | 95:2,15 96:3,8 | 133:4,10,11 |
| 12:14,16 91:18 | 31:2 | 96:12,13 | 141:10,25 |
| 91:22 149:23 | **continuous** | 112:15 187:18 | 142:17 144:6 |
| **consumer** | 165:25 | **corp** 40:13 | 144:12 145:18 |
| 184:22 185:18 | **contract** | **correct** 9:8 | 145:25 147:19 |
| 186:2,17 | 204:14,16 | 13:6 17:18,19 | 147:25 149:12 |
| **cont'd** 122:7 | 206:2,3 | 17:24 19:13 | 149:13 153:2,3 |
| **contain** 87:2 | **contracts** | 21:23 28:22 | 153:10 156:14 |
| **contained** | 204:20 206:13 | 29:14,19 30:5 | 156:15,19 |
| 16:16 81:2 | **contrast** 56:15 | 31:21 32:25 | 157:11,13 |
| 195:5 | **contributed** | 37:4 38:13,24 | 158:18 164:19 |
| **contemporan...** | 140:21 | 41:7 42:3,5 | 167:6 169:4 |
| 142:5 | **contribution** | 43:23 44:3,7,8 | 172:17 175:15 |
| **contend** 52:11 | 141:17 | 45:20 46:25 | 176:3 179:24 |
| 163:22 164:7 | **control** 63:20 | 47:10,11,22 | 179:25 181:23 |
| **contention** | 63:25 64:21 | 48:15 51:12 | 181:24 182:6 |
| 171:22 | 65:10 71:25 | 53:7 60:3 61:9 | 183:17,22,23 |
| **context** 51:2 | 72:10,11 | 62:25 63:6,14 | 183:25 184:20 |
| 64:3 77:12,14 | 119:12 | 63:22 69:24,25 | 187:5 188:17 |
| 79:8 94:19 | **controlling** | 71:16,17 72:13 | 190:8 191:4 |
| 99:20 108:4 | 63:13 74:8 | 72:19 76:8 | 194:12 197:13 |
| 132:17 136:24 | **conversations** | 77:5,6 78:7,11 | 197:14 201:8 |
| 138:12 139:4 | 193:8 | 78:24 80:3,10 | 201:18,19,22 |
| 140:25 149:24 | **conversely** 78:1 | 80:11,24 81:3 | 202:1,20 203:2 |
| 151:13 162:9 | **convert** 117:14 | 81:12 83:18 | 206:4,5 207:1 |
| 196:24 | **converted** | 84:1 85:25 | 209:9 210:10 |
| | 119:9 | 87:24 89:4,22 | 213:12 216:13 |

**[correct - damages]**                                                      Page 17

216:20 217:10
219:9
**corrected** 98:20
102:9
**correcting** 97:4
99:25 100:3
101:18
**corrections**
217:14,20
219:6
**corrective** 15:8
33:22 34:13,25
35:15 36:5,15
88:20 97:6
101:3 102:18
103:4 111:4,25
125:20,21
128:25 131:2
131:11,13,15
131:19,20
132:4,6,8
133:1,21
135:14 136:9
137:24 138:7
138:20 139:6,7
139:10,15
140:22 142:10
142:15,21
143:4,12 145:5
145:12 146:10
146:17,19
147:9,16 148:3
148:20,25
152:9,18 156:2

156:3,22,24,25
157:4,11 158:3
172:25 173:2
175:12 178:1,3
180:19 197:21
214:22,22,25
215:1
**correctly** 13:9
**correspond**
33:11
**corresponds**
34:22
**counsel** 5:5,16
9:1,10 16:5
45:5 47:7
80:19 95:14
97:16 99:9
107:7 115:17
128:18 129:13
176:17 177:1
188:2,7 192:9
193:9 194:6,10
194:24 213:3
221:23
**count** 23:1,24
24:10 123:14
**counted** 13:9
123:12
**county** 220:4
**couple** 20:4
35:4 91:25
128:13 151:14
154:14,19
175:5 210:3,5

**course** 186:20
189:23 191:24
**court** 1:1 5:9
5:13 6:8 17:17
18:2,5,22
21:24 22:5
25:2 38:10,11
39:9,10 40:5
114:22 116:9
117:6 127:13
127:19,21
187:19,21
189:2 190:11
**court's** 21:9
40:13 52:1,9
113:24 114:3
114:10,16
115:15
**courtroom**
119:21 120:1
**courts** 79:2,5
79:10,12
**cover** 45:2
**covered** 180:1
**covering**
216:14
**covers** 150:7
**covid** 72:17,23
73:1,7 74:14
75:4,20 184:17
186:14
**crashes** 48:11
56:3,19 57:24
57:24 58:8,13

59:19 60:8,13
60:22
**create** 33:20
174:20
**created** 34:6,7
63:16 72:25
216:8
**creates** 104:10
**creating** 168:10
**cromwell** 2:13
4:3 6:2,5,7
**cross** 77:17
**crr** 1:23 220:24
**current** 201:1
**cursory** 16:9
**cv** 1:5 11:8,12
11:18 13:2,14
13:16

---

**d**

**d** 6:10 122:6
221:1
**daily** 133:23
134:17,24
135:13,17
136:11,12,21
154:12 176:11
198:7 199:4,9
199:11,15
**damages** 10:24
13:24 14:2,5
14:16 15:13,24
40:25 41:2,21
43:10 44:20

**[damages - defect]**

45:19 80:14,20 81:22 82:23 83:5 84:23 85:13 87:23 88:4,8,10,18,24 89:4,17 90:18 90:25 91:2,7 91:24 92:7,8 92:10,21,22 97:18,18 98:2 98:11 99:7 108:8,13 109:17,19,25 110:5,20 112:6 114:12 115:20 116:4,5 117:10 117:17 122:14 122:17 123:19 125:1 126:5,18 127:1,11 145:2 146:23 147:2 192:25 193:18 197:9 205:2,6 206:10 207:14 207:23 208:21 209:4,11,12,20 210:1,22,25 211:6,10 212:13,16,20 213:6 214:7,17 215:9

**dan**   210:11
**data**   212:1

**date**   8:12 18:14 23:9,12 25:11 30:8 32:17 33:7,11 34:4 35:14,16,18 36:22 37:1,2 44:17 45:6 50:9 73:11,16 74:4 95:22 98:20 112:1,21 131:23 132:9 142:18 145:5 158:1,2 169:18 175:11,12 180:17 184:1 188:8 209:5 212:11 219:13 222:24
**dated**   8:3 95:3 95:19 112:16 112:20 114:10 133:8 221:17 221:20
**dates**   23:5 26:8 32:25 34:2,24 35:25 36:17 61:15 74:23 78:8,13 132:20 135:15 140:22 142:23 145:13 146:19 157:18 178:2 183:18 184:13 187:2 216:7,8 221:13

**day**   7:25 46:3 75:13 88:21 122:20,23 123:6 124:11 124:21 134:3,5 134:6,8 135:25 137:12 139:13 142:3 152:23 156:18 157:20 157:20 199:8 199:25 211:15 219:17 220:20
**days**   37:11,15 76:11,14,15,22 78:17 123:9,16 123:23 134:24 136:4 199:18
**dcf**   151:1
**deadly**   48:11
**dealt**   205:10 206:5
**decades**   127:15
**deceived**   104:9
**december**   8:3 8:18 11:10 16:25 17:12 18:4,24 44:14 133:8,15 134:20 135:12 137:4 184:3,10 195:6
**decide**   131:15
**decision**   21:9 39:10 40:2,10

40:13,17 41:14 41:22,24 52:9 113:22,24 114:4,15
**decisions**   38:10 38:11,16,23 55:19
**declaration** 112:15,19,23 112:25 113:5 113:11,17 114:3,6 116:3 117:18 221:19
**declare**   219:4
**decline**   93:25 107:21 108:24 111:24 131:21 132:10 139:9 169:18 170:25 171:5 180:19 181:1,4,9
**declined** 107:14,18 108:19
**declines**   125:19 125:24
**deemed**   219:7
**deeper**   134:12 144:22
**deeply**   211:4
**default**   212:4
**defect**   57:25 58:14

**[defendant - deverell]** Page 19

| | | | |
|---|---|---|---|
| **defendant** 5:6 97:1 143:5 | **degree** 9:23 42:4 136:2 156:3 202:12 206:14 | **derived** 201:14 | **detail** 24:22 |
| **defendants** 4:4 6:3,5,7,21,23 12:5,10 21:1 21:10,25 22:6 25:2,4,19 47:16 49:19,20 50:3,6,23,24 51:9,15 53:15 53:22 55:2,6 56:16 78:9 94:12 100:10 100:13 102:3 105:19 106:19 116:12 120:18 161:8 163:11 163:25 167:9 167:11 178:16 221:15 | **delineate** 43:18 | **describe** 22:23 42:25 67:14 73:15 88:2 89:6 90:24 109:23 121:4 125:4 132:1 146:3 165:16 174:13 200:11 211:2 | **detailed** 81:6 110:6 125:10 161:3 176:15 176:18 180:15 |
| | **demand** 184:23 185:19,21 186:3,17 | | **details** 114:1 144:4 186:7 |
| | **denying** 21:10 | **described** 68:21 90:9,22 97:24 107:23 126:8,21 196:18 199:14 207:6 215:7 | **determination** 110:13,23 111:3,18 121:13 129:8 136:21 147:12 200:6 |
| | **department** 29:13 185:3 186:16 | | |
| | **depend** 129:21 146:12 147:4 148:18 153:8 178:8,21 190:5 | **describes** 10:5 165:20 | **determine** 63:9 73:11 74:4 134:16 144:23 148:14 155:9 158:11 191:23 203:20 |
| | **depending** 212:10 | **describing** 58:18 67:16 82:23 99:7 115:23 116:3 127:4 | |
| | **depends** 106:13 147:18 152:8 152:16 171:1 200:21 201:1 212:1 | | **determined** 66:1 124:9,18 126:9,16 145:10 158:9 162:19 |
| **defense** 20:9,16 65:2,23 67:24 68:14 69:2,9 69:10,15 | | **description** 34:25 67:1,2 68:19 98:24 99:13 117:9 | |
| | **depicted** 166:6 | | **determines** 139:8 |
| | **deponent** 219:3 | **descriptions** 59:18 68:16,24 68:24 69:7 | **determining** 77:10 155:3 179:9 |
| **deferred** 29:12 185:2 | **deposition** 1:10 2:11 5:4 6:22 8:22 34:6,8 42:2 217:25 220:10,11 | | |
| **deficiencies** 83:13,23 86:5 | | **design** 58:14 | **develop** 123:20 124:2 196:8 |
| **deficiency** 189:3 | **deprived** 114:24 116:13 | **designated** 95:16 | **deverell** 4:12 5:11 |
| **define** 88:11 | | | |
| **defined** 116:7 | **depth** 20:21 | | |
| **deflation** 89:25 92:2 | | | |

**[deviated - dismiss]**                                                    Page 20

**deviated**
  154:21
**deviation** 74:7
**differ** 126:4
  127:7
**differed** 177:21
**difference**
  49:17 98:3,11
  119:11 121:6
  142:6
**differences**
  206:12
**different** 22:18
  22:21 23:5
  26:22 28:8,12
  28:22,24 29:1
  32:25 33:4,7
  33:10,18 34:13
  35:25 61:15
  74:20 86:21
  90:10 93:13,14
  93:15 97:14,14
  99:22 108:19
  109:24 118:22
  126:1 127:6
  128:14 140:16
  141:9 142:3
  143:23 151:6
  153:23 154:10
  154:15 155:18
  156:4 157:15
  157:18 161:6
  177:14 200:22
  203:16 204:5

  204:19 205:12
  205:14 206:13
  208:7 209:17
  213:2
**differently**
  191:9 204:15
**differs** 155:19
**difficult** 31:15
  66:24
**dimension** 68:2
**direct** 102:23
**directly** 73:4
  97:4 99:25
  101:8,11,15,18
  102:9 118:11
  200:17 201:14
**disaggregate**
  143:14 145:23
  146:16 147:8
  147:15 148:2
  148:16,22
**disaggregating**
  146:9
**disaggregation**
  129:1
**disagree** 103:1
  214:10
**disagreed**
  121:1
**disclose** 12:11
  178:17
**disclosed** 12:12
  93:18 97:8
  101:23 111:15

  132:9 141:8,22
  145:4,21,24
  155:17 171:17
  177:13 178:12
**disclosure**
  92:24 93:2,8
  93:17,21 100:2
  101:4 102:23
  112:1 131:20
  132:12 133:21
  135:15 139:6,7
  139:16 144:20
  145:5,12
  146:19 150:21
  150:21,23
  156:4,24 157:4
  157:11 158:3
  173:1,2 175:13
**disclosures**
  15:8 36:6,15
  102:22 110:3
  125:20 128:25
  130:21,25
  131:6,9,12,13
  131:15,16
  133:20 138:7
  146:10 156:2
  156:22,25
  172:23 178:2,3
  178:9 214:21
**discovery** 44:7
  44:9,15 45:17
  128:4,8,21,22
  129:2,6,11,15

  130:3,8 146:13
  147:5,7 151:22
  153:9,12 154:3
  177:6
**discrete** 165:25
**discuss** 83:25
  192:15,22
  194:2 197:9
**discussed** 28:8
  40:6 42:2
  61:16 143:6
  192:9,17 193:1
  195:12,13
  197:11
**discussing**
  185:15
**discussion**
  19:21 80:14
  81:6 114:11
  172:13 194:8
  195:22 196:15
**discussions**
  16:5 44:24
  47:7 193:16
  194:13,25
  195:4,11
  196:10,13,23
**dismiss** 21:1,10
  22:1,7 25:6,20
  49:20 50:3,7
  50:23 51:15
  55:3,19 163:11
  167:10 221:16

**[dispute - earlier]**    Page 21

**dispute** 13:12 37:17 78:14
**disputing** 184:6
**disrupted** 184:17
**disruptions** 186:15
**dissipated** 157:6
**dissipation** 135:3,21 139:11
**distinct** 127:7
**distinction** 127:22
**distinguish** 141:15 142:8 189:5
**distinguishable** 97:25
**distinguishes** 118:4
**distinguishing** 98:7
**distorted** 92:14 174:20
**district** 1:1,1 5:9,9 55:14
**divide** 28:21
**dividend** 201:22 202:3,4 202:6,10 203:9 203:11,13,21 203:24 204:2,4

204:7,8 207:7
**dividends** 201:6,18,25 202:7,8,12,15 202:19 206:25 207:6
**division** 1:2
**document** 8:2,4 17:5,20 18:2 18:22 20:20 25:1,8,16,21 34:1 50:10 95:25 100:19 187:19,21 188:11,14 189:1 190:10 221:11,13
**documents** 8:25 9:5 16:24 17:10,13,16,18 18:5 38:5,20 44:15 106:9 182:3
**doing** 11:4 128:16 133:24 136:14 153:20 154:18 158:4
**doj** 35:18 102:16 189:11
**dollar** 111:14 111:17,24 115:11 139:24 140:6 155:5 156:13,18

157:1,5,7,8,13 157:24 158:5 158:13,17,22 159:6,13,23 160:6,20 164:3 164:11 165:15 169:6,20 172:14 173:7 174:16,23 175:9,14 176:8
**dollars** 214:7 214:16
**don** 192:10
**door** 61:7 108:16
**dowd** 3:11
**dozen** 36:15
**dozens** 10:13 86:25
**dpa** 35:19 101:14 102:17 102:19 118:21 186:16 189:10 190:17
**draft** 47:2
**drafting** 81:18 82:3,16
**dramatic** 189:22,25
**dramatically** 189:5,17
**draw** 77:15 132:16 135:1 135:19 136:15

137:13
**drawn** 181:19
**dreamliner** 185:13
**driving** 150:16
**drops** 215:2
**due** 72:16,22 75:3 110:13 111:3 163:25
**duly** 6:11 220:11
**duration** 154:12 155:11 176:13
**dvi** 36:9

**e**

**e** 3:1,1 122:1,1 220:1,1 221:1 222:3,3,3
**earlier** 32:13 41:1 46:1,3 55:16 61:16 71:13 79:1 80:18 81:5 85:2 90:17 93:19,23 94:2 98:20 101:23 106:25 109:10 115:24 123:8 126:1 138:1,22 140:18 143:1 154:5 159:22 161:13 163:9

**[earlier - estimate]**                                                                  Page 22

167:18 173:6
180:21 181:10
191:8 198:4
199:14
**early** 150:15
**earnings** 76:7
76:22,25 77:21
78:2 79:21
80:4 142:13,16
143:8,12,15,22
144:18 150:10
150:12 152:13
183:1,3 199:17
**ease** 33:15
**easiest** 111:6
**easily** 94:6
110:12 150:23
206:5
**eastern** 1:1 5:9
**ebitda** 150:10
150:13,14,19
**ecf** 95:6
**economic** 30:15
31:22 64:15,17
67:5 68:6 72:4
79:16 127:2
135:19 136:15
139:13 141:16
159:15,19
160:3 168:14
174:10 180:25
**economically**
15:10 54:10
84:20

**economics** 9:23
42:20 43:18,22
77:13 127:5
170:13 171:13
**economist**
30:16 120:23
120:24
**economists**
79:6 127:18
194:4
**edit** 86:16
**edited** 35:3
**edits** 86:11,13
**education** 9:22
10:3,6 42:3
**effect** 30:18
57:5 63:4,10
76:3 103:17
168:9,25 191:7
196:4 199:4,5
**effectively** 15:9
**efficiency**
38:19 39:24
40:6 49:12
133:9 192:20
192:24 193:17
194:9 195:14
195:22 196:17
197:2 201:24
**efficient** 13:24
38:21
**effort** 52:14
65:10

**eight** 51:21
**either** 9:4 85:22
95:17 103:6
111:10 148:12
149:10 150:24
160:16 175:13
200:16 201:14
**element** 53:11
186:7,8
**elements** 99:18
183:12
**eliminate** 72:7
**ellison** 119:22
**emily** 3:8 5:22
**emphasized**
48:13
**emphasizing**
48:21
**employing**
211:12
**encompassed**
29:10 190:15
**ends** 62:16
121:23 172:2
**engage** 43:20
**engaged** 22:12
24:13 35:22
37:19 149:17
153:20 194:6
194:10
**engagement**
149:23,23
**engines** 69:19

**ensure** 106:14
**entered** 185:1
**entering** 185:7
**entire** 19:6
105:11 209:13
210:1
**entirely** 47:3
**entirety** 53:1
**entitled** 25:8
34:1 221:11,13
**entity** 188:13
188:15
**entry** 29:12
**enumerate**
159:14
**equal** 91:7
**equally** 65:7
**errata** 219:8
**error** 215:19
216:4
**errors** 74:7
**especially**
156:21
**esq** 3:7,8,9,15
4:7,8,9
**essence** 157:1
157:19
**essentially**
97:10 101:12
128:12
**establishes**
198:11
**estimate** 10:7
10:11 15:19,21

**[estimate - exhibit]** Page 23

15:22 37:23 82:7,18 107:21 108:23 134:22 135:17 138:15 182:8,23 197:24 203:7 204:10 205:18 207:9,15 211:13 214:19

**estimated** 82:10

**estimates** 210:21,25

**estimation** 72:25 73:6,20 75:19

**evaluate** 13:22 64:8 67:22 131:14 136:6 141:17 156:3 181:17 197:2 208:17

**evaluated** 102:21 149:7

**evaluating** 10:24 15:12 89:16 125:18 125:23 129:3 133:22 137:9 139:20 192:20 192:23 193:16 193:17 194:9

**event** 62:25 63:3,8,18,24

64:7,22 66:5 66:12 77:2,20 78:5,21 79:20 80:10 92:23 93:3 94:15 100:5 102:16 110:13 111:4 111:10,13,16 130:20 131:19 133:1,6,13 134:10,19 135:6,10 136:13 137:2 138:20 141:8 141:14,19 142:3,6,15,21 143:4,12,13 145:19 158:7 175:20 180:19 198:1,5,10 199:10

**events** 33:22 34:14 35:1,15 61:6,14 97:6 102:7 103:5,13 131:2 137:13 137:24 140:23 142:11 162:13 162:14,15 165:25 175:18 190:12 199:16 214:25

**eventually** 12:17

**evidence** 75:24 126:14 134:7 136:7 139:14 159:20 160:3 168:17 180:25

**evidentiary** 39:11

**evolve** 180:3

**evolved** 129:3 139:21 153:1,6 153:16 163:6 165:10 176:1 177:15,21

**exact** 10:12 37:13 46:21 61:10 74:23 86:24 112:5 183:18 187:11

**exactly** 23:1 56:5,9 59:19 76:17 82:4 83:2 85:18 87:17 94:22 109:17 115:22 122:25 134:13 141:24 156:20 177:11,11,19 179:20 185:24 206:19,20 216:10

**examination** 6:13 122:7 221:2

**examined** 6:11 76:5

**example** 28:19 29:6,7 32:11 69:18 82:14 97:12 111:7 112:3,9 115:8 119:6 133:1,20 135:25 139:7 150:9,20 151:4 151:18 152:11 157:3 169:11 170:15 172:25 173:14,17 174:18,19 200:20

**examples** 54:5 129:5 147:24 148:8,9 149:10 150:6 151:14 154:10,19 173:12 174:11

**exceeded** 73:17

**exception** 12:21

**excerpts** 26:2 26:21 95:11

**exclusively** 19:16 48:8 159:2,4

**exhibit** 8:1,5,6 8:10,11,16 11:7 18:9,11 18:21 19:1

**[exhibit - factors]**                                          Page 24

25:1,8,14,19
33:20,25 34:1
46:4 50:1,5
55:3 61:17
74:6,18 75:1,8
75:11 79:19
95:1,19 112:14
112:19,23
131:4 143:1
164:23 166:6
172:10 182:17
187:15,16,17
187:18 188:3
213:13 215:24
216:6,24 221:7
221:8,9,11,13
221:15,17,19
221:21
**exhibits**  96:10
113:1,7 213:22
217:22 221:5,6
**existed**  200:2
**existence**
182:18
**existing**  31:20
32:4 85:10
**exists**  32:16
**expect**  108:17
128:18,19
153:22 155:15
**expectations**
163:5 207:7
**expected**
198:11,14,17

198:21 201:4,6
201:18 206:21
206:24 207:1
**experience**
11:20 22:4
40:21 43:15
53:20 66:23
127:15 128:3
158:20 159:12
173:10 174:14
210:19,23
213:5 214:18
**expert**  7:5,13
7:18 8:2,6,10
8:17 10:9 11:9
11:13,21 12:4
12:14,15,23
13:5 21:13
22:12 24:13
27:7 35:23
37:20 39:1
46:2 57:15
59:25 80:13
82:22 86:9,22
87:12 90:13
91:19,23 95:2
95:19 96:3,19
109:14 120:4
120:18 149:18
158:21 164:21
166:19 172:9
195:6 196:6
207:13 209:18
209:24 210:9

210:15,19
211:7 221:7,17
**explaining**
64:10
**explanatory**
64:9,14
**explicit**  14:9
72:10
**explicitly**  40:19
41:15 112:4
168:19 206:8
206:16
**explosion**
114:23 115:2
115:18 165:19
**exposed**  66:14
**exposure**  69:11
**expressly**  106:5
**extend**  47:25
215:2
**extent**  10:2
19:19 26:15
35:1 72:3
102:21 125:19
125:23 127:3
140:20 141:6
171:15
**extreme**  112:8
115:8 169:10
**eye**  12:17 19:19
48:7

**f**

**f**  6:10,10 95:14
122:1,6,6
220:1
**faa**  58:2 183:24
187:4
**faa's**  189:6
**face**  64:16 67:4
**faced**  94:13
97:2 115:1
116:15
**fact**  29:16 41:5
51:17 71:3
110:2 126:10
126:16 132:17
138:12 160:8
175:20 186:1,9
205:9,11
**factor**  62:23
137:1 150:17
182:13
**factories**
173:18
**factors**  39:23
40:1,3 63:14
63:21,25 64:19
64:22 65:11,13
67:5,16 68:12
72:4 140:14
142:8 200:22
201:12,17
206:4 210:24
212:2

**[factory - form]**                                                    Page 25

| | | | |
|---|---|---|---|
| **factory** 59:2 62:8 | **far** 22:17 24:23 35:9 145:17 169:3 181:23 190:7,23 191:6 196:5 198:25 | **finds** 102:17 | **floor** 59:2 62:8 |
| **facts** 83:25 89:10 99:16 147:18 184:5,7 | | **firms** 66:13 | **flow** 147:1 150:22,24 |
| **factual** 58:19 153:7 | **fault** 57:23 | **first** 7:3 8:4 17:16 18:20 25:14 32:12 36:23 39:9 40:5 46:1 47:12,14 50:14 50:14 55:12 73:16 85:3 88:25 95:23 96:2 97:22 113:9 114:5 156:11 157:4,9 157:10 158:1,3 172:25 173:1 175:11,12 183:14 188:9 189:17 197:16 | **focus** 19:16 69:10 |
| **failure** 189:4 | **feasibly** 152:4 | | **focusing** 136:19 186:6 |
| **fair** 9:2 10:21 11:3 12:25 14:12 19:14 20:3,3 29:22 30:4,16,22 31:17 43:24 45:13 57:12 63:15 82:20 87:20 91:4 103:2 160:13 164:18 184:21 187:13 | **february** 73:8 73:12 75:4 | | **follow** 20:5 29:5 30:14 43:6 45:15 46:24 109:13 142:22 165:6 178:5 |
| | **federal** 18:12 19:3 54:19 214:8 221:10 | | |
| | **feel** 25:13 42:23 | | |
| | **fell** 73:17 | | **following** 48:11 75:13 101:13 107:15 169:24 |
| | **felt** 21:16 | | |
| | **field** 171:9 | | |
| | **fifth** 95:12 | | **follows** 6:12 65:22 |
| | **figure** 213:15 214:15 | | **foot** 16:21 |
| **fairly** 45:9 66:24 | **filed** 5:8 7:21 20:25 38:20 95:7,12 106:2 187:21 188:13 | **fit** 15:16 67:1 | **footnote** 25:25 46:9 58:5 78:19,20 83:17 83:24 92:16,20 94:8 109:14 110:1,9 127:24 133:5 182:15 195:19,25 196:2 |
| **fairness** 120:10 | | **five** 15:3,18,20 37:25 81:11 82:10,19 87:3 87:11 173:18 179:14 183:10 204:21 207:19 217:4 | |
| **fall** 43:8 127:10 | **filing** 11:15 194:23 | | |
| **falls** 111:17 | | | |
| **false** 22:19 23:5 26:3,11 47:16 78:10 105:20 155:22 190:19 | **fill** 27:9 | | |
| | **financial** 77:13 79:6 | **fixed** 75:13 | |
| | | **flat** 75:11 | **forces** 64:17 68:6 |
| **familiar** 38:18 40:12,15 | **find** 52:3 66:25 216:2,6,23 | **flight** 108:17 | |
| | **finder** 126:10 126:16 | **flights** 184:3 | **foregoing** 219:5 |
| **familiarize** 16:2 | | **flip** 25:13 33:17 | |
| | **finding** 58:23 | **flipping** 35:13 | **form** 14:4 27:20 30:3,21 |

**[form - given]** Page 26

32:10 43:12
52:24 53:24
54:23 57:3
58:17 61:23
62:4 64:2
66:17 70:5
81:20 83:1
84:9 87:5
94:18 100:16
103:11 104:4
106:1,6 108:1
108:21 109:21
131:25 137:6
138:5 141:12
143:19 152:7
160:23 161:18
162:3,25
175:17,22
176:23 195:8
195:18 199:9
202:22 207:17
211:13,16
212:8,15,18
**formal** 10:2
42:2 44:25
**formed** 155:1
176:5,14
189:19 191:6
191:11,13,18
214:20
**forming** 18:23
39:20 40:23
195:4

**formula** 88:3,8
88:9,11,22
89:6,9 90:8
92:3 110:12,18
110:21,22
111:2 112:6
125:4 126:17
126:20 199:22
200:11 201:10
205:22 206:6
206:16
**formulas** 90:22
205:17
**forth** 14:15
16:25 17:14
18:4,23 19:15
196:3,9 197:5
220:10
**forward** 32:17
60:24 157:16
**found** 35:18
57:19,23 79:2
166:14
**four** 13:4,8
15:3,18,20
28:22 37:7,21
37:25 38:11,15
39:17 82:10
113:4 131:3
158:14 173:19
218:11
**fourth** 35:8
113:15 130:16
142:12,16

143:7 144:18
**fraud** 87:24
141:5 160:1
**free** 25:13
201:5 206:23
**frequent** 22:16
**friend** 34:11
**front** 44:1
126:14
**full** 6:25 50:15
55:4 93:3,24
111:24 115:11
169:18 170:25
171:5 180:18
181:1,4,8
**fully** 110:14
111:4
**fund** 3:12
187:25 188:5
188:14 221:22
**fundamentally**
109:24
**fungible** 123:1
**further** 13:7
137:14 141:16
147:13 199:19
217:18 218:4
220:14
**future** 60:25

**g**

**gallery** 119:21
120:6

**gault** 3:8 5:22
5:22
**ge** 69:18
**geller** 3:11
**general** 43:17
61:25 65:24
68:4,11 99:19
155:23 174:14
179:2,4 182:4
191:13,14
**generality**
99:15
**generally** 40:15
47:23 67:2
72:5 94:5 99:6
99:10 192:21
195:15 197:3
**getting** 179:5
204:11
**gist** 56:9 61:11
**give** 29:5 45:8
51:2 52:3,5
84:21 88:22
102:14 132:25
135:24 150:6,7
151:4 154:10
154:19 160:12
182:8,16
187:20 199:1
**given** 18:15
21:18,18 24:5
44:12 84:25
128:17 130:14
153:21 173:24

**[given - hesitancy]**

176:25 178:7
178:19 179:23
180:13,15
190:11 203:22
206:18 214:15
219:10 220:12
**gives** 88:5
**giving** 49:15
62:5
**global** 20:10,17
186:13
**globally** 183:17
**go** 13:7 18:19
43:1 57:14
59:13 60:4
80:12,12
107:20 114:21
115:14 118:9
118:11,14
124:9,19
133:22 134:11
148:7 154:9
156:7 170:14
172:8,14 211:9
215:21 216:5
**goes** 27:3 35:15
55:23 56:13
147:23 216:11
**going** 5:1 7:25
13:3 14:20
18:8,21 25:15
30:13 32:17
33:23 34:19
45:13 57:17

60:23,24 87:19
94:25 95:25
96:2 107:6
108:10 112:12
112:14 113:5
113:10 120:4
122:13 165:4
171:4 174:4,7
188:10 212:22
217:15 218:7
**good** 6:15,16
16:11 34:10
67:17 122:9,10
122:11 170:1
**gotcha** 98:21
**graduate** 10:6
**granular** 211:4
**gravamen**
84:19
**greater** 46:14
92:13 170:10
**grounded**
183:17 187:3
190:14
**grounding**
184:8 186:13
**grounds** 212:23
**group** 76:11,14
**grouped** 28:16
**grow** 174:4,7
**growing** 105:9
118:20
**growth** 150:16
173:25 174:20

**guess** 30:15
33:24 49:7
68:1 72:12
85:5 104:5
160:24 182:25
208:10 217:19
**guzman** 1:23
2:15 5:14
220:5,24

**h**

**h** 6:10 32:24
34:23 122:6
222:3
**half** 9:20 37:8
37:21 112:24
**halli** 120:10
**halliburton**
38:24 39:3,10
39:19 120:11
**halt** 186:13
**halted** 184:9
**hand** 33:23
94:25 220:20
**handed** 25:19
**handle** 94:6
216:16
**happen** 171:5
**happened**
22:10 144:19
**happening**
111:16 170:18
170:21

**happens**
111:25
**hard** 24:7
36:17
**harmed** 97:5
**head** 11:17
28:1,5 38:2
54:13,15 74:2
184:4,7 185:24
**heading** 17:21
38:10
**heard** 93:12
**hearing** 39:11
39:15 119:6,18
120:10
**heightened**
75:6 116:23
**held** 2:12 56:3
88:16 114:22
157:21,25
175:10,13
211:16
**help** 142:4
**helped** 129:6
**helpful** 170:5
**helps** 29:6
**hereinbefore**
220:10
**hereto** 219:8
**hereunto**
220:20
**hesitancy**
149:21

**[high - includes]**                                               Page 28

**high**  10:3 11:22
  46:6,10,18
  74:19 75:9
  211:3
**higher**  73:5,23
  74:10 75:3,15
  159:21 170:22
**highly**  73:1,7
  75:20 132:17
  173:16
**historic**  186:3
**history**  16:10
**hold**  9:22 10:4
  39:10 52:3
  142:21 169:23
  193:6 216:1,22
**holder**  10:5
**holding**  115:15
  204:3 207:3
**holdings**  212:6
  212:7
**hope**  122:11
**hopefully**  11:7
  33:15
**hour**  9:17
**hours**  9:20 15:3
  15:18,20 82:10
  217:15,17
**huh**  44:2 128:1
  200:23
**hundred**  23:3
**hung**  195:21
**hypothesis**
  38:21

**hypothetical**
  32:11 107:7
  112:8 135:24

**i**

**i.d.**  221:6
**ibt**  3:12 187:24
  188:4,14,25
  189:2,15
  190:10,25
  221:22
**idea**  62:3
  196:12,22,24
**identical**  82:21
**identifiable**
  150:23
**identification**
  8:12 18:14
  25:11 34:4
  50:8 95:22
  112:21 188:7
**identified**
  39:23 65:21
  102:7 103:5
  131:9 149:3,15
**identifiers**
  23:10
**identifies**  13:3
**identify**  67:4
  147:24 175:23
**identifying**
  73:22 74:17
**ii**  4:7

**illinois**  55:15
**immaterial**
  111:11
**immediate**
  152:13
**immediately**
  56:2,2 75:11
  75:13 139:16
**impact**  72:9
  111:14 125:3
  132:5 141:9,20
  143:14 145:3
  145:20,24
  146:10,16
  147:9 148:16
  168:20 186:23
  190:3
**impacted**  15:11
**impacting**
  64:19
**implausible**
  190:13
**implemented**
  189:9
**implications**
  150:22,25
**implicit**  72:11
**implies**  172:21
**important**
  52:16 76:19
  179:18 186:21
  190:3 191:18
  192:4

**impossible**
  136:15
**improperly**
  94:16 97:8
  100:13 102:4
**improving**
  163:24
**inappropriate**
  160:20
**incident**  35:17
  60:25 83:11,21
  86:4 100:25
  104:21 107:5
  117:17,23
  118:7,13 119:2
  143:6 160:19
**incidents**  59:15
  104:7,18 105:3
  105:4,12,17
  107:2 109:3
  116:24
**include**  66:13
  69:23 71:14,19
  71:19 112:25
  113:6
**included**  8:6
  11:7 26:8
  34:14,15 37:11
  67:23 68:13
  69:1 70:14
  82:22 113:1
  123:23
**includes**  69:9
  123:9

**[including - inform]**

| | | | |
|---|---|---|---|
| **including** 46:9 69:19 89:24 114:11 185:12 190:23 192:21 | 72:6 73:16 74:9,18,24 | **inflation** 29:24 30:10 31:8,10 31:15,20 32:4 | 159:13,16,21 159:23 160:6 160:21 161:13 |
| **inconsistent** 53:2 208:19 | **indexes** 72:13 **indication** 79:25 167:19 | 32:12,16 88:12 88:13,15 89:1 | 161:15 162:22 164:3,11 165:17,23 |
| **incorporate** 212:5 | **indices** 65:16 66:4,7 67:9 | 89:2 90:2 91:8 91:9 98:1,10 110:8 111:23 | 166:2,5,7,8,13 167:6,12,17,21 168:1,11,11,21 |
| **incorrectly** 163:24 | **individual** 53:15 168:21 204:13 | 115:10,18 116:21 119:8 | 168:25 169:6 169:20 172:14 |
| **increase** 72:22 166:1 | **individually** 182:2 | 119:10 121:5 122:18,22 | 172:17,20 173:6,11,23 |
| **increased** 72:17 | **induced** 208:24 **industry** 63:13 | 123:5,21 124:20,25 | 174:9,16,17,23 174:24 175:1,8 |
| **increasing** 185:22 | 63:25 64:8,12 64:13,16,20,22 | 125:10,15 126:9,12,15,23 | 175:9,10,25 176:8,9,12 |
| **incremental** 167:17,21 168:20 | 64:23 65:1,11 65:14,16,20,23 | 129:3,9,10 130:19 133:10 | 178:6,19 179:9 179:21 180:2,6 |
| **incurs** 117:25 | 66:2,4,7,12,25 67:3,7,19 68:4 | 133:12 135:4 135:22 136:25 | 180:7 186:19 186:23 189:23 |
| **independent** 40:9 50:21 54:7 | 68:11 69:16,19 69:24 71:20 | 137:22 138:1 138:16,21 | 190:4 191:20 191:23 197:18 |
| **independently** 35:8 195:12 | 72:4,6,13 74:9 **infer** 198:15 | 139:12,14,21 140:4,9,19 | 200:6,15 203:7 204:11 205:20 |
| **index** 63:22 64:8,12,13,23 | **inferences** 77:16 | 147:1 152:20 152:22,25 | 207:10 209:6,8 209:21 |
| 65:1,3,5,5,6,7,8 65:10,14,21,22 | **inferred** 200:17 207:2 | 153:6,15 154:12 155:5 | **inflationary** 191:7 |
| 66:1,9,12 67:3 67:7,17,19,20 | **inflated** 31:9 83:7 84:17 | 155:10 156:13 156:17,23 | **influence** 161:10 179:21 |
| 67:24 68:14 69:2,9,24 | 89:14,20 90:7 140:2 172:21 | 157:6,7,8,17,21 157:24 158:7 | **inform** 148:21 198:23 199:6 |
| 71:14,20,20 | 173:3 206:15 | 158:13,17,22 158:23 159:7 | |

**[information - issues]**  Page 30

information
10:23 31:3
44:23 45:8
62:24 63:5,11
64:19 76:4
88:20 125:21
125:22 128:4,7
129:2,5,15,23
130:2,8 132:3
132:9 134:1,5
136:3,7,9
139:2,11
140:20 141:1,2
141:7,10,21
142:2 143:15
144:8,21 145:4
145:11,21,25
146:9,11,12,17
146:18 147:5,7
147:9,10,16
148:3,17,19,20
148:21,24,25
149:8 151:11
152:9,10,12
153:9,12 154:2
154:17,23
155:24 160:5
176:20 177:4
177:17 178:22
179:3,4,7,13
192:1 197:21
204:15
informed  128:4
128:20 129:10

177:6
informing
38:12 44:10
inherent  106:7
inherently
147:17
innocently
119:20,25
input  88:6
125:1,5 152:1
198:18 200:14
inputs  88:6
89:8 110:22
111:2 200:9,12
200:16
insofar  16:15
59:24
instance  54:3
54:20 131:18
instances  23:20
145:22 211:4
institutional
212:6,7
instructing
212:24
intend  42:6,12
42:16 209:11
intended  17:2
intensely  153:7
intent  67:3
intentionally
97:1
interact  30:9

interacts  31:14
38:22
interest  201:6
206:23
interested
220:17
interim  158:6
175:18
internal  151:23
interrelated
126:6
intraday  134:3
136:7 144:10
introduced
6:17 29:24
31:7 32:13
158:7 167:21
167:25
introduces
31:25
inverted  92:3
investigate
59:6 133:18
investigated
54:16 62:4
investigating
59:22
investigations
57:19,23
investing  52:15
investment
115:3
investor  117:25

investor's
207:25
investors  52:16
52:17 97:5
106:6,12
161:24 163:14
165:21 168:9
169:21 190:14
202:11 214:6
involved  27:6
27:12 69:15,17
90:5,5 180:6
193:9,16
involves  90:6
211:12,16
involving  58:9
island  3:4
isolated  73:2
isolation  52:12
issue  23:25
30:23 42:7,11
47:15 48:3
55:7 58:15
59:2 66:15
105:19 115:22
185:17 208:12
issued  76:13
77:1 96:14
issuer  94:14
97:3
issuer's  131:22
issues  21:7
42:10 185:11
185:15 187:10

**[issues - law]**                                                      Page 31

189:12 205:10
**italicized** 26:1
26:10,14,17,23
27:2
**items** 17:3 33:4
33:6
**iv** 32:24 34:23
**ix** 81:2,6,18
83:24 84:4
87:21 90:9
197:12

**j**

**jacob** 4:8 6:6
**jake** 3:7 5:18
**january** 1:12
2:8 5:2 29:14
29:20,25 33:12
35:16 44:18
61:7,15,21
62:7 95:3,20
96:4,19 100:9
107:16 124:8
132:21 133:3
143:7 158:2
164:21 165:7
185:4 189:10
220:21 221:18
**jed** 210:12
**jennifer** 1:23
2:15 5:13
220:5,24
**joint** 95:12

**jonathan** 3:15
5:20
**judge** 119:21
120:7
**judicial** 38:16
39:17,20
**july** 80:6
**june** 112:16,20
113:12 221:20
**justice** 29:14
185:3 186:16

**k**

**keep** 36:17
**keller** 3:3
**kind** 123:13
128:7 144:23
144:24
**knew** 40:3
**know** 10:12
12:11 15:1
19:20 20:21
22:8,15,17
23:12 24:11,19
24:24 27:21
29:15 32:8,18
33:18 36:17
37:13 41:8
52:25 62:10
64:4 66:25
69:5,18 70:14
71:10 79:5
82:3,9,17
84:10 85:10,18

85:24 86:24
87:14 92:9
95:16,17 96:1
96:21 99:15
107:19 108:16
109:6 111:20
112:23 115:9
115:10 117:20
117:23 119:24
121:11,12
122:25 123:7,9
124:7 128:10
129:18 133:16
134:8 136:24
139:18 143:20
144:2,6,16
149:24 152:8
153:14,15
154:1,16 155:9
155:13,14,16
157:18 159:14
160:10 162:7
164:14 167:15
168:17 169:10
171:16,21
173:17,19
175:4 177:7
178:11 179:22
181:9,13,21
184:7 186:16
188:20 195:23
201:11 204:20
205:8 207:19
208:22 209:18

214:17 215:11
215:12 216:15
216:16
**knowing**
148:23
**knowledge**
50:21 59:8,11
214:18
**known** 103:24
104:13 169:9
169:16,19
170:6,8 171:2
171:3 193:20
199:22
**knows** 170:9
**knox** 9:23
**krogman** 39:19
39:22
**ks** 106:1,6

**l**

**labaton** 3:3
**labeled** 25:3
**lack** 160:3
162:14,15
**language** 81:22
82:9,16 84:24
85:4,7,17
94:24 101:9
106:10,18
**large** 27:24
**largely** 84:5
**law** 38:11 42:4
43:23 187:23

**[law - little]**                                                                                     Page 32

188:3 221:21
**laws** 18:13 19:4
  54:20 214:8
  221:10
**lawyers** 6:20
  127:18
**laying** 108:3
**lead** 50:2,5
  174:21 187:25
  188:5,15
  190:25 195:11
  221:15,22
**leading** 194:22
**leads** 170:19
**lean** 150:13
  151:15
**learn** 128:22
**learned** 128:4,8
  129:5,11
  146:13 147:5
  153:9 154:2,18
**learning** 129:2
**leave** 43:4
**led** 183:4
**left** 34:22
  217:17
**legal** 5:12,14
  42:7,9,10,13
  43:7,13 92:12
  127:1,4,12,21
  191:1 218:12
**length** 18:16
  211:15

**lengthy** 95:24
**lettered** 23:10
**level** 16:21 46:6
  46:10,18 62:10
  77:5,8,24 78:6
  79:3,10,12,15
  79:16 80:9
  114:2 131:23
  165:18 168:20
  182:5 186:17
  211:3
**levels** 78:23
  80:2 186:4
**lexington** 3:13
**liability** 14:8
  16:3 30:7 41:4
  52:22 53:5
  54:7,8 80:24
  89:13 100:8
  103:16 104:16
  124:4 163:16
  166:9,14
**light** 118:23,24
**likelihood**
  104:20
**limitations**
  88:18
**limited** 19:19
  59:9 69:2
  116:25
**limiting** 128:11
**line** 17:3 75:11
  214:10 217:4
  222:4,7,10,13

222:16,19
**linear** 165:16
  165:23 166:1,2
**lines** 68:20
  106:11 196:18
**lining** 78:12
**linsk** 3:7 5:18
  5:19 27:19
  30:2,20 32:9
  34:5,9,18
  43:11 44:21
  52:23 53:23
  54:22 57:2
  58:16 61:22
  64:1 66:16
  70:4 79:4
  81:19 82:25
  84:8 87:4,25
  89:11 93:10
  94:17 95:5
  100:15 102:11
  103:10 104:3
  104:22 107:25
  108:20 109:20
  129:17 131:24
  137:5 138:4
  141:11 143:18
  152:6 160:22
  161:17 162:2
  162:24 163:19
  164:5 167:14
  168:12 169:22
  170:3 176:22
  193:5 195:7

202:21 207:16
  209:14 212:22
  215:16,22
  218:5
**list** 16:23 17:4
  20:8 38:18
  39:18 44:5
  148:7 182:1,3
**listed** 9:6 13:14
  17:17,20 33:4
  33:6 38:23
  40:1 55:12
  201:17
**lists** 33:21 38:5
  38:11 65:18
**literally** 85:11
  93:18 141:13
  142:5
**literature**
  77:12,14 79:7
  79:16
**litigation** 1:5
  15:14 52:2,10
  55:14 77:15
  95:4,21 96:7
  108:5 112:18
  113:11 164:22
  165:8 219:1
  221:18 222:1
**litigations** 5:7
**little** 13:7 45:25
  51:1 86:18
  181:20

**[live - manufactured]** Page 33

**live** 119:17
**llp** 3:3,11 4:3
**lmb** 1:5
**local** 187:24
  188:4,14
  221:21
**logic** 15:6
  30:15
**long** 9:15,18
  20:20 39:23
  81:9,25 82:2,5
  82:6 84:19
  106:9 112:24
  141:23 143:22
  159:18 169:25
  170:2 204:4,8
  207:7
**longer** 74:13
  100:18
**look** 16:13
  28:19 34:17
  38:8 39:24
  45:22 50:13
  51:20 55:1
  58:5 65:12,19
  68:12 70:23
  71:1 74:20
  76:10 78:19
  92:16 96:18
  109:2 114:5
  117:24 119:3
  127:23 133:25
  134:12 142:24
  143:24 144:3

164:20 172:8
183:4 188:24
190:9 195:19
214:12
**lookback** 88:21
**looked** 76:21
  145:16 163:9
  183:1
**looking** 68:6,9
  82:11 100:19
  133:21,23
  137:13 198:7
  213:22
**looks** 213:24
**loss** 42:17,21
  43:2,8,19
  44:19 45:18
  88:19 92:12
  110:6 112:4
  119:12 125:10
  125:16 126:4,7
  126:24 127:10
  128:3,16 129:7
  129:13 130:9
  131:7 133:22
  136:17 139:8
  146:24 153:20
  154:7 165:15
  176:15,18
  199:12
**losses** 214:7,16
**lot** 93:13,14
  133:17 134:10
  134:25 155:13

156:6 173:23
179:16
**lots** 19:21
**lower** 94:1
**lrv** 1:5
**lunch** 121:24
  122:11

**m**

**m** 6:10 122:6
**made** 22:2,24
  23:6,21 30:1
  30:19 31:14,19
  31:21 32:7
  48:18,21,25
  49:4,11 52:13
  53:6,6,10 57:9
  59:5 78:9
  86:10 98:14,18
  99:20 107:10
  111:18 113:2,3
  121:12 137:9
  142:13 143:11
  143:23 147:11
  151:21,24
  155:20 163:10
  163:14 168:6
  169:13 177:6
  190:19 194:7
  207:5 219:6
**maintain** 31:19
  105:9 118:18
  118:20

**maintained**
  31:9
**maintaining**
  168:11
**majority**
  207:21
**make** 7:24
  14:22 16:6
  41:11 86:6,18
  97:21 111:1
  133:13 134:18
  137:1 144:5
  146:5 147:3
  165:12 169:23
  170:7 174:9
  181:3,8,14
  183:10 198:20
  215:6 217:21
**makes** 37:6
  49:16 173:23
**making** 86:12
  86:13,19 94:7
  103:17 137:20
  158:5 168:15
  202:17 203:3
**manageable**
  113:3
**management**
  166:12 167:5
**manner** 166:8
  190:18
**manufactured**
  61:8

**[manufacturer - mean]**                                    Page 34

**manufacturer**
  69:18
**manufacturing**
  47:18 48:15
  58:14 59:2,20
  83:12,22 86:4
  104:10 105:21
  106:8 109:4
  184:14 185:13
**map** 156:4
**marble** 119:6
**mark** 7:25 18:8
  24:25 49:25
  112:14
**marked** 8:11
  18:13 25:11
  34:3 46:3 50:8
  55:3 95:21
  112:20 143:1
  164:22 172:10
  187:14 188:7
**market** 13:23
  38:19,21 39:24
  40:6 49:12
  63:5,12,13,21
  63:22 70:3,19
  71:5 72:12,19
  73:16 74:9
  76:5 103:18,24
  104:6,8,17,19
  106:21 107:1,3
  107:11 111:9
  114:24 116:13
  133:8 155:24

  166:10 167:4
  170:9,16,19,23
  171:1,6,11,17
  173:24 174:2,3
  174:3,6 178:22
  179:3,8 185:10
  192:20 195:14
  197:2 203:14
  203:21 213:9
  213:17
**market's**
  119:11 121:6
  161:11 162:12
  163:23 169:11
**marking** 33:24
**marriage**
  220:16
**master's** 9:24
**material** 9:4
  52:17 53:7
  159:17 163:14
  168:8 216:5,18
  217:11
**materiality**
  49:22 50:18,25
  51:11,19
  167:20 168:4
  168:17
**materialization**
  92:24 93:9,12
  94:11,15 96:24
  97:13,17 98:4
  98:5,15,25
  99:11 100:12

  101:3 102:1,2
  103:6,8 109:18
  110:4,15,24
  111:5,19 116:1
  116:6
**materializati...**
  97:7
**materialized**
  169:19
**materially**
  47:16 94:13
  97:2 105:20
  204:5
**materials** 9:4
  17:8 44:6,10
  45:18 192:8
**matter** 5:6
  11:16 13:13
  28:14 29:15
  30:14 31:22
  42:20 43:17,22
  43:23 73:19,22
  73:24 95:15
  127:5,12
  208:22 220:18
**matters** 11:23
  13:4,10,14
  52:15 81:22
  84:23 85:4
  192:9 208:13
**maturity** 201:3
  204:17 206:3
  206:13,19

**max** 58:10,25
  183:16,24
  184:2,9 186:13
  186:14 187:3,5
  189:7 190:15
**mcas** 189:11
**mean** 15:4
  16:18 19:20
  32:14 36:16
  40:20 41:4,6
  42:8,25 43:21
  45:16 54:10
  56:14 59:15
  60:11 61:20,24
  68:2 69:14
  71:1 89:21
  93:3 99:6,25
  101:11 102:15
  104:5,24
  105:25 109:1
  118:11 122:25
  123:13 128:11
  129:7 131:1,6
  132:2,6 134:21
  139:3 141:25
  150:5 155:14
  157:14,19,23
  158:12 160:24
  164:6,7 168:4
  170:6,8 171:15
  172:19 174:13
  177:2 179:16
  182:7 188:15
  196:24 201:1

**[mean - misrepresentations]** Page 35

203:22 205:8,9
205:10,13
208:11 212:4
212:17
**meaning** 93:15
100:2 139:5
162:14 168:6
168:14
**meaningful**
70:2,11,18
71:4
**means** 75:12
138:10
**meant** 17:9
101:17 123:3
**measure** 63:4
74:8 75:8
88:10 89:3
90:18,25 91:7
91:24 92:7
94:1,3 109:16
109:22,25
110:5 115:20
115:25 116:1,4
116:5 117:10
117:24 119:9
122:17 140:1
180:20,23
**measured**
80:20 98:11
**measurement**
110:20 114:12
115:10 138:21

**measures** 30:9
130:20
**measuring**
137:25 171:9
189:23 197:17
**mechanically**
85:19
**media** 5:3
62:16,21
121:23 122:5
172:2 218:10
**mediation**
149:24 211:9
**mediator**
210:15
**mediators**
210:9,11
**meet** 9:9
**meeting** 9:14
9:19
**melnick** 210:12
**memorandum**
187:23 188:3
188:25 221:21
**memory** 79:11
**mention** 59:17
84:3 156:12
189:8
**mentioned** 14:2
59:15 75:2
78:25 84:1
90:17 110:2
140:7 142:20
154:14 186:12

211:8 212:9
**mentioning**
142:19
**mere** 52:12
**merits** 39:6
128:15
**met** 8:25
**method** 85:15
91:1,15 92:21
94:6 117:15
151:1,15
156:11 157:8
158:9,18 160:9
164:4 195:12
199:3
**methodologies**
88:5 89:8
148:4 151:8
152:14 154:15
196:16
**methodology**
14:7,16 15:13
15:16,24 41:2
41:19,25 49:14
63:19 75:25
80:23 81:23
82:23 83:4
84:15,22 85:14
89:18 90:9,15
97:20 98:9
99:23 109:8
122:15 124:1
125:2 139:24
140:6 142:7

157:2,13 158:5
162:4 164:12
192:17,23,24
193:2,3 196:3
196:9,18,21
197:1,5,8,10,11
209:4 212:5
**methods**
149:20 150:1
193:17 194:8
196:5
**metric** 139:20
**metrics** 138:14
**middle** 57:18
134:2 146:8
199:20
**mind** 28:2
36:12,13,18
40:21 109:2
147:7 175:3,6
**minus** 88:13
89:2 91:9
**misleading**
22:20 23:6
26:3,12,15
47:17 78:10
105:20 155:22
**misperception**
173:25
**misrepresent...**
166:4 169:9,16
**misrepresent...**
55:7 84:18
98:14,18,19

**[misrepresented - necessarily]**

**misrepresented** 94:13 97:2
**misstated** 102:1 117:5 160:14 173:14
**misstatement** 23:11 25:22 26:21 36:23 97:4 100:1,4 101:19 102:18 111:20 137:18 157:10 158:1 165:10,13 166:15 170:15 170:16,18 175:11
**misstatements** 15:7 22:24,25 23:2,24 24:18 25:10 27:24 28:3,13,25 29:11,20,23 30:25 31:2,18 32:5 60:21 78:16,18 83:7 89:14,20 90:7 92:15 93:5 100:6 101:9 102:10,23 103:16 104:18 105:1,2 106:20 119:14 121:9 138:3 156:5 157:15 160:17

161:9,12 164:1 165:24 167:24 169:13 173:24 174:19 176:2 177:19,20 178:18 180:22 191:8,10 221:12
**mistake** 62:8
**mix** 155:23 178:21 179:3,7 179:13
**model** 63:17 64:12 72:24 75:17 82:1 123:20 161:23 162:16 163:5 165:20 199:23 199:24 200:18 200:20,21 201:9 203:7 206:10 211:13 211:17,19,23 212:8
**models** 211:19 211:20,22
**moment** 102:14 182:16 199:1
**momentous** 190:11
**monitor** 62:15 62:20 121:22 122:5 172:1,6

**month** 7:9 11:14
**months** 29:21 32:8,8 37:8 131:3 183:15
**morning** 6:15 6:16,18
**motion** 8:8 21:1 21:10,25 22:6 25:5,20 49:19 50:3,6,23 51:15 55:2,19 113:20,23 114:17 163:11 166:24 167:9 187:24 188:4 221:15,21
**mouth** 53:9
**mouths** 53:9
**move** 64:18
**moved** 198:16
**movement** 134:14 135:18 136:5,22 137:11,17 142:9 198:12 198:14,15,17 198:20,21 199:7
**movements** 77:4,23 78:4 80:7 140:21 144:11

**moving** 192:6 209:2
**multiple** 22:25 23:21 24:6 57:1 141:6,20 142:1 145:20 150:14 156:22
**multiples** 150:11,18
**multiplying** 119:10 121:5

**n**

**n** 3:1,8 6:10 122:1,1,1,6 221:1
**name** 5:11 6:19 6:25 188:18
**nature** 15:6,7 93:21 101:14 117:4 148:18 148:20 150:25 152:9,10,16,17 156:1 160:1 168:16 176:2 178:8 212:3
**near** 171:3,18
**nearly** 179:14 183:10 204:21
**necessarily** 32:15 66:21 69:21 102:12 161:4,20 164:6 168:13

**[necessary - objection]**                                                    Page 37

**necessary**
  21:17 44:11
  62:4 130:3
  145:2 162:18
  175:25 180:16
  181:3,14,16,18
  186:8 219:7
**need** 41:18
  56:11 63:25
  75:25 111:3
  121:16 122:23
  123:19 126:7
  133:13 134:18
  134:25 135:5
  135:22,22
  137:1,8 140:19
  141:16 144:6
  145:23 146:22
  149:6 152:24
  153:14 155:8
  155:13,14,16
  155:19,22
  156:1,2 164:8
  177:9,23
  178:24 179:6
  180:6 186:11
  186:18 189:21
  191:7,25 198:6
  200:9,12,14
  201:11 205:24
**needed** 57:7
**needs** 64:5
  122:19 124:3
  205:14

**negative**
  162:15
**negotiated**
  210:21,24
**neutral** 91:18
  91:23 210:9,15
  210:19
**never** 12:12,18
  41:23 48:6
  54:1 98:18
  202:9
**nevertheless**
  108:15
**new** 1:11,11
  2:14,14,17 3:6
  3:6,14,14 4:6,6
  10:23 31:25
  32:5,6 56:18
  62:24 63:4,11
  64:18 76:3
  143:15 196:8
  205:21 220:2,4
  220:7
**news** 17:7
  71:22 72:1,8
  76:12,15,24
  134:9 135:2
  199:18
**non** 170:8
**nonactionable**
  56:3
**noncontrover...**
  84:14

**nonfraud**
  125:22
**nonzero** 204:25
**normal** 75:3
**normally**
  127:17
**northern** 55:14
**notary** 2:17
  219:14,21
  220:7
**note** 20:7 48:17
  72:16 77:13
  83:9 88:17
  91:12 96:9
  182:17 204:23
**noted** 122:2
  218:2,14 219:7
**notice** 2:14
**november**
  183:25
**number** 10:12
  13:3 23:8,24
  24:5 27:24
  28:3 34:22
  36:5,10,11
  37:13,15,22
  46:21 65:13
  79:24 86:24
  118:22 131:14
  180:11 181:21
  182:12,20,23
  183:2 187:24
  188:14 205:7,9
  205:10 212:2

  213:12,25
  214:1 217:7,11
  218:10
**numbers** 215:4
  217:8
**numerous**
  11:22 24:18
  27:13 48:20
  120:25 121:1
  128:24 209:23
  210:24

**o**

**o** 6:10 122:1,1
  122:1,6
**oath** 120:3,8
**object** 107:7
  212:23
**objection** 27:19
  30:2,20 32:9
  43:11 52:23
  53:23 54:22
  57:2 58:16
  61:22 64:1
  66:16 70:4
  79:4 81:19
  82:25 84:8
  87:4,25 88:1
  89:11 93:10
  94:17 100:15
  102:11 103:10
  104:3,22 108:1
  108:20 109:20
  129:17 131:24

**[objection - option]**                                          Page 38

137:5 138:4
141:11 143:18
152:6 160:22
161:17 162:2
162:24 163:19
164:5 167:14
168:12 170:7
176:22 195:7
202:21 207:16
**objects** 213:3
**observable**
  201:14
**observation**
  168:15 203:22
**observe** 216:19
**observed** 91:17
  91:22 98:3,12
  140:21 200:17
  203:17 207:3
**observing**
  197:19 201:16
**obtained** 95:7
  153:12
**obviously**
  16:18 17:3
  31:25 112:7
  128:20 177:25
  216:14,17
**ocampo** 1:23
  2:15 5:14
  220:5,24
**occasion**
  120:14,15

**occasions**
  128:24 209:23
  210:4,6
**occur** 23:12
**occurred** 10:19
  23:8 58:10
  93:20 107:22
  108:16 185:17
**occurrence**
  115:12
**occurrences**
  22:22
**occurring**
  111:10,13,22
  187:12 202:4
**occurs** 118:2
  166:4
**offer** 42:6,12
  42:16 44:19
  186:6
**offering** 30:25
  42:10 43:7,13
  57:6
**offices** 2:12
**okay** 8:9 13:17
  25:7 26:5,25
  34:9 35:11
  38:7 43:6 46:5
  51:4,23 52:4,6
  55:17 57:14,16
  57:16 60:4
  70:25 80:15
  90:17 92:19
  96:22 100:23

104:14 112:11
113:8 121:20
123:17 124:16
143:2 165:2
171:23 172:12
187:16 195:24
199:19 214:3
214:14 215:14
**omission** 166:4
**omissions** 83:8
  84:18 89:14,20
  90:7 165:24
**once** 31:19
  85:11 126:9
  129:24 150:2
  153:19
**onset** 72:16,22
**open** 44:1
  199:13 217:15
**opening** 25:5
**operating**
  173:18
**operations**
  106:8
**opine** 80:19
**opined** 207:22
**opining** 127:3
**opinion** 14:4,14
  15:5,23 20:2
  30:11,13 31:1
  39:21 40:23
  42:7,10,13,17
  43:7,14 49:12
  49:14 52:1

58:22 81:1
82:13 84:21
85:12 101:5
126:11 155:1
176:6,14
189:20 191:11
191:13,19
192:13 212:16
212:18 214:20
**opinions** 16:16
  16:25 17:13
  18:3,23 38:13
  39:17,20 41:14
  42:8 44:10,12
  44:19 49:9,15
  57:5 62:5
  186:5 195:5
**opportunities**
  151:25
**opportunity**
  114:25 116:14
  130:5
**opposed** 125:21
  127:1 136:25
  165:25
**opposing** 49:19
  50:23
**opposition** 50:2
  50:6 51:14,21
  55:2,23 163:10
  167:9 221:15
**option** 197:18
  197:20 198:16
  198:20 199:21

**[option - paragraphs]**                                                      Page 39

199:25 200:1
200:10,18
201:3,4,15
204:3,6,14,15
204:20,24,25
205:17,19,25
206:2,15,18
207:23,25
208:2,9 209:1
**options**  13:23
192:12,20,21
192:24,25
193:18,20
194:9 195:15
195:22 196:4
196:17 197:2
197:10,25
198:25 199:4,7
201:10 203:8
206:13 207:3
207:15 209:2
**oral**  120:6,13
**order**  95:18
114:10,16
116:10 134:16
135:18
**organized**  20:7
**organizes**  28:9
**orient**  34:21
**originally**
131:10
**outcome**
220:17

**outlined**  192:18
193:2 197:1
**output**  85:25
118:20
**overall**  167:24
**overcompens...**
169:20
**overlap**  54:9
69:3
**overlapping**
53:21 54:21
55:16
**overlaps**  53:17
54:8
**overpaid**  115:3
115:4 116:16
116:20 117:7
**overstated**
173:21
**overview**  87:22
88:5
**own**  65:5

**p**

**p**  3:1,1
**p.m.**  121:22,24
122:2,5 172:1
172:6 218:8,14
**page**  8:4 11:18
13:2 33:22
34:12 46:2,12
46:12,13,17,20
50:14,15 51:20
52:8 55:1,5

56:18 78:20
80:13 92:17
96:16 113:15
125:8 127:25
130:18 133:6
136:19 165:1
172:11 188:24
189:2 190:10
190:10 195:20
197:13,15
214:2 221:2
222:4,7,10,13
222:16,19
**pages**  13:3
18:19 19:12
27:4,10 33:18
46:22 51:22
81:9 112:24
113:4,4
**paid**  83:6
**pandemic**
72:17,23 75:4
**paper**  193:19
193:20
**paragraph**
20:6 28:19,20
29:10 46:2,6
46:11,13,23
47:2,9,13
48:10 50:15
51:25 52:5,8
55:4,22 57:14
57:18 58:5
59:25 61:5

70:24 71:2
72:15 73:15
76:17 80:12
82:15 83:10,16
86:6 90:23
91:15 96:19,21
96:23 97:10,21
97:22 98:25
99:14 101:10
109:11 114:6,9
114:22 119:3
121:4 125:7
130:17 132:25
142:24 143:5
144:16 146:3,7
147:14,23
148:8 149:3,15
152:4 153:4
154:9 156:12
164:20,24
165:5,7 172:9
172:15 175:24
176:7 197:15
199:20 200:12
203:1,4 204:23
213:13,23
214:1,12
**paragraphs**
16:12,14 34:16
35:9 45:24,25
81:11,14,14
82:19,20,21
86:22 87:3,11
96:1 109:11,23

**[part - performing]**

**part** 11:1 15:25 21:13 26:19 42:17 45:18 51:18 53:4 56:25 57:8 63:18 76:9 90:8 93:3 102:24 110:9 110:11 113:19 115:23 116:22 125:15 126:24 126:25 145:7 149:22 150:21 150:22 163:13 172:10 178:8 178:21 181:22 182:10 196:10 206:6,6

**partial** 134:6

**partially** 110:14 111:4 132:3

**participated** 91:17,22

**particular** 14:5 16:2 19:20 30:7 31:7 64:16 65:9,17 79:11 82:18 89:10 90:23 99:5 116:25 117:11 119:1 129:14 130:2,7 133:19 135:2

144:2 152:15 153:11 160:2 168:22 178:13 179:8,24 185:17 189:20 195:16 196:25 197:8 204:12 211:23 212:14 213:15

**particularized** 168:22

**particularly** 21:7 52:15 57:6 82:2 101:5

**parties** 20:25 220:15

**party** 65:16,22

**pass** 24:23

**passage** 160:18

**past** 148:2 154:20

**paste** 85:7

**pasted** 84:5,10 85:11,22

**pdf** 217:12

**peer** 66:3 69:24 71:8,14,20

**pending** 53:14 55:14

**pension** 3:12 187:24 188:5 188:14 221:22

**people** 148:13 211:15

**pepperman** 4:7 6:1,1,14,20 7:23 14:19,24 18:7 24:25 33:14 34:5,7 34:10 49:25 62:12 91:13 94:25 95:10 112:11 121:18 122:8 169:25 171:23 187:13 193:14,21 209:16 213:1 215:14,21 216:1,11,22 217:1,14 218:3 221:3

**perceived** 119:11,13 121:6,9 169:11

**percent** 77:5,7 77:18,20,23 78:5,22,22 79:3,9,12,14 80:1,1,2,8,8,9 111:12,21 115:9 131:22 169:12,14 170:17,20 171:7,10,10,11 173:3,8,21 174:4,8 217:6

**percentage** 155:6 170:10 170:22 172:17 172:20,22 173:11,23 174:9,16,22 175:1,8,14 176:9

**percentages** 217:8

**perception** 161:11

**perfect** 202:19 202:24 203:2

**perfectly** 15:16

**perform** 45:3,6 73:19 74:21 129:16 131:7 137:16 146:24 199:2

**performed** 45:10,10 62:24 63:9 133:7,14 134:20 135:11 137:3 145:14 151:5 179:19 199:10,14,16 214:23

**performing** 43:16 64:7 79:7 108:8,13 127:16 129:1 135:6 204:1

**[period - plc]**                                              Page 41

| | | | |
|---|---|---|---|
| **period** 10:18 | 179:15 182:21 | **places** 35:4 | 82:11,12 84:19 |
| 29:2,22 31:5 | 183:8,11,15,19 | **plain** 157:12 | 89:12,21 90:1 |
| 36:18 37:7,12 | 183:21 184:15 | 175:16,21 | 92:6 96:5 99:9 |
| 37:20 48:25 | 185:11,20,23 | **plaintiff** 3:4,12 | 100:7,24 102:3 |
| 49:6 53:16,17 | 186:2,20 | 94:12 96:25 | 103:15,21 |
| 54:8,14 56:1 | 189:18,24 | 109:18 187:25 | 104:16,19,25 |
| 73:1,3,4,7,8,14 | 190:16 191:9 | 188:6,20 | 105:2 106:24 |
| 73:18,23 74:10 | 191:17,24 | 190:25 221:22 | 108:7,12 |
| 74:11,13,15,17 | 192:3 200:1 | **plaintiff's** 18:9 | 114:17,23 |
| 74:19,21 75:16 | 201:20 203:10 | 21:2 59:10 | 115:17 116:11 |
| 75:20,23 76:1 | 204:22 205:1,5 | **plaintiffs** 5:19 | 116:20,24 |
| 76:8 77:2,22 | 209:7 212:3 | 5:21,23,25 7:3 | 118:8,19 124:4 |
| 78:3 79:22 | 213:12,20 | 7:13,19 8:7 9:1 | 129:13 142:25 |
| 80:6,22 88:16 | 215:3 | 9:10 10:10 | 145:6 153:22 |
| 106:2 115:2 | **periods** 37:25 | 12:24 14:8 | 155:15,16 |
| 122:21,24 | 153:23 157:22 | 15:6,9 16:3,5 | 163:10,15,22 |
| 123:6,23 | 187:12 | 16:15,18 17:23 | 164:2,7 166:9 |
| 124:12,22 | **person** 194:14 | 18:1 19:2,14 | 166:18,24 |
| 129:4 131:3 | **pg&e** 11:16 | 20:15 22:13,19 | 167:3,9,10 |
| 137:12 138:2 | 13:13 | 23:18 26:7,11 | 171:16 176:17 |
| 138:22 139:1 | **phone** 194:14 | 26:24 28:11,20 | 177:12 178:11 |
| 139:19,22 | 194:16 | 31:3,6 39:1 | 178:15 188:16 |
| 140:2,5,10 | **phrase** 101:18 | 41:4 44:19 | 192:8 194:6,10 |
| 152:24 153:1,7 | **pick** 194:3 | 45:2,5 46:7,14 | 194:24 212:13 |
| 153:16 154:13 | **picked** 72:6 | 47:4,7,24 | 212:20 213:2,7 |
| 155:12,18 | **piece** 129:15 | 48:20 49:18 | 214:4,16 215:9 |
| 156:14,19 | 130:2,8 135:2 | 50:2,5,22 | 221:15 |
| 158:24 159:8 | 153:11 | 51:14,17,21 | **planes** 19:22 |
| 160:16 161:14 | **pieces** 141:7,10 | 52:9,21 53:9,9 | **play** 138:14 |
| 161:16 162:23 | 141:20 142:1 | 55:2,23 56:16 | 208:4 |
| 163:6,25 176:1 | 145:20,24 | 56:23 57:8 | **played** 136:3 |
| 176:13 177:14 | **pilots** 58:1 | 60:2,15,18,20 | **playing** 171:9 |
| 177:16,18 | **place** 62:1 | 70:17 71:3 | **plc** 95:3,20 |
| 178:8,20 | | 78:9 80:19,24 | 96:6 112:17 |

**[plc - price]**

221:18
**please**   5:16 6:9
  6:24 14:18
  51:3 66:19
  70:7 104:1
  187:7
**plots**   74:18
**plug**   61:7
**plugging**
  205:21
**plugs**   108:16
**plus**   177:3
**pocket**   41:19
  85:15 88:10
  89:3 90:18,25
  91:6,15,24
  92:7 94:6
  97:20 98:9
  99:23 109:16
  109:25 110:5
  110:19 114:12
  115:20,25
  116:5 117:10
  117:15,17,24
  122:17
**point**   8:14 12:7
  12:13 22:3,23
  45:8 83:3
  87:16 93:23
  94:7 97:11
  101:6 110:25
  121:16,19
  124:7,17,18
  129:22 130:1

134:5 137:19
137:25 138:8
138:20,23
149:20 154:6
155:21 157:16
177:1 178:7,13
178:17,20
179:9,22
180:21 181:11
202:5,13
215:23
**pointed**   51:13
**points**   29:1
  76:1 97:14
  138:22 155:18
  159:22 173:6
  177:14
**policy**   9:24
  201:22 203:24
**portion**   14:25
  64:10 66:20
  70:8 100:25
  104:2,23,24
  105:13 187:8
  192:13 198:11
  198:13,14
**portions**   19:8
  26:10,14,18
  27:3 185:22
**position**   48:1
**positive**   136:7
  150:12,13
  170:10

**positively**
  31:12
**possibilities**
  150:8
**possibility**   72:1
  72:8
**possible**   31:23
  32:3 35:1
  107:17 108:22
  108:24 109:1
  144:24 160:25
  161:20 180:4
  200:13
**possibly**   163:20
**post**   10:3
**potential**   45:18
  88:5 89:7
  174:21
**potentially**   7:4
  76:12,23 104:7
  154:17 158:15
  180:8 208:8
**power**   64:9,14
**powerful**
  192:19 195:13
  196:20
**practice**   64:7
  133:20
**practices**   164:2
**pre**   114:23
  115:2,18
**precipitate**
  175:19

**precise**   85:1
  106:10 134:15
  199:11
**precisely**   68:18
  84:13 90:14
  109:6 137:16
**predate**   190:16
**preferable**
  150:4 151:2
**prepare**   8:22
  209:5
**preparing**   85:5
  86:8 105:24
  217:25
**present**   4:11
  139:19 194:24
  208:14
**presented**
  119:7 137:10
**pretty**   102:17
  170:1
**prevail**   114:23
  116:11
**previous**   179:1
**previously**
  24:12 27:6
  35:22 51:8
  56:23 93:20
  210:8
**price**   15:11
  16:10 29:25
  30:18 31:9,13
  31:21 35:5
  62:23 63:5,12

**[price - proposed]**                                              Page 43

| | | | |
|---|---|---|---|
| 71:23 72:2 | 197:19,25 | 61:1 | **production** |
| 76:5,6,14 77:4 | 198:12,13,15 | **privileged** | 106:15 184:9 |
| 77:23 78:4 | 198:16,17,21 | 44:23 45:8 | 184:19 185:10 |
| 80:7 83:7 | 199:25 201:2,3 | 212:23 | 185:15 186:14 |
| 84:17 89:15,20 | 201:15 203:17 | **probability** | 187:5 189:7 |
| 90:6 92:14 | 203:17,18 | 104:20 106:21 | **productive** |
| 93:23,25 94:1 | 204:17 205:19 | 107:4 111:9 | 173:15,20 |
| 94:2 98:3,4,12 | 205:21 206:1,2 | 118:6,12 119:1 | **professional** |
| 98:13 107:13 | 206:12,20,23 | 119:12,13 | 11:20 |
| 108:18 111:15 | 208:2,2,6 | 121:7,8 | **professor** |
| 111:17 114:25 | **priced** 171:12 | **probably** 10:15 | 192:10,15,22 |
| 115:19 116:14 | **prices** 10:23 | 15:3,18 16:11 | 193:19 194:1 |
| 125:19,24,25 | 197:18 207:3 | 37:14 45:2 | 194:13,25 |
| 126:1 130:21 | **pricing** 143:24 | 47:5 67:8 | 195:4 196:11 |
| 131:22 132:5 | 171:7 199:22 | 87:20 96:10 | 196:13,23 |
| 132:11 134:7 | 200:10,18 | 138:8 140:11 | 197:6 |
| 134:13 135:14 | 201:10 205:17 | 159:10 183:5 | **profile** 11:22 |
| 135:17 136:8 | **primarily** 48:5 | 205:3 | 161:25 163:24 |
| 137:11,17,23 | 69:10 | **problem** 18:17 | 165:22 |
| 137:23 138:1,6 | **printing** 216:4 | 216:17 217:3 | **program** 206:7 |
| 138:19 139:9 | 216:8,17 217:3 | **proceed** 18:18 | **programmati...** |
| 140:1,21 142:9 | 217:12 | **process** 15:4,17 | 205:11 206:11 |
| 143:14 144:10 | **prior** 27:17 | 65:12 128:22 | **progression** |
| 145:3 146:10 | 30:8 98:4,5,15 | 129:6 132:2 | 165:17 166:1,3 |
| 146:16 147:9 | 119:8 139:15 | 154:18 166:11 | **properly** 66:11 |
| 150:10,10,17 | 139:17 156:23 | 167:5 | 104:12 190:17 |
| 150:19 152:22 | 157:3 170:15 | **processes** 109:4 | **proportionate** |
| 166:12 167:6 | 172:25 196:6 | 127:6,9 184:19 | 173:15 |
| 167:12 168:10 | 202:3 | **produce** 105:10 | **proposed** 37:6 |
| 169:18 171:5 | **prioritize** | **produced** 44:6 | 37:11,20 53:16 |
| 172:21 173:3,8 | 101:13 | 44:15 | 53:17 75:23 |
| 178:6 180:3,18 | **prioritizing** | **product** 195:17 | 76:7 77:2,21 |
| 180:20 181:1,4 | 48:14,22 49:1 | 196:14 | 78:2 79:22 |
| 181:8,10 | 56:19 60:7 | | 80:5,22 81:23 |

**[proposed - quickly]**                                                                  Page 44

106:2 122:20
123:8,23
124:11,22
140:10 153:16
155:11 156:18
176:13 183:8
183:11,15
185:20 186:1
189:18 192:2
204:22 209:13
212:14,20
213:7,11,20
215:9
**prosecution**
29:13 185:2
**protective**
95:18
**prove** 128:19
128:19,20
153:22 155:15
**provide** 16:20
17:9 46:13
47:8 134:22
148:7
**provided** 9:5
21:15,20,22
115:16 125:4
151:9
**provides** 31:8
46:18 87:22
88:7 135:16
139:13 168:16
**providing** 88:3
192:7

**public** 2:17
9:24 52:15
60:6,22 63:11
76:4 177:4
219:21 220:7
**publically** 95:7
**puffery** 52:13
**purchase** 88:13
88:15 89:1
91:8
**purchased**
211:14
**purchasers**
80:21 83:6
115:1 116:15
208:25 209:1
**purely** 158:4
217:3
**purports** 28:21
**purpose** 146:6
198:8
**purposes** 57:5
133:9 135:3
201:24 202:14
**pursuant** 2:14
115:19
**push** 45:14
**put** 34:12 53:8
85:17 126:14
134:17 137:9
192:6 193:25
197:10 204:25
**puts** 92:4

**q**

**qualified**
131:11
**quality** 83:12
83:22 86:5
**quantification**
125:9,14
126:13,23
**quantified**
27:12 122:19
**quantifies**
123:20
**quantify** 98:2
98:10 110:7
124:25 126:8
130:19 135:13
137:22 140:18
146:25 152:21
**quantifying**
43:9 124:10,20
152:20
**quantitative**
68:8
**quarter** 142:13
142:16 143:7
144:18
**question** 8:15
14:18 18:20
25:14 30:14
31:16 32:19
40:25 41:12
42:23 44:22
45:15 46:24

51:5,7,16
66:22 67:12
68:1 81:1 85:3
85:5 87:15
95:11,23 96:2
100:17 103:3
109:4,6,10
113:9 118:12
124:14,24
127:1,2,4,13
129:20,25
132:18 134:15
142:22 147:17
152:21 159:5
161:7 169:5,24
179:24 181:17
182:22 188:9
193:7,10,15,15
199:13 209:15
212:25
**questioning**
217:16
**questions** 20:5
21:17 33:16
34:20 45:23
96:2 113:4
122:14 130:6
165:6 168:23
169:2 180:17
193:12 215:15
215:19 217:18
218:4,6
**quickly** 14:20

**[quite - recertified]**                                                    Page 45

| | | | |
|---|---|---|---|
| **quite** 98:16 | 85:12 186:3 | **realized** 97:19 | **reasons** 25:9 |
| **quotation** | **reaching** 49:14 | **really** 15:5 40:9 | 131:14 159:16 |
| 51:25 52:20 | 78:13 82:13 | 45:7 111:20 | 181:6,7 192:19 |
| **quote** 48:12 | **react** 10:23 | 124:13 129:19 | 221:11 |
| 50:16 52:11 | **reacted** 180:21 | 130:13 148:22 | **reassure** 52:14 |
| 55:25 56:1 | **reaction** 62:24 | 150:16 151:12 | **recall** 7:2,7,9 |
| 98:1 140:3 | 134:7 144:1 | 152:12,15 | 7:11,16 11:15 |
| 189:2 190:11 | **reactions** | 160:2 171:8 | 11:16 20:14,19 |
| 214:6 | 130:21 137:24 | 173:19 174:20 | 20:23 21:3,19 |
| **quoted** 26:19 | 138:6,19 | 200:14 208:16 | 24:16,20,22 |
| **quotes** 26:1 | **read** 14:18,25 | **realtime** 2:16 | 26:6,13,17 |
| **quoting** 27:2 | 19:6,9 20:14 | 220:6 | 27:15,16,23,25 |
| 52:9 | 20:20,24 21:9 | **reason** 13:12 | 33:9 36:3,4,7,9 |
| | 21:13,19 48:1 | 15:12 21:4,21 | 36:14 37:22,24 |
| **r** | 48:6 51:1 52:4 | 31:8 37:17 | 54:12,15,17,20 |
| | 55:18 56:5,8 | 71:18 78:14 | 54:25 66:6 |
| **r** 3:1 122:1 | 56:10,11 57:17 | 84:13 85:1 | 70:11,20 73:25 |
| 220:1 222:3,3 | 59:9,17 66:19 | 135:9 204:10 | 74:1 78:12 |
| **range** 10:19 | 66:20 70:7,8 | 217:12 222:6,9 | 79:10 86:13,19 |
| 33:12 35:14 | 86:17 96:21 | 222:12,15,18 | 87:14 90:19 |
| 73:12 74:4 | 104:1,2 105:13 | 222:21 | 92:6 95:8 |
| 87:8 | 105:13 165:4 | **reasonable** | 106:17 114:1,2 |
| **rate** 173:25 | 166:22 167:15 | 67:7,8,21 | 123:15 143:21 |
| 201:5 202:4 | 167:18,23 | 68:15 74:16,25 | 149:19,25 |
| 206:23 | 168:13,18 | 121:15,19 | 151:23 163:2 |
| **rather** 58:14 | 187:7,8 219:5 | 129:9 137:10 | 184:1,2 185:21 |
| 97:3 99:15,25 | **reading** 47:6 | 140:1 148:21 | 186:9 204:20 |
| 115:11 116:5 | 179:16 | 151:10 159:24 | 214:8 |
| 165:14 174:23 | **reads** 47:14 | 172:16 173:5 | **recently** 38:20 |
| **rational** 165:21 | 57:22 114:9 | 174:5,15 181:2 | 175:6 |
| **rationale** 64:15 | 132:24 165:9 | 205:18 214:19 | **recertification** |
| **reach** 44:11 | **real** 208:14 | 215:8 | 189:7 |
| 194:1 | **reality** 111:12 | **reasonably** | **recertified** |
| **reached** 45:11 | 170:21 | 165:12 176:11 | 183:24 |
| 69:13 70:12 | | | |

[recess - relevant]                                                    Page 46

recess  62:17
  121:24 172:3
recklessly  97:1
recognize
  30:12 95:24
  202:17
recognizing
  20:13
recollection
  22:15 33:8
  48:5 86:16
  114:19 185:16
  194:20
reconsideration
  113:20,23
  114:18
record  5:2 6:19
  6:25 14:25
  62:16,19 66:20
  70:8 104:2
  121:23 122:4
  151:17 165:4
  172:2,5 187:8
  218:8,13
  220:12
recorded  5:4
records  7:15
  126:19
recover  210:2
recoverable
  92:12
reduce  60:24
refer  33:7
  76:10 77:16

  89:5 95:25
  100:17 120:17
  166:6 213:22
reference  7:24
  23:4 34:15
  40:22 41:11
  83:10,15,20
  86:3 146:5
  147:4 152:3
  184:13 200:5
referenced
  110:1 176:7
references
  82:14 84:3
referencing
  128:8 151:19
referred  55:15
  58:8 79:13
  86:2 94:20
  99:11 119:8
  140:7 151:18
  179:2 182:4
  211:18,21
referring  23:7
  23:9 52:7
  55:24 56:6
  90:21 93:16
  94:5 99:3
  100:18 110:19
  112:10 128:13
  128:13 213:23
reflect  74:16
  105:5

reflected  57:10
reflective
  125:24
reflects  157:5
regard  212:17
regarding
  47:17 105:21
regardless
  203:14
regression
  63:17 64:9,12
  72:23 75:22
  198:5 199:5,11
regular  64:6
regularly  40:11
  65:19
regulations
  105:8
regulatory  29:9
reinstated
  202:9
relate  48:3
  113:18
related  48:5
  49:21 50:17,24
  51:10 60:25
  103:23 105:3,4
  105:6,8,11
  107:2,5 116:12
  117:19,21
  118:10,13,15
  121:7 125:22
  137:18 152:21
  160:18 163:13

  167:11 168:5
  170:24 179:13
  189:11 220:15
relatedly  50:16
relates  28:13
  81:8
relationship
  63:11 76:3
  208:1
relative  141:17
  144:20 165:19
release  142:16
  143:16 144:8
  197:20
released  76:24
  142:2,5 144:19
  146:18
relevance  40:6
  41:25
relevant  16:16
  17:13 21:7
  34:16 42:9
  59:22 76:12,23
  96:25 99:1
  100:5 101:1,5
  107:11 118:22
  122:19 129:23
  130:22 131:1
  132:22 133:2
  135:19 141:4
  145:8 153:24
  154:3 159:18
  171:6 180:25
  191:17 192:10

[relevant - respect]                                                            Page 47

| | | | |
|---|---|---|---|
| 198:10 205:3 | 52:14 53:6,10 | 109:12,14 | 190:24 196:6 |
| 208:21 | 57:10 | 110:2,10 | 209:19,20,24 |
| **reliable** 144:10 | **repetition** | 115:24 119:4,7 | 211:7 |
| **relied** 195:10 | 49:20 50:16,24 | 120:16 125:5,7 | **represent** |
| **relies** 109:18 | 51:9 160:16 | 126:21 127:24 | 55:11 97:6 |
| **rely** 195:3,17 | 161:12 163:12 | 130:17 133:7,8 | 98:2 101:22 |
| 196:14 | 167:11,16,19 | 133:15 134:20 | **representation** |
| **remain** 158:13 | 168:3 | 134:22 135:12 | 16:8 |
| **remainder** | **report** 7:18,21 | 137:4 140:8 | **representations** |
| 148:8 | 8:2,6,10,15,17 | 146:4 147:4 | 56:17 |
| **remember** 28:5 | 8:23,24 9:7 | 153:5 164:21 | **represented** |
| 36:1,8,16 38:1 | 11:6,8,9,13,15 | 165:8 166:22 | 100:11 102:2 |
| 39:5 46:21 | 12:19 13:16,17 | 172:9 188:17 | **representing** |
| 68:18 86:11 | 14:15 16:13,17 | 192:8,10,18 | 5:12 6:21 |
| 87:17 106:10 | 16:22 17:1,11 | 193:2 194:23 | **represents** |
| 106:11 151:4 | 17:14 18:4,24 | 195:6,20 196:3 | 93:17 94:15 |
| 183:18,19 | 20:6 38:4,9,19 | 196:9,19 197:1 | **reprice** 204:2 |
| 184:5,12,13 | 42:25 43:3 | 197:5,12 | **require** 129:16 |
| 185:5,6,14,23 | 44:13 45:22,24 | 215:20,25 | 130:9 147:8 |
| 187:9,11 203:3 | 46:2 57:15 | 217:22,24 | 161:2 176:15 |
| 203:4 214:9 | 59:25 72:16 | 221:7,17 | 176:24 177:16 |
| **remove** 65:6 | 74:6 75:1 | **reportable** 20:8 | 178:14 |
| 145:3 | 76:18 78:20,21 | **reported** 1:22 | **required** |
| **rene** 120:20,22 | 79:14,19 80:13 | **reporter** 2:16 | 138:11 140:15 |
| **renton** 62:8 | 81:2,7,18 | 5:13 6:9 220:6 | 178:16 219:14 |
| **repeat** 51:5 | 83:24 84:5 | **reports** 17:6 | **requirements** |
| 142:18 | 85:6,17 86:9 | 59:16 82:22 | 29:9 42:13 |
| **repeated** 57:1 | 86:17,22 87:21 | 84:6,13,25 | **requires** 110:6 |
| 161:9 163:25 | 88:24 89:7 | 87:1,12 119:7 | 125:10,18,23 |
| 166:10 167:3 | 90:10,22,24 | 119:9 151:9 | 139:17 |
| 168:15 | 92:17,17 95:2 | 179:17 181:22 | **resolving** |
| **repeatedly** | 95:19 96:3,13 | 182:2,10,19 | 189:11 |
| 48:13,18,25 | 96:20 97:22,23 | 183:2,7 184:17 | **respect** 29:17 |
| 49:5,11,16,16 | 101:10 105:25 | 185:9,14 | 128:11 151:3 |

**[respect - right]**                                                    Page 48

| | | | |
|---|---|---|---|
| 192:12 199:17 | **retentions** | 69:6 182:19 | 96:16 99:17 |
| **respected** | 10:19 | 183:6 190:23 | 101:19,23 |
| 120:24 | **retroactive** | 217:24 | 102:4,10 |
| **responded** | 30:17 | **reviewed** 8:23 | 106:16 107:2 |
| 136:8 | **return** 63:22 | 8:23 9:3 16:4 | 110:21 113:15 |
| **responds** 76:14 | 133:24 134:17 | 20:21 44:14 | 113:25 115:12 |
| **response** 76:6 | 134:24 135:13 | 51:4 54:16 | 118:2,13 |
| **responsive** | 136:11,12 | 58:24 65:24 | 121:16 123:10 |
| 166:9,13 | 198:7 | 68:16,19 82:8 | 123:14 124:5 |
| **rest** 200:16 | **returns** 64:10 | 85:25 106:1 | 127:9,13 130:1 |
| **result** 78:3 83:7 | **retype** 85:7,19 | 114:10 181:21 | 130:7,12 131:4 |
| 84:17 110:14 | **retyped** 85:23 | 182:10,20 | 132:22 133:3 |
| 111:5 116:21 | **reveal** 44:23 | **reviewing** 21:3 | 133:17 136:19 |
| 123:17 166:5 | 130:21,25 | 23:18 26:6 | 137:7 141:22 |
| 205:20 | 133:2 | 74:23 86:10 | 142:20,23 |
| **resulted** 77:3 | **revealed** 32:24 | **rhode** 3:4 | 144:15 147:3,6 |
| 77:22 80:6 | 33:4 34:3 | **richard** 4:7 | 147:21 149:1 |
| 166:12 167:5 | 35:24 37:3 | **rick** 6:1,19 | 153:9,13 154:7 |
| 167:12 | 61:6 94:14 | **right** 12:1 | 154:13 155:3 |
| **results** 74:15 | 97:5 100:9,25 | 13:11 17:21 | 156:9 157:13 |
| 74:24 78:21 | 102:9 132:4,22 | 20:18,22 24:23 | 157:20 158:3,8 |
| 197:25 | 221:14 | 29:2,17 34:15 | 158:14 166:20 |
| **resume** 122:13 | **reveals** 93:3 | 35:9 36:24 | 166:25 167:13 |
| 202:12 | 100:5 | 37:8,9,16 | 168:2,11 169:3 |
| **resumed** 122:6 | **revelation** | 42:24 46:20 | 170:12 171:2 |
| 184:2 189:8 | 88:19 118:7 | 51:4 53:5 | 178:23 179:10 |
| **retained** 7:12 | 141:3 145:7 | 54:11,24 56:6 | 180:7,10 181:5 |
| 10:9 12:5,6,10 | **revenue** 150:16 | 57:11 58:6 | 182:5 184:11 |
| 44:18 90:12 | 150:17 | 63:17 64:24 | 184:23 185:4 |
| 99:17 138:18 | **review** 16:9 | 75:9 76:11,18 | 185:13 186:4 |
| 207:12 218:11 | 19:18 20:1 | 76:19 81:9,15 | 186:24 188:22 |
| **retention** 45:1 | 21:4,22 23:3 | 83:13 84:11 | 193:20 200:22 |
| 45:1 | 24:2 48:24 | 87:19 89:10 | 201:7,12 205:7 |
| | 59:6 68:23 | 94:22 95:9 | 205:23 206:25 |

**[right - securities]** Page 49

209:8,13
213:24 216:7
**risk** 60:24
92:25 93:9,20
94:4,11,13,16
96:24 97:2,7
97:13,17 98:6
98:15 99:1,11
100:12 101:3
102:2,3 103:7
103:9,23,24
104:10,13
105:3 109:19
110:15,25
111:5,8,19,22
114:25 115:4
116:1,6,14,23
117:7,16,22,25
118:1 160:15
161:11,25
163:5 165:10
169:9,11,15,16
169:19 170:6,8
170:9,9,10,18
170:20,22,24
171:7 201:5
206:23
**risks** 66:15
93:13 110:4
**robbins** 3:11
**robust** 196:5,9
**role** 39:4 136:3
164:17 208:4

**root** 62:2
**roughly** 29:21
81:10 213:21
**rudman** 3:11
**rule** 22:5 71:24
88:21 95:14
152:13
**ruled** 21:24
**rulings** 127:19
**run** 23:15

**s**

**s** 3:1 122:1,1,1
222:3
**s&p** 63:21 65:2
65:17 67:24
68:13 69:1,8
**safe** 47:18,21
105:22
**safer** 103:18
**safety** 48:14,22
49:1,21 50:17
50:24 51:10
53:11 56:1,19
60:7,25 61:1
83:12,22 86:4
101:13 103:23
104:7,9,17
105:3,4,12,16
107:2,5 109:4
116:12,23
117:19,21,22
118:6,10,13
119:1 121:7

160:18 161:25
163:13,24
164:1 165:22
166:11 167:5
167:11 168:5
189:11
**sale** 88:14 89:3
91:10
**samantha** 4:9
6:4
**sat** 85:23
**saw** 22:21 24:5
57:4 167:8
184:17
**saying** 30:5
31:17 43:14,14
56:12 97:23
99:3 117:18
133:18 134:24
135:18 155:25
157:20 168:2
**says** 8:4 11:20
47:13 48:16
50:16 97:10
135:20
**scenario**
161:21,22
169:17 175:8,9
**scenarios**
157:14 175:7
**scholes** 199:23
200:19,21
201:9 203:7
206:16

**school** 10:3
**season** 7:9
**sec** 169:23
**second** 14:1
33:2 38:9 51:2
52:3,5 55:4
98:24 99:14
110:9,11
113:24 121:17
125:8 193:6
216:1,22
**section** 22:5
23:10 28:7
32:24 34:23
38:9 54:19
81:2,6,7,18
82:3,17 83:24
84:4,12 85:6
86:8,17 87:21
89:22 90:9
91:2,16 125:16
127:12 145:1
148:11 158:21
158:24 159:9
197:12 207:14
210:16
**sections** 23:14
23:15 24:7
**securities** 1:5
5:7 10:10,22
10:24 12:3,23
15:14 18:13
19:3 20:16
21:14 22:11

**[securities - several]**                                                    Page 50

24:14 27:7
35:23 37:18
38:11,22 40:7
42:18 52:2,10
53:14,21 54:20
55:13 63:6
64:18 77:15
87:23 95:4,21
96:5,6 108:5
112:17 113:11
149:12,17
151:8,20
164:22 165:8
207:13 210:20
211:9,11 214:8
219:1 221:10
221:18 222:1
**security** 11:22
20:10 64:11
70:15 71:16
97:3
**see** 11:23 20:10
25:21,23 27:1
27:4 29:6 33:3
35:12,19,21
47:18 50:15,18
50:19 51:24
52:4,6,7,18
53:2 55:9 56:3
56:6,20 57:20
58:2 60:8
68:20 71:6
75:9,14,24
78:16 94:9

95:6 102:5
105:14 107:7
110:16 114:7
114:13 115:5
115:21 119:15
122:13 125:11
128:5 130:23
143:3,8,25
146:13 166:16
189:13,14
190:20,21
195:25 196:6
197:22 200:3
213:2 214:14
217:4
**seeing** 26:13,17
74:24 184:13
**seeking** 90:1
92:6 136:23
**seem** 169:13
214:19 215:8
**seems** 96:13
191:1 208:19
213:21
**seen** 25:15
50:10 53:25
54:1,2,4,5
59:17 89:23
91:25 94:20
97:12 127:20
138:8 148:2,5
148:10,12
149:11 185:9
188:10,18

189:1
**segment** 19:17
19:20 20:17,17
69:4 71:9,12
**segments** 19:25
20:8 151:25
**select** 38:15
**selected** 67:7
67:20
**selection** 188:1
188:6 221:23
**selling** 183:16
**sense** 30:15
49:7,8 101:25
170:13 173:23
174:10 179:17
194:7 213:4
**sensitive** 204:7
**sentence** 47:12
47:14 48:10
50:14 51:14
55:5 56:14
57:17,22 58:4
60:5 97:22
99:2,24 110:11
125:8 130:16
197:16
**sentences** 61:4
98:24 99:14
**separate** 44:25
54:9,13,18
72:25 73:6,20
75:19 128:23
141:9,20

145:20 152:21
**separated** 15:2
144:9
**september**
36:20,22 75:5
157:25 168:7
183:22
**series** 61:6
204:24,25
205:12 217:5
**serve** 7:12
31:19
**served** 11:21
12:4 13:5
210:8,14
**services** 20:10
20:17
**serving** 7:4
**set** 14:14 16:25
17:14 18:4,23
19:15 177:17
179:4 196:3,9
197:5 220:10
220:20
**setting** 11:20
**settlement**
120:11
**settlements**
210:20,23
**seven** 37:7
217:17
**several** 87:16
92:5 154:10

**[severe - specific]** Page 51

| | | | |
|---|---|---|---|
| **severe** 160:15 165:11 | **showed** 77:3,20 | 134:8 168:5 | **somewhat** 75:15 |
| **severity** 165:13 | **shows** 74:6,9 74:19 182:17 | **sir** 6:24 18:20 113:9 | **sorry** 98:5 107:25 200:25 |
| **shape** 166:6 195:18 | **side** 95:17 192:7 | **sit** 20:18,22 30:11 42:24 54:11,24 70:21 130:1,12 137:7 153:18 154:4 | **sort** 27:11 28:16 31:12 54:6,11 65:19 75:9 92:3 94:7 112:9 115:7 117:16 134:2 148:5 151:1 153:18 161:4 179:17 199:15 206:3 208:12 216:3 |
| **share** 80:20 88:24 90:3 91:8,9 111:14 122:18,22 123:3,4,5,21 124:10,12,20 125:1,10,15 126:9,12,15,24 129:9,10 138:16 139:10 139:12,15 152:25 153:6 153:16 154:12 156:17 157:24 158:12 166:2 176:12 179:21 191:21,24 200:15 207:10 209:7,8,21 | **signature** 96:15 113:14 220:23 | | |
| | **significance** 77:11 79:2 80:1 132:7 136:1 | **sitting** 15:21 24:21 119:20 119:25 120:5 124:8 130:6 147:3,6 149:1 182:7 | |
| | **significant** 49:4 49:7,10 77:4 77:17,23 78:4 79:9 80:7 131:21 132:5 132:10 134:23 136:5,13 217:6 | | |
| | | **situation** 94:7 120:12 132:8 169:15,15 171:14 | **sorts** 128:21 177:22 |
| | **similar** 66:13 66:14 67:4 87:16 109:3 120:12 | **six** 77:3 200:22 201:11 217:4 | **sound** 13:10 37:16 |
| | | **size** 107:21 108:24 | **sounds** 37:9 94:23 |
| | **similarly** 167:8 | **skimmed** 19:9 | **source** 23:11 |
| **shares** 116:17 211:14 | **simplifying** 202:24 203:12 | **slightly** 161:6 | **space** 20:9,16 |
| | | **slowly** 18:18 | **speak** 38:20 |
| **shield** 5:24,24 | **simply** 18:21 25:15 51:16 59:21 135:6 165:14 190:12 | **small** 86:11 | **speaking** 67:2 |
| **shields** 3:9 | | **software** 57:25 58:13 59:21 | **specific** 22:14 34:20 37:22 40:22 41:11,12 68:7 70:20 72:8 74:22 78:13 82:11,14 84:3 86:3,7,15 87:15,15 88:3 88:8,22,22 |
| **short** 75:10 169:7 198:3 | | **sold** 211:14 | |
| **shorthand** 2:16 220:6 | **simultaneously** 141:8,13 145:24 | **solely** 105:2 118:15,25 136:20 | |
| | | **solutions** 5:12 5:15 218:12 | |
| **show** 75:2 187:14 217:13 | **single** 17:5 19:9 19:11 33:22 | | |

**[specific - statistical]** <span style="float:right">Page 52</span>

89:9,12 90:10
96:1 97:15
99:4,7,16,21,21
106:17 132:17
132:17 138:12
138:13 139:1
140:14 141:7
141:21 145:4
145:21,25
147:6,17,18
151:13,13
153:8,17
154:22 160:8
175:20,20
176:2 184:13
185:6,16
191:11,19
193:3 204:16
206:3 213:23
214:9
**specifically** 7:7
19:22 20:19
29:4 34:8
46:25 47:14
57:24 93:16
97:16 98:7
123:15 124:19
**specifications**
106:16
**specificity**
46:14,19 62:11
114:2
**specified**
122:23

**specify** 65:14
148:23
**speculating**
103:13 129:19
129:25
**speculative**
102:25
**spend** 14:14
81:17 82:2
**spent** 10:21
11:3 82:9,15
**spot** 193:25
**ss** 220:3
**stable** 105:9
118:20
**stage** 12:18
128:15 150:15
**staircase** 166:5
166:7
**stamping** 95:6
**stand** 36:12,13
119:22 120:8
**standard** 41:6
74:7 84:22
85:14,21 86:7
91:1
**standing** 168:8
**stands** 16:19
**start** 28:25
62:20 87:10
122:16 131:17
153:19 185:25
198:9 208:18

**started** 6:18
30:1 138:19
156:8
**starting** 13:2
128:17 129:22
137:25 138:8
138:20,23
153:21 154:1
**starts** 29:11,20
55:5 57:19
130:20 164:25
165:1 197:18
**state** 2:17 5:16
6:24 60:6 61:5
92:20 96:23
110:10 114:21
128:2 130:18
133:6 147:13
153:5 172:14
189:5,16 190:1
197:16 220:2,7
**stated** 42:9
94:16,21 99:15
142:12
**statement**
11:25 12:25
14:9 30:17,19
31:13 43:24
57:12 102:16
102:20 142:13
143:11,17
144:2,17
147:21 168:6,7
168:19,21

184:21 190:25
203:3
**statements**
22:19 23:6,21
24:6,15 26:2,8
26:10,22 27:3
27:9,14,17
28:10,14,21
29:8 30:1,8
31:7 32:7,13
32:14 47:9,17
48:3,18,21
49:1,5,10,21
50:17,25 51:10
52:12,13,17
53:5,11 56:24
57:9 59:24
60:1 78:9
99:20 100:11
100:13 102:4
105:21 107:10
116:13 117:20
117:21 118:11
143:23 153:24
155:20 163:13
167:12,20
168:3,16,24
190:13,19
**states** 1:1 5:8
25:25 48:10
143:5 185:3
**stating** 61:12
**statistical** 73:3
74:3,22 77:11

**[statistical - sullivan]** Page 53

| | | | |
|---|---|---|---|
| 77:15 79:2,25 136:1 | 144:10 152:23 166:12 167:6 168:10 169:18 171:5 173:3,8 176:12 178:6 180:3,20 197:17 198:2,6 198:11,12,13 198:15,22,23 199:6 200:7,16 201:2,5,7 203:19 205:21 206:1,22,24 208:3,7,25 209:3,7,21 213:10,18 | 64:7,22 66:5 66:12 77:2,20 78:5,21 79:20 80:10 130:20 133:6,14 134:19 135:7 135:10 136:13 137:2 141:8,14 141:19 142:4,7 143:13 145:19 198:1,5,10 199:10 | 25:2,4,19 84:6 96:4 166:23 188:17,25 |
| **statistically** 77:3,17,22 78:3 80:7 131:21 132:10 134:23 136:4 217:5 | | | **submitting** 17:11 44:13 114:3 |
| **stays** 110:22 | | | **subperiods** 75:21 |
| **steering** 70:23 | | **studying** 177:19 | **subscribed** 219:16 |
| **step** 59:14 102:13 126:18 207:24 | | **stulz** 119:7 120:16,20,22 | **subsections** 22:22 23:20 |
| | | | **subsequent** 193:11 217:23 |
| **steps** 60:24 | | **stylized** 173:12 173:16 | **substantial** 36:5,10,11 201:21 203:23 |
| **stock** 13:23 14:16 16:10 29:25 30:18 31:10,13,21 32:16 35:5 63:13 71:23 72:2,18 76:5,6 80:21 81:4,8 82:24 84:17 89:15,21 90:6 107:14 108:18 111:15,17 115:1 122:15 122:19 123:1,1 123:22 124:11 124:21 131:22 132:5,11 135:14,17 136:22 137:22 138:1 140:1 | **stocks** 116:16 | **subcategories** 26:22 28:16 34:23 | **substantive** 86:12 189:8 |
| | **stopped** 184:14 | **subclass** 115:2 115:18 | **substituted** 67:12 |
| | **stopping** 121:15,19 | **subheadings** 26:9 28:8 33:11 35:2 | **sucharow** 3:3 |
| | **story** 15:10 | | **suffered** 214:6 |
| | **strange** 216:4 | | **sufficiently** 111:11 144:8 |
| | **strategies** 208:24 | | |
| | **strategy** 208:1 208:5 | **subject** 28:13 30:13 59:8 64:11 85:3 114:16 | **suggest** 139:16 159:20 173:20 |
| | **street** 2:13 4:5 | | **suggesting** 31:11 144:12 160:4 162:11 |
| | **strike** 201:2 204:17 206:1 206:12,20 208:2 | **submit** 12:19 87:2 113:10 | **suggests** 58:25 |
| | **studied** 70:13 | **submitted** 7:18 8:17 11:9,13 | **sullivan** 2:13 4:3 6:2,5,7 |
| | **study** 62:25 63:3,8,18,24 | | |

**[summaries - testifying]** Page 54

| | | | |
|---|---|---|---|
| **summaries** 17:4 | 14:24 16:6 | 94:3 96:18 | 148:6,10 149:3 |
| **summarize** 14:11 16:14 17:8 60:17 79:20 | 67:9 70:22 87:7 125:6 136:19 142:23 151:17 169:23 173:12 207:19 207:21 208:5 209:1 215:24 | 102:13 108:10 114:5 120:7 121:14 126:19 127:23 142:24 155:23 156:1 164:20 169:6 171:23 181:9 184:16 193:14 195:16 200:19 205:24 206:8 206:18 214:12 | 149:10,14,15 152:3 |
| **summarized** 61:17 81:5 131:4 | | | **tell** 127:21 |
| | | | **telling** 15:9 127:15 |
| | **surged** 185:19 | | **tells** 190:11 |
| **summarizing** 46:16 | **surprise** 71:12 106:18 215:4 | | **template** 84:12 85:10,17,22 86:7 |
| **summary** 9:2 16:11,20 17:9 46:7,10,18 63:15 91:4 160:13 | **surrounding** 183:9 192:1 203:9 212:2 | | **tend** 64:17 |
| | **suspended** 187:4 202:2,5 202:8 203:10 | **taken** 5:5 62:17 89:16 93:22 112:4 121:24 172:3 | **term** 84:11 90:20 93:12 97:13 |
| **supply** 184:18 | | | **terms** 9:21 18:5 67:17 74:17 137:16 138:15 155:4 168:10 174:14 182:12 205:25 209:18 |
| **support** 7:19 8:7,24 9:3 25:5 58:4 136:17 160:6 166:23 187:23 188:4 221:21 | **swear** 6:9 119:23 120:8 | **takes** 166:5 206:16 | |
| | **sworn** 6:11 219:16 220:11 | **talk** 202:13 | |
| | **system** 57:25 106:15 189:11 | **talked** 41:1 127:18 | **test** 73:3 76:9 196:4,17 |
| **supports** 136:16 | | **talking** 75:18 100:20 109:11 112:2 141:23 152:19 169:14 | **testified** 6:12 71:13 85:2,15 198:4 |
| | **t** | | |
| **supposedly** 93:4 102:1,9 133:1 | **t** 122:1 220:1,1 222:3,3 | **task** 197:17 | **testify** 39:14 119:17 120:2 |
| | **tail** 195:21 | **technique** 63:4 130:19 139:23 147:15 148:15 150:4 176:7,8 176:9 | **testifying** 7:4 7:12 10:9 11:21 12:4,15 12:17,23 13:5 22:12 24:13 27:7 35:23 37:19 91:18,23 |
| **suppressed** 184:22 | **tailored** 198:7 | | |
| **supreme** 39:9 40:5,13 | **take** 16:13 28:18 45:16 50:20 59:14 60:23 62:12 70:23 92:16 | **techniques** 87:22 146:3,5 146:12 147:24 | |
| **sure** 7:1,15 10:17,20 14:22 | | | |

**[testifying - threshold]**

| | | | |
|---|---|---|---|
| 149:18,22 | 97:13,17 99:1 | 54:3 56:5 | 189:25 190:4 |
| 158:20 207:12 | 99:3,4,8,13 | 57:12 67:5,6 | 193:8,9,12,24 |
| **testimony** 12:8 | 100:8 103:16 | 67:14,17,18 | 194:19 195:10 |
| 119:5 218:9 | 103:21 104:16 | 76:19 78:25 | 200:13 203:25 |
| 219:10 220:12 | 104:19 109:19 | 83:9 84:2 85:2 | 204:23 205:23 |
| **testing** 199:8 | 116:6 118:25 | 85:9 87:6 91:4 | 207:6 208:12 |
| **tests** 74:22 | 124:4 163:15 | 91:12,14,25 | 213:12,25 |
| **text** 79:13 | 164:2 166:9 | 96:9,9 102:12 | 216:4,18 |
| 83:16 | 171:16 | 103:20 104:25 | 217:10 |
| **thank** 8:13 | **thing** 22:16 | 105:1,11 | **thinking** 82:12 |
| 13:17 14:23 | 54:11 88:25 | 106:19 107:3,3 | 150:9 |
| 25:12 32:20 | 96:9 109:1 | 107:13,24 | **third** 65:16,17 |
| 34:18 98:21 | 112:9 140:12 | 109:9 111:6 | 65:22 98:24 |
| 112:11 122:12 | 153:18 181:2 | 116:21,24 | 99:14,24 |
| 174:12 218:13 | 215:17 | 118:3,8,14,15 | 176:10 |
| **theme** 60:15 | **things** 17:5 | 118:16,24,25 | **thirteen** 164:25 |
| **theoretical** | 54:9 59:16,17 | 120:22 123:7 | **thought** 16:8 |
| 196:15 199:21 | 77:16 79:9 | 123:12 127:8 | 54:10 98:8 |
| 200:10 201:10 | 101:14,16 | 127:19 130:3,7 | 109:5,7 127:17 |
| 205:17 | 120:25 121:2 | 132:13,16 | 129:19 151:9 |
| **theoretically** | 128:14 129:10 | 135:9 136:18 | 164:16 169:2 |
| 31:23 32:2 | 133:25 141:18 | 137:8,9 140:7 | 170:1 179:23 |
| 160:25 161:19 | 177:22 186:22 | 140:17 142:25 | 180:13,16 |
| 162:16 180:4 | 187:10 206:17 | 150:7 153:13 | 192:14 194:7 |
| 205:15 208:10 | 218:2 | 154:1,5,14 | **thoughtfully** |
| 208:23 | **think** 9:1 12:6 | 159:4,10 161:3 | 130:13 |
| **theories** 54:7 | 12:25 13:15 | 161:19 162:10 | **thousand** 37:14 |
| 92:10,12 | 16:20 21:6 | 167:17 168:14 | **thousands** 17:6 |
| **theory** 14:8 | 29:9 30:4,23 | 170:5,12 171:8 | 17:6 205:12 |
| 16:3 41:4 | 32:12,20,23 | 171:13 174:18 | **three** 20:8 81:8 |
| 52:21 53:4 | 35:13 41:1 | 175:16 176:24 | 112:24 194:19 |
| 57:9 80:24 | 43:2,25 44:17 | 178:10 179:1 | **threshold** |
| 89:13,19,22 | 45:9,12 47:5 | 180:1 185:8 | 77:10,18 |
| 94:11 96:24 | 50:1 51:15 | 186:21,25 | |

**[thursday - triple]**                                      Page 56

| | | | |
|---|---|---|---|
| **thursday** 9:13 | 177:21 178:7 | **today's** 8:22 | **traded** 70:15 |
| **tied** 99:16 | 178:10,13,17 | 44:17 45:6 | 71:16 125:25 |
| **ties** 109:13 | 178:20 179:9 | 217:25 218:9 | 204:21 205:4 |
| **time** 5:16 10:18 | 179:19 180:3,6 | **together** 25:4 | **trader** 208:9 |
| 14:13,19 15:2 | 180:7,21 | 64:18 195:13 | 211:19,19 |
| 22:23 29:1 | 181:11 183:13 | **told** 29:19 | 212:8 |
| 39:23 59:11 | 183:20 184:15 | 174:3,6 181:20 | **trading** 30:19 |
| 62:14,19 73:8 | 186:6 187:11 | 189:2 | 37:10,15 |
| 74:14 81:17 | 190:2 191:16 | **tomorrow** | 122:20 123:9 |
| 82:2,16 86:17 | 197:20 201:3 | 129:12 | 123:22 124:11 |
| 88:12,14,15 | 202:13 204:17 | **took** 15:2 85:21 | 124:21 126:19 |
| 89:1,2,24 91:8 | 206:2,12,19,21 | **tools** 145:23 | 205:1 207:25 |
| 91:10 92:14 | 211:15 217:16 | **top** 11:17,19 | 208:24 211:13 |
| 93:24 94:4 | 218:14 | 28:1,5 38:1 | 211:17 |
| 97:15 120:5 | **timeframe** | 54:12,15 74:1 | **traditional** |
| 121:21 122:2,4 | 194:21 | 130:17 177:25 | 97:20 |
| 124:17 126:2 | **times** 10:8,13 | 184:4,7 185:24 | **transaction** |
| 138:22,25 | 24:5 40:8 | 214:2 | 208:15 |
| 141:22,24 | 75:16 85:16 | **topic** 194:2 | **transactions** |
| 142:6 143:25 | 86:25 121:1,2 | **total** 13:10 | 208:13,15,18 |
| 144:9 145:22 | 138:13 142:3 | 23:24 26:16 | **transcript** |
| 149:20 150:25 | 160:11 | 63:21 88:18 | 219:5,10 |
| 153:23 154:6 | **timing** 144:16 | 167:24 178:21 | **translate** |
| 155:19,21 | 144:17 176:2 | 179:7 218:10 | 199:24 |
| 156:23 157:22 | 184:5 185:6,24 | **touched** 15:25 | **travel** 184:23 |
| 159:17,22 | **title** 193:24 | 45:25 80:18 | 185:19,21 |
| 160:2,5,18 | **titled** 8:2 19:5 | 109:9 140:17 | 186:3,17 |
| 161:10 162:1 | 25:22 187:22 | 181:25 | **treat** 191:7 |
| 162:13,17 | **today** 6:22 | **towards** 11:19 | **treatment** |
| 165:11,14,15 | 13:21 15:21 | 12:17 19:19 | 76:11 |
| 165:17,22 | 24:21 33:15 | 48:7 150:13 | **trends** 66:14 |
| 166:3,11 | 124:17 135:10 | 151:15 174:22 | **tried** 35:1 |
| 167:22 171:25 | 182:7 187:16 | **tracks** 76:16 | **triple** 23:16 |
| 172:5 173:6,22 | 188:22 | | |

**[true - understanding]** Page 57

| | | | |
|---|---|---|---|
| **true** 9:22 59:7 69:5 70:12 92:4 102:13 111:20 116:10 143:10 147:21 159:10 161:1,4 161:20 164:8 175:17,22 183:20 184:6 186:9 189:21 208:25 219:9 220:12 **truth** 32:24 33:3 34:2 35:24 37:3 61:5 93:4 94:14 97:5 100:5,10 101:1 102:8 105:15 107:11 118:8 118:23 130:22 131:1 132:22 133:2 141:4 145:8 171:2,3 171:17 174:6 221:13 **truthful** 178:9 **try** 67:4 104:14 124:15 135:1 162:16 211:13 213:1 **trying** 14:10 39:5 54:14 60:14,17 68:17 | 110:25 127:21 138:15 160:12 **tuesday** 1:12 **turn** 38:3 46:1 **turned** 56:18 **two** 9:20,20 36:11 48:11 49:15 54:6,9 54:13,18,21 55:8 58:9,13 58:22,25 60:13 61:4 65:15 141:15 210:11 211:19,20 212:8 218:2 **type** 97:24 121:3,10 148:21 153:24 **types** 42:22 43:1,19 90:15 131:16 148:4 151:11 **typical** 15:13 138:7 **typically** 21:12 98:8 210:20 **u** **uh** 44:2 128:1 200:23 **ultimate** 165:18 **ultimately** 123:18 124:2 | 127:13 146:22 181:16 186:22 191:23 199:12 **unbiased** 207:9 **uncertainties** 106:7 **uncertainty** 201:21 202:14 203:9,23 **uncertified** 190:15 **unchanged** 158:14 **under** 11:19 17:21 24:8 33:3 34:22 36:3 38:10 54:19 91:6 95:18 100:7 103:15 104:16 104:18 120:3,8 156:16 157:8 157:12 159:11 173:9 214:7 217:5 **underestimate** 104:20 **undergraduate** 10:6 **underlying** 8:25 200:7,15 201:2,5,7 203:18 205:21 206:1,22,24 | 208:3,6,23 **underneath** 22:25 **underscored** 49:21 56:17 **underscores** 50:17,25 51:10 168:3 **understand** 15:5 28:15 41:6 42:8 53:12 56:12 76:20 88:17 94:10 99:6 104:6,24 107:12 108:6 116:18 118:18 124:13 128:15 136:18 155:20 188:25 **understanding** 7:22 23:19 24:3 28:11 30:6 36:25 37:5 40:4 41:9 42:19 43:17,21 48:2,19,23 49:2 52:21 58:12 60:19 61:3,18,19,25 62:6 70:16 79:1 82:1 93:7 104:15 106:23 108:2,11 117:3 |

**[understanding - vanilla]**

125:14 126:3
127:5 132:23
177:10,12,17
178:15 184:25
188:23 194:5
208:11
**understands**
104:17 171:12
**understated**
100:14 102:4
103:7,23
117:22
**understates**
169:9,16
**understood**
16:7 47:24
60:17 107:1,4
**undisclosed**
117:16
**unexpected**
198:13
**unique**  66:24
**unit**  5:3
**united**  1:1 5:8
185:3
**units**  218:11
**university**  9:25
**unknown**
104:10 111:8
170:23
**unprecedented**
190:12
**unpriced**  115:4
117:7,25 118:1

**unquote**  98:1
140:3
**unrelated**
19:24 141:4
143:16 145:6
**unusual**  22:4,9
53:20
**update**  161:24
165:21
**updates**  11:12
**updating**
161:23 162:9
162:11,13,21
163:4,17
165:20 169:1
**use**  65:9 73:8
77:7 84:12
90:20 117:14
137:23 139:6
145:23 149:4
150:18 161:22
162:5,8 163:16
174:15 198:14
198:18,20
199:21 201:9
203:6 206:15
211:24 212:5,8
**used**  7:22 15:13
39:25 41:21
61:11 63:4
65:2 67:10
72:13 73:18
75:19 77:10
79:15,17 81:21

82:1 85:3
86:21 87:23
90:11,21 93:13
94:24 97:14
98:1,10 101:9
101:18 112:7
126:17 130:18
134:6 135:12
139:23 140:8
140:11 146:6
147:15,25
148:1,2,5,10,12
148:13 149:6
149:11,11,16
149:22 154:11
158:17,22
159:1,2,3,9
162:20 163:5
176:11 196:5
198:1 199:5,12
202:3 213:16
213:25 214:1
**using**  14:6
63:21 64:23
66:8 72:7
74:11 75:12,21
78:22 80:22
87:10 115:19
115:24,25
116:4 138:6
150:1,14
151:23 165:15
169:17 173:16
180:25 196:19

196:25 199:4,9
199:15 203:14
203:22
**usual**  22:9
99:23
**usually**  138:23
151:1 211:12
211:16
**utilize**  146:11

**v**

**v**  74:18
**vague**  55:25
**valiant**  27:22
36:10 175:4
**valuation**  146:2
146:11 147:14
147:24 148:6,9
148:15 149:2
149:10,14
151:7 152:2
204:6
**valuations**
151:5,19,23
**value**  76:12,23
133:12 150:17
151:10 160:4
168:22 186:19
205:25
**values**  138:24
**valuing**  133:10
136:24
**vanilla**  157:12
175:16,22

**[variables - wide]**                                     Page 59

| | | | |
|---|---|---|---|
| **variables** 207:4 | **view** 26:16 29:4 | **w** | 124:14 132:5 |
| **variant** 155:6 | 42:20 49:4 | | 135:21 137:14 |
| **variation** 86:21 | 84:14 97:18 | **w** 1:10 2:11 | 144:21,22,22 |
| 87:2,11 | 102:5 149:2 | 6:10 23:16 | 148:22 151:10 |
| **variations** | 174:20 186:23 | 219:2,4,13 | 159:17 160:3 |
| 89:24 | 191:2,3,6 | 220:9 221:3 | 162:10 173:16 |
| **varies** 212:9 | **viewed** 52:12 | 222:2,24 | 191:3 195:14 |
| **variety** 181:6 | **views** 41:24 | **wake** 60:8 | 195:17 204:12 |
| **various** 13:4 | **violated** 35:19 | **want** 14:21 | 205:14 209:17 |
| 26:8 47:9 | 102:17,19 | 45:23 53:8 | 213:2 215:2,12 |
| 113:1 185:10 | **violation** 18:12 | 54:1 56:10 | 220:17 |
| 185:15 | 118:21 221:9 | 67:16 93:11 | **ways** 60:7,12 |
| **vary** 87:6 | **violations** 19:3 | 97:11 101:2 | 93:14 97:14 |
| 154:16 | **virginia** 1:1 | 107:9 109:12 | 109:1 118:22 |
| **varying** 180:7 | 5:10 | 112:22 113:6 | 154:19 160:11 |
| **verified** 35:13 | **virtually** 81:24 | 137:15 163:21 | **we've** 33:19 |
| **veritext** 5:12,14 | 82:21 90:4,11 | 169:23 170:7 | 44:24 75:18 |
| 218:12 | 91:16 | 193:2,25 206:9 | 152:19 |
| **versus** 40:14 | **vix** 73:16,17 | 215:23 216:16 | **wednesday** |
| 42:21 43:9 | 74:18,23 | **wanted** 40:3 | 9:12 |
| 144:17 148:19 | **volatile** 73:1,7 | 130:4 | **weeds** 144:22 |
| 150:10 198:12 | 75:20 | **wants** 34:17 | **week** 9:11,13 |
| **video** 5:4 62:15 | **volatility** 72:18 | **warned** 106:5 | 9:16 |
| 62:19 121:22 | 72:22 73:2,5 | 106:12 | **weeks** 194:22 |
| 122:4 172:1,5 | 73:23 74:8,11 | **washington** | **weighted** 65:7 |
| **videographer** | 74:12,19 75:3 | 62:9 | **weinstein** |
| 4:12 5:1 6:8 | 75:7,10,15 | **way** 20:1 40:22 | 210:12 |
| 62:14,18 | 201:4 206:22 | 49:10 67:6,15 | **went** 15:17 |
| 121:21 122:3 | 207:2 | 67:19 68:8 | 17:7 |
| 171:25 172:4 | **volume** 27:8 | 87:15,16 90:3 | **whereof** 220:19 |
| 218:7 | **volumes** 205:1 | 93:21 95:8 | **white** 96:12 |
| **videotaped** | **voluminous** | 99:6 102:6 | **wide** 13:25 |
| 1:10 2:11 | 27:15,18,22 | 105:12,15 | 14:3,6 41:2,21 |
| | 28:3 | 109:17 111:6 | 49:13 91:2 |

**[wide - zweig's]**                                                    Page 60

92:22 112:6
123:18 126:17
146:23
**widely** 130:18
**william** 3:9
5:24 7:1 218:9
**willing** 84:21
144:4,13
**window** 73:1,6
73:20 75:10,13
75:19
**withdraw**
193:21
**withdrawn**
91:13
**witness** 6:9,11
8:9,13 14:17
14:21 25:7,12
66:18 70:6
103:25 121:14
121:20 187:6
215:24 216:3
216:13,24
217:2 218:1
220:9,13,19
221:2
**wondering**
18:19
**word** 19:10,11
20:14 66:21
67:13 97:9,9
133:17 139:3
**wording** 14:22

**words** 53:8
60:16 61:10
85:8,20,24
118:8 174:1
198:19 204:8
**work** 12:16,22
21:13 35:2
45:10,16,18
66:4 127:16
135:5,23
136:14 154:18
154:24 156:6,9
162:9 164:4,12
181:22 182:10
190:22 191:5
195:16 196:14
198:24 213:5
**workforce**
184:18
**working** 37:24
**works** 162:11
**world** 98:12,13
98:17,19
107:15,23
108:3,4,6,11,14
108:19 181:11
208:8,14
**write** 4:12 5:11
119:4 125:8
196:2 199:21
**writing** 206:7
**wrong** 70:23
144:7 216:9

**wrote** 60:12
76:17 179:2
193:19

**x**

**x** 1:3,6 74:18
221:1

**y**

**yeah** 10:12
15:1 32:18
33:3 43:4 51:1
61:10 64:4
90:20 100:23
182:16 193:23
193:23
**year** 10:19
20:25 37:25
87:2,6,7,13,18
179:14 189:17
204:21
**years** 13:4,8
37:7,21 38:18
40:2,9 43:15
56:16,17 57:1
87:17 120:3
158:14 183:10
216:9,10
**yesterday** 9:14
9:19
**york** 1:11,11
2:14,14,18 3:6
3:6,14,14 4:6,6
220:2,4,8

**z**

**zero** 106:22
107:5 111:10
111:11 165:17
169:12,15
170:8,11
171:11 201:25
202:6,7,16,19
204:2
**zoom** 194:15,16
**zweig** 3:15 5:20
5:20
**zweig's** 188:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to

access the material. Our data is hosted in a Tier 4

SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and

State regulations with respect to the provision of

court reporting services, and maintains its neutrality

and independence regardless of relationship or the

financial outcome of any litigation. Veritext requires

adherence to the foregoing professional and ethical

standards from all of its subcontractors in their

independent contractor agreements.

Inquiries about Veritext Legal Solutions'

confidentiality and security policies and practices

should be directed to Veritext's Client Services

Associates indicated on the cover of this document or

at www.veritext.com.