# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| IN RE THE BOEING COMPANY SECURITIES LITIGATION | ) ) ) ) ) | Case No. 1:24-cv-00151-LMB-LRV<br>Hon. Leonie M. Brinkema<br><br>Hearing Date: March 7, 2025 at 10:00 a.m. |

## LEAD PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................................1

II.    ARGUMENT......................................................................................................................2

       A.    Plaintiffs' Out-of-Pocket Damages Methodology for Boeing Common
             Stock Purchasers Is Sufficient Under Rule 23 and *Comcast*...................................2

             1.    *Comcast*'s Narrow Concern with the Fit Between Liability Theory
                   and Damages Methodology Is Firmly Satisfied Here................................2

             2.    Defendants Overstate the Degree of Detail Required of a Damages
                   Methodology at This Stage ...........................................................................4

             3.    A Wealth of Authority Confirms More Detail Is Not Required .................5

             4.    Defendants' Arguments Concerning *Ludlow v. BP* Are Meritless .............8

             5.    Certification Is Not Barred by the Immensity of the Fraud .....................10

       B.    Defendants' Attempts to Shorten the Class Period Are Meritless........................14

             1.    The Class Period Should Begin on September 30, 2019 ...........................14

             2.    The Class Period Should End on May 14, 2024......................................16

       C.    Defendants' Attempts to Exclude Options Traders Are Meritless ......................17

III.   CONCLUSION...............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan PLC Sec. Litig.*,
 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)..............................................................15

*In re Allstate Corp. Sec. Litig.*,
 2022 WL 842737 (N.D. Ill. Jan. 10, 2022), *R. & R. adopted*,
 2022 WL 17683310 (N.D. Ill. Feb. 22, 2022) ...........................................................11

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)......................................................................................................5

*Baker v. Seaworld Ent., Inc.*,
 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017)...............................................................9

*Brown v. Nucor Corp.*,
 2014 WL 12861857 (D.S.C. Feb. 14, 2014)..................................................................4

*Bustillos v. Bd. of Cnty. Comm'rs*,
 310 F.R.D. 631 (D.N.M. 2015)....................................................................................16

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
 337 F.R.D. 193 (D. Minn. 2020)..................................................................................10

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
 270 F.R.D. 247 (D.S.C. 2010)......................................................................................16

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
 HQ*,
 322 F. Supp. 3d 676 (D. Md. 2018)...................................................................9, 15, 20

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)................................................................4

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
 2022 WL 1459567 (N.D. Cal. May 9, 2022)..................................................................7

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013).................................................................................................*passim*

*In re Comput. Scis. Corp. Sec. Litig.*,
 288 F.R.D. 112 (E.D. Va. 2012)...................................................................................15

*Cosby v. KPMG, LLP*,
 2020 WL 3548379 (E.D. Tenn. June 29, 2020), *R. & R. adopted*,
 2021 WL 1828114 (E.D. Tenn. May 7, 2021) .............................................................................9

*Deluca v. Instadose Pharma Corp.*,
 2023 WL 5489032 (E.D. Va. Aug. 24, 2023) ...........................................................................16

*In re EQT Corp. Sec. Litig.*,
 2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) .............................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011) ....................................................................................................................5

*FindWhat Inv. Grp. v. FindWhat.com*,
 658 F.3d 1282 (11th Cir. 2011) ................................................................................................15

*In re Flag Telecom Holdings*,
 574 F.3d 29 (2d Cir. 2009) .......................................................................................................16

*In re Glob. Brokerage, Inc.*,
 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021) ..........................................................................10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
 594 U.S. 113 (2021) ..................................................................................................................14

*Gunnells v. Healthplan Servs., Inc.*,
 348 F.3d 417 (4th Cir. 2003) ............................................................................................. 17-18

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
 2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) ........................................................................6, 10

*Henderson v. Corelogic Nat'l Background Data, LLC*,
 2016 WL 4611571 (E.D. Va. Sept. 2, 2016) ............................................................................18

*Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*,
 348 F.R.D. 35 (D.S.C. 2024) ....................................................................................................16

*In re Interpublic Sec. Litig.*,
 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) ..........................................................................10

*Junge v. Geron Corp.*,
 2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) .......................................................................6, 10

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
 2017 WL 4297450 (D.S.C. Sept. 28, 2017) ...........................................................................3, 6

*Levie v. Sears, Roebuck & Co.*,
 496 F. Supp. 2d 944 (N.D. Ill. 2007) .......................................................................................18

- iii -

*Levy v. Gutierrez*,
   448 F. Supp. 3d 46 (D.N.H. 2019)..................................................................................6, 19, 20

*Loritz v. Exide Techs.*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015) ...........................................................................7

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) .................................................................................................1, 8

*Merck & Co. Sec. Derivative & "ERISA" Litig.*,
   2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................................10

*In re Merck & Co., Vytorin/Zetia Sec. Litig.*,
   2012 WL 4482041 (D.N.J. Sept. 25, 2012) ............................................................................18

*In re Mills Corp. Sec. Litig.*,
   257 F.R.D. 101 (E.D. Va. 2009)..............................................................................................16

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019)............................................................................................6, 7

*In re NeuStar, Inc. Sec. Litig.*,
   2015 WL 5674798 (E.D. Va. Sept. 23, 2015)...........................................................................4

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) (Brinkema, J.) .................................................................2, 3, 6

*In re Nissan N. Am., Inc. Litig.*,
   122 F.4th 239 (6th Cir. 2024) ...................................................................................................7

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018).........................................................................7

*In re Orbital Scis. Corp. Sec. Litig.*,
   188 F.R.D. 237 (E.D. Va. 1999)..............................................................................................18

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y Mar. 29, 2012)..................................................................................10

*Piotrowski v. Wells Fargo Bank, NA*,
   2015 WL 4602591 (D. Md. July 29, 2015)..............................................................................18

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
   2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...........................................................................6, 7

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ........................................................................10

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................................................4

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012).....................................................................18

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...............................................................................................8

*In re Snap Inc. Sec. Litig.*,
    334 F.R.D. 209 (C.D. Cal. 2019)........................................................................................7

*Snodgrass v. Richardson*,
    2024 WL 1260571 (E.D. Va. Mar. 25, 2024)...................................................................19

*In re Teva Sec. Litig.*,
    2021 WL 872156 (D. Conn. Mar. 9, 2021) ...................................................................7, 10

*Thorpe v. Walter Inv. Mgmt., Corp.*,
    2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)....................................................................6

*In re Under Armour Sec. Litig.*,
    631 F. Supp. 3d 285 (D. Md. 2022)....................................................................................5

*In re Vale S.A. Sec. Litig.*,
    2022 WL 969724 (E.D.N.Y. Mar. 31, 2022)......................................................................7

*In re Vaxart, Inc. Sec. Litig.*,
    2024 WL 5135206 (N.D. Cal. Dec. 17, 2024)..................................................................18

*In re Vivendi, S.A. Secs. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..............................................................................................15

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).............................................................................................3, 10

*Ward v. Apple Inc.*,
    784 F. App'x 539 (9th Cir. 2019) .......................................................................................7

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) .....................................................................................6

*Weisfeld v. Sun Chem. Corp.*,
    84 F. App'x 257 (3d Cir. 2004) .........................................................................................18

*In re Willis Towers Watson PLC Proxy Litig.*,
    2020 WL 5361582 (E.D. Va. Sept. 4, 2020).....................................................................3, 5

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...........................................................................6

*Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*,
    935 F.3d 496 (6th Cir. 2019) ..............................................................................................3

## Statutes & Rules

Fed. R. Civ. P. 23....................................................................................................................*passim*

## I.      INTRODUCTION

Defendants do not dispute that Plaintiffs satisfy Rule 23's numerosity, commonality, typicality, adequacy, and superiority elements, or that Boeing stock traded in an efficient market. While they raise several weak arguments trying to redefine the Class, Defendants' **only** argument against certification of a class challenges Plaintiffs' damages methodology. *See* ECF No. 115 ("Opp."). Damages methodologies are presented at this stage merely to show that individualized issues will not predominate, and Defendants do not identify any individualized issues.

Instead, Defendants' opposition to certifying a class is limited to a misplaced argument based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which held that any proffered damages method must fit the theory of liability. Plaintiffs' Out-of-Pocket Method is "well accepted" and *perfectly* fits the theory of liability: the fraud artificially inflated Boeing's stock price, and the damages methodology measures losses due to that inflation. Defendants do not dispute this fit.

While that should end the inquiry, Defendants argue that the immensity of their alleged fraud will make measuring inflation challenging and suggest this requires an unusually detailed damages methodology at this stage. That is a non-sequitur. The supposed challenge of measuring inflation is irrelevant to *Comcast*'s mandate that any damages model fit the liability theory. This is why legions of opinions, including one by this Court, reject calls for further detail at this stage.

Moreover, Defendants fail to even establish that inflation will be particularly difficult to measure in this case. Their expert, René Stulz, merely raises issues he thinks **might** need to be accounted for at the merits stage, while ignoring that the emerging discovery record shows a persistent chasm between Defendants' statements about safety and the reality within Boeing. Likewise, Defendants raise a superficial comparison to *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), but *BP* dealt with a unique damages method and has no relevance to this case, in which the standard Out-of-Pocket Method will be used.

## II.    ARGUMENT

### A.    Plaintiffs' Out-of-Pocket Damages Methodology for Boeing Common Stock Purchasers Is Sufficient Under Rule 23 and *Comcast*

Plaintiffs' proposed Out-of-Pocket Method is the gold standard for calculating damages in securities class actions.  Defendants' long-shot *Comcast* arguments have been rejected by this Court in *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413-14 (E.D. Va. 2015) (Brinkema, J.) and in ***dozens*** of other cases (*see* Reply Ex. A).[1]  Nothing justifies a different outcome here.

### 1.    *Comcast*'s Narrow Concern with the Fit Between Liability Theory and Damages Methodology Is Firmly Satisfied Here

*Comcast* addresses a precisely defined concern: whether Plaintiffs' damages methodology is ***consistent*** with their theory of liability.  This inquiry bars attempts to "cheat" around Rule 23(b)(3)'s predominance requirement.  Many non-securities classes face significant individual damages issues.  One could potentially "avoid" these issues by proposing a damages methodology that, while unrelated to the claims at issue, is uniformly applied.  *Comcast* forecloses that possibility by requiring consistency between the damages methodology and liability theory.

In *Comcast*, only one of plaintiffs' four theories of antitrust liability was allowed to proceed.  *Comcast*, 569 U.S. at 31.  Plaintiffs' proposed damages methodology sought to assess the ***total*** harm caused by Comcast's anticompetitive conduct, even though the damages from the ***one*** remaining theory would be lower and varied among class members.  *Id.* at 37 (describing variation in how different antitrust theories could affect class members).  This explicit mismatch is what *Comcast* found improper.  *Id.* at 36 (finding damages model "fail[ed] to measure damages resulting from the particular antitrust injury on which petitioners' liability . . . is premised").

---

[1] All terms not otherwise defined herein have the definitions stated in the opening brief in support of the Motion (ECF No. 104, the "Opening Br.") and citation styles are as described therein. References herein to "Reply Exhibits" (cited "Reply Ex. [ ]") refer to documents attached as Exhibits to the Declaration of Christine M. Fox submitted contemporaneously with this reply brief.

"*Comcast* merely held that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the liability] theory." *NII*, 311 F.R.D. at 413; *see In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at \*10-11 (E.D. Va. Sept. 4, 2020) (*Comcast* asks if the damages method is "consistent" with the liability theory); *Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 510 (6th Cir. 2019) ("[A]ny model supporting a plaintiff's damages case must be **consistent** with its liability case.").

Plaintiffs' expert, Chad Coffman, explained that damages will be calculated based on the "standard and well accepted" "Out-of-Pocket Method," where damages are equal to "artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale." ECF No. 105-1 ("Coffman Rpt.") ¶96; *see id.* ¶¶96-100 (full methodology). This method is perfectly consistent with Plaintiffs' liability theory: Defendants' fraud inflated Boeing's stock price, causing injury to investors as the truth was revealed and inflation was removed. ¶¶1000-01.

It is well established that the Out-of-Pocket Method is consistent with the theory of liability in fraud on the market cases like this one. *See NII*, 311 F.R.D. at 413-14 (explaining Coffman's Out-of-Pocket Method is "widely accepted as the traditional measure of damages for Rule 10b-5 actions"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (holding that the Out-of-Pocket Method is "directly linked with [the] underlying theory of classwide liability . . . and is **therefore** in accord with . . . *Comcast*"); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at \*7 (D.S.C. Sept. 28, 2017) (The "Supreme Court long ago agreed with this approach"); *see also* Reply Ex. A (listing dozens of securities cases applying Out-of-Pocket Method).

Defendants **do not dispute** that the Out-of-Pocket Method is the correct approach to damages here. *See* Opp. at 12 (conceding that the Out-of-Pocket approach is "the standard measure of damages in Section 10(b) cases"); Reply Ex. B ("Stulz Tr.") at 44:21-45:11 (similar).

### 2.    Defendants Overstate the Degree of Detail Required of a Damages Methodology at This Stage

Unable to challenge the Out-of-Pocket Method as genuinely inconsistent with Plaintiffs' liability theory, Defendants resort to calling for a more detailed damages model. Opp. at 10-14. Revealingly, Defendants do not identify any standard stating the requisite degree of detail. They recognize that Plaintiffs need not *prove* loss causation or calculate inflation at this stage (*see* ECF No. 115-4 ("Stulz Rpt.") ¶33) but vaguely argue that simply setting out a damages methodology that is consistent with the liability case is somehow insufficient.[2] *See* Stulz Tr. at 65:10-17.

Defendants cannot state how much detail *Comcast* requires because *Comcast* does not even require a damages methodology, detailed or otherwise. *See Brown v. Nucor Corp.*, 2014 WL 12861857, at *3 (D.S.C. Feb. 14, 2014); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407-08 (2d Cir. 2015). *Comcast* is merely a guardrail, holding that ***if*** a plaintiff proffers a damages method it must fit the liability theory—a hurdle Plaintiffs easily clear here. *See* Section II(A)(1). Plaintiffs do not provide a damages method *because of Comcast* but rather to show that individualized damages inquiries will not predominate. The relevant inquiry is whether Plaintiffs provide a method that resolves predominance concerns, without violating *Comcast*'s fit requirement.

The predominance requirement is easily satisfied because, under the Out-of-Pocket Method, the ***only*** individualized inquiry necessary to calculate damages is the trivial and routine act of processing trading data from Class members. *See In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *7 (E.D. Va. Sept. 23, 2015) (holding that the "minimal" step of processing trading data does not pose predominance issues). Defendants do not suggest that the processing of trading data raises predominating individualized issues or identify any other individualized issues.

---

[2] *See City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (that the Out-of-Pocket Method fits most securities cases does not weigh against "class treatment," but merely reflects "that securities fraud cases fit Rule 23 like a glove").

The remaining steps in proving loss causation and damages—a merits-stage task—turn on an economic analysis of factors affecting Boeing's stock price (*e.g.*, assessing artificial inflation and corrective events). That analysis does not implicate **any** individualized inquiries because it has nothing to do with specific investors. As Mr. Coffman explains: "[T]he determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques . . . [that] are class-wide in nature and do not depend on the identity or circumstance of any specific investor." Coffman Rpt. ¶100; *see Willis Towers*, 2020 WL 5361582, at *10 (damages issues do not predominate where they may be resolved by a "damages model" and "common evidence"); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (holding that use of Out-of-Pocket Method "vitiated" predominance concerns).

Defendants' arguments about the supposed difficulty of measuring inflation speak to the merits issue of proving damages, not to whether common issues predominate over individualized issues or whether the damages method is consistent with the liability theory. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (finding it erroneous to require plaintiffs to "show loss causation" at certification stage); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (likelihood of proving the merits case is irrelevant to class certification).

### 3.    A Wealth of Authority Confirms More Detail Is Not Required

The tremendous weight of authority rejects the notion that more detail is required at this stage. Indeed, Reply Exhibit A details *dozens* of failed *Comcast* challenges, many of which rejected calls for more detail. The cases discussed below are just a subset of those many opinions.

This Court's decision in *NII* is directly on point. There, Mr. Coffman explained the Out-of-Pocket Method and, as Defendants' expert has conceded here (Stulz Tr. at 54:17-25), Coffman's explanation in *NII* was no more detailed than the one Coffman provided in this case. *See* Reply Ex. C at ¶¶138-39 (Coffman report in *NII*). In assessing that damages method, this Court held:

> [T]he Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage. . . . Plaintiffs provide adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day. Coffman Report ¶¶ 138, 139. Th[at] method . . . is widely accepted as the traditional measure of damages for Rule 10b-5 actions. . . . Accordingly, [Plaintiffs'] damages model supports a finding of predominance.

*NII*, 311 F.R.D. at 413-14 (Brinkema, J.); *see also In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *28 (W.D. Pa. Aug. 11, 2022) ("Plaintiffs are not required to produce a detailed damages model."); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018) (rejecting criticism that expert did not "specify which valuation tools he will use," or "how he will calculate inflation"); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019) ("sufficient" that expert "specified a damages model" without specifying "the inputs to that model"); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *16 (S.D. Fla. Mar. 16, 2016) ("[N]othing in *Comcast* requires an expert to perform his analyses at the class certification stage."); *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2023 WL 7285167, at *23 (E.D. Pa. Nov. 3, 2023) (possible measurement issues "do[] not impede class certification").

Many courts have specifically held that Mr. Coffman's explanation of the Out-of-Pocket Method — just like his explanation here — is sufficient at this stage. *E.g.*, *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 64-65 (D.N.H. 2019) (holding that Coffman's method "satisfies . . . *Comcast*"); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (crediting Coffman's method and holding that "*Comcast* does not suggest" more "precise" damages analysis is required "at this juncture"); *KBC Asset Mgmt.*, 2017 WL 4297450, at *7 (crediting Coffman's method and holding that greater detail "is not required"); *Junge v. Geron Corp.*, 2022 WL 1002446, at *5 (N.D. Cal. Apr. 2, 2022) (argument that Coffman must "commit to a detailed explanation of his technique" for measuring inflation "misapprehend[s] *Comcast*[]"); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) (similar).

Against this authority, Defendants primarily rely on two out-of-circuit, and heavily criticized, outlier cases. Opp. at 13-15 (citing *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) ("*OPERS*"); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015)).

*OPERS* addressed a very different situation. Unlike here, defendants in *OPERS* refuted market efficiency, which meant the damages model could not match a liability case that "did not hold together." *TreeHouse Foods*, 2020 WL 919249, at *9 n.8. Also, unlike here, defendants' expert in *OPERS* opined that "a class-wide damages model could *not* be constructed." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *10 (N.D. Cal. May 9, 2022). *OPERS* is limited to its facts, contrary to *Comcast*, and often rejected. *E.g.*, *In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at *6 (E.D.N.Y. Mar. 31, 2022) (*OPERS* "is contrary to [] many recent [] cases"); *Monroe Cnty.*, 332 F.R.D. at 399 (rejecting *OPERS*; greater detail "is not required at this stage"); *In re Teva Sec. Litig.*, 2021 WL 872156, at *39 (D. Conn. Mar. 9, 2021) (similar).

In *Loritz*, plaintiffs' expert provided a lengthy account of tools for measuring inflation, but did not identify that plaintiffs would use the Out-of-Pocket Method or specify another damages model. Reply Ex. D at ¶¶197-263 (expert report in *Loritz*); *Loritz*, 2015 WL 6790247, at *22. If anything, *Loritz* underscores that what matters is clearly identifying a damages model, not detail about loss causation. *See Oracle*, 2022 WL 1459567, at *10 (*Loritz* turned on failure to specify a damage model); *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 217 (C.D. Cal. 2019) (similar).[3]

---

[3] Defendants' other cases are no more availing. For example, *In re Nissan North America, Inc. Litigation*, an out-of-circuit consumer class action, addressed a *Daubert* challenge to an expert's analysis of *commonality* (not damages). Opp. at 11 (citing 122 F.4th 239, 253-54 (6th Cir. 2024)). In *Ward v. Apple Inc.*, an out-of-circuit antitrust class action, plaintiffs' expert merely provided two general approaches corresponding to two theories of the impact of the anticompetitive conduct and, like in *Comcast*, failed to tie any particular measurement of anticompetitive conduct to the plaintiffs' specific antitrust liability theory. Opp. at 11 (784 F. App'x 539, 540 (9th Cir. 2019)).

#### 4.    Defendants' Arguments Concerning *Ludlow v. BP* Are Meritless

Defendants also make a superficial comparison between this matter and *Ludlow v. BP, P.L.C. See* Opp. at 21-24 (citing 800 F.3d 674 (5th Cir. 2015)). That comparison arises because both cases involve a corrective event that could be called a "materialization of risk." That term describes frauds that (partially or fully) came to light through the occurrence of an adverse event. *See* Stulz Tr. at 131:25-134:22 (confirming that his use of the term described "the event in which [a] risk materialized" — *i.e.*, the Alaska Airlines Incident — not a theory of damages or liability).

The Fourth Circuit recognizes that cases involving a materialization of risk or corrective disclosure "ultimately" may pursue the same "loss causation" theory: that a fraud concealed information and investors were injured when the truth came to light. *Singer v. Reali*, 883 F.3d 425, 446-47 (4th Cir. 2018). As discussed below, *BP* is a narrow opinion and irrelevant to the claims here, but to the extent Defendants interpret it otherwise, *Singer* controls, not *BP*.

Unlike this case, *BP* involved a ***unique*** damages methodology, premised on the unconventional assertion that investors would not have purchased BP stock ***at all*** if certain risks had been disclosed. *BP*, 800 F.3d at 689-90. From that premise, plaintiffs pursued a damages methodology that sought to broadly assess losses that were a consequence of owning BP stock, rather than those losses specifically attributable to artificial inflation in BP's stock price due to the fraud. *Id.* In other words, plaintiffs sought to recover based on the full price decline following the oil spill (the corrective event at issue in *BP*), not just the portion of that decline due to artificial inflation dissipating from the stock price. *Id.* In contrast, the standard Out-of-Pocket Method that Plaintiffs rely on here only measures damages from inflation in the share price due to the fraud.

The holding in *BP* ***did not*** turn on the fact that the case involved a fraud being revealed through an adverse event, but on the specific unconventional damages method plaintiffs pursued. *Id.* ("[Plaintiffs'] theory hinges on a determination that each plaintiff would not have bought BP

- 8 -

stock *at all* were it not for the alleged misrepresentations—a determination . . . requiring individualized inquiry."). Courts recognize that *BP* was narrowly concerned with the unique damages methodology at issue, which the *BP* court "explicitly" stated "was different from an out-of-pocket damages measurement." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 691-92 (D. Md. 2018).

Therefore, *BP* is inapplicable to this case because Plaintiffs here propose a standard Out-of-Pocket Method, not the unique theory of damages sought by plaintiffs in *BP*. Defendants ***do not*** deny that the Out-of-Pocket Method can be used in cases where the fraud was partially or fully revealed through adverse events. *See* Opp. at 21-24. When Defendants' expert was asked whether the Out-of-Pocket Method is "inconsistent with plaintiffs' theory of liability," he responded: "I am not questioning the use of that formula." Stulz Tr. at 66:22-67:3. And, when he was asked if he believed that the Out-of-Pocket Method cannot be used in scenarios involving a materialization of risk, he confirmed this was not his opinion, stating: "***No, absolutely not.***" *Id.* at 135:4-9.

As shown in Reply Exhibit E, arguments based on *BP* are routinely rejected where plaintiffs proffer the Out-of-Pocket Method. *See e.g.*, *Cosby v. KPMG, LLP*, 2020 WL 3548379, at *28 (E.D. Tenn. June 29, 2020), *R. & R. adopted*, 2021 WL 1828114 (E.D. Tenn. May 7, 2021) (granting certification in a materialization of the risk case, where plaintiffs used the Out-of-Pocket Method, as opposed to seeking "consequential damages"); *Baker v. Seaworld Ent., Inc.*, 2017 WL 5885542, at *14 (S.D. Cal. Nov. 29, 2017) (holding that *BP*'s decision turned on plaintiffs' unique damages theory and is not applicable to cases using the Out-of-Pocket Method).

To the extent Defendants demand detail about how the change in inflation following the Alaska Airlines Incident will be distinguished (*i.e.*, "disaggregated") from other potential causes of that stock price decline, that demand is no different from Defendants' other premature calls for

more detail.  *See* Sections II(A)(1)-(3); *Junge v. Geron Corp.*, 2022 WL 1002446, at *5-9 (N.D. Cal. Apr. 2, 2022) (rejecting *BP* argument, holding that disaggregation of confounding causes of price decline following an adverse event is a merits-stage task); *Teva Pharms.*, 2023 WL 7285167, at *23 ("disaggregation . . . need not be established at this juncture").  Even so, Coffman's rebuttal report describes how such disaggregation analysis could be conducted. *See* Reply Ex. F ("Coffman RR") ¶¶33-37.  Indeed, as Stulz recognizes, disaggregating various causes of stock declines is routinely performed at the merits stage. *See* Stulz Tr. at 137:4-21.

### 5.    Certification Is Not Barred by the Immensity of the Fraud

Defendants suggest that their alleged fraud was so pervasive and lengthy that they are effectively immune from class action liability.  Opp. at 15-25.  Defendants cite the Class Period length, the supposed "evolving" nature of the fraud, the repetition of misstatements, and other factors, to suggest that measuring inflation (at the merits stage) will be challenging.  *Id.*  This is not an argument against certification.  *See Waggoner*, 875 F.3d at 106 (rejecting the argument that "variations in inflation over time" posed an issue at certification stage).  Furthermore, Defendants do not even establish that these factors will pose an unusual challenge at the merits stage.

For example, one of Defendants' arguments is that the Class Period's length presents issues with measuring inflation over time.  Opp. at 14-19.  But they cite no support for the notion that lengthy class periods are uncertifiable, and they offer no argument as to why length itself is a relevant consideration.  No company is ever perfectly static across any period of months or years, yet many securities class actions with longer class periods have been certified.[4]

---

[4] *See, e.g.*, *Merck & Co. Sec. Derivative & "ERISA" Litig.*, 2013 WL 396117, at *15 (D.N.J. Jan. 30, 2013); *In re Teva Sec. Litig.*, 2021 WL 872156, at *42; *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *17 (S.D. Cal. Mar. 20, 2023); *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *6 (S.D.N.Y. Nov. 6, 2003); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y Mar. 29, 2012); *In re Glob. Brokerage, Inc. Sec. Litig.*, 2021 WL 1105367, at *1 (S.D.N.Y. Mar. 23, 2021); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 213 (D. Minn. 2020).

As for their remaining arguments, Defendants' expert merely logged a list of events and circumstances during the Class Period, without opining that any factor: (a) in fact, led to variation in inflation; (b) would be expected to lead to large enough variations to warrant specific modeling at the merits stage; or (c) that such factors could not be reasonably considered during a merits-stage analysis of inflation. *See* Stulz Tr. at 68:24-69:4, 81:11-16, 83:2-9.

For example, Stulz suggested that the introduction of a "learning platform" called "Safety Experience" could have potentially altered the public perception of Defendants' alleged misstatements (Stulz Rpt. ¶¶42, 43(h)), but he offered no opinion that it, in fact, caused inflation to vary, and could not even identify what this "platform" was (*e.g.*, a website). *See* Stulz Tr. 99:6-21. Similarly, Stulz imagines challenges by misconstruing Plaintiffs' allegations (s*ee* Coffman RR ¶¶49-64), such as when he misinterprets Plaintiffs' argument that "repetition of safety-related statements underscores their materiality" (ECF No. 53 at 16) to suggest that such repetition may have led to variation in inflation (Stulz Rpt. ¶38). Of course, at the motion to dismiss stage, Plaintiffs were arguing that the repetition of these misstatements demonstrated and highlighted (*i.e.*, "underscores") their materiality, not opining on whether or how inflation varied over time.

Additionally, Coffman's rebuttal report explains that Stulz' apparent conception of the hypothetical "but-for" world misconstrues the allegations, including in ways that ignore the prospect that the alleged corrective events are *conservative* measures of inflation, which could obviate the need to precisely model for the factors Stulz identifies. *See* Coffman RR ¶¶49-64. Indeed, Coffman explains why he doubts that the factors that Stulz discusses will pose substantial challenges (*id.* ¶¶65-94), and why he is confident he can assess loss causation here (*id.* ¶¶22-48).[5]

---

[5] *E.g.*, *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737 (N.D. Ill. Jan. 10, 2022), *R. & R. adopted*, 2022 WL 17683310 (N.D. Ill. Feb. 22, 2022) (denying merits-stage *Daubert* motion where expert's constant-dollar approach was "conservative"); Reply Ex. G (Order in *Utesch v. Lannet Co.*) (denying merits-stage *Daubert* motion where Coffman accounted for variation in inflation).

Defendants' argument also ignores the emerging discovery record, which demonstrates that the chasm between Boeing's internal practices and Defendants' public statements—*e.g.*, that safety and quality were Boeing's "highest priority," and that it "do[es] not compromise these values for cost or schedule," (¶¶582, 576, 596)—was essentially consistent across the Class Period.

Immediately before the Class Period, Boeing's leadership internally concluded that manufacturing quality issues were "going [in] the wrong direction" and "completely unacceptable" (Reply Ex. H at '0050 (July 23, 2019)), and that "disruptive" quality problems plaguing the fuselages that Spirit AeroSystems was supplying to Boeing were "simply not getting better" (Reply Ex. I at '5868 (Sept. 21, 2019)).

Then, early in the Class Period, those conclusions were confirmed as employees warned executives that Boeing was "cut[ting] corners [to] make it look like we don't produce any defects," which could "hurt passengers" (Reply Ex. J at '7173 (Nov. 13, 2019)), and that "removing thousands" of quality inspections meant defects are "now covered up," affecting systems that "control the functionality of the airplane" on "all 737, 777, 767, 747" (Reply Ex. K at '8667 (Nov. 4, 2019)). Employees documented that "management turns a blind eye" to critical problems "because it interferes with production schedules" (*id.* '8669), and that "[t]he fact that so many defects are being passed down the line shows the major failure of the traditional Boeing Quality process," as "employees are rushed to complete inspections hastily to support quicker and quicker manufacturing demand" (Reply Ex. L at '1322 (Jan. 22, 2020)). Likewise, Boeing employees were under "daily pressure . . . to not follow our processes" regarding quality, leaving them questioning how "leadership can say quality is a core value." *Id.* at '1338, '1323. Indeed, Board members were aware that Boeing was "so poor at Quality." Reply Ex. M at '2217 (Sept. 1, 2020).

Defendants' public assertions that safety was Boeing's "highest priority" (*e.g.*, ¶¶735, 884, 894) remained consistently misleading throughout the Class Period.  Boeing claimed publicly that it was eliminating the unsafe practice of traveled work, but leadership recognized internally that traveled work was "absolutely embedded as a norm in [Boeing's] current environment," and they could not "even imagine" eliminating it, because Boeing's "complete production system culture" was "based on" it, and that traveled work happened "every day," even when "it creates an unsafe condition."  Reply Ex. N at '8631 (Nov. 4, 2021).  Likewise, executives recognized internally that Boeing was knowingly "sacrificing quality for schedule," and was "sending the message schedule is more important than quality."  Reply Ex. O '5028 (Feb. 10, 2022).  Boeing leadership concluded internally there was "something terribly wrong" with Boeing's "continued" and "significant quality violations" (Reply Ex. P at '4975 (Feb. 13, 2022)), including the "severe quality control deficiencies" at key fuselage supplier Spirit AeroSystems (Reply Ex. Q at '6960 (July 24, 2023)).

Then, after the Alaska Airlines Incident, Defendant West admitted that "[f]or years, we prioritized the movement of the airplane through the factory over getting it done right" (¶225), and Defendant Calhoun admitted traveled work was "embedded and normalized in our factory" (¶226).

This evidence, and much more, demonstrates that the gap between Defendants' words and Boeing's internal practices was not isolated or short-lived, but rather was consistent and systemic throughout the Class Period.  There is no reason to doubt that Mr. Coffman will be able to proffer a reasonable merits-stage assessment of the artificial inflation caused by this persistent fraud.  In any event, opening merits expert reports are due on March 10, the business day immediately after oral argument on this Motion.  Rather than speculating, Defendants should review the forthcoming merits-stage report and raise any criticisms at that time; there are no issues here under *Comcast* or Rule 23's predominance requirement, and therefore Defendants' commentary is premature.

**B.    Defendants' Attempts to Shorten the Class Period Are Meritless**

**1.    The Class Period Should Begin on September 30, 2019**

Defendants argue the Class Period should start on January 7, 2021, rather than September 30, 2019.  Opp. at 27.  Defendants' preferred start date corresponds to Boeing entering into the Deferred Prosecution Agreement (¶81), but Defendants give no rationale for why that date was selected.[6]  Defendants' two arguments for shortening the Class Period are entirely meritless.

**First**, Defendants argue that statements made early in the Class Period did not have "price impact," *i.e.*, did not cause Boeing's stock to trade at inflated levels.  *Id.*  Defendants bear the burden of persuasion in any attempt to challenge price impact.  *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021).  Attempts to meet that burden typically involve expert analysis opining on a lack of analyst commentary about the statements.  Defendants forgo any similar approach, likely because analysts clearly placed weight on the misstatements here, including the early ones (¶¶579-89).  *See, e.g.*, Reply Ex. R at 3, Reply Ex. S at 3, Reply Ex. T at 1 (analysts in October 2019 commenting on the alleged false and misleading statements).

Instead, Defendants challenge price impact on the basis that there were not statistically significant price increases following the early misstatements.  Opp. at 27.  That argument falls flat because price increases are not a prerequisite to price impact and not the only way a fraud can cause prices to be artificially inflated.  Rather, "price maintenance"—*i.e.*, that a fraud maintained a stock's prices at elevated levels, compared to where it would have traded upon truthful disclosures—is an accepted form of price impact, which Plaintiffs allege (*e.g.*, ¶¶365, 569, 1000).

---

[6] Defendants appear to select this start date based on comments by one Lead Plaintiff prior to appointment that the ***relative*** merits of the period after this date were stronger. Opp. at 27. Quoting statements that were made prior to their appointment as Lead Plaintiff, prior to the factual investigation that led to the operative amended complaint, and prior to discovery, is distraction, not argument. Both Lead Plaintiffs believe in the merits of the full Class Period and ongoing discovery is confirming that the fraud ran through the entire period. *See supra* at 12-13.

Defendants do not deny that price maintenance is an accepted form of price impact. *See* Opp. at 27. Nor could they, as many cases have endorsed price maintenance. *E.g.*, *Emergent Biosolutions*, 322 F. Supp. 3d at 690 (rejecting argument that plaintiff must show increases in "stock price after any of the alleged misstatements," crediting price maintenance theory, and concluding that "a significant change in price would only occur when the truth was revealed" as opposed to when "misrepresentations [were] made"); *In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 120-21 (E.D. Va. 2012) (recognizing misstatements would not cause price to "rise," where they were "expected"); *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) (lies "maintain[ing] inflation . . . affect a company's stock price"); *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*11 (S.D.N.Y. Sept. 8, 2021) (lack of price "*increase*" irrelevant given theory that fraud "helped *maintain*" the price); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011) ("Fraudulent statements that *prevent* a stock price from falling can cause harm by *prolonging* the period during which the stock is traded at inflated prices.").

Instead, Defendants challenge price impact here with a bizarre and unsupported factual theory that the Crashes in 2018 and 2019 left Boeing's safety reputation so impaired that there was nothing left to maintain. Opp. at 27. This makes no sense. Defendants recognized that "without [safety] there is no shareholder value" at Boeing (*e.g.*, ¶617), yet Boeing was trading nowhere near $0 after the Crashes. Defendants artificially maintained Boeing's price after the Crashes by saying what the market expected,[7] assuring investors that Boeing was prioritizing safety. These disclosures were not a surprise—rather, the surprise was the later revelation that Boeing's supposed prioritization of safety was a sham. Mr. Coffman's rebuttal report further explains that Plaintiffs' price maintenance theory is economically reasonable. *See* Coffman RR ¶¶49-64.

---

[7] *E.g.*, Reply Exs. U, V, and W (pre-Class Period analyst commentary that is indicative of the market's expectation that Boeing would announce safety reforms).

- 15 -

**Second**, Defendants claim that the early portion of the Class Period should be stricken because *a portion* of that period is also part of a distinct — not yet certified — class action. Opp. at 28 (citing *In re Boeing Co. Aircraft Sec. Litig.*, 19-cv-02394 (N.D. Ill.) (the "*Illinois Action*")). The *Illinois Action* concerns misstatements prior to the 2018 and 2019 Crashes, whereas this case alleges misstatements *after* those Crashes. Defendants suggest there are inconsistencies between the two actions, without even attempting to tie that supposed issue to any Rule 23 element.[8] Their only example is that a press release was alleged to partially correct the fraud in the *Illinois Action* (Opp. at 28), whereas *other statements* in that press release were alleged to be misleading here (¶615). There is no inconsistency and no colorable argument for why this would matter.

### 2. The Class Period Should End on May 14, 2024

Defendants argue that the Alaska Airlines Incident fully revealed the truth, such that later events could not have further corrected the fraud. Opp. at 28-30. Here, Defendants simply try to litigate the merits of whether Plaintiffs will *prove* that the later events were corrective.

"[C]ourts must not inquire into the merits to determine the adequacy of a class period." *Deluca v. Instadose Pharma Corp.*, 2023 WL 5489032, at *3 (E.D. Va. Aug. 24, 2023); *see In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107 (E.D. Va. 2009) (declining to shorten class period; explaining that disputes concerning the "curative effect of a disclosure" cannot be resolved by the court, where there is a "question of fact" as to that issue); *Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*, 348 F.R.D. 35, 49 (D.S.C. 2024) (similar); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 258 (D.S.C. 2010) (similar).

---

[8] Defendants' only citations concerning "overlap" are two cherry-picked quotes from off-topic cases. Opp. at 28. *Bustillos v. Board of County Commissioners* is not a securities case, and Defendants cite background-section *dicta*, noting that overlap "may" weigh against certification, *unless* the cases involve "different claims." *Id.* (citing 310 F.R.D. 631 (D.N.M. 2015)). *In re Flag Telecom Holdings* had **nothing** to do with overlap and instead criticized a theory that losses occurred prior to any corrective event. *Id.* (citing 574 F.3d 29, 40-41 (2d Cir. 2009)).

Plaintiffs adequately allege the new information that was provided by each corrective event. *See* ¶¶365-472. For example, on March 12, 2024, it was revealed that Boeing failed 33 of 89 FAA product audits (¶435), which obviously provided new information beyond that provided by the Alaska Airlines Incident. Likewise, on May 14, 2024, details were disclosed concerning DOJ's finding that Boeing had violated the DPA. ¶¶462-64. Defendants have provided nothing to justify their theory that these events were irrelevant as a matter of law.

Defendants' criticism of the later corrective events is premised on their false assertion that Plaintiffs allege that the only import of the misstatements was that they hid "the risk of an accident materializ[ing]." Opp. at 29-30. Boeing's statements about safety mattered beyond the risk of a single accident and affected its reputation, regulatory status, and competitive position. Stulz Tr. at 103:7-104:7 (recognizing inflation would not be limited to safety initiatives reducing the risk of an accident: "I fully agree with you. . . . I can see a theory of inflation [about] the market believing that there is a commitment to safety[,] when it's not there, which is your allegation").

Defendants also comment that some alleged corrective events were not followed by statistically significant price declines, per data from Mr. Coffman's analysis of market efficiency. Opp. at 29-30. Assessing those declines is a merits-stage task. If some events do not correspond to a cognizable loss, that would not change the Class Period, unless the final drop is excluded, and Defendants do not dispute that the data shows the final drop was statistically significant. *Id.*

## C. Defendants' Attempts to Exclude Options Traders Are Meritless

Plaintiffs included options traders in the Motion because they suffered substantively identical injuries to stock purchasers. Defendants offer no valid reason to exclude options traders.

**First**, Defendants argue options traders cannot be included in the Class because options traders were not included in the Amended Complaint. Opp. at 25. This assertion is contrary to the law. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 (4th Cir. 2003) (permitting

- 17 -

deviation from class definition stated in pleadings in certification motion); *Henderson v. Corelogic Nat'l Background Data, LLC*, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) ("[M]any courts have held . . . it is inappropriate to constrain the parties to the class definition propounded in the . . . pleadings."); *Piotrowski v. Wells Fargo Bank, NA*, 2015 WL 4602591 (D. Md. July 29, 2015) ("proper inquiry" does not hinge on whether the class definition "precisely tracks" the pleadings).

Defendants contend that Plaintiffs can only narrow a class (Opp. at 25), but the case they cite held only that courts are not "bound" to the definition in the pleadings. *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004). Courts have certified classes in this exact situation, where options are added at this stage. *E.g.*, Reply Exs. X, Y (complaint and class certification opinion in *In re Apple Inc. Sec. Litig.*) (certifying class, where options were added in motion to certify class); *In re Vaxart, Inc. Sec.* 2024 WL 5135206, at *2 (N.D. Cal. Dec. 17, 2024) (same). Defendants also cite cases holding that changes cannot substantially prejudice defendants by blindsiding them with matters outside the scope of prior discovery. *See* Opp. at 25-26. No such issue is present here. The stock and options claims are premised on the same facts.

**Second**, Defendants comment that Lead Plaintiffs did not themselves trade Boeing options. *Id.* However, Courts routinely find that stock purchasers can represent classes that include options traders because both groups have essentially the same interests. *E.g., In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *9-10 (D.N.J. Sept. 25, 2012) (holding stock traders adequate to represent options traders); *In re Merck & Co., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *11 (D.N.J. Sept. 25, 2012) (same); *Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 949-50 (N.D. Ill. 2007) (same); *see In re Orbital Scis. Corp. Sec. Litig.*, 188 F.R.D. 237, 239 (E.D. Va. 1999) ("Even if the shareholders and the optionholders are not identically situated . . . they share a mutual interest" in classwide resolution of their claims).

**Third**, Defendants challenge the damages methodology that will be applied for Boeing options. Mr. Coffman explained that he would apply a conceptually identical approach to both stock and options, with appropriate modifications for the mechanics of options trading. *See* Coffman Rpt. ¶¶101-05. Defendants argue Coffman has not provided adequate detail concerning how inflation in options prices will be measured (Opp. at 26), but this assertion is meritless as discussed in Sections II(A)(1)-(3); *Levy*, 448 F. Supp. 3d at 66 (accepting that Coffman's proposed Out-of-Pocket Method for options "account[s] for the variety and complexity of options"); Reply Exs. X, Y (*In re Apple Inc. Sec. Litig.,* accepting similar options damages methodology).

Essentially, Defendants argue that modeling inflation in the options prices may be challenging because the relationship between stock and options prices is not perfectly linear. Coffman addressed this concern by explaining that he would model the relationship between inflation in the stock price and inflation in options prices using an options pricing model. Coffman Rpt. ¶¶101-05. In his rebuttal report, Coffman elaborates on why the task of assessing inflation in options prices using an options pricing model is not especially challenging. Coffman RR ¶140.

**Fourth**, in a single footnote, Defendants argue that Plaintiffs have not established that Boeing options traded in an efficient market. Opp. at 26 n.4. That argument is moot due to two points Defendants concede through silence. *See Snodgrass v. Richardson*, 2024 WL 1260571, at *7 (E.D. Va. Mar. 25, 2024) (arguments not contested are waived). Defendants ***do not dispute*** that Plaintiffs established that Boeing's stock traded in an efficient market. *See* Opening Br. at 17-23; Coffman Rpt. ¶¶24-80; Stulz Tr. at 32:19-24. Defendants also ***do not dispute*** that where the underlying stock trades in an efficient market, options traders are entitled to the fraud on the market presumption because they would consider the stock's price when trading, and thus, like a stock purchaser, rely on the alleged misstatements. *See* Opening Br. at 24-25 (collecting cases).

- 19 -

Plaintiffs also established that the fraud on the market presumption is available to Boeing options traders because the options market itself was efficient. Opening Br. at 24-25. Coffman conducted multiple tests that showed the efficiency of the options market, including (a) a put-call parity analysis; (b) an analysis that established that 99% of the changes in Boeing options prices could be explained by changes in Boeing stock prices; and (c) an analysis showing that Boeing options demonstrated a cause-and-effect reaction to new information. Coffman Rpt. ¶¶86-95.

Defendants' main response is that Boeing's options are heterogeneous, such that Coffman's analysis may not prove that each Boeing options series traded efficiently. Opp. at 26 n.4. Because Defendants have not proffered any analysis or expert opinion suggesting Boeing options did *not* trade in an efficient market, their argument carries no weight. *See Emergent Biosolutions*, 322 F. Supp. 3d at 676 (rejecting "attacks" on market efficiency, where defendants did not provide "evidence to demonstrate that the market was not efficient").

In any event, as Coffman thoroughly explains in his rebuttal report, his analysis firmly establishes that Boeing options reacted rapidly to new information (*i.e.*, traded in an efficient market), and there is no reason to doubt that this would hold true across all Boeing options series. *See* Coffman RR ¶¶115-17. While some options may *trade* less frequently than others, there is no reason to doubt that their publicly-quoted bid-ask prices are rapidly updated. *Id.* Criticisms that some options may have anomalous trading could be made in every case involving options, and yet, options are routinely included in certified classes. *See supra* at 17-18; *see also Levy*, 448 F. Supp. 3d at 66-67 (certifying options class despite heterogeneity arguments).

## III.    CONCLUSION

For the foregoing reasons, the Motion should be granted.

DATED:  February 20, 2025

*/s/ Carol C. Villegas*

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Christine M. Fox
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
jbissel-linsk@labaton.com

*Lead Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Proposed Class*

*/s/ Chad Johnson*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Chad Johnson
Noam Mandel
Jonathan Zweig
Desiree Cummings
Brent Mitchell
420 Lexington Ave., Suite 1832
New York, NY 10170
Tel: (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com
bmitchell@rgrdlaw.com

*Lead Counsel for Lead Plaintiff Local #817 IBT Pension Fund and the Proposed Class*

*/s/ Steven J. Toll*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Va. Bar No. 15300)
S. Douglas Bunch
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of The Employees' Retirement System of Rhode Island and the Proposed Class*

*/s/ Craig C. Reilly*

**THE OFFICE OF CRAIG C. REILLY**
Craig C. Reilly (Va. Bar No. 20942)
209 Madison Street, Suite 501
Alexandria, VA 22314
Tel: (703) 549-5354
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*Liaison Counsel for Lead Plaintiff Local #817 IBT Pension Fund and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic copy of the foregoing to all counsel of record in this case.

/s/ *Steven J. Toll*