# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| IN RE THE BOEING COMPANY SECURITIES LITIGATION | Case No. 1:24-cv-151-LMB-LRV <br><br> Honorable Leonie M. Brinkema |

**SUR-REBUTTAL EXPERT REPORT OF RENÉ STULZ, Ph.D.**

March 3, 2025

## I.       Mr. Coffman Asserts Without Basis That the Price Declines Following the Alleged Corrective Events Are Likely a Fraction of Total Alleged Inflation[1]

1.       In the Coffman Report,[2] Mr. Coffman suggested that measuring inflation "starts from" measuring the decline in Boeing's stock price following the Alleged Corrective Events.[3]  In his rebuttal report, he now claims that a "quality escape" like the Alaska Airlines accident is not "the only method by which the relevant truth could be disclosed and that this case is [not] all about the probability of catastrophic accidents."[4]  Instead, Mr. Coffman asserts that "Lead Plaintiffs' theory is that Boeing needed to disclose the existing fact that production was being prioritized over safety."[5]  Mr. Coffman's new opinion that the Alleged Corrective Events do not reveal the same information as an allegedly truthful disclosure in the but-for world is inconsistent with his opinion in the Coffman Report.[6]  This underscores the point I made in my report—that Mr. Coffman's suggestion of using the price reactions to the Alleged Corrective Events as the measure of inflation introduced by the Alleged Misrepresentations throughout the Putative Class Period is flawed.  Even Mr. Coffman now seems to acknowledge that there is a disconnect between the Alleged Corrective Events and the Alleged Misrepresentations, but he never explains how he intends to address that disconnect.

2.       In his rebuttal report, Mr. Coffman further states that even though Plaintiffs allege hundreds of different misstatements about different topics, "they all fundamentally concealed the same underlying truth"—that "Boeing was taking dangerous shortcuts and prioritizing short term profits (e.g., via production speed) over correcting safety and quality control deficiencies and maintaining appropriate legal compliance."[7]  But he has not proposed a class-wide damages methodology consistent with Plaintiffs' theory of liability that can value the effect of this alleged "underlying truth" throughout the Putative Class Period.  For example, the information revealed by the Alaska Airlines accident on January 5, 2024 (which

---

[1] The documents considered in forming my opinions are described in my report filed on January 21, 2025 ("Stulz Report").  I also considered the Expert Rebuttal Report of Chad Coffman, CFA dated February 20, 2025 ("Coffman Rebuttal Report") and backup materials, Mr. Coffman's and my depositions in this case, and other documents listed in Appendix A of the Stulz Report.  Capitalized terms in this report have the same meaning as set forth in the Stulz Report.  I have not attempted to address every error, flaw, or inaccuracy in, or every area in which I disagree with, the Coffman Rebuttal Report.  The Coffman Rebuttal Report does not change any of the opinions I reached in the Stulz Report and the fact that I do not explicitly address a particular issue does not indicate that my agreement with Mr. Coffman on that issue.

[2] The Coffman Report is the Expert Report of Chad Coffman, CFA, dated December 13, 2024.

[3] Coffman Report, ¶ 99.

[4] Coffman Rebuttal Report, ¶ 70.

[5] Coffman Rebuttal Report, ¶ 70.

[6] Coffman Rebuttal Report, ¶ 57.

[7] Coffman Rebuttal Report, ¶ 53.

represented an actual, widely publicized air safety accident—even if it *also*, as Mr. Coffman claims, "disclosed profound safety issues") differs from Mr. Coffman's allegedly truthful disclosure that "the Company was actively prioritizing production over safety."[8]

3.      Mr. Coffman also suggests that the price declines following Alleged Corrective Events may *not* in fact measure inflation because, he speculates, "Plaintiffs may ultimately argue that the eventual real-world corrective events and corresponding stock-price declines are only a partial measure of the total artificial inflation maintained by the alleged fraud."[9] He also asserts, without support, "that it is entirely plausible that the price declines observed on the alleged corrective disclosures represent a fraction of the full price impact that a disclosure of the relevant truth may have had at earlier points in time."[10]  Mr. Coffman goes on to say—without providing any economic basis that could be assessed—that it is "**more likely** . . . that the market value of the artificial inflation exceeds the losses suffered in connection with the alleged corrective disclosures,"[11] and that "it would be **reasonable to assume** that the market price impact would have subsumed the impact that occurred at the time of the Alaska Airlines incident."[12]  Mr. Coffman concludes that because "Plaintiffs are limited in their recovery to the amount of the price declines suffered at the time of the corrective disclosures … the need for precise measurements of inflation" is "simplifie[d]"[13] and indeed not even necessary.[14]

4.      Mr. Coffman provides no support for his speculation that "precise measurements of inflation" may not be necessary if the inflation exceeds the actual losses on the dates of the Alleged Corrective Events.[15]  This failure serves only to underscore that Mr. Coffman has not proposed a class-wide damages methodology consistent with Plaintiffs' theory of liability. Mr. Coffman essentially concedes that using the price declines following the Alleged Corrective Events as a proxy for inflation works only if he can establish both that (i) the inflation introduced by the Alleged Misrepresentations exceeded the price declines after the Alleged Corrective Events, and (ii) the level of inflation would not have varied substantially

---

[8] Coffman Rebuttal Report, ¶¶ 69, 86.  *See* Stulz Report, ¶¶ 208–209.
[9] Coffman Rebuttal Report, ¶ 57.
[10] Coffman Rebuttal Report, ¶ 58.
[11] Coffman Rebuttal Report, ¶ 81 (emphasis added).
[12] Coffman Rebuttal Report, ¶ 87 (emphasis added).
[13] Coffman Rebuttal Report, ¶ 60.
[14] Coffman Rebuttal Report, ¶ 93.
[15] Coffman Rebuttal Report, ¶ 60.

throughout the Putative Class Period.[16]  But Mr. Coffman provides neither a methodology to assess whether those assumptions hold nor evidentiary support for them.

## II.        Mr. Coffman Misstates My Opinions

### A.        Mr. Coffman Misstates My Opinions About the "Out-of-Pocket Method"

5.        Mr. Coffman states that "Dr. Stulz ultimately does not believe the Out-of-Pocket method is flexible enough to accommodate the 'factors' that he identifies as potential reasons that measuring inflation may be difficult in this case."[17]  I have no such opinion.  My point, as I also explained at my deposition, is that the out-of-pocket measure is not a methodology, but rather an arithmetic formula that simply states that damages equal the inflation at the time of purchase minus the inflation at the time of sale.[18]  To apply that formula in any given case, a class-wide methodology for measuring the amount of per-share inflation throughout the class period is required.[19]  Consistent with this opinion, I make clear in my report that my criticism of Mr. Coffman is that he has failed to propose a class-wide methodology for estimating per-share inflation, and therefore damages, throughout the Putative Class Period in a manner consistent with Plaintiffs' liability theory,[20] not whether the out-of-pocket measure is flexible.

6.        Mr. Coffman never addresses how he could calculate per-share inflation as part of a damages methodology.  His repeated assertions that the out-of-pocket measure can accommodate any amount of inflation determined by the finder of fact[21] underscores his failure to offer any actual damages methodology.  Without more, his approach would leave to the finder of fact numerous complex economic analyses without providing any guidance or structure.[22]  Moreover, my report does not criticize Mr. Coffman for not actually calculating inflation or damages.  Rather, my point is that Mr. Coffman has failed to provide any

---

[16] Coffman Rebuttal Report, ¶¶ 58, 61.

[17] Coffman Rebuttal Report, ¶ 23.  None of the points in the Stulz Report relate to the level of difficulty. Instead, I discuss a wide array of developments that need to be considered.  In addition, as discussed above, Mr. Coffman now says he may not have to calculate inflation precisely.  This is in tension with his view that the "Out-of-Pocket method" is a class-wide damages methodology consistent with Plaintiffs' theory of liability.

[18] Stulz Deposition, 39:10–13, 48:5–13; 135:9–13.

[19] Stulz Deposition, 39:10–13; 48:5–13.

[20] *See*, *e.g.*, Stulz Report, Section VI.

[21] *See*, *e.g.*, Coffman Rebuttal Report, ¶¶ 39, 46, 88, 91, 94.

[22] While Mr. Coffman responds to some of my criticisms by saying he can use "valuation techniques," he does not explain which tools he would use in which context or how they would be applied.  He thus still fails to provide a damages methodology consistent with Plaintiffs' theory of liability.  *See* Coffman Rebuttal Report, ¶ 34.

*methodology* for measuring inflation or estimating damages at a later stage of the case in a manner consistent with Plaintiffs' liability theory.

### B. My Report Does Not Opine on "Loss Causation," Nor Does It Suggest That Mr. Coffman Should Have Performed a Loss Causation Analysis

7.     Mr. Coffman frames my opinions regarding a damages methodology as a premature loss causation analysis.[23]  This framing misstates my opinions.  The Stulz Report does not address the question of *whether* an alleged misstatement caused a later economic loss.

8.     For example, Mr. Coffman states that I suggest "one would need to determine the portion of the stock price decline following the January 5, 2024 Alaska Airlines incident that reflected a negative stock-price reaction to the occurrence of that adverse event, and what portion reflected the stock price reaction to the market learning that safety practices at Boeing were worse than previously believed."[24]  Mr. Coffman asserts that such a determination is "part of a loss causation analysis."[25]  That argument misunderstands my opinion.  In my report, I explain that a widely publicized event such as the Alaska Airlines accident likely would have caused Boeing's price to decline even without any Alleged Misrepresentations, and that Mr. Coffman fails to propose a methodology for determining which portion of the observed price decline could be attributed to the Alleged Misrepresentations and used as a measure of inflation.[26]  Mr. Coffman still has not provided such a methodology.

### C. Mr. Coffman's Characterization of Consequential Events as Confounding Information Is Misleading

9.     Mr. Coffman notes that I raise the consequential nature of most of the Alleged Corrective Events, and he suggests that I am claiming that those events constitute "confounding" information.  This characterization is misleading.  I do not claim that those events are confounding information.  My opinion instead is that the stock price reactions to those consequential events cannot simply be "back-cast" as a measure of inflation (as it appears Mr. Coffman may do) because the stock price impact of those events cannot be assumed to be the same throughout the Putative Class Period.[27]  Mr. Coffman still has not provided a method in either of his reports that would address this issue.

---

[23] *See*, *e.g*., Coffman Rebuttal Report, ¶¶ 11–12.
[24] Coffman Rebuttal Report, ¶ 30.
[25] Coffman Rebuttal Report, ¶ 30.
[26] Stulz Report, ¶ 187.
[27] *See*, *e.g.*, Stulz Report, ¶ 194.

10.     Mr. Coffman states that he could "pars[e] the portion of a stock price decline following an event that provided both corrective information and confounding non-corrective consequences."[28]  This response focuses on "consequences" as confounding information, the stock price impact of which he asserts would need to be removed from any damages calculation and could not be removed using an event study.  In my report, however, I took no position on whether the impact of those "consequences" should be included in a measure of damages in certain instances over some period of time, but instead emphasized that determining how to "back-cast" that amount as part of an inflation band is complex and that Mr. Coffman has provided no methodology to address this complexity in a manner consistent with Plaintiffs' liability theory.

11.     As an example, the Alleged Corrective Event on May 14, 2024, when the DOJ announced that Boeing had violated the DPA, could not have been disclosed at all points earlier in the Putative Class Period—in particular, not before the DPA was signed. Mr. Coffman now recognizes as much, stating that "it may be appropriate to assess the amount of artificial inflation differently before and after Boeing executed the DPA."[29]  Yet he offers no methodology to reliably address this issue.

12.     As described in my report, many of the Alleged Corrective Events seem to represent only the *consequences* of a quality escape.[30]  For such events, there is nothing to "pars[e]"— but the question of how, if at all, to translate the stock price decline to a measure of inflation earlier in the Putative Class Period remains and Mr. Coffman fails to address it.[31]

### D.     Mr. Coffman Misstates My Opinion That He Has Not Proposed a Damages Methodology to Address the Materialization of a Known Risk

13.     As I state in my report, even in the absence of Alleged Misrepresentations that supposedly understated the risk of quality escapes, the price of Boeing's stock would still have fallen after the materializations of the known risk that there could be quality escapes.[32] Mr. Coffman has not proposed a methodology capable of using the price decline following

---

[28] Coffman Rebuttal Report, ¶ 33.
[29] Coffman Rebuttal Report, ¶ 76.
[30] *See*, *e.g.*, Stulz Report, ¶¶ 226–227.
[31] Later in his rebuttal report, Mr. Coffman claims that I "aver[] that a damages methodology would need to somehow eliminate the price impacts of 'consequences' of safety escapes from the measurement of artificial inflation per share."  This is also misleading.  At this point, I have no opinion on whether some part of the price impact of consequential events on particular dates can be recovered as damages.  My point is simply that back-casting the impact of such an event is complex and that Mr. Coffman has failed to provide a damages methodology capable of doing so consistent with Plaintiffs' liability theory.  Coffman Rebuttal Report, ¶ 93.
[32] Stulz Report, ¶ 198.

such an event to measure inflation (as he suggests he may do). As I explained at my deposition, an event study itself is of limited use in assessing inflation attributable to the misrepresentation of a known risk.[33]

14. Mr. Coffman's response suggests a misunderstanding of how materialization of risk works. In my report, I used an example of a car manufacturer to illustrate how the price decline after a quality escape occurs cannot be used to measure the inflation introduced by a statement suggesting that the risk of a quality escape was 1% when, in fact, the true risk of a quality escape was 10%.[34] Mr. Coffman tries to address this problem by suggesting that one can easily measure inflation once the true risk of an accident is established.[35] But he never proposes a methodology to measure inflation during the Putative Class Period in that scenario.

15. I also am not suggesting that the materialization of a known risk necessarily needs to be separated from inflation or removed from the damages calculation. Instead, the point I make in my report is that Mr. Coffman has provided no methodology for establishing how the value impact of a misrepresentation regarding a risk that was known to the market would have evolved over the Putative Class Period.[36]

### E.  Mr. Coffman Misstates My Criticisms of His Event Study[37]

16. In my report, I opine that Mr. Coffman has failed to propose a damages methodology capable of addressing the evolving contribution of Boeing's Commercial Airplanes ("BCA") segment to its overall business.[38] To illustrate the importance of this factor, I show that Boeing's stock price is closely correlated with the S&P 500 Passenger Airlines Index ("Airline Index") throughout the Putative Class Period, that the Airline Index is statistically

---

[33] Stulz Deposition, 141:8–22 ("[T]he answer depends on information that is not disclosed by the event [and] the stock price reaction to the event. In a typical disaggregation exercise, you would say that what happens on a given day is the market reacting to two effects. If we have one – if we can compute one of the effects, then we have – we have the other one. Here you can't get anywhere unless you address the issue of the difference in the assessment of risk by investors given the alleged misstatement versus no misstatements. And the event study doesn't tell you that.").

[34] Stulz Report, ¶¶ 212–215.

[35] In discussing my hypothetical, Mr. Coffman states that my "concern is easily accommodated with the Out-of-Pocket Methodology, which can easily handle the above example by utilizing inflation of $9 per share instead of $9.90 to appropriately calculate damages." Coffman Rebuttal Report, ¶ 90. Mr. Coffman errs; the inflation in my hypothetical is $0.90, not $9.00.

[36] Stulz Report, ¶ 199.

[37] Mr. Coffman states: "Dr. Stulz does not dispute the conclusions I reached from the event study presented in the Coffman Report, or the event study's relevance in establishing market efficiency as part of my *Cammer* Factor 5 analysis." Coffman Rebuttal Report, ¶ 95. I do not agree with his event study, and I have not been asked to review Mr. Coffman's market efficiency analysis or conclusions. *See* Stulz Report, ¶¶ 160–164.

[38] Stulz Report, ¶ 153.

significant when added to Mr. Coffman's event study model even when Mr. Coffman's Peer Index is not, and that including this additional index in Mr. Coffman's model alters the statistical significance of Boeing's residual returns.[39]

17.     Mr. Coffman responds that my use of the Airline Index is "flawed" because "negative information about safety at Boeing would . . . have a negative impact on companies that were dependent on receiving aircraft from Boeing."[40]  This misstates my opinions.  In my report, I opine that Mr. Coffman's use of an aerospace and defense index as his sole Peer Index fails to account for certain industry-wide factors such as consumer demand for air travel that affect airlines and also could affect Boeing's stock price given the importance of the BCA segment to Boeing's business.[41]  I do not suggest that the inclusion of the Airline Index is the only way to rectify the inadequacies of Mr. Coffman's approach, and instead present this analysis to illustrate that accounting for factors that affect the airline industry has the potential to alter the findings of Mr. Coffman's model in important ways.[42]

### III.     Mr. Coffman's Claims Regarding Plaintiffs' Theory of Liability Do Not Change My Opinion That He Has Not Provided a Class-Wide Damages Methodology Consistent with Plaintiffs' Liability Theory

18.     In my report, I convey my understanding of Plaintiffs' theory of liability in this case based on my review of the Complaint and Plaintiffs' Opposition to MTD.[43]  I then use this understanding to describe examples of substantial complexities that are likely to arise when computing class-wide damages in this case in view of the length of the Putative Class Period and the number and nature of the Alleged Misrepresentations.[44]  In his rebuttal report, Mr. Coffman claims that Plaintiffs' theory of liability is different from my understanding.[45]  Specifically, he asserts that Plaintiffs are relying on a price maintenance theory of liability,[46] a claim that he did not make anywhere in his initial report.  Not only does Mr. Coffman never explain the implications of such a liability theory for the calculation of damages in this case,

---

[39] Stulz Report, ¶ 163.
[40] Coffman Rebuttal Report, ¶ 106.
[41] Stulz Report, ¶¶ 160–161.
[42] Confronted with my criticism that he does not sufficiently account for factors related to Boeing's BCA segment such as consumer demand for air travel, Mr. Coffman "construct[s] an alternative Peer Index that adds Airbus, Embraer and Bombardier."  Coffman Rebuttal Report, ¶ 103.  Mr. Coffman fails to consider, however, that negative news about Boeing potentially could have a positive effect on the stock price of Boeing's direct competitors in the commercial airline industry.  This inverse relationship would bias Mr. Coffman's alternative model towards finding residual returns that are more negative than would be correct.
[43] Stulz Report, ¶¶ 12, 31.
[44] Stulz Report, Section VI.
[45] Coffman Rebuttal Report, ¶¶ 69, 72.
[46] Coffman Rebuttal Report, Section III.B.

but even under Mr. Coffman's new view of the theory of liability, the points I make remain equally valid.

19.     Notwithstanding the sheer number and variety of Alleged Misrepresentations in this case, Mr. Coffman asserts that Plaintiffs' theory of liability is that Defendants should have made the same hypothetical disclosure—that Boeing was "taking dangerous shortcuts and prioritizing production over safety"[47]—throughout the nearly five-year Putative Class Period, without variation.[48]  Mr. Coffman appears to assume, without basis, that Boeing was *either* "prioritizing safety" during the Putative Class Period or "prioritizing production,"[49] as though it was purely one or the other.  That assumption ignores the many complexities in this case as explained in my initial report.

20.     Mr. Coffman also appears to suggest that although Boeing's stock price did not increase due to any of the Alleged Misrepresentations before the DPA was announced on January 7, 2021, those statements still could have created artificial inflation by maintaining inflation that already was present in Boeing's stock price before the Putative Class Period.  If that is his contention, Mr. Coffman still has not proposed a damages methodology to measure inflation consistent with Plaintiffs' liability theory for all of the reasons discussed in my report.  A price maintenance theory does not address all the criticisms in my report that using a back-casting approach based on the stock price decline following the Alleged Corrective Events to measure inflation in this case is inconsistent with Plaintiffs' theory of liability.

21.     If Mr. Coffman is suggesting that a price maintenance theory of liability means that the Alleged Misrepresentations before the announcement of the DPA did not change the market's perception of Boeing, that theory is inconsistent with economic evidence.  As I discuss in my report, the Putative Class Period begins in the aftermath of two accidents involving the 737 MAX and when that airplane was still grounded.  Early on in the Putative Class Period, investors appeared to be concerned about whether Boeing was giving priority to safety over production, with one analyst noting that Boeing was a "show-me" story and that he was looking for a "demonstrat[ion]"—i.e., Boeing still needed to prove that it would put safety first.[50]  A price maintenance theory in which Alleged Misrepresentations (often

---

[47] Coffman Rebuttal Report, ¶ 74.

[48] Other examples include Coffman Rebuttal Report, ¶¶ 53, 69.

[49] Coffman Rebuttal Report, ¶¶ 67–69.

[50] *See*, *e.g.*, "Crisis of confidence:  BA needs to prove it can navigate commercial aero turbulence," Bank of America, July 31, 2020.  In addition, analysts and market participants commented on the difficulty of implementing a culture change to prioritize safety at a large and complex organization like Boeing.  *See* Stulz Report, ¶¶ 49–50, 52–64.

involving intentions) during the first part of the Putative Class Period do not increase inflation effectively assumes that the market concluded *before* the start of the Putative Class Period that Boeing would do all it said it would do during the Putative Class Period even without the knowledge of what Boeing would say. It similarly implies that the impact of specific programs implemented by Boeing during the Putative Class Period would have been fully incorporated into Boeing's stock price before they were announced and before the first Alleged Misrepresentation on September 30, 2019.

22.    Moreover, as I explain in my report, the operational context for Boeing early in the Putative Class Period was fundamentally different from what existed later in the Putative Class Period when Boeing faced record demand for its aircraft and was navigating supply chain and workforce challenges following COVID.[51] As these changes unfolded throughout the Putative Class Period, there was significant variation in production and deliveries of Boeing's aircraft.[52] Mr. Coffman fails to explain how an allegedly "truthful" statement that Boeing was prioritizing production over safety would have the same value effect when production was low (e.g., during COVID) as when production was high (e.g., in 2023).

23.    Despite saying that my opinions about the complexity of measuring the stock price impact of the Alleged Misrepresentations between 2019 and 2024 are "based on incorrect assumptions about Lead Plaintiffs' theory,"[53] Mr. Coffman appears to agree that certain events during the Putative Class Period could cause the level of inflation to change. For instance, he acknowledges that a methodology consistent with Plaintiffs' theory may need to (1) increase inflation after the DPA[54] and (2) reduce inflation during COVID.[55] He also acknowledges that these issues may require adjustments, but provides no methodology to reliably make such adjustments consistent with Plaintiffs' liability theory.

## IV.    Mr. Coffman's Responses To My Criticisms of His Analysis of the Efficiency of the Markets for Boeing's Options Are Misleading

24.    The Coffman Rebuttal Report does not change my opinion that Mr. Coffman fails to reliably establish that Boeing options traded in efficient markets during the Putative Class Period. In assessing market efficiency for options, Mr. Coffman still does not consider all the

---

[51] *See* Stulz Report, Section VI.A.3.b, IV.A.3.d.
[52] *See* Stulz Report, ¶¶ 91, 167.
[53] Coffman Rebuttal Report, ¶ 72.
[54] Coffman Rebuttal Report, ¶ 76.
[55] Coffman Rebuttal Report, ¶ 82.

factors that he takes into account in assessing market efficiency for common stock, or provide relevant incremental economic evidence on them.[56]  Moreover, an efficient equity market for a company cannot be used as the basis for an opinion that the markets for options also are efficient because options markets can differ from equity markets and cannot be assumed to function in the same way.[57]

25.    While Mr. Coffman admits that *Cammer* Factor 5 is the most direct test of market efficiency,[58] he does not analyze options using actual transaction prices.  Instead, he relies on option quotes, including when analyzing earnings announcements.[59]  Mr. Coffman's use of quote data in this way is not reliable.  For example, relying on quote data he could conclude that the market for an option is efficient even if the option never traded.[60]  In addition, his analysis of "expected returns" derived from *stock* prices is not equivalent to an analysis using actual option transaction prices.[61]

26.    Mr. Coffman's assertion that he has addressed the heterogeneity of Boeing options because he has "taken into account the differences across options on a series-by-series basis" in each of his analyses is misleading.[62]  Mr. Coffman concedes that he "aggregated the series-level analysis to one overall test," a critical flaw that is common across his options analyses and potentially masks inefficiency of some options series.[63]

Executed this 3rd of March, 2025

_____
René M. Stulz, Ph.D.

---

[56] Coffman Rebuttal Report, Section IV.A.4.

[57] *See* Coffman Rebuttal Report, ¶ 111; Stulz Report, ¶ 27.

[58] Coffman Report, footnote 108.

[59] *See*, *e.g.*, Coffman Rebuttal Report, ¶ 119; Coffman Report, Appendix C.

[60] Stulz Report, ¶ 258.

[61] Coffman Rebuttal Report, ¶ 130.  Similarly, Mr. Coffman's analysis of his "synthetic stock price" represents an analysis of model-derived equity prices based on quoted option prices.  *See* Stulz Report, Section VII.D; Coffman Rebuttal Report, ¶¶ 118–129.

[62] Coffman Rebuttal Report, ¶ 116.

[63] Coffman Rebuttal Report, ¶ 116.  *See also* Coffman Rebuttal Report, ¶¶ 114, 131, 134.